# 21-3121-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

CRAIG HINES,

*Defendant-Appellant.*

*On Appeal from the United States District Court
for the District of Connecticut*

## APPENDIX
## VOLUME I OF II
## Pages A-1 to A-188

UNITED STATES ATTORNEY'S OFFICE
  FOR THE DISTRICT OF CONNECTICUT
*Attorneys for Appellee*
1000 Lafayette Boulevard, 10th Floor
Bridgeport, Connecticut 06604
203-696-3027

  *and*

Connecticut Financial Center
157 Church Street
New Haven, Connecticut 06510

LAW OFFICE OF JAMES M. BRANDEN
*Attorneys for Defendant-Appellant*
80 Bay Street Landing, Suite 7j
Staten Island, New York 10301
212-286-0173

**A - i**

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
----------------------------------------x

UNITED STATES OF AMERICA,

                 Appellee,                Docket No.
                                            21-3121-cr

      -against-

CRAIG HINES,

                 Defendant-Appellant.

----------------------------------------x

## <u>APPENDIX FOR APPELLANT CRAIG HINES</u>

*Page No.*

Docket Entries. . . . . . . . . . . . . . . . . . . . A1-17

The Indictment. . . . . . . . . . . . . . . . . . . . A18-20

The Guilty Plea Agreement . . . . . . . . . . . . . . A21-32

The Transcript of the Change of Plea Proceeding . . . . . A33-85

The Original Sentencing . . . . . . . . . . . . . . . A86-118

The Original Judgment . . . . . . . . . . . . . . . A119-121

District Court's Ruling on Section 2255 and
    First Step Act Motions . . . . . . . . . . . . . A122-134

The Resentencing

    The Defendant's Re-sentencing Memorandum . . . . . A135-152
    The Government's Response. . . . . . . . . . . . A153-188
    The Defendant's Supplemental Re-sentencing
        Memorandum. . . . . . . . . . . . . . . A189-191
    The Government's Supplemental Response . . . . . . A192-195
    The Re-sentencing Hearing, Part I. . . . . . . . A196-248
    The Re-sentencing Hearing, Part II . . . . . . . A249-314

The Amended Judgment. . . . . . . . . . . . . . . . A315-318

The Notice of Appeal. . . . . . . . . . . . . . . . A319-323

CT CMECF NextGen                                    https://ecf.ctd.uscourts.gov/cgi-bin/DktRpt.pl?105968592899211-L_1_0-1

**Query    Reports    Utilities    Help    Log Out**

APPEAL,CLOSED,EFILE

# U.S. District Court
## District of Connecticut (New Haven)
## CRIMINAL DOCKET FOR CASE #: 3:05-cr-00118-SRU-1

Case title: USA v. Hines                              Date Filed: 05/03/2005

                                                     Date Terminated: 03/02/2006

Assigned to: Judge Stefan R. Underhill

**Defendant (1)**

**Craig Hines**                   represented by   **Craig Hines**
*TERMINATED: 03/02/2006*                           #16275-014
                                                   COLEMAN II
                                                   U.S. PENITENTIARY
                                                   Inmate Mail/Parcels
                                                   P.O. BOX 1034
                                                   COLEMAN, FL 33521
                                                   PRO SE

                                                   **Deirdre A. Murray**
                                                   Federal Public Defender's Office - Htfd
                                                   10 Columbus Blvd.
                                                   6th Floor
                                                   Hartford, CT 06106-1976
                                                   860-493-6260
                                                   Fax: 860-493-6269
                                                   Email: deirdre_murray@fd.org
                                                   *TERMINATED: 05/27/2005*
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*
                                                   *Designation: Public Defender*

                                                   **Peter J. Schaffer**
                                                   Attorney at Law
                                                   1127 High Ridge Rd.
                                                   PMB #330
                                                   Stamford, CT 06905-1203
                                                   203-322-3031
                                                   Email: schaffer1law@gmail.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*
                                                   *Designation: CJA Appointment*

**A - 2**

**Vito A. Castignoli**
Law Office of Vito A. Castignoli
P.O. Box 110
Milford, CT 06460
203-877-8407
Fax: 203-876-2295
Email: vcastignoli@yahoo.com
*TERMINATED: 11/02/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: CJA Appointment

**Charles F. Willson**
Federal Public Defender's Office - Htfd
10 Columbus Blvd.
6th Floor
Hartford, CT 06106-1976
860-493-6260
Fax: 860-493-6269
Email: Charles_Willson@fd.org
*TERMINATED: 03/19/2019*
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| | The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 262 months. The defendant shall be imprisoned for 120 months on count one, 28 months' imprisonment on count two and 114 months' imprisonment on count three. The sentence on counts one, two and three shall run consecutive to one another for a total of 262 months. Upon release from imprisonment, the defendant shall be on supervised release for a total term of 3 years on count one; 3 years on count two and five years on count three, to run concurrently. |
| UNLAWFUL TRANSPORT OF FIREARMS, ETC. Possession of a firearm by a convicted felon (1) | |
| CONTROLLED SUBSTANCE - SELL, DISTRIBUTE, OR DISPENSE (2) | The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 262 months. The defendant shall be imprisoned for 120 months on count one, 28 months' imprisonment on count two and 114 months' imprisonment on count three. The sentence on counts one, two and three shall run consecutive to one another for a |

VIOLENT CRIME/DRUGS/MACHINE GUN
(3)

total of 262 months. Upon release from imprisonment, the defendant shall be on supervised release for a total term of 3 years on count one; 3 years on count two and five years on count three, to run concurrently.

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 262 months. The defendant shall be imprisoned for 120 months on count one, 28 months' imprisonment on count two and 114 months' imprisonment on count three. The sentence on counts one, two and three shall run consecutive to one another for a total of 262 months. Upon release from imprisonment, the defendant shall be on supervised release for a total term of 3 years on count one; 3 years on count two and five years on count three, to run concurrently.

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| **USA** | represented by | **Elena Lalli Coronado** |
|---|---|---|
| | | DOJ-USAO |
| | | 1000 Lafayette Blvd. |
| | | Ste 10th Floor |
| | | Bridgeport, CT 06604 |
| | | 203-696-3027 |
| | | Email: elena.coronado@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**James I. Glasser**
Wiggin & Dana-NH
265 Church Street P.O. Box 1832
New Haven, CT 06508-1832
203-498-4313
Email: jglasser@wiggin.com
*TERMINATED: 09/24/2007*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin J. O'Connor**
Bracewell & Giuliani, LLP - CT
CityPlace I, 34th Floor
185 Asylum St.
Hartford, CT 06103
860-256-8602
Fax: 860-256-3201
Email: kevin.oconnor@bgllp.com
*TERMINATED: 04/21/2008*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Nardini**
U.S. Attorney's Office-NH
157 Church St., 25th Floor
New Haven, CT 06510
203-821-3748
Fax: 203-777-5377
Email: william.nardini@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/03/2005 | 1 | INDICTMENT returned before Joan G. Margolis.Returned before grand jury number N-05-1 New Haven Rotation, Detainer to issue, as to Craig Hines (1) count(s) 1, 2, 3. (Jefferson, V.) (Entered: 05/04/2005) |
| 05/03/2005 | 2 | ELECTRONIC FILING ORDER . Signed by Judge Stefan R. Underhill on 5/3/05. (Cody, C.) (Entered: 05/10/2005) |
| 05/10/2005 | 3 | MOTION for Pretrial Detention by USA as to Craig Hines. (Nardini, William) (Entered: 05/10/2005) |
| 05/10/2005 | 8 | Application for Writ of Habeas Corpus ad Prosequendum as to Craig Hines with order thereon to appear 5/12/05 @ 12:00 in Bridgeport. Original writ and two true attested copies handed USM for service. Signed by Joan G. Margolis. (Jefferson, V.) (Entered: 05/19/2005) |
| 05/12/2005 | 4 | Minute Entry for proceedings held before Judge William I. Garfinkel :Arraignment as to Craig Hines (1) Count 1,2,3 held on 5/12/2005, Initial Appearance as to Craig Hines held on 5/12/2005, Plea entered by Craig Hines (1) Count 1,2,3. by Craig Hines Not |

| | | |
|---|---|---|
| | | Guilty on counts 1,2,3. Defendant's motion due 6/1/05 & Government responses due 6/15/05. Jury Selection set for 7/18/2005 08:30 AM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill. (Tape #0-336.) (Gutierrez, Y.) (Entered: 05/17/2005) |
| 05/12/2005 | 5 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Craig Hines Deirdre A. Murray for Craig Hines appointed . Signed by Judge William I. Garfinkel on 5/12/05. (Gutierrez, Y.) (Entered: 05/17/2005) |
| 05/12/2005 | 6 | ORDER OF DETENTION as to Craig Hines. Signed by Judge William I. Garfinkel on 5/12/05. (Gutierrez, Y.) (Entered: 05/17/2005) |
| 05/12/2005 | 7 | Sealed Document by Craig Hines - Filed separately from case file. (Gutierrez, Y.) (Entered: 05/17/2005) |
| 05/20/2005 | 9 | MOTION to Appoint Substitute Counsel by Craig Hines. (Cody, C.) (Entered: 05/26/2005) |
| 05/27/2005 | 10 | ELECTRONIC ORDER granting 9 Motion to Substitute Attorney as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 5/27/05. (Montz, A.) (Entered: 05/27/2005) |
| 06/02/2005 | 14 | USM Return of Service on Detainer executed as to Craig Hines on 5/12/05 (Barrille, J.) (Entered: 06/09/2005) |
| 06/06/2005 | 11 | ATTORNEY APPEARANCE: Peter J. Schaffer appearing for Craig Hines (Gutierrez, Y.) (Entered: 06/07/2005) |
| 06/06/2005 | 15 | CJA 20 as to Craig Hines: Appointment of Attorney Peter J. Schaffer for Craig Hines . Signed by Clerk on 6/13/05. (Barrille, J.) (Entered: 06/13/2005) |
| 06/07/2005 | 12 | First MOTION for Extension of Time To File Pretrial Motions until July 15, 2005 by Craig Hines. (Schaffer, Peter) (Entered: 06/07/2005) |
| 06/09/2005 | 13 | ELECTRONIC ENDORSEMENT ORDER granting 12 Motion for Extension of Time to 7/15/05 to file pretrial motions as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 6/9/05. (Sbalbi, B.) (Entered: 06/09/2005) |
| 06/21/2005 | 16 | NOTICE OF E-FILED CALENDAR as to Craig Hines: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Jury Selection set for 7/18/2005 at 9:00 AM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill. Jury Trial set for 7/26/2005 at 9:00 AM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill. (Sbalbi, B.) (Entered: 06/21/2005) |
| 06/30/2005 | 17 | WAIVER of Speedy Trial by Craig Hines (Schaffer, Peter) (Entered: 06/30/2005) |
| 06/30/2005 | 18 | WAIVER of Speedy Trial by Craig Hines (Schaffer, Peter) (Entered: 06/30/2005) |
| 07/01/2005 | 19 | MOTION to Seal *Ex Parte Motion to Incur Expenses* by Craig Hines. (Schaffer, Peter) (Entered: 07/01/2005) |
| 07/01/2005 | 20 | NOTICE *Notice of Manual Filing of Ex Parte Motion to Incur Expenses* by Craig Hines (Schaffer, Peter) (Entered: 07/01/2005) |

| | | |
|---|---|---|
| 07/05/2005 | 21 | NOTICE *certificate of service* by Craig Hines re 19 MOTION to Seal *Ex Parte Motion to Incur Expenses* (Schaffer, Peter) (Entered: 07/05/2005) |
| 07/05/2005 | 22 | EX PARTE MOTION by Craig Hines. (Gutierrez, Y.) (Entered: 07/07/2005) |
| 07/14/2005 | 23 | Second MOTION for Extension of Time to file Motions and for Jury Selection until August 15, 2005 by Craig Hines. (Schaffer, Peter) (Entered: 07/14/2005) |
| 07/18/2005 | 24 | ELECTRONIC ENDORSEMENT ORDER granting 23 Motion for Extension of Time to 10/7/05 for Jury Selection as to Craig Hines (1). See attached Order for further details. Signed by Judge Stefan R. Underhill on 7/18/05. (Sbalbi, B.) (Entered: 07/18/2005) |
| 07/19/2005 | 25 | ELECTRONIC ENDORSEMENT ORDER granting 19 Motion to Seal as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 7/19/05. (Sbalbi, B.) (Entered: 07/19/2005) |
| 07/19/2005 | 26 | ENDORSEMENT ORDER granting [22 ExParte Motion as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 07/19/05. (Gutierrez, Y.) (Entered: 07/27/2005) |
| 08/30/2005 | 27 | Minute Entry for proceedings held before Judge William I. Garfinkel :Change of Plea Hearing as to Craig Hines held on 8/30/2005, Plea entered by Craig Hines (1) Guilty Count 1,2,3. Government's oral motion to permit law student intern to represent the United States - granted. Sentencing set for 12/2/2005 03:00 PM before Judge Stefan R. Underhill. (Court Reporter Baldwin.) (Barrille, J.) (Entered: 08/31/2005) |
| 08/30/2005 | 28 | Consent Form as to Craig Hines to enter guilty plea before WIG (Gutierrez, Y.) (Entered: 08/31/2005) |
| 08/30/2005 | 29 | PLEA AGREEMENT as to Craig Hines (Gutierrez, Y.) (Entered: 08/31/2005) |
| 09/06/2005 | 31 | FINDINGS AND RECOMMENDATIONS as to Craig Hines re 27 Plea Entered . Signed by Judge William I. Garfinkel on 8/30/05. (Gutierrez, Y.) (Entered: 09/08/2005) |
| 09/07/2005 | 30 | First MOTION for Extension of Time for the Sentencing Hearing and Disclosure of the PreSentence Report until January 16, 2005 by Craig Hines. (Schaffer, Peter) (Entered: 09/07/2005) |
| 09/09/2005 | 32 | ELECTRONIC ENDORSEMENT ORDER granting in part 30 Motion for Extension of Time of sentencing date as to Craig Hines (1). Sentencing is RESCHEDULED for 1/20/06 at 10:00 a.m. Signed by Judge Stefan R. Underhill on 9/9/05. (Sbalbi, B.) (Entered: 09/09/2005) |
| 09/09/2005 | 33 | ELECTRONIC ENDORSEMENT ORDER as to Craig Hines re 31 Findings and Recommendations. Recommendation approved and plea accepted. Signed by Judge Stefan R. Underhill on 9/9/05. (Sbalbi, B.) (Entered: 09/09/2005) |
| 09/09/2005 | | Reset Hearings as to Craig Hines: Sentencing set for 1/20/2006 10:00 AM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill. (S-Gutierrez, Y.) (Entered: 09/12/2005) |
| 01/06/2006 | 34 | SENTENCING SCHEDULING ORDER as to Craig Hines. Sentencing RESCHEDULED for 2/17/2006 at 11:00 AM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill. Signed by Judge Stefan R. Underhill on 1/6/06. (Sbalbi, B.) (Entered: 01/06/2006) |

| 02/01/2006 | 35 | NOTICE *of Manual Filing of Sentencing Memorandum* by Craig Hines (Schaffer, Peter) (Entered: 02/01/2006) |
|---|---|---|
| 02/02/2006 | 36 | SENTENCING MEMORANDUM by Craig Hines (Attachments: # 1 Memorandum pgs1-14# 2 Memorandum pgs 15-28)(Simpson, T.) (Entered: 02/03/2006) |
| 02/17/2006 | 37 | Minute Entry for proceedings held before Judge Stefan R. Underhill :Sentencing as to Craig Hines held on 2/17/2006. 40 minutes(Court Reporter Corriette.) (Montz, A.) (Entered: 02/17/2006) |
| 03/02/2006 | 38 | JUDGMENT as to Craig Hines (1), Count 1, 262 Months Imprisonment; Five Years Supervised Release with Special Conditions; Forfeiture of Guns and Ammunition; $100 Special Assessment; Count 2, 202 Months Imprisonment to run concurrent to count one; Five Years Supervised Release with special Conditions, to run concurrent to count one; Forfeiture of Guns and Ammunition; $100 Special Assessment; Count 3, 60 Months Imprisonment to run consecutive to the term imposed on count two, but concurrent to the term imposed on count one; Five Years Supervised Release to run concurrently to counts one and two; Forfeiture of Guns and Ammunition; $100 Special Assessment . Signed by Judge Stefan R. Underhill on 3/1/06. (Montz, A.) (Entered: 03/02/2006) |
| 03/02/2006 | 39 | Second MOTION to Incur Expenses *for Expert Services* by Craig Hines. (Schaffer, Peter) (Entered: 03/02/2006) |
| 03/03/2006 | 40 | ELECTRONIC ENDORSEMENT ORDER granting 39 Motion to Incur Expenses by Attorney Peter Schaffer as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 3/3/06. (Sbalbi, B.) (Entered: 03/03/2006) |
| 03/07/2006 | 41 | MOTION for Forfeiture of Property by USA as to Craig Hines. (Attachments: # 1 Text of Proposed Order Proposed preliminary order of forfeiture)(Nardini, William) (Entered: 03/07/2006) |
| 03/09/2006 | 42 | Preliminary ORDER DIRECTING FORFEITURE OF PROPERTY as to Craig Hines. Signed by Judge Stefan R. Underhill on 3/8/06. (Barrille, J.) (Entered: 03/14/2006) |
| 03/10/2006 | 43 | NOTICE OF APPEAL by Craig Hines re 38 Judgment. (Barrille, J.) (Entered: 03/14/2006) |
| 03/20/2006 | 44 | MOTION to Incur Expenses by Craig Hines. (D'Onofrio, B.) (Entered: 03/21/2006) |
| 03/22/2006 | 45 | ELECTRONIC ENDORSEMENT ORDER granting 44 Motion to Incur Expenses by Attorney Peter Schaffer as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 3/22/06. (Sbalbi, B.) (Entered: 03/22/2006) |
| 03/23/2006 | 46 | Pre Sentence Investigation Report Returned to USPO as to Craig Hines (Montz, A.) (Entered: 03/23/2006) |
| 03/29/2006 | 47 | ACKNOWLEDGMENT of Pre Sentence Investigation Report by USPO as to Craig Hines (Montz, A.) (Entered: 03/29/2006) |
| 03/30/2006 | | CJA 21 as to Craig Hines: Authorization to Pay for Expert Services in the amount of $ 6,637.50, Voucher # 060315000033. Final payment Approved by Judge Reena Raggi at USCA . Signed by Judge Stefan R. Underhill on 3/30/06. (Villano, P.) (Entered: 05/12/2006) |

| 03/31/2006 | 48 | USCA Scheduling Order as to Craig Hines re 43 Notice of Appeal - Final Judgment USCA Number: 06-1214-cr (Gutierrez, Y.) (Entered: 04/07/2006) |
|---|---|---|
| 05/04/2006 | 49 | MOTION for Forfeiture of Property by USA as to Craig Hines. (Attachments: # 1 Text of Proposed Order Final Order of Forfeiture)(Nardini, William) (Entered: 05/04/2006) |
| 05/04/2006 | | CJA 20 as to Craig Hines: Authorization to Pay Peter J. Schaffer, Esq.. Amount: $ 7,930.52, Voucher # 060424000010. 15 CJA 20 - Appointment Final payment. Certified by USCA. Signed by Judge Stefan R. Underhill on 5/4/06. (Villano, P.) (Entered: 06/15/2006) |
| 05/15/2006 | 50 | Final ORDER DIRECTING FORFEITURE OF PROPERTY as to Craig Hines. Signed by Judge Stefan R. Underhill on 5/12/06. (Simpson, T.) (Entered: 05/18/2006) |
| 08/21/2006 | 51 | USCA Scheduling Order as to Craig Hines re 43 Notice of Appeal - Final Judgment USCA Number: 06-1214-cr (Barrille, J.) (Entered: 08/23/2006) |
| 09/05/2006 | 52 | INDEX TO RECORD ON APPEAL by Craig Hines re 43 Notice of Appeal - Final Judgment, 36 Sentencing Memorandum, 6 Order of Detention, 28 Consent Form, 27 Change of Plea Hearing, Plea Entered, Set Deadlines/Hearings,,,, 38 Judgment,,, 49 MOTION for Forfeiture of Property, 50 Order for Forfeiture of Property, 37 Sentencing, 41 MOTION for Forfeiture of Property, 29 Plea Agreement, 9 MOTION to Substitute Attorney, 1 Indictment, 17 Waiver of Speedy Trial, 3 MOTION for Pretrial Detention, 18 Waiver of Speedy Trial, 42 Order for Forfeiture of Property.For docket entries without a hyperlink, contact the court to arrange for the document(s) to be made available to you. (Gutierrez, Y.) (Entered: 09/11/2006) |
| 10/18/2006 | 53 | TRANSCRIPT of Change of Plea as to Craig Hines held on 8/30/05 before Judge Underhill. Court Reporter: Baldwin. (Barrille, J.) (Entered: 10/31/2006) |
| 10/18/2006 | 54 | TRANSCRIPT of Sentencing as to Craig Hines held on 2/17/06 before Judge Underhill. Court Reporter: Corriette. (Barrille, J.) (Entered: 10/31/2006) |
| 02/22/2007 | 55 | ELECTRONIC ORDER denying as moot 41 Motion for Preliminary Order of Forfeiture of Property as to Craig Hines - See Order entered 3/9/06 (1); denying as moot 49 Motion for Final Order of Forfeiture of Property as to Craig Hines (1) - See order entered 5/15/06. Signed by Judge Stefan R. Underhill on 2/22/07. (S-Montz, A.) (Entered: 02/22/2007) |
| 03/23/2007 | | Request from USCA for Record on Appeal Made Via EMail re 43 Notice of Appeal - Final Judgment : Presentence Report as to Craig Hines (Gutierrez, Y.) (Entered: 04/03/2007) |
| 04/04/2007 | 56 | Transmitted Supplemental Record on Appeal Consisting of Presentence Report as to Craig Hines re 43 Notice of Appeal - Final Judgment (Presentence Report mail attention to Vincenza Mathias) (Gutierrez, Y.) (Entered: 04/04/2007) |
| 06/14/2007 | 57 | USCA Scheduling Order as to Craig Hines re 43 Notice of Appeal - Final Judgment USCA Number: 06-1214-cr (Gutierrez, Y.) (Entered: 06/19/2007) |
| 06/22/2007 | | Special Assessment Payment by Craig Hines in the amount of $78.00. Receipt #N021640. Partial payment. Balance $22.00. (Carfora, C.) (Entered: 06/28/2007) |
| 10/03/2007 | | Special Assessment Payment by Craig Hines in the amount of $122.00. Receipt #N022506. Partial payment. Balance $100.00. Per Judgement SA is $300.00. (Carfora, C.) (Entered: 10/05/2007) |

| | | |
|---|---|---|
| 01/04/2008 | | Special Assessment Payment by Craig Hines in the amount of $25.00. Receipt #N023362. Partial payment. Balance $75.00. (Carfora, C.) (Entered: 01/11/2008) |
| 04/03/2008 | 58 | MANDATE of USCA dated 3/12/08 Granting summary affirmance re 43 Notice of Appeal - Final Judgment as to Craig Hines and denying as moot Goverment's motion to dismiss (Barrille, J.) (Entered: 04/14/2008) |
| 04/16/2008 | 59 | Special Assessment Payment by Craig Hines in the amount of $25.00. Receipt #N024319. (Carfora, C.) (Entered: 04/20/2008) |
| 07/16/2008 | | Special Assessment Payment by Craig Hines in the amount of $50.00. Receipt #N025107. (Carfora, C.) (Entered: 07/24/2008) |
| 06/26/2016 | | Motion to Vacate Sentence/2255 as to Craig Hines: filed in Civil Case number 16CV1044. All filings related to this should now be filed in the civil case. (Basha, D.) (Entered: 06/27/2016) |
| 02/28/2019 | 60 | MOTION to Appoint Counsel Re: First Step Act. by Craig Hines. (Fanelle, N.) (Entered: 02/28/2019) |
| 03/18/2019 | 61 | MOTION for Federal Public Defender's Office to Withdraw as Attorney *and For Appointment of CJA Counsel* by Craig Hines. (Willson, Charles). Added MOTION to Appoint Counsel on 3/19/2019 (Oliver, T.). (Entered: 03/18/2019) |
| 03/19/2019 | 62 | ORDER granting 60 Motion to Appoint Counsel as to Craig Hines; granting 61 Motion to Appoint Counsel as to Craig Hines; granting 61 Motion to Withdraw as Attorney. Charles F. Willson withdrawn from case as to Craig Hines. The clerk is directed to appoint CJA counsel for Mr. Hines. Signed by Judge Stefan R Underhill on 3/19/19. (Kaas, E.) (Entered: 03/19/2019) |
| 03/22/2019 | | Attorney update in case as to Craig Hines. Attorney Vito A. Castignoli for Craig Hines added. (Torres, K.) (Entered: 03/22/2019) |
| 06/20/2019 | 63 | MOTION to Reduce Sentence - First Step Act by Craig Hines. (Castignoli, Vito) (Entered: 06/20/2019) |
| 07/02/2019 | 64 | PRESENTENCE INVESTIGATION REPORT (Supplement) *(SEALED - government and defense counsel)* as to Craig Hines. (available to USA, Craig Hines) (Attachments: # 1 Standing Order, # 2 PSR, # 3 Addendum, # 4 J&C, # 5 SOR, # 6 BOP 2017 Progress Report, # 7 BOP Disciplinary History, # 8 BOP Programs History)(Nagy, M.) (Entered: 07/02/2019) |
| 07/23/2019 | 65 | Sealed Document: Response to First Step PSR Addendum by Craig Hines re 64 Presentence Investigation Report, - (Castignoli, Vito) (Entered: 07/23/2019) |
| 07/24/2019 | 66 | RESPONSE/REPLY by Craig Hines re 64 Presentence Investigation Report, (Castignoli, Vito) (Entered: 07/24/2019) |
| 08/06/2019 | 67 | Response to Defendant's Motion for Immediate Release Under First Step Act by USA as to Craig Hines re 63 MOTION to Reduce Sentence - First Step Act , 66 Reply/Response Misc (Nardini, William) (Entered: 08/06/2019) |
| 09/17/2019 | 68 | ATTORNEY APPEARANCE Elena Lalli Coronado appearing for USA (Coronado, Elena) (Entered: 09/17/2019) |
| 01/21/2020 | 69 | MOTION for Infective Assistance of Counsel by Craig Hines. (Attachments: # 1 copy of envelope) (Oliver, T.) (Entered: 01/21/2020) |

**A - 10**

| | | |
|---|---|---|
| 02/07/2020 | 70 | ORDER granting 63 Motion regarding Reduction of Sentence re First Step Act as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 2/7/2020. (Smith, E) (Entered: 02/07/2020) |
| 02/25/2020 | 71 | NOTICE OF E-FILED CALENDAR as to Craig Hines: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Resentencing set for 4/20/2020 10:00 AM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill (Jaiman, R.) (Entered: 02/25/2020) |
| 03/11/2020 | 72 | SENTENCING SCHEDULING DEADLINE as to Craig Hines Memo in aid of sentencing due 4/6/2020 Government Response due 4/13/2020 Sentencing set for 4/20/2020 10:00 AM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill (Jaiman, R.) (Entered: 03/11/2020) |
| 04/02/2020 | 73 | MOTION to Continue *Dates* by Craig Hines. (Castignoli, Vito) (Entered: 04/02/2020) |
| 04/13/2020 | 74 | ORDER granting 73 Motion to Continue as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 04/13/2020. (Rosenberg, J.) (Entered: 04/13/2020) |
| 04/20/2020 | 75 | NOTICE OF E-FILED CALENDAR as to Craig Hines: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 4/20/2020*, SET / RESET SENTENCING SCHEDULING DEADLINE as to Craig Hines Memo in aid of sentencing due 6/16/2020 Government Response due 6/23/2020 Resentencing set for 6/30/2020 at 11:00 AM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill (Jaiman, R.) (Entered: 04/20/2020) |
| 06/10/2020 | | NOTICE regarding hearing via Zoom as to Craig Hines: The Resentencing scheduled for June 30, 2020 at 11:00 a.m. will be conducted via Zoom. The video link is https://www.zoomgov.com /j/1618179027?pwd=Z3h4YWdmSGd5d1FPY1hJcCtOcndHZz09 and call in number is +1 646 828 7666 US (New York) +1 669 254 5252 US (San Jose). Meeting ID: 161 817 9027 Meeting Password: 948441 Please note: Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, screenshots, streaming, and rebroadcasting in any form, of court proceedings. The Judicial Conference of the United States, which governs the practices of the federal courts, has prohibited it. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Jaiman, R.) (Entered: 06/10/2020) |
| 06/16/2020 | 76 | MOTION to Continue *Dates* by Craig Hines. (Castignoli, Vito) (Entered: 06/16/2020) |
| 06/17/2020 | 77 | ORDER granting 76 Motion to Continue as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 6/17/2020. (Jaiman, R.) (Entered: 06/17/2020) |
| 06/22/2020 | 78 | CANCELLATION NOTICE regarding the hearing via Zoom as to Craig Hines: The Resentencing scheduled for June 30, 2020 at 11:00 a.m. conducted via Zoom. The video link is https://www.zoomgov.com |

| | | |
|---|---|---|
| | | /j/1618179027?pwd=Z3h4YWdmSGd5d1FPY1hJcCtOcndHZz09 and call in number is +1 646 828 7666 US (New York) +1 669 254 5252 US (San Jose). Meeting ID: 161 817 9027 Meeting Password: 948441 IS CANCELLED. (Jaiman, R.) (Entered: 06/22/2020) |
| 07/06/2020 | 79 | SENTENCING MEMORANDUM by Craig Hines (Castignoli, Vito) (Entered: 07/06/2020) |
| 07/06/2020 | 80 | SENTENCING MEMORANDUM by Craig Hines (Attachments: # 1 Exhibit Dr Meyer Statement, # 2 Exhibit Dr Beyrer Statement)(Castignoli, Vito) (Entered: 07/06/2020) |
| 07/27/2020 | 81 | NOTICE OF E-FILED CALENDAR as to Craig Hines: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 6/30/2020* Resentencing set for 8/10/2020 03:00 PM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill (Jaiman, R.) (Entered: 07/27/2020) |
| 08/04/2020 | 82 | MOTION to Continue *Dates* by Craig Hines. (Castignoli, Vito) (Entered: 08/04/2020) |
| 08/05/2020 | 83 | ORDER granting 82 Motion to Continue as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 8/5/2020. (Jaiman, R.) (Entered: 08/05/2020) |
| 08/07/2020 | 84 | NOTICE OF E-FILED CALENDAR as to Craig Hines: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 8/10/2020* Resentencing set for 9/9/2020 10:00 AM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill (Jaiman, R.) (Entered: 08/07/2020) |
| 09/03/2020 | 85 | NOTICE OF E-FILED CALENDAR as to Craig Hines: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 9/9/2020* Resentencing set for 9/21/2020 03:00 PM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill, and will be conducted via Zoom. The video link is https://www.zoomgov.com /j/1603763528?pwd=ZzVyMUdwTHVQam5lQktxbmNUNkZudz09 and call in number is +1 646 828 7666 US (New York)+1 669 254 5252 US (San Jose). <br><br>Meeting ID: 160 376 3528 <br><br>Meeting Password: 043862 <br><br>Please note: Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, screenshots, streaming, and rebroadcasting in any form, of court proceedings. The Judicial Conference of the United States, which governs the practices of the federal courts, has prohibited it. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Jaiman, R.) (Entered: 09/03/2020) |

| 09/16/2020 | 86 | SENTENCING MEMORANDUM by USA as to Craig Hines (Chen, Harold) (Entered: 09/16/2020) |
|---|---|---|
| 09/17/2020 | 87 | SEALED MOTION Defendant's Submissions In Aid of Sentencing - by Craig Hines. (Attachments: # 1 Exhibit Defendant Submission, # 2 Exhibit Defendant Submission, # 3 Exhibit Defendant Submission, # 4 Exhibit Defendant Submission)(Castignoli, Vito) (Entered: 09/17/2020) |
| 09/18/2020 | 88 | Letter Dated 8/5/2020 by Craig Hines Adjudicative Facts along with those substantative issues to be presented in Federal District Court. (Jaiman, R.) (Entered: 09/18/2020) |
| 09/21/2020 | 91 | Minute Entry for proceedings held before Judge Stefan R. Underhill:Sentencing as to Craig Hines held on 9/21/2020 Total Time: 1 hours and 15 minutes. Defendant detained. (Court Reporter Masse, S.)(Jaiman, R.) (Entered: 09/23/2020) |
| 09/22/2020 | 89 | ORDER **denying as moot** 69 Hines's motion for ineffective assistance of counsel, which is really a motion for appointment of counsel other than Mr. Castignoli. The basis for Hines's motion, filed on January 21, 2020, was that Mr. Castignoli had not filed a motion asking me to rule more quickly on Hines's habeas petition based on *Johnson v. United States*, 576 U.S. 591 (2015) and his First Step Act claims. *See* Mot. for Ineffective Assistance of Counsel, Doc. No. 69 , at 1. On February 7, 2020, I issued an Order denying Hines's habeas petition and granting his First Step Act motion for a resentencing. *See* Order, Doc. No. 70 . On September 21, 2020, I held that resentencing hearing, but I did not resentence Hines. Instead, I ordered that Hines and Mr. Castignoli work together to secure Hines a polygraph test so that he can proceed expeditiously with his state habeas proceeding. Thus, the grievance about which Hines complained in his motion for ineffective assistance is now moot. Further, Hines has not reported any other issue with Mr. Castignoli. In fact, at Hines's recent resentencing hearing, Hines agreed to work with Mr. Castignoli moving forward. For those reasons, I deny as moot Hines's motion for ineffective assistance of counsel. Signed by Judge Stefan R. Underhill on 09/22/2020. (Rosenberg, J.) (Entered: 09/22/2020) |
| 09/22/2020 | 90 | ORDER granting 87 Sealed Motion as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 9/22/2020. (Jaiman, R.) (Entered: 09/22/2020) |
| 01/04/2021 | 92 | NOTICE OF E-FILED CALENDAR as to Craig Hines: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephonic Status Conference set for 1/12/2021 03:00 PM before Judge Stefan R. Underhill. The call-in for the conference is 888.636.3807; when prompted for the access code, dial 650.8043 followed by #. (If asked whether to join the conference as the host, bypass that option by dialing #.) (Rosenberg, J.) (Entered: 01/04/2021) |
| 01/12/2021 | 93 | Minute Entry for proceedings held before Judge Stefan R. Underhill:Telephonic Status Conference as to Craig Hines held on 1/12/2021. Total Time: 0 hours and 10 minutes. (Court Reporter S. Masse.) (Rosenberg, J.) (Entered: 01/12/2021) |
| 01/27/2021 | 94 | MANDAMUS by Craig Hines (Attachments: # 1 copy of envelope) (Oliver, T.) (Entered: 01/28/2021) |
| 02/04/2021 | 95 | MOTION to Appoint New Counsel by Craig Hines. (Oliver, T.) (Entered: 02/04/2021) |
| 02/05/2021 | 96 | ORDER denying 95 Hines's motion for a new attorney for substantially the same reasons I recently denied Hines's motion for "ineffective assistance of counsel." *See* Order, Doc. No. 89. More specifically, in the instant motion, Hines writes that he "has |

| | | |
|---|---|---|
| | | a First Step Act motion pending for time serve since June 12 2019" and a "Johnson claim [] pending since May 2017." Mot., Doc. No. 95 . Hines indicates that he would like to "resolve his issues for time serve" and that he "should of been released from federal custody." *Id.* Hines asserts that his "motion been pending now for 4 1/2 years and Im tired." *Id.*<br><br>Hines is incorrect that he has any motions pending before me, other than the instant motion. On February 7, 2020, I granted Hines's First Step Act motion and denied his habeas petition (16-cv-1044). *See* Order, Doc. No. 70 . I then held a resentencing hearing for Hines on September 21, 2020. Because Hines is currently facing an effective life sentence (125 years) for a double murder conviction in state court, all parties agreed that the best path forward was to delay the resentencing in this federal case until Hines's state habeas proceeding concludes. Thus, there are currently no deadlines to meet in this matter: We are simply waiting for Hines's state habeas proceeding to conclude.<br><br>Although I understand that Attorney Castignoli does not represent Hines in his state habeas proceedings, Attorney Castignoli kindly agreed to help Hines arrange for a polygraph test for the purpose of expediting Hines's state habeas case. On January 12, 2021, I held a status conference with the parties, and I am convinced that Attorney Castignoli is working diligently to arrange that polygraph test for Hines. (That arrangement has proven more difficult than expected due to the COVID-19 pandemic.) Thus, I deny Hines's motion for appointment of new counsel.<br><br>Signed by Judge Stefan R. Underhill on 02/05/2021. (Rosenberg, J.) (Entered: 02/05/2021) |
| 04/02/2021 | 97 | LETTER MOTION for Copy of Sentencing Transcript by Craig Hines. (Attachments: # 1 copy of envelope) (Oliver, T.) (Entered: 04/06/2021) |
| 04/06/2021 | 98 | LETTER MOTION for Copy of Sentencing Transcript by Craig Hines. (Attachments: # 1 copy of envelope) (Oliver, T.) (Additional attachment(s) added on 4/6/2021: # 2 REPLACEMENT PDF) (Oliver, T.). (Entered: 04/06/2021) |
| 04/06/2021 | 99 | Docket Entry Correction as to Craig Hines re 98 MOTION for Copy of Sentencing Transcript MODIFIED TO ADD A REPLACEMENT PDF TO THE DOCKET ENTRY (Oliver, T.) (Entered: 04/06/2021) |
| 04/07/2021 | 100 | ORDER denying without prejudice 97 and 98 Hines's duplicative motions seeking a free copy of the transcript from Hines's resentencing hearing, which I held on September 21, 2020. *See* Min. Entry, Doc. No. 91 . Hines's motions are denied without prejudice to his lawyer's re-filing the motions. Any future motion requesting transcripts should explain why Hines requires the relevant transcript. Signed by Judge Stefan R. Underhill on 04/07/2021. (Rosenberg, J.) (Entered: 04/07/2021) |
| 05/21/2021 | 101 | MOTION to Withdraw Counsel by Craig Hines. (Oliver, T.) (Entered: 05/21/2021) |
| 05/25/2021 | 102 | ORDER denying 101 Hines's *pro se* motion for his counsel, Vito Castignoli, to withdraw. In his motion, Hines complains that Attorney Castignoli "doesnt want to give me a court date" for Hines's resentencing, even though Hines's polygraph examination regarding his two state homicide convictions is now complete. Hines's motion is denied both because Attorney Castignoli has diligently pursued this matter and because Hines misunderstands the posture of this case. |

**A - 14**

| | | |
|---|---|---|
| | | On May 11, Attorney Castignoli did, in fact, email my law clerk (and the government). Castignoli forwarded a copy of Hines's polygraph test results and asked to set a date for Hines's resentencing in this matter. On May 13, my law clerk emailed back (at my direction) and explained that "it does not make sense to schedule Hines's re-sentencing until his state habeas case has *concluded*." My law clerk further explained (again, at my direction) that "[t]he important piece of information to Judge Underhill will be whether Hines must serve a 125-year state sentence, or not." Thus, I asked the parties to bring this case back to my attention upon the earlier of: (1) the conclusion of Hines's state habeas case or (2) six months from the date of that email, which is November 15.<br><br>For the reasons stated in the above-referenced email, there is no need to re-schedule Hines's re-sentencing until his state habeas case has concluded. Attorney Castignoli has diligently aided Hines so far, and I am sure that he will continue to do so.<br><br>Signed by Judge Stefan R. Underhill on 05/25/2021. (Rosenberg, J.) (Entered: 05/25/2021) |
| 06/14/2021 | 103 | MOTION to Suasponte to Intervene by Craig Hines. (Oliver, T.) (Entered: 06/14/2021) |
| 06/21/2021 | 104 | ORDER denying 103 Hines's *pro se* motion "to suasponte intervene" for the purpose of scheduling a re-sentencing hearing. Hines claims that I am "avoiding scheduled legal action not wanting to give [Hines] a court date." Mot., Doc. No. 103 , at 2. That is incorrect. Hines's request is denied for the reasons I have already spelled out in prior orders. *See* Orders, Doc. Nos. 89, 96, and 102. As described in my most recent Order, the parties are instructed to bring this case back to my attention upon the earlier of: (1) the conclusion of Hines's state habeas case or (2) November 15. *See* Order, Doc. No. 102.<br><br>Signed by Judge Stefan R. Underhill on 06/21/2021. (Rosenberg, J.) (Entered: 06/21/2021) |
| 07/16/2021 | 105 | TRANSCRIPT of Proceedings: as to Craig Hines Type of Hearing: Resentencing. Held on 9/21/2020 before Judge Stefan R. Underhill. Court Reporter: Sharon L. Masse. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 8/6/2021. Redacted Transcript Deadline set for 8/16/2021. Release of Transcript Restriction set for 10/14/2021. (Cianciullo, Melissa) (Entered: 07/16/2021) |

| | | |
|---|---|---|
| 08/12/2021 | 106 | NOTICE OF E-FILED CALENDAR as to Craig Hines: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.<br><br>Telephonic Status Conference set for 9/9/2021 01:00 PM before Judge Stefan R. Underhill. The call-in for the conference is 888.636.3807; when prompted for the access code, dial 650.8043 followed by #. (If asked whether to join the conference as the host, bypass that option by dialing #.) (Rosenberg, J.) (Entered: 08/12/2021) |
| 09/09/2021 | 107 | NOTICE OF E-FILED CALENDAR as to Craig Hines: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 9/9/2021 01:00 PM* Telephonic Status Conference set for 9/9/2021 03:00 PM before Judge Stefan R. Underhill. The call-in for the conference is 888.636.3807; when prompted for the access code, dial 650.8043 followed by #. (If asked whether to join the conference as the host, bypass that option by dialing #.)(Torres, K.) (Entered: 09/09/2021) |
| 09/09/2021 | 108 | Minute Entry for proceedings held before Judge Stefan R. Underhill:Status Conference as to Craig Hines held on 9/9/2021. Total Time: 00 hours and 15 minutes. (Court Reporter Melissa Cianciullo.) (Guerrier, C.) (Entered: 09/09/2021) |
| 09/20/2021 | 109 | ORDER OF REFERRAL TO PROBATION FOR PRESENTENCE INVESTIGATION AND REPORT as to Craig Hines. Sentencing set for 10/27/2021 10:00 AM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill<br>Signed by Judge Stefan R. Underhill on 9/20/2021. (Torres, K.) (Entered: 09/21/2021) |
| 10/12/2021 | 110 | SENTENCING MEMORANDUM by Craig Hines (Attachments: # 1 Supplement Attachment, # 2 Supplement attachment, # 3 Supplement attachment, # 4 Supplement attachment)(Castignoli, Vito) (Entered: 10/12/2021) |
| 10/13/2021 | 111 | PRESENTENCE INVESTIGATION REPORT (Supplement) *(SEALED - government and defense counsel)* as to Craig Hines. (available to USA, Craig Hines) (Nagy, M.) (Entered: 10/13/2021) |
| 10/26/2021 | 112 | SENTENCING MEMORANDUM by USA as to Craig Hines (Coronado, Elena) (Entered: 10/26/2021) |
| 10/27/2021 | 113 | Minute Entry for proceedings held before Judge Stefan R. Underhill:Re-Sentencing as to Craig Hines held on 10/27/2021 Total Time: 1 hours and 19 minutes(Court Reporter M. Cianciullo.)(Torres, K.) (Entered: 10/27/2021) |
| 10/27/2021 | 114 | AMENDED JUDGMENT as to Craig Hines (1), Count(s) 1, 2, 3, The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 262 months. The defendant shall be imprisoned for 120 months on count one, 28 months' imprisonment on count two and 114 months' imprisonment on count three. The sentence on counts one, two and three shall run consecutive to one another for a total of 262 months. Upon release from imprisonment, the defendant shall be on supervised release for a total term of 3 years on count one; 3 years on count two and 5 years on count three, to run concurrently.<br>Signed by Judge Stefan R. Underhill on 10/27/2021. (Imbriani, Susan) (Entered: 10/28/2021) |

| | | |
|---|---|---|
| 10/28/2021 | 115 | MOTION for Vito A Castignoli to Withdraw as Attorney by Craig Hines. (Castignoli, Vito) (Entered: 10/28/2021) |
| 11/02/2021 | 116 | ORDER granting 115 Motion to Withdraw as Attorney. Vito A. Castignoli withdrawn from case. as to Craig Hines (1). Signed by Judge Stefan R. Underhill on 10/29/2021. (Guerrier, C.) (Entered: 11/02/2021) |
| 11/05/2021 | 117 | Statement of Reasons *(SEALED - government and defense counsel)* as to Craig Hines. (available to USA, Craig Hines) (Nagy, M.) (Entered: 11/05/2021) |
| 11/29/2021 | 118 | ORDER as to Craig Hines: Pursuant to Federal Rule of Appellate Procedure 4(b)(4), I, *sua sponte*, find good cause to extend the time frame for Hines to file a notice of appeal based on the recent withdrawal of Hines' attorney. The time for Hines to file an appeal is therefore extended by no later than 30 days, or on or before **December 10, 2021**. *See* Fed. R. App. P. 4(b)(4). To the extent that Hines intends to file a notice of appeal, Hines need not wait for counsel to be appointed. **Failure to file a notice of appeal by December 10, 2021 will prohibit Hines from appealing.** Signed by Judge Stefan R. Underhill on 11/29/2021. (Guerrier, C.) (Entered: 11/29/2021) |
| 11/29/2021 | 119 | ORDER as to Craig Hines: The Federal Bureau of Prisons (BOP) website indicates that Hines current address is the United States Penitentiary Atlanta. If Hines is no longer at Wyatt Detention Facility as reflected on the public docket, a change of address must be filed with the Clerk of Court pursuant to D. Conn. L. Civ. R. 83.1(c)(2). Signed by Judge Stefan R. Underhill on 11/29/2021. (Guerrier, C.) (Entered: 11/29/2021) |
| 12/20/2021 | 120 | MOTION for Extension of Time to file a Notice of Appeal by Craig Hines. (Attachments: # 1 copy of envelope)(Oliver, T.) (Entered: 12/20/2021) |
| 12/20/2021 | 121 | MOTION to Appoint Counsel by Craig Hines. (Attachments: # 1 copy of envelope) (Oliver, T.) (Entered: 12/20/2021) |
| 12/20/2021 | 122 | NOTICE OF APPEAL by Craig Hines re 114 Amended Judgment (Attachments: # 1 copy of envelope) (Oliver, T.) (Entered: 12/20/2021) |
| 12/20/2021 | 123 | MOTION for Leave to Proceed in forma pauperis by Craig Hines. (Attachments: # 1 copy of envelope) (Oliver, T.) (Entered: 12/20/2021) |
| 12/20/2021 | 124 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 122 Notice of Appeal - Final Judgment. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Robin D. Tabora, Clerk. Documents manually filed not included in this transmission: none (Oliver, T.) (Entered: 12/20/2021) |
| 01/18/2022 | 125 | NOTICE of Change of Address by Craig Hines (Payton, R.) (Entered: 01/18/2022) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 01/24/2022 13:23:09 | | |
| **PACER Login:** | jamesmbranden | **Client Code:** | |

| Description: | Docket Report | Search Criteria: | 3:05-cr-00118-SRU |
|---|---|---|---|
| Billable Pages: | 18 | Cost: | 1.80 |
| Exempt flag: | Exempt | Exempt reason: | Exempt CJA |

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

GRAND JURY N-_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:05-CR-_____ |
| | : | |
| v. | : | VIOLATIONS: 18 U.S.C. § 922(g)(1) |
| | : | (Possession of a firearm by a |
| CRAIG HINES | : | convicted felon) |

21 U.S.C. § 841(a)(1)(B)
(Possession with intent to distribute more
than 5 grams of cocaine base)

18 U.S.C. § 924(c)(1)
(Possession, use and carrying of firearm
during, in relation to, and in furtherance of
drug offense)

18 U.S.C. § 924(d)
(forfeiture)

**I N D I C T M E N T**

The Grand Jury charges **CRAIG HINES**, the defendant herein, as follows:

**COUNT ONE**

On or about December 24, 2004 through on or about January 15, 2005, in the District of

Connecticut, **CRAIG HINES,** the defendant herein, having been convicted in Connecticut

Superior Court on or about the following dates for the following offenses:

| Date | Offense |
|---|---|
| February 5, 1996 | Sale of Hallucinogen/Narcotic<br>C.G.S. § 53a-48 |
| October 22, 1997 | Larceny, 2nd Degree<br>C.G.S. § 53a-123 |
| | Robbery 3rd Degree<br>Conn. Gen. Stat. § 53a-136 |

Failure to Appear, 1st Degree
Conn. Gen. Stat. § 53a-172

Conspiracy to Commit Assault, 2nd Degree
Conn. Gen. Stat. §§ 53a-48, 53a-61

all of which crimes are punishable by imprisonment for a term exceeding one year, did

knowingly possess in and affecting commerce a firearm, that is, an EXCAM Armi Tanfoglio

Giuseppe .32 caliber semi-automatic handgun, serial number C61224, which had been

transported in interstate and foreign commerce.

All in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2) and

924(e).

## COUNT TWO

On or about January 15, 2005, in the District of Connecticut, **CRAIG HINES,** the

defendant herein, knowingly and intentionally possessed with intent to distribute more than 5

grams of a compound, mixture or substance containing a detectable amount of cocaine base, a

Schedule II Controlled Substance.

All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).

## COUNT THREE

On or about January 15, 2005, in the District of Connecticut, **CRAIG HINES**, the

defendant herein, did knowingly use and carry and possess a firearm, more specifically, an

EXCAM Armi Tanfoglio Giuseppe .32 caliber semi-automatic handgun, serial number C61224,

during, in relation to, and in furtherance of, a drug trafficking crime, that is, possession with the

intent to distribute cocaine base, a Schedule II controlled substance, in violation of Title 21,

United States Code, Sections 841(a)(1)(b), as more specifically set forth in Count Two of this

Indictment, which is incorporated by reference herein.

All in violation of Title 18, United States Code, Section 924(c)(1).

<u>FORFEITURE ALLEGATION</u>

Upon conviction of Count One and/or Count Three of this Indictment, defendant **CRAIG**

**HINES** shall forfeit to the United States, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C.

§ 2461(c), all firearms and ammunition involved in the commission of the offense, including but

not limited to the following: an EXCAM Armi Tanfoglio Giuseppe .32 caliber semi-automatic

handgun, serial number C61224.

A TRUE BILL

_____

FOREPERSON

_____
KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

_____
JAMES I. GLASSER
CHIEF, CRIMINAL DIVISION

/s/

_____
WILLIAM J. NARDINI
ASSISTANT UNITED STATEuS ATTORNEY



U.S. Department of Justice

United States Attorney
District of Connecticut

United States District Court
District of Connecticut
FILED AT          BRIDGEPORT

8-30 2005

Edwin F. Rowe, Clerk

By

Deputy Clerk

Connecticut Financial Center          (203)821-3700
157 Church Street
P.O. Box 1824
New Haven, Connecticut 06510          Fax (203) 773-5376

August 30, 2005

Peter Schaffer, Esq.
1127 High Ridge Road, #330
Stamford, CT 06905-1203

Re:   **United States v. Craig Hines**
      **Criminal No. 3:05-CR-118 (SRU)**

Dear Mr. Schaffer:

This letter confirms the plea agreement entered into between your client, Craig Hines, a.k.a. "Mousie" (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") concerning the referenced criminal matter.

## THE PLEA AND OFFENSE

The defendant, Craig Hines ("Hines") agrees to plead guilty to a three-count indictment charging him with:

*Count One*: being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e);

*Count Two*: possessing with intent to distribute more than 5 grams of crack cocaine in violation of 21 U.S.C. § 841(a) and 841(b)(1)(B); and

*Count Three*: using, carrying, and possessing a firearm during, in relation to, and in furtherance of the drug offense outlined in Count Two, in violation of 18 U.S.C. § 924(c).

He understands that to be guilty of these offenses, the following essential elements of the offenses must be satisfied:

*Count One*

1.   The defendant was a convicted felon.
2.   The defendant knowingly possessed a firearm.
3.   The firearm had traveled in interstate commerce.

*Letter to Peter Schaffer, Esq.*
*August 30, 2005*
*Page 2 of 12*

    4.    The defendant qualifies as an Armed Career Criminal, meaning that he had three previous convictions for a violent felony or a serious drug offense as defined in 18 U.S.C. § 924(e).

**Count Two**

1.    The defendant knowingly possessed a controlled substance
2.    The controlled substance was, in fact, 5 grams or more of crack cocaine
3.    The defendant intended to distribute the controlled substance

**Count Three**

1.    The defendant committed the drug offense in Count Two
2.    The defendant knowingly carried a firearm during and in relation to Count Two, or knowingly possessed the firearm in furtherance of Count Two

In order to obtain forfeiture of the gun under 18 U.S.C. § 924(d), the Government would simply have to obtain a conviction on Count One.

## THE PENALTIES

The offense conduct carries the following penalties with respect to imprisonment: Count One carries a mandatory minimum penalty of 15 years of imprisonment, and maximum penalty of life in prison. Count Two carries a mandatory minimum penalty of 5 years of imprisonment and a maximum of 40 years of imprisonment. Count Three carries a mandatory minimum penalty of 5 years of imprisonment, to be served consecutively to any term of imprisonment imposed on the other counts of conviction, or for any other conviction.

Moreover, the defendant is also subject to being sentenced to a term of supervised release upon the completion of any term of imprisonment. On Counts One and Three, he is subject to up to five years of supervised of supervised release under 18 U.S.C. § 3583(b). On Count Two, he is subject to a term of four years to life of supervised release undre 21 U.S.C. § 841(b)(1)(B). The defendant understands that should he violate any condition of the supervised release during its term, he may be required to serve a further term of imprisonment of up to five years, equal to the period of the supervised release with no credit for the time already spent on supervised release.

The defendant also is subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant as to Count One is $250,000; Count Two: $2,000,000 pursuant to 21 U.S.C. §§ 841 (b)(1)(B); and Count Three: $250,000.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100.00 on each count of conviction. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

*Letter to Peter Schaffer, Esq.*
*August 30, 2005*
*Page 3 of 12*

Finally, unless otherwise ordered, should the Court impose a fine of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of a fine amount not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine pursuant to 18 U.S.C. §§ 3572 (h), (i) and § 3612(g).

Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution to any victims of the offense conduct under 18 U.S.C. § 3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless ordered otherwise by the Court.

Forfeiture

The defendant agrees to forfeit to the United States, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), all firearms and ammunition involved in the commission of the offense, including but not limited to the following: an EXCAM Armi Tanfoglio Giuseppe .32 caliber semi-automatic handgun, serial number C61224, and a magazine containing .32 caliber ammunition, all seized during a search of 518 George Street, New Haven, Connecticut, on January 15, 2005. He also agrees to forfeit the following items seized during a search of 279 Park Road, Hamden, Connecticut, on January 11, 2005: a High Point sawed-off shotgun with an obliterated serial number; a box of .32 caliber ammunition, one 9mm round, and 3 shotgun rounds.

The defendant understands and agrees that by virtue of his plea of guilty he waives any rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

**THE SENTENCING GUIDELINES**

1. Applicability

The defendant understands that although application of the United States Sentencing Guidelines is not mandatory, they are advisory and the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case. *See United States v. Booker*, 125 S. Ct. 738 (2005). The defendant expressly understands and agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Officer who prepares the presentence investigation report. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated.

*Letter to Peter Schaffer, Esq.*
*August 30, 2005*
*Page 4 of 12*

2. <u>Acceptance of Responsibility</u>

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's Adjusted Offense Level under section § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, the Government intends to file a motion with the Court pursuant to § 3E1.1(b) recommending that the Court reduce defendant's Adjusted Offense Level by one additional level based on the defendant's prompt notification of his intention to enter a plea of guilty. This recommendation is conditioned upon the defendant's full, complete, and truthful disclosure to the Probation Office of information requested, of the circumstances surrounding his commission of the offense, of his criminal history, and of his financial condition by submitting a complete and truthful financial statement. In addition, this recommendation is conditioned upon the defendant timely providing complete information to the Government concerning his involvement in the offense to which he is pleading guilty. The defendant expressly understands that the Court is not obligated to accept the Government's recommendation on the reduction.

The Government will not make this recommendation if the defendant engages in any acts which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (Sentencing Guideline section § 3E1.1); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (Sentencing Guideline § 3C1.1); or (3) constitute a violation of any condition of release. Moreover, the Government will not make this recommendation if the defendant seeks to withdraw his plea of guilty. The defendant expressly understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make this recommendation.

3. <u>Stipulation</u>

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into a stipulation which is attached to and made a part of this plea agreement. The defendant understands that this stipulation does not purport to set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant expressly understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

4. <u>Waiver of Right to Challenge Prior Convictions Used To Enhance Sentence</u>

The defendant understands and agrees that the offense of conviction set forth in Count One carries enhanced penalties because of his prior criminal record. The defendant further understands and agrees that under *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), the fact of defendant's prior convictions need not be approved by a grand jury or submitted to a trial jury and proved beyond a reasonable doubt. Defendant expressly understands and agrees that such facts will be determined either: by stipulation between the parties; in accordance with the procedures specified by the United States Sentencing Guidelines; or by the Court upon a finding

*Letter to Peter Schaffer, Esq.*
*August 30, 2005*
*Page 5 of 12*

that the relevant facts have been established by reliable evidence, which may include hearsay evidence, and proven by a preponderance of the evidence.

    5.  Guideline Stipulation

        The Government and the defendant stipulate that as an Armed Career Criminal ("ACC") (based on his prior Connecticut state convictions for violent felonies and a serious drug offense), the defendant's total offense level is 34, and that he falls into Criminal History Category VI. This yields a sentencing guidelines range of 262-327 months of imprisonment, a fine range of $17,500 to $2,000,000, a term of supervised release of four to five years, and a mandatory $300.00 special assessment.

        The Government and the defendant stipulate that the defendant was convicted of the following offenses in Connecticut Superior Court on the dates specified, each of which constitute either a violent felony or a serious drug offense for purposes of the Armed Career Criminal Act, 18 U.S.C. § 924(e):

| | |
|---|---|
| February 5, 1996 | Sale of Hallucinogen/Narcotic<br>Conn. Gen. Stat. § 53a-48 |
| October 22, 1997 | Robbery 3rd Degree<br>Conn. Gen. Stat. § 53a-136 |
| | Conspiracy to Commit Assault, 2nd Degree<br>Conn. Gen. Stat. §§ 53a-48, 53a-61 |

As an Armed Career Criminal, the defendant's sentencing guideline range is calculated under U.S.S.G. § 4B1.4(b)(2), which imports the highest applicable level from either (a) the guideline applicable to the underlying offense, (b) the career offender guideline set forth in U.S.S.G. § 4B1.1, or (c) the guidelines set forth in U.S.S.G. § 4B1.4. In the present case, the career offender guideline, § 4B1.1, entails the highest offense level, and is therefore applicable. Under § 4B1.1(b), because the offense statutory maximum for Count One is life imprisonment under§ 924(e), the defendant is placed into Criminal History Category VI and offense level 37. Three levels are subtracted under U.S.S.G. § 3E1.1 for the defendant's acceptance of responsibility, as noted above, resulting in a total offense level of 34. A total offense level 34 with a criminal history category VI, which the parties calculate the defendant to be, results in a range of 262 to 327 months of imprisonment, a fine range of $17,500 to $2,000,000 under U.S.S.G. § 5E1.2(b)(3)-(4), a term of supervised release of four to five years under U.S.S.G. § 5D1.2(a)(1), and a mandatory special assessment of $300.

        The parties agree that neither a downward nor an upward departure from the sentencing range set forth above is warranted and that a sentence within the agreed range is reasonable. Accordingly, neither party will seek such a departure or seek any adjustment not set forth herein. Nor will either party suggest that the Probation Office consider such a departure or adjustment, or suggest that the Court *sua sponte* consider such a departure or adjustment.

*Letter to Peter Schaffer, Esq.*
*August 30, 2005*
*Page 6 of 12*

The defendant expressly understands that the Court is not bound by this agreement on the Guideline and fine ranges specified above. The defendant further expressly understands that he will not be permitted to withdraw the plea of guilty if the Court imposes a sentence outside the Guideline range or fine range set forth in this agreement.

In the event the Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the Government expressly reserves the right to challenge or defend any sentencing determination, including one other than that stipulated by the parties, in any post-sentencing proceeding.

      6.  Waiver of Right to Appeal
          <u>or Collaterally Attack Sentence</u>

The defendant acknowledges that under certain circumstances he is entitled to appeal his conviction and sentence. It is specifically agreed that the defendant will not appeal or collaterally attack in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241, the conviction or sentence of imprisonment imposed by the Court if that sentence does not exceed 327 months of imprisonment, even if the Court imposes such a sentence based on an analysis different from that specified above. Similarly, the Government will not appeal a sentence imposed within or above the stipulated sentencing range. The defendant expressly acknowledges that he is knowingly and intelligently waiving his appellate rights.

      7.  <u>Information to the Court</u>

The Government agrees to take no position at sentencing with respect to where within the appropriate guidelines range the defendant should be sentenced. The Government further agrees that it will not file a second-offender notice pursuant to 21 U.S.C. § 851, which would increase the defendant's statutory range of imprisonment to a mandatory minimum of ten years and a maximum of life, and a maximum fine of $4,000,000, and the mandatory minimum period of supervised release of eight years. Nevertheless, it is expressly understood that the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to its file, with the exception of grand jury material.

**<u>WAIVER OF RIGHTS</u>**

<u>Waiver of Trial Rights and Consequences of Plea</u>

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that

*Letter to Peter Schaffer, Esq.*
*August 30, 2005*
*Page 7 of 12*

plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, and the right to compulsory process for the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives and gives up those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant understands and agrees that should the conviction following defendant's plea of guilty pursuant to this plea agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

### Waiver of Right To Post-Conviction DNA Testing of Physical Evidence

The defendant understands that the Government has various items of physical evidence in its possession in connection with this case that could be subjected to DNA testing. The defendant further understands that following conviction in this case, he could file a motion with the Court to require DNA testing of physical evidence pursuant to 18 U.S.C. § 3600 and § 3600A in an attempt to prove his innocence. The defendant fully understands his right to have all the physical evidence in this case tested for DNA, has discussed this right with his counsel, and knowingly and voluntarily waives his right to have such DNA testing performed on the physical evidence in this case. Defendant fully understands that because he is waiving this right, the physical evidence in this case will likely be destroyed or will otherwise be unavailable for DNA testing in the future.

## ACKNOWLEDGEMENT OF GUILT; VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his

*Letter to Peter Schaffer, Esq.*
*August 30, 2005*
*Page 8 of 12*

understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

The defendant expressly acknowledges that he is not a "prevailing party" within the meaning of Public Law 105-119, section 617 ("the Hyde Amendment") with respect to the count of conviction or any other count or charge that may be dismissed pursuant to this agreement. The defendant voluntarily, knowingly, and intelligently waives any rights he may have to seek reasonable attorney's fees and other litigation expenses under the Hyde Amendment.

## SCOPE OF THE AGREEMENT

The defendant acknowledges and understands that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant understands and acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant further understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and may thereby be deprived of certain federal benefits as provided in 21 U.S.C. § 862 and will be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Bureau of Prisons or the Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his (1) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e); (2) possessing with intent to distribute 5 grams or more of crack cocaine in violation of 21 U.S.C. § 841(b)(1)(B); and (3) using, carrying, and possessing a firearm during, in relation to, and in furtherance of the drug offense outlined in Count Two, in violation of 18 U.S.C. § 924(c), which form the basis of the indictment in this case.

*Letter to Peter Schaffer, Esq.*
*August 30, 2005*
*Page 9 of 12*

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his plea of guilty.

**NO OTHER PROMISES**

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

WILLIAM J. NARDINI
ASSISTANT UNITED STATES ATTORNEY

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

CRAIG HINES
The Defendant

8/30/05
Date

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

PETER SCHAFFER, ESQ.
Attorney for the Defendant

8/30/05
Date

*Letter to Peter Schaffer, Esq.*
*August 30, 2005*
*Page 10 of 12*

## STIPULATION OF OFFENSE CONDUCT

The defendant Craig Hines, a.k.a. "Mousie," and the Government stipulate and agree to the following offense conduct that gives rise to the defendant's agreement to plead guilty to the information:

From December 24, 2004, through January 15, 2005, defendant Hines knowingly possessed a firearm, specifically an EXCAM Armi Tanfoglio Giuseppe .32 caliber semi-automatic handgun, serial number C61224 (the "EXCAM gun"), which was manufactured in Italy and had therefore been transported in interstate and foreign commerce

In the evening of January 15, 2005, Hines was at an apartment on the third floor of 518 George Street, New Haven, Connecticut. At this time, Hines knowingly possessed the EXCAM gun. When police entered the building, the gun was loaded, with the safety off, with one round chambered, and six rounds in the magazine. Upon hearing police enter the building, Hines attempted to hide the EXCAM gun on the roof outside a window leading to the fire escape, but then hid the gun in the back of a small refrigerator. He also knowingly possessed a .32 caliber magazine containing additional rounds of ammunition. Hines further knowingly possessed, and stored in his anus, four small clear plastic bags containing a total of eighty-eight (88) individually wrapped items of crack totaling 28 grams. He intended to sell these drugs and carried a gun to protect himself from robberies in connection with his drug sales.

On February 5, 1996, and October 22, 1997, respectively, Hines was convicted of the following felonies under Connecticut state law, which were punishable by imprisonment for a term exceeding one year, and he was therefore a convicted felon at the time that he knowingly possessed the EXCAM gun: (1) Sale of Hallucinogen/Narcotic; (2) Larceny 2nd Degree; Robbery 3rd Degree; Failure to Appear; 1st Degree and Conspiracy to Commit Assault, 2nd Degree.

The written stipulation above is incorporated into the preceding plea agreement. It is understood, however, that the defendant and the Government reserve their right to present additional relevant offense conduct to the attention of the Court in connection with sentencing.

*Craig Hines*
CRAIG HINES
The Defendant

*William J. Nardini*
WILLIAM J. NARDINI
ASSISTANT UNITED STATES ATTORNEY

*Peter Schaffer*
PETER SCHAFFER, ESQ.
Attorney for the Defendant

<u>RIDER CONCERNING RESTITUTION</u>

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A.  The order of restitution may include:

1.      If the offense resulted in damage to or loss or destruction of property of a victim of the offense, the order of restitution shall require the defendant to:

> A. Return the property to the owner of the property or someone designated by the owner; or

> B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

>> The greater of -

>> (I) the value of the property on the date of the damage, loss, or destruction;  or

>> (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim --

> A. pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

> B. pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

> C. reimburse the victim for income lost by such victim as a result of such offense;

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant.  In addition to the court ordered restitution, the court may order that the conditions of its order of restitution be made  a condition of probation or supervised release.  Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e). Failure to pay

*Letter to Peter Schaffer, Esq.*
*August 30, 2005*
*Page 12 of 12*

restitution may also result in the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. See 18 U.S.C. § 3614. The Court may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555.

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,       .    Case No. 3:05-CR-00118
                                .    (SRU)
                Plaintiff,      .
                                .    Bridgeport, Connecticut
        v.                      .    August 30, 2005
                                .
CRAIG HINES,                    .
                                .
                Defendant.      .
. . . . . . . . . . . . . .

CHANGE OF PLEA HEARING
BEFORE THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:              Office of the U.S. Attorney
                                By:  WILLIAM NARDINI, ESQ.
                                     MS. CHINELO DIKE
                                157 Church Street
                                New Haven, CT 06510

For the Defendant:              Law Offices
                                By:  PETER SCHAFFER, ESQ.
                                1127 High Ridge Road
                                Suite 330
                                Stamford, CT 06905

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

2

1        (Proceedings commenced.)

2            THE COURT: Thank you.

3            Good afternoon, and let me just tell you

4    we're here on United States against Craig Hines, and

5    that's Docket Number 3:05-CR-118, and it's a case

6    assigned to Judge Underhill, and I understand that

7    we're here for a change of plea; is that correct?

8            MR. NARDINI:  Yes, Your Honor.

9            THE COURT:  Okay.

10           And, Mr. Nardini, you're here for the

11   government, and you just want to give me just a little

12   bit of background, and also just your appearance, sir,

13   for -- It's good to see you again, how you doing?

14           MR. SCHAFFER:  Good afternoon, Your Honor,

15   Peter Schaffer for Mr. Hines.

16           THE COURT:  Okay.

17           Mr. Schaffer, you're all set to proceed?

18           MR. SCHAFFER:  Yes.

19           THE COURT:  Okay, thanks.

20           Well, let me -- I'll turn to you in a little

21   bit, but let me just turn first to Mr. Nardini.

22           MR. NARDINI:  Good afternoon, Your Honor.

23           Let me just ask, I have submitted paperwork,

24   Your Honor, asking permission of the Court to let a law

25   student intern, Chinelo Dike, speak for the government

3

1   this afternoon.  I believe she meets all of the

2   qualifications under Rule 83.9.

3           THE COURT:  Okay.  I don't know if I have

4   that.  We don't have it, --

5           MR. NARDINI:  Okay.

6           THE COURT:  -- but you could do it orally.

7           MR. NARDINI:  Thank you, Your Honor.

8           I do so move.  I had asked someone to hand-

9   deliver it yesterday, and I will make sure you get a

10   copy of it today.

11           THE COURT:  Okay.

12           MR. NARDINI:  What I --

13           THE COURT:  Would you introduce her?

14           MR. NARDINI:  Yes, please.

15           Ms. Dike is a law student intern presently at

16   the U.S. attorney's office.  She is a student at Yale

17   Law School, and I believe that she meets all of the

18   necessary qualifications under the local rule.

19           THE COURT:  Okay.

20           And how do you pronounce your last name,

21   ma'am?

22           MS. DIKE:  Dike.

23           THE COURT:  Dike?  Okay.

24           And any objection, Mr. Schaffer?

25           MR. SCHAFFER:  No, Your Honor.

4

1          THE COURT:  Okay.  Thank you.

2          MR. NARDINI:  And just for the record, Your

3    Honor, if I may, just to complete.

4          Also with us at counsel table is Special

5    Agent Mark Essing from the Bureau of Alcohol, Tobacco

6    and Firearms, --

7          THE COURT:  Yes.

8          MR. NARDINI:  -- and --

9          THE COURT:  It's good to see you.

10          MR. NARDINI:  -- so you know too, we also

11    have two of the detectives from the New Haven Police

12    Department here today, Richard Pelletier and Peter

13    Carusone, who also investigated this case.

14          THE COURT:  You're certainly very welcome to

15    be here.

16          MR. NARDINI:  Thank you, Your Honor.

17          THE COURT:  Thanks.

18          Well, I understand that there is a plea

19    agreement that I've had a chance to actually review a

20    copy that's been provided to me, and I take it what I

21    got is dated August 30th, today, that's the copy I get

22    -- I have is the operable copy.  There haven't been any

23    changes?

24          MS. DIKE:  Your Honor, there have been a

25    number of changes, just minor changes, that we've

5

1    distributed corrected versions to the Court and to

2    defense --

3              THE COURT:  Okay.

4              MS. DIKE:  -- counsel.

5              THE COURT:  Let's see.

6              Yeah, it looks like I have an earlier draft,

7    and then I do have some of the corrected changes.

8    Okay.

9              Well, let me go ahead and get started, and I

10   understand also, that it's going to be a change of

11   plea.  It's going to be -- to an indictment, right, the

12   three-count indictment?

13             MS. DIKE:  Yes, Your Honor.

14             THE COURT:  Okay.

15             Well first, with respect to proceeding before

16   me, I'm a United States magistrate judge, and I'm

17   working with Judge Underhill on the case.

18             You can wait to proceed before Judge

19   Underhill, who is the judge who actually would be your

20   trial judge if there were to be a trial, and also would

21   be your sentencing judge, and I can only make a

22   recommendation to Judge Underhill that -- based upon

23   what I hear today, and read, that he accept the plea of

24   guilty.  I expect that he would if I recommend it, but

25   you do have a right to wait and proceed before Judge

6

1    Underhill himself, if you wish to.

2            Mr. Schaffer, have you discussed that with

3    Mr. --

4            MR. SCHAFFER:  Yes.

5            THE COURT:  -- Mr. Hines?  Okay.

6            And has he signed a consent to proceed form?

7            MR. SCHAFFER:  No.  We have it in front of,

8    but I think he's prepared to do that.

9            THE COURT:  Okay.

10           Mr. Hines, do you understand the situation,

11   and knowing that you could choose to proceed today, or

12   wait to do it -- do this in front of Judge Underhill,

13   --

14           THE DEFENDANT:  Yes.

15           THE COURT:  -- do you want to go ahead today?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Okay.

18       (Pause.)

19           MS. DIKE:  May I approach, Your Honor?

20           THE COURT:  Yeah.  Thanks.

21       (Pause.)

22           THE COURT:  Well, the form looks in order,

23   and I do find that Mr. Hines understands his right to

24   proceed in front of Judge Underhill if he were to so

25   choose, but that he does knowingly and voluntarily

7

1    consent to proceed before me today for this change of

2    plea proceeding, and before proceeding any further, I

3    need to have Mr. Hines sworn in because I'll have to

4    ask you questions under oath, and under oath, of

5    course, you have to answer truthfully and fully to the

6    best of your ability, knowing that if you didn't do so,

7    if you didn't answer truthfully and knowingly to --

8    fully, to the best of your ability, you would be

9    subjecting yourself to possible penalties for perjury

10   or making a false statement.

11           Do you understand that, sir?

12           THE DEFENDANT:  Yes.

13           THE COURT:  Okay.

14           So, I'll ask if you could just stand and

15   listen while the clerk administers the oath.

16      (The Defendant is Sworn.)

17           THE COURT:  Thank you, and you can be seated

18   during most of the proceedings, sir.  It goes on for a

19   bit.  I would just ask later that you stand to actually

20   enter the plea.

21           Mr. Hines, what is your full name?

22           THE DEFENDANT:  Craig Nicholas Hines.

23           THE COURT:  Okay.

24           Have you ever used any other names?

25           THE DEFENDANT:  No.

8

1          THE COURT:  Okay.

2          How old are you sir?

3          THE DEFENDANT:  Twenty-six.

4          THE COURT:  And how far in school did you go,

5     sir?

6          THE DEFENDANT:  Eleventh grade.

7          THE COURT:  Okay.

8          And are you currently under the care of any

9     doctor or therapist or clinician of any kind?

10          THE DEFENDANT:  Uh-uh.

11          THE COURT:  Okay.

12          And in the past two days, have you had

13     anything to drink, eat, or ingest, in the way of

14     medication or drug that could affect the clarity of

15     your thinking?

16          THE DEFENDANT:  No.  I just -- Ibuprofen for

17     my leg.

18          THE COURT:  Okay.

19          That wouldn't be a problem.

20          THE DEFENDANT:  All right.

21          THE COURT:  Okay.

22          Do you -- And do you feel clear-headed and

23     able to go through with this proceeding today?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Okay.

9

1           And as far as your leg goes, whatever pain

2   you have, is it not so bad that it would, you know,

3   interfere with your ability to --

4           THE DEFENDANT:  No.

5           THE COURT:  -- to do this?  No problem?

6           THE DEFENDANT:  No problem.

7           THE COURT:  Okay.

8           Have you, Mr. Schaffer, had any difficulty

9   communicating with Mr. Hines in this case?

10          MR. SCHAFFER:  No, Your Honor.

11          THE COURT:  And have you had a chance to

12   discuss the case, as much as you feel was necessary,

13   with Mr. Hines?

14          MR. SCHAFFER:  Yes.

15          THE COURT:  And you think he understands the

16   nature of the charges against him, and all the factors

17   that go into, in your experience, entering a guilty

18   plea?

19          MR SCHAFFER:  Yes.

20          THE COURT:  And, Mr. Hines, have you had any

21   difficulty communicating with your lawyer, Mr.

22   Schaffer?

23          THE DEFENDANT:  No.

24          THE COURT:  Okay.

25          And have you had as much chance as you would

1   like, to discuss the case with him and get his advice?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Okay.

4          And just a follow-up, Mr. Schaffer.

5          I -- Do you have any doubt at all, as to Mr.

6   Hines' competence to enter a plea in the case?

7          MR. SCHAFFER:  No.

8          THE COURT:  Okay.

9          And I take it you've advised him of the

10  maximum possible sentence and fine, and the way that

11  the sentencing guidelines operate these days?

12         MR. SCHAFFER:  Yes.

13         THE COURT:  Okay.

14         All those things?

15         MR. SCHAFFER:  Yes.

16         THE COURT:  Okay.

17         And I take it the two of you, then, have

18  also, of course, gone through the text of the

19  indictment, and the particular penalties that could

20  apply to each of those charges?

21         MR. SCHAFFER:  Yes.

22         THE COURT:  Okay.

23         And you understand the charges in the

24  indictment, Mr. Hines?

25         THE DEFENDANT:  Yes.

11

1          THE COURT:  Okay.

2          And you can be seated too, Mr. Schaffer.

3     It's fine.

4          At this point, I just need to make sure that

5     Mr. Hines understands certain important rights that he

6     would be waiving by pleading guilty and, of course, as

7     you know, foremost on this -- in the system, the

8     prosecution, the government, would have the full burden

9     of proving you guilty beyond a reasonable doubt, and if

10    they couldn't do that, the jury would have the duty to

11    find you not guilty, even if you know that you are

12    guilty.

13         Do you understand that, sir?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Okay.

16         And if you were to plead not guilty, you

17    would be entitled to what we call a "speedy public

18    trial," by a jury, with the assistance of your lawyer

19    on the charges against you.

20         Do you understand that, sir.

21         THE DEFENDANT:  Yes.

22         THE COURT:  And, of course, you would be

23    presumed innocent and, as I said, the government would

24    have to overcome that presumption of innocence and

25    prove you guilty by competent evidence, beyond a

12

1    reasonable doubt.

2          You wouldn't have to prove that you were

3    innocent.  The government would have the burden to

4    prove that you're guilty, and if they couldn't do that,

5    the jury, as I said, would have the duty to find you

6    not guilty, and you indicated you understand that, sir,

7    correct?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.

10          And, of course, at trial, any witnesses for

11   the government would have to come to court and testify

12   in your presence, and your lawyer would have the right

13   to cross-examine those witnesses, as well as to object

14   to any other evidence the government introduced, if he

15   felt there was a basis for objecting.

16          Do you understand those rights, sir?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And those rights, like the other

19   rights I just discussed, are things that you would be

20   waiving by pleading guilty.

21          Do you understand, sir?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Okay.

24          Now, at -- if there were a trial, you could

25   testify if you wanted to, but you wouldn't have to, and

1   under the Constitution, as I said, you could not be

2   forced to take the witness stand and say anything that

3   could be used to show that you are guilty.

4           If there were a trial and you decided not to

5   testify, the Court would instruct the jury that they

6   could not hold that against you.

7           Do you understand, sir?

8           THE DEFENDANT:  Yes.

9           THE COURT:  Okay.

10          And also, if there were a trial, you would

11  have the right to present evidence in your defense,

12  including requiring witnesses to testify for you, and

13  again, if you chose not to present any evidence or call

14  any witnesses, the jury would be instructed that they

15  could not hold that against you.

16          Do you understand those rights, sir?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And those are the things you'd be

19  waiving by pleading guilty.

20          Do you understand that, sir?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Okay.

23          Now, if you do decide to plead guilty, I'll

24  have to ask you some questions myself, to satisfy

25  myself that you are, in fact, guilty of the charges,

14

1   and you'll have to answer those questions, and by doing

2   that, you would be acknowledging your guilt and giving

3   up that right not to say anything that could be used to

4   show you are guilty, what we call that "right against

5   self-incrimination."

6          Do you understand that you'd be giving up

7   those rights, sir?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.

10          And if you -- So, if you go ahead and plead

11   guilty and the plea is accepted, you will have given up

12   the constitutional rights to trial and the other rights

13   I've just discussed, so there wouldn't be a trial, and

14   the Court would simply enter a judgment of guilty on

15   the basis of your guilty plea.

16          Understanding that, sir, are you willing to

17   go ahead?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Okay.

20          Now, I know that there's a written plea

21   agreement and an up-to-dated copy -- up-to-date copy

22   has been provided to the Court, and at this point,

23   before I ask you, you know, whether you've read it all,

24   and have you signed it, I'm just going to ask counsel

25   for the government, in this case Ms. Dike for the

1    government, to outline on the record, the essential

2    terms of that agreement, and then I'll ask you some

3    more questions.

4            MS. DIKE:  Yes, Your Honor, Thank you.

5            The agreement -- In the agreement, Mr. Hines

6    has agreed to plead guilty to three counts of an

7    indictment, dated May 3rd, 2005.

8            Count I, which states that he is a felon in

9    possession of a firearm, in violation of 18 U.S.C.

10   922(g)(1) and 924(e); Count II, possessing with intent

11   to distribute more than five grams of crack cocaine;

12   and Count III, charging him with using, carrying, and

13   possessing a firearm during or relation to, and in

14   furtherance of the drug offense outlined in Count II.

15           Would you like me to go through the

16   penalties?

17           THE COURT:  Yes.  Uh-huh, and, of course, the

18   plea agreement outlines the elements of the offense,

19   and I'll go through that a little bit later and, yes,

20   if you could -- Well, I'll go through the penalties.

21   I'll do that myself, and then if you could then proceed

22   with the rest of the essential terms.

23           MS. DIKE:  Yes, Your Honor.

24        (Pause.)

25           MS. DIKE:  Mr. Hines has agreed to -- agreed

16

1    that he qualifies as an armed career criminal, and that

2    his offense is -- his date offense is dated February

3    5th, 1996 for a sale of a hallucinogen and narcotics,

4    and the offense is dated October 22nd, 1997, for

5    robbery in the third degree and conspiracy to commit

6    assault, second degree, go towards that qualification.

7             He's also agreed that there'll be neither a

8    downward nor upward departure from the sentencing

9    range, that none is warranted, but he will not appeal

10   nor collaterally attack the sentence imposed if it does

11   not exceed three hundred and twenty-seven months of

12   imprisonment, and he understands that the government

13   will not appeal the sentence if it is within or above

14   the sentencing range.

15            We've agreed that the government will not

16   file a second offender notice under 21 U.S.C. 851, and

17   we've agreed not to take any position on where, within

18   the sentencing range, his sentence should fall.

19            THE COURT:  What about acceptance of

20   responsibility and -- what's the agreement on that?  If

21   you could just outline the understanding of it.

22            MS. DIKE:  We've agreed on a three-level

23   decrease.

24            His initial offense level was thirty-four,

25   but with his acceptance of responsibility, he now falls

17

1    on level thirty-four.

2            So, the initial was thirty-seven.  He now

3    falls within level thirty-four, and --

4            THE COURT:  Okay.

5            MS. DIKE:  I'm sorry?

6            THE COURT:  Okay.

7            MS. DIKE:  And finally, the government agrees

8    that this plea agreement satisfies his federal criminal

9    liability as it pertains to the three-count indictment.

10           I'm sorry, there are actually a couple more

11   things, if I may.

12           The defendant also waives his right to post-

13   conviction DNA testing of physical evidence, and he

14   also understands with this plea agreement, that the

15   guilty plea may result in his being deprived of certain

16   federal benefits and rights.

17           THE COURT:  With respect -- Again, just to

18   make sure that, as far as waiving any appellate rights,

19   what' the -- is the right of appeal only with respect

20   to the sentence?

21           MR. DIKE:  Yes, Your Honor.

22           THE COURT:  Okay.

23           What --

24           MS. DIKE:  As long as it --  He agrees not to

25   appeal as long as it does not exceed three hundred and

18

1     twenty-seven months, and we -- the government agrees

2     not to appeal as long as it is within that sentencing

3     range.

4             Oh, I'm sorry, and it also covers the

5     conviction as well as the sentence.  My apologies.

6             THE COURT:  And I take it, also, that there's

7     been a waiver of right to challenge the use of prior

8     convictions to enhance the sentence?

9             MS. DIKE:  Yes, Your Honor.

10            THE COURT:  Okay.

11            Now, let -- Okay.  Now, the charges against

12    Mr. Hines are set forth in three counts.

13            Count I, the central elements are the

14    defendant was a convicted felon, and that he knowingly

15    possessed a firearm, and that the firearm had traveled

16    in interstate commerce.

17            Count I carries a mandatory minimum penalty

18    of fifteen years of imprisonment, a maximum penalty of

19    life in prison.

20            There's Count II, which -- and the elements

21    of that are that the defendant knowingly possessed a

22    controlled substance, that the controlled substance

23    was, in fact, five grams or more of crack cocaine, and

24    that the defendant intended to distribute the

25    controlled substance.

1          Count II carries a mandatory minimum penalty

2    of five years of imprisonment, a maximum of forty

3    years.

4          Count III has two essential elements: That

5    the defendant committed the drug offense outlined above

6    in Count II, and that he knowingly carried a firearm

7    during, and in relation to, the activity at issue in

8    Count II, or knowingly possessed the firearm in

9    furtherance of the activity outlined in Count II.

10         Count III carries a mandatory minimum of five

11   years of imprisonment, to be served consecutively to

12   any term of imprisonment imposed on the other counts of

13   conviction, or for any other conviction.

14         There could be a term of supervised release

15   upon a completion of any term of imprisonment.

16         On Counts I and III, the defendant could

17   receive up to five years of supervised release.

18         On Count II, could be up to four years to

19   life of supervised release, and if there is supervised

20   released -- release imposed as part of the sentencing

21   in the case, any violation of conditions of supervised

22   release during its term, could require the defendant to

23   serve a further term of imprisonment of up to five

24   years, equal to the period of the supervised release,

25   with no credit for the time already spent on release --

1   on supervised release.

2          There's an alternative fine provision that's

3   outlined in the plea agreement.  There's a maximum fine

4   that might be imposed under Count I, of two hundred and

5   fifty thousand; Count II, two million; and Count III,

6   two hundred and fifty thousand; special assessment of a

7   hundred dollars on each count; and the plea agreement

8   explains how interest would be assessed on any fine.

9          Restitution could be a part of the sentencing

10  format if there are any victims of the offense conduct

11  under 18 U.S.C. Section 3663(a), and as a rider

12  concerning restitution also, the defendant agrees to

13  forfeit to the United States, all firearms and

14  ammunitions involved in the commission of the offense,

15  and if -- and the material at issue is outlined in the

16  plea agreement itself.

17         Under the forfeiture provision of the plea

18  agreement, the defendant waives any rights or cause of

19  action to claim he is a substantially prevailing party,

20  for purposes of recovery of attorney's fees and other

21  costs.

22         Now, -- Well, it's been said orally, as sort

23  of a summary of the full terms of the plea agreement

24  which governs, but let me ask Mr. Schaffer, what's been

25  discussed here in Court, is that consistent with your

1    understanding of the plea agreement, as well?

2              MR. SCHAFFER:  Yes.

3              THE COURT:  And have you had a chance to go

4    over the full text of the plea agreement with Mr.

5    Hines?

6              MR. SCHAFFER:  Yes.

7              THE COURT:  Mr. Hines, do you feel you've

8    gone over this detailed plea agreement sufficiently,

9    with your lawyer, in order to go ahead and sign it?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Okay.

12             And are you prepared to sign that plea

13   agreement, sir?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Has anyone made any promises to

16   you to make you plead guilty, other than what's

17   included in this plea agreement?

18             THE DEFENDANT:  No.

19             THE COURT:  Has anyone made any threats

20   against you, to coerce you to plead guilty or force you

21   to plead guilty?

22             THE DEFENDANT:  No.

23             THE COURT:  Okay.

24             Oh, if you could speak a little bit louder,

25   as well, sir?

1          THE DEFENDANT:  No.

2          THE COURT:  Okay.

3          And are you pleading guilty today of --

4   voluntarily, and of your own free will?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Okay.

7          And -- Then the two of you could go ahead and

8   execute the plea agreement.

9       (Pause.)

10          MR. SCHAFFER:  Your Honor, there's also a

11   stipulation --

12          THE COURT:  Stipulation of offense conduct.

13          MR. SCHAFFER:  -- of offense conduct, and

14   with the Court's permission, we'll sign that at the --

15          THE COURT:  Okay.

16          MR. SCHAFFER:  -- same time, and -- or if --

17          THE COURT:  Okay.

18          MR. SCHAFFER:  Does the Court wish to --

19          THE COURT:  And, Mr. Hines, have you also

20   gone over what that sheet that's called the

21   "Stipulation of Offense Conduct" what outlines what the

22   government says happened in this case?  What you did?

23          THE DEFENDANT:  Yes, we read this.

24          THE COURT:  Okay.

25          And you're prepared to sign that voluntarily

23

1   and of your own free will, too, as well, sir?

2           THE DEFENDANT:  Yes.

3           THE COURT:  And that's something you've gone

4   over with your lawyer ahead of time?

5           THE DEFENDANT:  Yes.

6           THE COURT:  Okay.  Thank you.

7           You can execute that, as well.

8       (Pause.)

9           MR. SCHAFFER:  May I approach?

10           THE COURT:  Yes, thank -- Has Mr. Nardini --

11           MR. SCHAFFER:  He signed.

12           THE COURT:  He signed, as well?

13           MR. NARDINI:  Yes, Your Honor, I did before

14   this proceeding.

15           THE COURT:   Okay.

16           The stipulation of offense conduct and the

17   plea agreement have been properly executed by

18   representatives of the U.S. attorney's office and the

19   -- and by the defendant, here in open court, and I'll

20   go ahead and have that filed with the clerk.  Thank

21   you.

22           Excuse me.  Thanks.  Okay.

23           UNIDENTIFIED SPEAKER:  Bless you.

24           THE COURT:  I wonder how that will show up on

25   the transcript, but thanks.

1          Now, just a few words about the guidelines.

2    As outlined in the plea agreement, the sentencing

3    guidelines are not mandatory, but they are advisory,

4    and the Court is required to consider any applicable

5    sentencing guidelines, as well as other factors

6    enumerated in the statute, and to tailor an appropriate

7    sentence, and you need to understand that the

8    sentencing guideline determinations will be made by the

9    Court by a preponderance of the evidence, based upon

10   input from you and your lawyer, and also from the

11   government and the U.S. probation office.

12          If the sentence or the guideline application

13   determined by the judge turns out to be different than

14   what you hope or expect, that wouldn't be a basis for

15   withdrawing the guilty plea.

16          Do you understand that, sir?

17          THE DEFENDANT:  Say that again?

18          THE COURT:  Okay.

19          If your guideline determination -- your

20   sentencing guideline determination -- and this is

21   complicated for lawyers too, but if it turns out to be

22   different than what you expect it to be, --

23          THE DEFENDANT:  Yeah.

24          THE COURT:  -- that, in and of itself,

25   wouldn't be a basis for withdrawing your guilty plea.

1        Do you understand that, sir, --

2        THE DEFENDANT:  I --

3        THE COURT:  -- that no one can tell you

4   exactly what your guideline application will be.

5   That's going to -- You can have an understanding from

6   your lawyer, what he expects it to be and what the

7   government expects it to be, but ultimately, it's the

8   decision for the judge who will be imposing sentence,

9   Judge Underhill.

10        Do you understand that, sir?

11        THE DEFENDANT:  Okay.  So you're saying that,

12   like they might say that I'm doing a certain --

13        MR. SCHAFFER:  Sir, let me just talk --

14        THE COURT:  Sure.

15   (Pause.)

16        THE DEFENDANT:  I understand.

17        THE COURT:  You do understand?

18        THE DEFENDANT:  I understand.

19        THE COURT:  Okay.

20        Mr. Schaffer, do you want to put on the

21   record what you explained to your client, sir?

22        MR. SCHAFFER:  Yes, Judge.

23        We've -- We have talked about it, but we

24   talked about the fact that the -- we had actually --

25   it's a detailed plea agreement where the government and

26

1    I stipulated to what we believe the guideline range,
2    based on looking at all the individual facts, --
3              THE COURT:  Uh-huh.
4              MR. SCHAFFER:  -- based -- looking at my
5    client's record, and all of the relevant factors in
6    this case; however, that notwithstanding the fact that
7    the government believes that this would be the
8    appropriate guideline range, and I believe it based on
9    all of that research, that ultimately it's up to the
10   trial court, after input from probation, et cetera, and
11   that if somehow the trial court believes it's different
12   -- I'm sorry, the sentencing judge believe it's
13   different than what we've anticipated, that the plea is
14   still in effect, you can't just take it back, and he --
15             THE COURT:  Right, and that --
16             MR. SCHAFFER:  -- my client understands
17   that.
18             THE COURT:  That's the correct way to explain
19   it.
20             Do you understand that, sir?
21             THE DEFENDANT:  I understand it like a little
22   bit.  I really, really didn't understand it, but I
23   understand it a little bit.
24             THE COURT:  Well, let me -- Just to make sure
25   that you do understand sufficiently.

1           That basically, your lawyer can give you his

2    best prediction of what the Court's going to decide the

3    guideline application will be, and that's what he's

4    done, but ultimately, it's the Court itself that makes

5    the decision, and your lawyer's prediction and the

6    government's understanding, as well, could turn out to

7    be wrong.

8           The Court could disagree, and ultimately,

9    it's only the judge who's going to decide what your

10   guideline application would be, and therefore, also

11   only the judge could tell you, and will at your

12   sentence -- at your sentencing, what your actual

13   sentence is going to be.

14          THE DEFENDANT:  All right.

15          Could I ask you something?

16          THE COURT:  Sure.

17          Why don't you ask Peter first?

18      (Pause.)

19          THE COURT:  You know what we're going to do?

20   We're going to take a recess, --

21          MR. SCHAFFER:  Okay.

22          THE COURT:  -- 'cause -- Yeah.

23          MR. SCHAFFER:  I'm sorry, Judge.

24          THE COURT:  Yeah, and either we're going to

25   get this done by 3;45 or we're going to have to do it

1    another time.

2         MR. SCHAFFER: Okay.

3         THE COURT: So, -- Yeah, that -- Yeah.

4         So, if there's a fundamental problem, I'm not

5    going to, you know, just rush through a guilty plea.

6         MR. SCHAFFER: Oh, no, Judge, no, and in no

7    way is Mr. Hines being -- I think he's having a genuine

8    --

9         THE DEFENDANT: Could I speak with him, sir?

10        THE COURT: You should really talk -- Before

11   you say anything in open court on the record, you

12   should really run it by your lawyer, and basically,

13   there's nothing tricky about what I'm doing.

14        This is part of every single guilty plea in

15   the country, is that every defendant needs to be told

16   that even though his lawyer and the government's lawyer

17   may figure out what they believe the guideline result

18   will be, ultimately, it's the Court that makes that

19   decision, and everybody who pleads guilty needs to

20   understand that if the Court doesn't agree with what

21   their lawyer or the government predicts, that, in and

22   of itself, is not a basis for withdrawing a guilty

23   plea, and your plea agreement does include a provision

24   that would allow you to appeal, under certain limited

25   circumstances, and that's -- or collaterally attack, in

29

1    a different kind of proceeding, a sentence imposed that

2    exceeds three hundred and twenty-seven months of

3    imprisonment, and it -- that -- so that's provided in

4    the plea agreement, as well.

5              It's also provided that the government would

6    not appeal a sentence imposed within the stipulated

7    range that's outlined in this agreement.

8              So, there is some degree of appellate rights

9    preserved, with respect to the length of a sentence

10   that exceeds a certain amount, and I should just

11   mention that, as well.

12             But with respect to all that's mentioned here

13   in the plea agreement about the guideline range, your

14   lawyer and the government lawyer are very experienced

15   in this, and this is their understanding of it, but

16   everybody needs to know that ultimately, it's the judge

17   who imposes the sentence, whose determination counts.

18   He's the one who makes the final decision.

19             That's, in essence, what you were explaining,

20   correct, Peter -- Mr. Schaffer?

21             MR. SCHAFFER:  Yes.

22             THE COURT:  Right.  Okay.

23             Do you need to take a --

24             THE DEFENDANT:  Could I ask you something?

25             The way you say it to me, I understand it

30

1   better then.

2          MR. SCHAFFER:  Okay.

3          THE COURT:  Okay, but the way I -- they way I

4   just explained it though, do you understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Okay.

7          THE DEFENDANT:  I understand you said I could

8   appeal it, like, right?  Appeal it mean, like, if I --

9   if -- like say I want take it -- took the plea today,

10  then I could --

11         THE COURT:  Uh-huh.

12         THE DEFENDANT:  -- sign another piece of

13  paper, or something, and go back on my word, right,

14  about appealing it, --

15         THE COURT:  Yeah, you -- Yes, you --

16         THE DEFENDANT:  -- appealing guilty, or

17  something like that?

18         THE COURT:  You could only appeal it if the

19  sentence exceeds --

20         MR. SCHAFFER:  If we're wrong about the

21  range.

22         THE DEFENDANT:  Oh, okay.

23         THE COURT:  -- if it exceeds three hundred

24  and twenty-seven months.

25         THE DEFENDANT:  All right.

31

```
 1              THE COURT:  Yes.  Okay.

 2         Do you understand that?

 3              THE DEFENDANT:  Yeah, I understand.

 4              THE COURT:  Okay.

 5              And now do you understand what I'm saying

 6    about the -- all the guidelines -- I know it's

 7    complicated, and I could understand, I don't blame you,

 8    it's just that in -- your lawyer's done a good job and

 9    the government's lawyer's done a good job outlining it,

10    but ultimately, it's Judge Underhill who will decide

11    what the final result would be, and what the actual

12    sentence would be.

13              Do you understand that?

14              THE DEFENDANT:  Yes.

15              THE COURT:  And likewise -- Well, neither the

16    government nor your lawyer would be asking the judge to

17    do any sort of departure from what the guideline

18    determination would be.

19              Whether there would be a departure or not,

20    that's up to Judge Underhill.  He has to make that

21    decision after he hears from your lawyer, the

22    government's lawyer, and the probation office.

23              Do you understand that, sir?

24              THE DEFENDANT:  Yes.

25              THE COURT:  Okay.
```

32

1          MR. NARDINI:  Your Honor, and if I may, just

2     to clarify one thing so it's clear for Mr. Hines, the

3     distinction between withdrawing a plea and appealing,

4     there's -- because Mr. Hines is describing what -- if

5     he could sign a paper and go back on his decision, that

6     under -- the plea agreement provides that if Mr. Hines

7     were to get a different sentence from the one he

8     expected, he could not withdraw his guilty plea, --

9          THE COURT:  Right.

10         MR. NARDINI:  -- and the appellate rights

11    might or might not go to whether he could withdraw his

12    plea or he could challenge the sentence, but as far as

13    the plea agreement is concerned, it foresees that he

14    couldn't withdraw his guilty plea, --

15         THE COURT:  That's correct.

16         MR. NARDINI:  -- and go back to a jury trial

17    if --

18         THE COURT:  That's right.

19         MR. NARDINI:  -- if he got a sentence that he

20    didn't expect.

21         THE COURT:  The appeal would only be with

22    respect to his sentence.

23         MR. NARDINI:  Arguably.  There might be

24    circumstances in which he could claim that he could

25    withdraw his guilty plea, but under the plea agreement,

33

1  it says he can't.

2          So, that's what's foreseen in the plea

3  agreement.

4          THE DEFENDANT:  See, now -- See, the way he's

5  saying it to me, I really, really understand it, Your

6  Honor, like the way he saying it, --

7          THE COURT:  Yeah.

8          THE DEFENDANT:  -- you know, understand it.

9          THE COURT:  You understand that, sir?

10          THE DEFENDANT:  Yes.

11          THE COURT:  And understanding that you wish

12  to go ahead, sir, with the change of plea and plead

13  guilty?

14          THE DEFENDANT:  Yeah, I still do want to

15  plead guilty.

16          THE COURT:  Okay.

17          I think that's sufficient.  I think that was

18  very helpful.  Yeah.  Okay.

19          Now, I've gone over the elements of the

20  offense as outlined in the plea agreement.  What I'm

21  going to ask now, is counsel for the government to go

22  over what the government would establish at trial to

23  show that Mr. Hines is, in fact, guilty, that he did

24  commit all the elements of the offenses to which he

25  would be pleading guilty.

34

1          MS. DIKE:  Yes, Your Honor.

2          The government and Mr. Hines stipulate and

3     agree that from December 24th, 2004, through January 20

4     -- sorry, January 15th, 2005, Mr. Hines knowingly

5     possessed a firearm -- firearm, specifically, and Excam

6     gun, which was manufactured in Italy and had,

7     therefore, been transported in interstate and foreign

8     commerce;

9          that on the evening of January 15th, 2005, he

10    was in apartment on the third floor of 518 George

11    Street, New Haven, and at that time, he knowingly

12    possessed this Excam gun; and

13         that when police entered the building, the

14    gun was loaded, with the safety off, with one round

15    chambered, and six round -- rounds in a magazine.

16         Upon hearing the police enter the building,

17    he attempted to hide the gun on the roof outside a

18    window, but then later took it in and then hid it --

19    and hid the gun in the back of a small refrigerator.

20         The government would also establish that he

21    knowingly possessed a .32 caliber magazine containing

22    additional rounds of ammunition, and that he further

23    knowingly possessed and stored, in his anus, four small

24    clear plastic bags containing a total of eighty-eight

25    individually wrapped items of crack, totaling twenty-

35

1    eight grams, and that he intended to sell these drugs,

2    and carried a gun to protect himself from robberies in

3    connection with his drug sales.

4           The government would also establish, and Mr.

5    Hines has stipulated, that on February 5th, 1996, and

6    October 22nd, 1997, respectively, he was convicted of

7    the following felonies under Connecticut state law,

8    which were both punishable by imprisonment for a term

9    exceeding one year, and that he was therefore a

10   convicted felon at the time that he knowingly possessed

11   the Excam gun.

12          The first was the sale of

13   hallucinogen/narcotic; the second  -- So, the first

14   offense for a sale of hallucinogen was the February

15   5th, 1996 felony, and the 9th -- October 22nd, 1997

16   felonies were larceny, second degree; robbery, third

17   degree; failure to appear; and first degree and

18   conspiracy to commit assault, second degree.

19          That's the stipulation of offense conduct,

20   but the government also has other conduct which the

21   defendant has not stipulated to, but the government

22   would like to bring to the Court's attention.

23          THE COURT:  Uh-huh.

24          MS. DIKE:  As stated, the defendant has

25   stipulated that from December 24th, 2004, through

36

1    January 15th, 2005, he knowingly possessed a Excam gun.

2              Oh, he has not stipulated, but the government

3    notes that on December 24, 2004, Hines -- Mr. Hines

4    approached three men outside Pop's Grocery Store --

5              MR. SCHAFFER:  Could I just have one moment

6    with the government just --

7              THE COURT:  Yeah.

8              MR. SCHAFFER:  -- to get --

9              THE COURT:  If this is not --

10             MR. SCHAFFER:  -- because that's -- Yeah.

11             THE COURT:  -- if it's not essential, I'm not

12   sure I'd go there.

13             MS. DIKE:  Okay, Your Honor.

14             Government --

15             THE COURT:  Okay.

16             MS. DIKE:  -- is fine with that.

17             THE COURT:  Okay.

18             Mr. Hines, let me go over a couple of things

19   that -- and let me ask you myself, a couple of

20   questions.

21             Is it true that this winter, back in December

22   and January of -- December of last year, 2004, and

23   January of this year, 2005, that you did knowingly

24   possess a .32 caliber semi-automatic handgun?

25             THE DEFENDANT:  Yes.

37

1      THE COURT:  Okay.

2      And do you have any reason to doubt the

3  government's claim that that handgun was manufactured

4  in Italy, and transported into this country at some

5  point?

6      THE DEFENDANT:  Uh-uh.  No.

7      THE COURT:  Okay.

8      You would -- You have no reason to disagree

9  with that, I take it.

10      Correct, sir?

11      THE DEFENDANT:  Say that again.

12      THE COURT:  That -- The government has

13  determined that that handgun was manufactured in Italy

14  and, at some point, brought into this country, not by

15  you, but at some point it was brought into this

16  country.

17      THE DEFENDANT:  Yeah.

18      THE COURT:  You understand that, sir?

19      THE DEFENDANT:  Yes.

20      THE COURT:  Okay.

21      You have no reason to doubt that, right?

22      THE DEFENDANT:  No.

23      THE COURT:  Okay.

24      And back on January 15th of this year, were

25  you over at 518 George Street in New Haven?

38

1             THE DEFENDANT:  Yes.

2             THE COURT:  Okay.

3             And at that time, did you have that gun with

4      you?

5             THE DEFENDANT:  Yes.

6             THE COURT:  Okay.

7             And that gun, at the time, was loaded and it

8      had a round in the chamber, and some other rounds in

9      the magazine.

10            Is that correct, sir?

11            THE DEFENDANT:  Yes.

12            THE COURT:  Okay.

13            And at the time, you also possessed and had

14     on your person or -- four plastic bags that had -- that

15     appears to be eighty-eight wrapped items of crack?

16            THE DEFENDANT:  Yes.

17            THE COURT:  Okay.

18            And you don't have any reason, I take it, to

19     doubt the government's claim that that crack totaled,

20     when they weighed it, twenty-eight grams?

21            THE DEFENDANT:  I don't know about that.

22            THE COURT:  Do you have any reason to

23     disagree with that, though?

24            THE DEFENDANT:  I don't know.  It should be

25     in my paperwork.

1          THE COURT:  Okay, but if the government

2    weighed it and came up with twenty-eight grams, you

3    don't have any reason to disagree with that, I take it?

4          THE DEFENDANT:  No.

5          THE COURT:  Okay.

6          And at the time, back on January 15th of this

7    year, you did intend to sell those drugs.

8          Is that correct, sir?

9          THE DEFENDANT:  Yes.

10          THE COURT:  And you were carrying a gun to

11    protect yourself, at the time, from being robbed in

12    connection with your drug sale; is that correct?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Okay.

15          And long before this happened, back in 1996

16    and 1997, you had been convicted of some felonies under

17    Connecticut law, involving the sale of drugs, and

18    larceny and assault; is that right?

19          THE DEFENDANT:  I don't really remember

20    those.

21          THE COURT:  You may not remember the

22    particular dates or the particular charges, but it --

23    do you agree that back in the '90s, you had been

24    convicted of certain state felonies involving either

25    drugs or robbery and assault?

40

1          THE DEFENDANT:  I ain't really seen all -- I

2     didn't see all these like.  I didn't see all these.  I

3     only got certain things.

4          MR. SCHAFFER:  Judge, I just need one second.

5     I did --

6          THE COURT:  Sure.

7          MR. SCHAFFER:  I did provide my client with

8     copies of his criminal record and we went over his

9     individual convictions; however, again, as they are

10    somewhat attenuated in time, he may --

11         THE COURT:  Right.

12         MR. SCHAFFER:  -- he may not remember

13    exactly.

14         THE COURT:  Well, do you remember though,

15    that before this year, you had been convicted of some

16    felonies and -- in state court in Connecticut?  You

17    were in prison?

18         THE DEFENDANT:  When, this year?

19         THE COURT:  No, earlier.

20         You had served some time in prison in

21    Connecticut, right?

22         THE DEFENDANT:  Not this year.

23         THE COURT:  No, no, no, not this year.  Back

24    in the'90s, a few years ago.

25         THE DEFENDANT:  Yeah.

41

1                THE COURT:  Okay.

2                And that was because you had been convicted

3    of certain felonies that are outlined here in this plea

4    agreement; is that right?

5                THE DEFENDANT:  Yeah.

6                THE COURT:  Okay.  That's fine.  I just

7    needed -- and I think that -- And I know you heard the

8    lawyer for the government, or the law student intern, I

9    should say, for the government, outline what the

10   government believes happened in this case.

11               Do you basically agree with what she said

12   happened?

13               THE DEFENDANT:  Yes.

14               THE COURT:  Okay.

15               Well, I think we've covered all the essential

16   elements, and I just wanted to make sure, and that's

17   something that's part of any guilty plea.

18               You understand, sir.

19               THE DEFENDANT:  Yes.

20               THE COURT:  Okay.

21               Now, at this point, I were to have Mr. Hines

22   stand and enter a guilty plea.

23               Now, let me ask you, Mr. Schaffer, have you

24   and Mr. Hines discussed whether he would waive the

25   clerk of court reading out the whole text of the

42

1    indictment?

2            MR. SCHAFFER:  Yes.  We -- I mean, we've had

3    -- I've provided Mr. Hines with copies of the

4    indictment and he has it, and we've read through it a

5    number of times, so he knows what's in there, right?

6        (Mr. Schaeffer and the Defendant confer.)

7            MR. SCHAEFFER:  Judge, can we have five

8    minutes?

9            THE COURT:  Yeah, sure.

10           We'll recess for a few minutes, Thanks.

11       (Recess.)

12                          AFTER RECESS

13           THE COURT:  Thank you.

14           Mr. Hines, we just took a recess for a few

15   minutes.

16           Have you had a chance to speak to Mr.

17   Schaffer?

18           THE DEFENDANT:  And I'm straight.

19           THE COURT:  Okay.

20           And have you had a chance to have any

21   questions or any concerns you have discussed with Mr.

22   Schaffer?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Okay.

25           Do you feel that you've had enough chance to

43

1    discuss things with Mr. Schaffer to go ahead?

2              THE DEFENDANT:  Yeah.

3              THE COURT:  Okay.

4              And let me just ask you sir, are you

5    satisfied with the representation you've received in

6    this case from Mr. Schaffer?

7              THE DEFENDANT:  Yeah.

8              THE COURT:  Okay.

9              And at this point, do you need anymore time

10   before we go ahead and have you enter a plea?

11             THE DEFENDANT:  No, I'm all right.

12             THE COURT:  Okay.

13             Well, what I'll do at this point is ask that

14   you just remain standing and listen while the clerk

15   puts you to plea on the three counts in the indictment.

16             THE CLERK:  Should I read the whole

17   (inaudible)?

18             THE COURT:  Sure.

19             THE CLERK:  United States District Court,

20   District of Connecticut, Grand jury, N0-51:

21             "United States of America v. Craig Hines."

22             Case Number 3:05-CR-118 (SRU).

23             Violations:  18 U.S.C., Section 922(g)(1),

24             possession of a firearm by a convicted felon;

25             21 U.S.C. Section 841(a)(1) and 841(a)(1)(B),

1    possession with intent to distribute more

2    than five grams of cocaine base; 18 U.S.C.

3    924(c)(1), possession, use and carrying of

4    firearm during, in relation to, and in

5    furtherance of drug offense; 18 U.S.C.

6    Section 924(d), forfeiture.

7    Indictment.  The grand jury charges Craig

8    Hines, the defendant herein, as follows:

9    Count I.  On or about December 24th, 2004,

10   through on or about January 15th, 2005, in

11   the District of Connecticut, Craig Hines, the

12   defendant herein, having been convicted in

13   Connecticut Superior Court, on or about the

14   following dates, for the following offenses.

15   The date: February 5th, 1996.

16   The offense: Sale of hallucinogen narcotic.

17   Connecticut General Statutes 53a-48.

18   October 22nd, 1997, larceny, second degree,

19   Connecticut General Statues, Section 53a-

20   123.  Robbery, third degree, Connecticut

21   General Statutes, Section 53a-136); failure

22   to appear, first degree, Connecticut General

23   Statutes, Section 53a-172; conspiracy to

24   commit assault, second degree, Connecticut

25   General Statutes, Section 53a-48, 53a-61, all

45

1            of which crimes are punishable by

2            imprisonment for a term exceeding one year,

3            did knowingly possess, in and affecting

4            commerce, a firearm; that is, an Excam Army

5            Tanfoglio Giuseppe .32 caliber semi-automatic

6            handgun, Serial Number C61224, which has been

7            transported in interstate and foreign

8            commerce, all in violation of Title 18,

9            United States Code, Section 922(g)(1) and

10           924(a)(2), and 924(e).

11           THE COURT:  What is your plea to Count I,

12   sir?

13           THE DEFENDANT:  Guilty.

14           THE COURT:  Okay.  Thank you, sir.

15           THE CLERK:  Count II.

16           On or about January 15th, 2005, in the

17           District of Connecticut, Craig Hines, the

18           defendant herein, knowingly and intentionally

19           possessed with intent to distribute, more

20           than five grams of a compound, mixture or

21           substance containing a detectable amount of

22           cocaine base, a Schedule II controlled

23           substance, all in violation of Title 21,

24           United States Code, Sections 841(a)(1) and

25           841(b)(1)(B).

46

1          THE COURT:  And, sir, what is your plea to

2     the Count II?

3          THE DEFENDANT:  Guilty.

4          THE COURT:  Thank you, sir.

5          THE CLERK:  Count III.

6          On or about January 15th, 2005, in the

7          District of Connecticut, Craig Hines, the

8          defendant herein, did knowingly use and carry

9          and possess a firearm, more specifically, an

10         Excam Army Tanfoglio Giuseppe .32 caliber

11         semi-automatic handgun, Serial Number C61224,

12         during, in relation to, and in furtherance of

13         a drug trafficking crime; that is, possession

14         with the intent to distribute cocaine base, a

15         Schedule II controlled substance, in

16         violation of Title 21, United States Code,

17         Section 841(a)(1)(B), as more specifically

18         set forth in Count II of this indictment,

19         which is incorporated by reference herein,

20         all in violation of Title 18, United States

21         Code, Section 924(c)(1).

22         THE COURT:  And, sir, what is your plea to

23    Count III?

24         THE DEFENDANT:  Guilty.

25         THE COURT:  Thank you, sir, and you can be

1    seated, sir, thank you, and you too.

2          Thank you, Mr. Schaffer.

3          We don't have to enter a plea on the

4    forfeiture count.

5          Now, I know this took some time today, and

6    I'm glad that we did take the time to allow Mr.

7    Schaffer to speak a little bit extra -- little bit

8    longer with Mr. Hines, and it took a little bit extra

9    time to explain some of the aspects of the plea

10   agreement, and while the defendant did have some

11   questions and did need some things clarified, I do feel

12   that he understands the nature of the proceedings and

13   what he's pleading guilty to, and the consequences of

14   pleading guilty, and I -- and the rights that he's

15   waiving, and I think Mr. Schaffer's done an excellent

16   and thorough job with working with Mr. Hines, and

17   trying to make sure that he understands, and that a

18   plea is properly entered in his best -- and that Mr.

19   Hines properly enters a plea which is in his best

20   interests.

21         I'm going to note that -- on the record, that

22   on the basis of the detailed written plea agreement,

23   which has been executed by counsel and by the

24   defendant, the answers given by the defendant to

25   questions in open court, and further discussion and

1    colloquy that we've had here in court, the remarks of

2    very able defense counsel, and of representatives of

3    the government, I do find that the defendant is

4    competent to plead and capable of entering an informed

5    plea, that he does know his rights to jury trial and

6    other trial-related rights, and he knows the maximum

7    possible sentence and other possible consequences of a

8    guilty plea, and understands the procedure that will be

9    followed for the judge to ultimately determine a

10   sentence.

11          I do find that there is a factual basis for

12   the defendant's plea, and that he is entering the plea

13   voluntarily, knowingly, and of his own free will.

14          Therefore, I'm going to recommend to Judge

15   Underhill that he accept a plea of guilty and that a

16   finding of guilty be entered, in which case the case

17   would be forwarded to the probation department, which

18   would do a presentence report, and that presentence

19   report is a very important part of the sentencing

20   process.

21          Now ordinarily, it's very helpful to a

22   defendant to cooperate with the probation officer in

23   helping him prepare the presentence report, and the

24   same is true of the defendant's family, to give

25   information to the probation officer, but because it is

1    so important, it's also very good for the defendant to

2    make sure that he discusses with his lawyer, all his

3    dealings with the probation department, and all the

4    information that's provided to the probation

5    department.

6           Now, I can give you the dates that we have

7    right now, assuming that Judge Underhill accepts the

8    guilty plea, which calls for disclosure of the

9    presentence report October 25th, and then we would have

10   comments, objections, let's see, would be November 8th,

11   and final disclosure, November 15th, and currently,

12   sentencing is scheduled before Judge Underhill for

13   December 2nd.

14      (The Court and the Clerk confer.)

15           THE COURT:  And I'm not sure exactly what

16   time on December 2nd, but that --

17           THE CLERK:  Three p.m.

18           THE COURT:  Three p.m., here on the fourth

19   floor, and here in -- right up here in Bridgeport,

20   Judge Underhill's courtroom.

21           The -- There's no bond situation to discuss

22   at this point, and I think that's really all we need to

23   do this afternoon.

24           Mr. Nardini, Ms. Dike, anything further from

25   the government?

50

1              MS. DIKE:  Nothing further, Your Honor.

2              THE COURT:  Anything from the defendant?

3              MR. SCHAFFER:  No, Your Honor.

4              Judge, I just -- It has nothing to do with

5     the plea or -- but I did note that it was -- this is a

6     significant plea, and that my client understands that

7     these are very serious charges, and it was very

8     important to him that his family was present, and I

9     would note that in full force, his family came out and

10    was here in support.  He -- I know that he appreciates

11    it --

12             THE COURT:  Right.

13             MR. SCHAFFER:  -- and that the Court

14    acknowledges --

15             THE COURT:  Sure, and it --

16             MR. SCHAFFER:  -- that they're here, as well.

17             THE COURT:  -- speaks well for the defendant

18    and for his family that they came out in significant

19    numbers, four -- I think four of you, to be here with

20    him.

21             THE DEFENDANT:  There's more outside, but

22    they would -- (inaudible) --

23             THE COURT:  Okay.

24             THE DEFENDANT:  -- the baby.

25             THE COURT:  Okay, but it's obviously a very

1   significant proceeding, and I do believe that he was

2   very well served by having Mr. Schaffer assigned to

3   him.

4           It's a very -- It's a -- You know, it's a

5   painstaking process to make sure that a plea agreement

6   is worked out that's appropriate, and I think Mr.

7   Schaffer, as usual, did a very good job, so I

8   appreciate his efforts, as well.

9           Anything to note from the probation

10  department?

11          THE PROBATION OFFICER:  No, Your Honor.

12          THE COURT:  Okay.

13          You don't, at this point, know who actually

14  will be doing the presentence report?

15          THE PROBATION OFFICER:  Yeah, I do.  It's

16  Sandy Hunt.

17          THE COURT:  Okay.

18          THE PROBATION OFFICER:  She's been in touch

19  with the government.  I'm gonna talk to Peter about

20  (inaudible).

21          THE COURT:  Okay.

22          So, Ms. Hunt will be your probation officer

23  for the report.  Okay.  Thank you.

24          I think we're then done for this afternoon.

25          We'll be in recess.  Thank you.

52

1          Good luck to you, sir.  Thank you.

2          MR. NARDINI:  Thank you, Your Honor.

3     (Proceedings concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

53

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.

*Stephen C. Bowles*   October 3, 2006

STEPHEN C. BOWLES

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,   .   Case No. 3:05-CR-00118
.   (SRU)
        Plaintiff,   .
.   Bridgeport, Connecticut
  v.           .   February 17, 2006
.
CRAIG HINES,         .
.
        Defendant.   .
. . . . . . . . . . . . .

SENTENCING HEARING
BEFORE THE HONORABLE STEFAN R. UNDERHILL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:      Office of the U.S. Attorney
By: WILLIAM NARDINI, ESQ.
157 Church Street
New Haven, CT 06510

For the Defendant:     Law Offices
By:  PETER SCHAFFER, ESQ.
1127 High Ridge Road
Suite 330
Stamford, CT 06905

For Probation:        U.S. Probation Office
By:  SANDRA HUNT, USPO
915 Lafayette Boulevard
Bridgeport, CT 06604

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

2

1          (Proceedings commenced.)

2               THE COURT: Good morning.

3               COUNSEL:  Good morning.

4               THE COURT:  We're here for sentencing in the

5     matter of United States v. Craig Hines.

6               Could I have appearances, please?

7               MR. NARDINI:  Yes.  Good morning, Your Honor.

8               Appearing for the United States, my name is

9     William Nardini.

10              I also note for the record that U.S.

11    Probation Officer Sandra Hunt is also present today.

12              THE COURT:  Thank you.

13              MR. SCHAFFER:  Good morning, Your Honor.

14              Peter Schaffer for Mr. Hines.

15              THE COURT:  Good morning.

16              My apologies for being a little late this

17    morning.  We've been looking at an issue that I'll be

18    taking up with you in just a moment, but first let me

19    note that Mr. Hines appeared before Magistrate Judge

20    Garfinkel on August 30th, 2005, and entered a guilty

21    plea to Counts One, Two, and Three of the indictment,

22    charging him with, in Count One, felon in possession of

23    a firearm, in violation of 18 U.S.C., Sections

24    922(g)(1) and 924(e).

25              Second, possession with intent to distribute

3

1  five grams or more of cocaine base, in violation of 21

2  U.S.C., Sections 841(a)(1) and 841(b)(1)(B); and

3         third, possession, use, and carrying a

4  firearm during, in relation to, and in furtherance of a

5  drug offense, in violation of 18 U.S.C., Section

6  924(c)(1).

7         I approved and adopted Judge Garfinkel's

8  findings and recommendation, and accepted the plea on

9  September 9, 2005.

10        A presentence report was thereafter prepared

11  for the Court by the U.S. probation office.  The

12  initial report was dated January 5th, 2006.  I've

13  reviewed that report, as well as the first addendum to

14  the report, also dated January 5th, 2006, and I've

15  consulted with Ms. Hunt, who is the principal author of

16  the PSR.

17        In addition, I have reviewed the defendant's

18  memorandum in aid of sentencing, as well as the letters

19  that are supported -- that are attached to that brief,

20  and in support of Mr. Hines' position.

21        Mr. Schaffer, let me make sure that both you

22  and Mr. Hines have had a chance to read the PSR, and

23  the addendum to the PSR.

24        MR. SCHAFFER:  Yes, Your Honor.

25        THE COURT:  And do you have any objections to

4

1   any of the factual statements set forth there?

2           MR. SCHAFFER:  No.

3           THE COURT:  Very good.

4           Mr. Nardini, has the government had the same

5   opportunity?

6           MR. NARDINI:  Yes, Your Honor.

7           THE COURT:  Any objections?

8           MR. NARDINI:  No, Your Honor.

9           THE COURT:  All right.

10          I'm going to adopt the findings of -- the

11  factual statements of the PSR, as the findings of fact

12  of the Court in this matter, and before turning to the

13  plea agreement, I wanted to raise one issue that I'd

14  like to get counsel's input on, and that is whether --

15  with respect to the second count, whether the mandatory

16  minimums set forth in the plea agreement are accurate

17  or not.

18          It appears to me, under 21 U.S.C., Section

19  841(a) -- excuse me, (b)(1)(B), that Mr. Hines'

20  previous drug conviction, as set forth in paragraph 21

21  of the PSR, makes his mandatory minimums doubled what

22  they otherwise would be for Count One, and it would

23  appear that the mandatory minimum would be ten years

24  imprisonment, a four million dollar fine, and eight

25  years of supervised release.

5

1          MR. NARDINI:  I can speak for that, Your

2     Honor.

3          That would be true if the government had

4     filed an information pursuant to Title 21 U.S.C.,

5     Section 851.

6          The Court is actually only permitted to

7     impose the enhanced penalties based on those prior

8     convictions, if the government files that information

9     pursuant to Section 851.

10         As you'll see on page 6 of the plea

11    agreement, the parties did negotiate, as part of the

12    plea agreement, that the government would not file such

13    an information, and accordingly, the lower mandatory

14    minimums are applicable.

15         THE COURT:  Mr. Schaffer, you agree with

16    that?

17         MR. SCHAFFER:  Yes, Your Honor.

18         THE COURT:  Okay.  All right.  Thank you.

19         I think it's immaterial, in any case, given

20    -- Well, except perhaps, with the mandatory supervised

21    release term that would otherwise apply if the 851 had

22    been filed, because the mandatory minimum imprisonment

23    on Count One is higher even, than the enhanced penalty

24    would be on Count Two.

25         MR. NARDINI:  I think it's correct as to the

6

1    Court's ultimate decision of where the sentence -- It's

2    immaterial.  The only effect it may have is what

3    sentence the Court would have the legal authority to

4    impose as to the 841 count, Count Two.

5         The Court, now, would at least have statutory

6    authority to go lower than it might otherwise go.

7         Of course, the parties have stipulated that

8    they won't seek a departure --

9         THE COURT:  Right.

10        MR. NARDINI:  -- from the guideline range, --

11        THE COURT:  Right.

12        MR. NARDINI:  -- but the only effect would be

13   this Court's legal authority to go below ten years.

14        (Pause.)

15        THE COURT:  Okay.  Thank you.

16        With that clarified, I'm going to accept the

17   plea agreement that was entered into on August 30th,

18   2005, and filed that same day, being satisfied that the

19   agreement and the stipulation of offense conduct, and

20   rider concerning restitution attached to the agreement,

21   adequately reflect the seriousness of the actual

22   offense behavior, and that accepting it would not

23   undermine the purposes of sentencing.

24        We have, as set forth, apparently correctly

25   now, in the plea agreement, the following minimum and

7

1    maximum penalties:

2              For Count One, a minimum term of imprisonment

3    of 15 years, a maximum of life.

4              On Count Two, a minimum of five years and

5    maximum of forty years; and

6              on Count Three, a mandatory five years,

7    consecutive to the imprisonment term set forth in Count

8    Two.

9              The supervised release terms are a minimum of

10   five years on Count One, up to life; four years to life

11   on Count Two, and five years on Count Three.

12             The fine would be a maximum of 250,000 on

13   Count One, two million on Count Two, and 250,000 on

14   Count Three, and there is a $100 special assessment on

15   each count of conviction, for a total of $300.

16             Do either counsel have any correction to that

17   statement of the maximum and minimum penalties in that

18   case?

19             MR. NARDINI:  No, Your Honor.

20             MR. SCHAFFER:  None by defendant.

21             THE COURT:  All right.  Thank you.

22             Obviously, the parties have agreed to the

23   guideline calculation that applies in this case, and it

24   appears to me that the guidelines have been accurately

25   set forth in the PSR, specifically with the application

8

1    of the career offender, and on career criminal

2    provisions, set the base offense level at a 37.

3              I understand the government is making a

4    motion under 3B1.1?

5              MR. NARDINI:  Yes, Your Honor, for the third

6    point for acceptance?

7              THE COURT:  Yes.

8              MR. NARDINI:  Yes, Your Honor.

9              THE COURT:  All right.

10             That motion's granted, and I will award a

11   three-point reduction for acceptance of responsibility,

12   which gives us a total offense level of 34.

13             There is a criminal history category of VI

14   that's applicable under the career offender provisions,

15   and that leads to the following guideline sentencing

16   range:

17             A term of imprisonment of 262 to 327;

18             a supervised release term of five years;

19             a fine of between fifteen thousand and two

20   million dollars; and a mandatory special assessment of

21   $300.

22             Do either counsel have any question to that

23   statement of the sentencing guideline range?

24             MR. NARDINI:  No, Your Honor.

25             MR. SCHAFFER:  No, Your Honor.

1          THE COURT:  All right.  Thank you.  All

2    right.

3          I understand there won't be any motions for

4    downward departure and, therefore, Mr. Schaffer, I'd

5    like to turn to you at this point, and ask you for

6    whatever argument you want to make for an appropriate

7    sentence in the case.

8          MR. SCHAFFER:  Thank you, Your Honor.

9          THE COURT:  Mr. Hines, when your lawyer's

10   finished, I'm happy to hear from you.  You are not

11   required to say anything today, but I'd be interested

12   in hearing whatever you'd like to say, if you choose to

13   speak, and then when the two of you are done, I'll hear

14   from Mr. Nardini.

15         MR. SCHAFFER:  Thank you, Your Honor.

16         Judge, we're joined here -- My client's

17   father, Craig Hines, Sr. is here, and also, I asked

18   that Clinton Roberts is here, who helped me and

19   prepared the sentencing report, interviewed my client

20   and his family on a number of occasions, in case the

21   Court had any questions.

22         It goes without saying, Judge, this is a

23   somber occasion because we're here today, my client is

24   27 years old, and he's here knowing that he faces a

25   sentence that would be equal to, or greater than, the

1   life that he's already lived, and we provided you with

2   the information in this sentencing report, not as an

3   excuse for any of this behavior, he's fully accepted

4   responsibility on a number of occasions, and -- early

5   on in this case, but perhaps for just a little

6   explanation about Mr. Hines, his background, and to

7   support what I would suggest, a sentence at the bottom

8   of 262 months, which I would submit is a very

9   significant sentence, almost 22 years, to this young

10  man.

11          The reason it's such a significant sentence,

12  he understands, is because of his criminal conduct

13  prior to this, the instant indictment, and the conduct

14  that's encompassed by this prosecution, but

15  nevertheless, I suggest that a sentence at 262 months

16  would be sufficient, but not greater than necessary, to

17  comply with all of the goals of sentencing.

18          Now, this was -- this case is somewhat

19  unusual for me, Your Honor, in that because I replaced

20  another lawyer that had a conflict, rather than just

21  meeting my client at the time of his arrest, with a

22  naked indictment, I was -- before I even met with Mr.

23  Hines, I was provided with a very, very large discovery

24  packet by the government, and then the prior file, so I

25  really had an opportunity, before meeting with Mr.

1    Hines the first time, to look into the circumstances of

2    the crime, and I was provided with reports on prior

3    offenses, and needless to say, based on the seriousness

4    of those offenses, and the violent allegations in

5    nature, I had some expectation before I went to meet

6    with Mr. Hines.

7         I can tell you that when I went to meet with

8    him in Northern, he was being held at that time, in

9    Northern Correctional Institute in Connecticut, which

10   is the most secure facility, where they actually take

11   you back into the cell block to conduct the interview.

12   All of that, everything I'd read, and the environment

13   that I was meeting with this young man, within a very

14   short time, the person that I met didn't match, in some

15   respects, everything that I read, and again, I'm saying

16   this without minimizing anything he's done, but early

17   on.

18        My client's never denied responsibility for

19   these acts, or suggested that his behavior was

20   acceptable, but there's things that -- Just in having

21   an initial conversation, there was something about Mr.

22   Hines, and I told him right away that he didn't match

23   that.

24        One of the things that I had heard before I

25   went to go meet him, were tapes of him speaking to his

1    former girlfriend, the mother of his son, who's also a

2    victim of a crime, and the -- he -- the overriding

3    thing that I was left with, was this feeling of, "Are

4    you gonna be there for me when I get out?", knowing

5    that he was facing an astronomical sentence, and he had

6    that same feeling with -- early on with me.

7         After he met me a couple times, his concern

8    was not that he would have to accept responsibility and

9    serve a very long sentence, but he wanted me to assure

10   him that when this was all over, that I would be

11   around, and I certainly hope I will be, but that he

12   could ask me for help, and nobody's ever, you know --

13   In several thousand people that I've represented on

14   criminal cases, nobody's ever asked that, whether 20

15   years from now, if I'd be in my office, if they could

16   call me for help, and I've been on part of three-way

17   conversations with his family, and he has the same

18   feeling that, "Is somebody gonna be there for me?"

19        At the same time, he expressed what I can

20   only -- and I'm not suggesting it's a diagnosis, and

21   I've -- I asked Mr. Roberts and he agreed that we

22   wouldn't try to provide a diagnosis in his sentencing

23   report because we're not qualified, other than the

24   report -- Mr. Roberts did speak to the psychiatrist at

25   his current facility, but in the layman's terms, Mr.

13

1    Hines had this, what I can only describe as "paranoid,"

2    thinking that the people that were close to him, or

3    anyone, were out to get him in some way, and he felt

4    that way about the mother of his child, at different

5    points worried about his parents, people at the

6    facility, and this was at different facilities he went

7    to, and some of them were unexplainable, by anything

8    other than what I think is maybe some untreated or

9    undiagnosed mental issues.

10         Now, I know that he was sent, finally, to

11   where he is at Garner, and he's getting some treatment.

12   He's getting some medication, and he -- Craig indicates

13   that that makes him feel a small amount better, but

14   there was a real dichotomy between this worrying about

15   the people that were around him, and yet needing them

16   intensely.

17         He also has the feeling that he didn't want

18   to be left alone in a jail.  He was worried about it,

19   and now, the one thing he's concerned, Judge, and I'm

20   gonna be sure to ask for, is that he only be -- is that

21   the Court recommends to the Bureau of Prisons that he's

22   housed in a single cell, because he's worried -- he's

23   -- about other people, when he's put in a cell with

24   other people.  That causes him great concern.  He's

25   been in some fights, but --

1      So, he -- Not necessarily -- Usually, people
2  are concerned.  They don't like the plea bargain that's
3  presented to them, especially one here, such as in this
4  case, that talks about a very significant, long
5  sentence.  He's concerned about smaller things.
6      He wants to start serving his sentence so he
7  can get away from where he is.  He wants to be in a
8  single cell.  He doesn't want anybody to bother them
9  (phonetic).
10      He's ready.  He's accepted that he's gonna
11  serve a long sentence, and he hopes he's gonna get some
12  education and training, but he continues to have these
13  concerns, and that -- I guess it's a very long
14  introduction as to why I asked for help, and the Court
15  granted me permission to retain Mr. Roberts, who really
16  looked into my client's past, and I think -- and I
17  would ask that the Court consider the information
18  that's in defendant's sentencing memorandum when
19  determining those factors in 3553(a), that really says
20  that although we have sentencing guidelines, and
21  although they're statutory minimums, you still have to
22  look at the individual, and again, notwithstanding
23  these acts that have been committed by my client, I do
24  believe that he is in need of a very thorough
25  evaluation, and I'm hoping that during that

15

1    significantly long period of incarceration that he has

2    to receive, that he will get some treatment.

3         Again, I think that as sort of a stop-gap,

4    the Connecticut Department of Corrections put him in

5    Garner in a special facility where they do medicate

6    him, but I'm not really sure that they -- they've done

7    the type of evaluation that I'm hopeful, and I think

8    that the Bureau of Prisons is better suited to do.

9         So, I think that there's more than meets the

10   eye.  If you just look at the offenses here, they do

11   present, and I've talked about it with my client, over

12   and over, they do present very serious, unacceptable

13   criminal conduct, but I think, again, not as an excuse,

14   but some explanation as to how this person that had

15   loving parents, although from a broken family, how he

16   got to this stage here, which is really very

17   unfortunate, that a relatively young person is now

18   facing such a significant sentence.

19        So, I'm gonna ask that the Court consider all

20   of these things that are in the report that was

21   prepared, and sentence my client to 262 months.

22        I'm gonna ask, and I'm sure that they might

23   do it anyways, but that my client receive a full mental

24   health screening, and that be -- he be provided

25   appropriate treatment for whatever conditions are

16

1    determined that he may have.

2            I'm gonna ask, although I've explained to

3    Craig, that this Court has no -- can't bind the Bureau

4    of Prisons with its orders, that it's recommended that

5    my client be housed in a single cell, if that's at all

6    appropriate, and I know that -- I've explained to him

7    that, you know, one of the goals of the Bureau of

8    Prisons is to put him in a place that will not only

9    incarcerate him and keep him away from society, but

10   will be -- provide him a safe location, and again, the

11   Court doesn't need to order that, that's part of

12   they're -- what they are bound to do.

13            Other than what's in the reports, and what I

14   just said, I have nothing further to add.

15            Thank you.

16            THE COURT:  All right.  Thank you.

17            Mr. Hines, do you wish to say anything today?

18            THE DEFENDANT:  Yeah.

19            I was gonna apologize to Ms. -- I was gonna

20   apologize to Ms. Smedley for what I did.  I know what I

21   did was wrong.  I was gonna apologize to her.

22            THE COURT:  Okay.

23            THE DEFENDANT:  I just want to move on, but I

24   want you to write down in the record that I don't want

25   no correspondence, and I don't want her writing me

17

1    never again in life.

2         THE COURT:  Okay.  I understand how you feel.

3    Okay.  All right.

4         Thank you.

5         MR. HINES, SR.:  Your Honor, could I say

6    something?  I'm his father.

7         THE COURT:  Sure.

8         MR. HINES, SR.:  All right, and Craig, since

9    he's been in jail, (inaudible) grandmother just -- his

10   grandmother died in May.

11        THE COURT:  Right.

12        MR. HINES, SR.:  His grandfather just died

13   last week, that raised him.

14        You know, he -- You know, his mother and

15   everybody, they said they were gonna be here, you know.

16   I was looking for them to be here.  You know, they said

17   Kia was gonna be here, Kia Smedley, you know, and she

18   -- you know, he's gonna apologize to her, and I'm

19   surprised that no one showed up.

20        THE COURT:  Well, we moved courtrooms.

21   Perhaps they're across the hall.

22        MR. HINES, SR.:  No, they would have to go to

23   the clerk's office, 'cause they tell you right

24   downstairs to go to the clerk's office --

25        THE COURT:  Okay.

18

1          MR. HINES, SR.:  -- to find out.

2          THE COURT:  All right.  All right.

3          Thank you.

4          Mr. Nardini?

5          MR. NARDINI:  Your Honor, the only thing I

6    really have to say is that in a strange way, I think

7    we're fortunate to be here today.  We're fortunate to

8    be here in a sentencing for crimes that, as serious as

9    they are, are only for possession of a firearm,

10   possession of drugs.

11         We could be here on a triple homicide case.

12   Mr. Hines open-fired on a street, in two places in New

13   Haven at -- He fired shots at a car.  One shot grazed

14   the hood, and one shot blew out the back window of a

15   car in which two people were driving, and I think we

16   can all be grateful that no one was hit.

17         He opened fire another day in Fair Haven, and

18   he shot a man in the leg, and I think that although Mr.

19   Washington, the victim, certainly didn't want to be in

20   that position, in a way we can be grateful that at

21   least it was not a mortal wound.  I mean, Mr.

22   Washington will get better.

23         These are serious charges.  I think we're

24   grateful that they're not more serious than they could

25   have been, and I think that the guideline range called

19

1    for in this case, given the extreme nature of the

2    violence involved, is a fair range, and I think it's

3    fully within the Court's discretion to determine where,

4    within that range, Mr. Hines should be sentenced.

5              Thank you.

6              THE COURT:  All right.

7              Thank you.

8              MR. NARDINI:  Oh, could I also just place one

9    thing in the record, that the government did notify

10   each of the victims, well in advance of the sentencing.

11   They were aware -- made aware of the time and place

12   today, and that the government, at no point, was

13   contacted by the victims, in a request that we relay

14   any of their thoughts to the Court, and as the Court

15   can see, they are not present here today.

16             THE COURT:  Yes, thank you.  All right.

17             Mr. Hines, I'm required to consider any

18   number of factors when I decide how to sentence you.  I

19   need to think about you and your background, the nature

20   of the offense, the purposes of sentencing, which

21   include punishment for wrongdoing.

22             THE DEFENDANT:  I know I did wrong, --

23             THE COURT:  Yeah.

24             THE DEFENDANT:  -- but every situation that I

25   was going through, you see, I -- that girl was trying

1    to get me killed.

2                THE COURT:  Okay.  All right.

3                Well, --

4         (Mr. Schaffer and the Defendant confer.)

5                THE COURT:  I need to think about the

6    purposes of sentencing, which include punishment for

7    wrongdoing, deterrence of others, deterrence of you,

8    rehabilitation, and incapacitation, meaning to protect

9    the public.

10               I've got to look at the sentencing guidelines

11   and what they recommend, and I've got to basically take

12   all the information I have about you, the good and the

13   bad, everything that's in the brief that I have,

14   everything that's in the letters that have been sent

15   in, everything that I know about you, everything the

16   prosecutors got -- said in his statements, and so

17   forth, so -- and I've got to weigh the good and the

18   bad, and in doing that, a couple of things stand out.

19               One is the seriousness of these offenses.

20   Mr. Nardini put it well, you know, but for some luck,

21   you'd be facing murder charges, and you would, in

22   effect, have no hope of getting out of jail ever.

23               I mean, you're facing a long sentence.

24   You're facing a mandatory minimum of 15 years on one

25   count, mandatory minimum of five on another, five

1   consecutive on the third.  So, you're facing a lot of

2   time, and the sentencing guidelines are even longer

3   than that, over 20 years.

4           So, you know, that's in recognition of the

5   seriousness of what it is that you did.

6           You know, when you take a gun in your hands

7   and you start shooting it, very bad things can happen.

8   Bad things can happen to you.  Bad things can happen to

9   the people that you're shooting at.  Bad things can

10  happen to people who just happen to be around.

11          I mean, I was struck by the seriousness of

12  this offense.  I used to live about a block and a half

13  from where you shot at your girlfriend.  I know that

14  neighborhood and --

15          THE DEFENDANT:  You used to live around

16  there?

17          THE COURT:  I used to live around there, and

18  so that could have been -- that shot could have hit me,

19  it could have hit my family, it could hit anybody

20  walking down that street, and that's something that you

21  got to take into account, you know, right?

22          When you pull the trigger of a gun, bad

23  things can happen, and not just to the people that you

24  intend it to happen to.  So, this is a -- I think, a

25  very serious offense, and one that calls for serious

22

1    punishment.

2           The guidelines here are quite high.  I mean,

3    the guidelines are serious punishment, and I think

4    that's appropriate.

5           What I want you to think about, both today

6    and when you're in prison, is how you're going to avoid

7    this problem in the future, and if you pick up a gun

8    when you get out, if you start selling drugs when you

9    get out, if you hurt somebody when you get out, that's

10   pretty much the end of your life, you know.

11          You're going to get caught.  You're going to

12   get brought back into court.  You're going to be at the

13   top of the guideline range, and you're going to be

14   looking at basically the rest of your life in prison.

15   It's not worth it.  It's not worth it to do those

16   things, and you got to come to terms with that, and so

17   you've got to use your time in prison to prepare

18   yourself for when you get out.

19          You got to get educated.  You got to get that

20   GED.  You got to learn some job skills, and most

21   important, you got to make sure your attitude is the

22   right attitude, you know.  Get your mental health

23   issues taken care of, and get yourself prepared to work

24   for a living and make something of your life.

25          It's a long sentence, but you're going to be

23

1    a relatively young man when you get out of prison,

2    because you're so young now.  So, you got a lot of life

3    ahead of you, and what you've got to do is think about

4    that and prepare yourself for that.

5         If you hang out with the wrong crowd in

6    prison, you know, it's not going to be pretty when you

7    get out, because you're not going to have the skills

8    you need, you're going to fall right back into what you

9    were doing, and I or some other judge is going to be

10   sending you off to prison for the rest of your life.

11        So, you got to focus on that, think about it.

12   This is really your last chance to kind of turn things

13   around, you know?  So, I hope you will.  I hope you'll

14   take the time.  You're going to have a lot of time, and

15   you can use it wisely or you can use it poorly.

16        If you use it wisely, you know, you've got a

17   future.  If not, you don't.  So --

18        MR. NARDINI:  Your Honor, before Your Honor

19   goes ahead and gets to the point where you might

20   pronounce sentence, I just note that several people

21   entered the room.  I believe one of the victims is

22   present.

23        I don't know if the Court wants to inquire of

24   whether she'd like to address the Court --

25        THE COURT:  That'd be fine.

24

1          MR. NARDINI:  -- as is her right.

2          THE COURT:  Ms. Smedley, are you here?

3          MS. SMEDLEY:  (No audible response.)

4          THE COURT:  Do you -- You have a right to

5     speak, if you wish to.  You're not required to, but you

6     -- if you wish to say anything, I'd be happy to hear

7     from you.

8          MS. SMEDLEY:  I just think, like, 27 years, I

9     think that's a lot of time.  You know, he got kids.  He

10    didn't kill nobody, and he need to be here for his

11    kids.

12          I mean, like, what he did was wrong, but he

13    don't need to be in jail that -- like no 27 years.  He

14    need to be here for his kids and his family.

15          THE COURT:  All right.  Thank you.

16          MR. SCHAFFER:  Well, Judge, I think --

17          THE COURT:  That's fine.

18          MR. SCHAFFER:  -- my client said something

19    before, and he wanted to repeat it again.

20          THE COURT:  That's fine.

21          THE DEFENDANT:  I apologize, Ms. Smedley, for

22    what I did was wrong.  I ain't holding no grudges.  I'm

23    giving my life to God right now.

24          I just lost my grandfather.  I lost my

25    grandmother.

25

1    Straight, I just don't want no more

2    correspondence, and I don't want her to write me, no

3    contact, no nothing.  All right.

4         THE COURT:  Okay.  All right.

5         The point I was making earlier was this is a

6    very serious offense, but the sentence is going to give

7    you a chance to rehabilitate yourself, to deal with

8    your problems and to get ready to lead a productive

9    life when you get out of jail, and I hope that you'll

10   do that.

11        The parties have stipulated to a guideline

12   range that's -- that appears to be the correct range,

13   and I don't see any reason to depart from that range.

14   However, the -- for the reasons set forth by your

15   lawyer today, and also in the brief that was submitted

16   in your behalf, I agree that a sentence at the bottom

17   of that guideline range, which is still a significant

18   sentence, is appropriate in this case.  I think it

19   addresses both the seriousness of the offense.  It

20   certainly ought to deter you and others from this kind

21   of conduct, and it gives you a chance to rehabilitate

22   yourself.

23        So, it's my intention to sentence you as

24   follows:

25        On Count One, to a term of imprisonment of

1    262 months, five years of supervised release.  I'm

2    going to waive a fine because I find that you cannot

3    afford to pay a fine within the guideline range, but

4    I'm required to impose a mandatory $100 special

5    assessment.

6              On Count Two, a term of imprisonment of 202

7    months, to run concurrently with that of Count One; a

8    five-year supervised release, also concurrent; no fine,

9    and a $100 special assessment.

10             Count Three, a term of imprisonment of 60

11   months, consecutive to the term in Count Two, with the

12   combined term of Counts Two and Three, to run

13   concurrent, as I said, with Count One; five years of

14   supervised release, concurrent; no fine, and a $100

15   mandatory special assessment.

16             As conditions of supervised release, I'm

17   going to order that you comply with the mandatory

18   conditions of supervised release set forth in Guideline

19   Section 5D1.3(a):

20             One, that you not commit another federal,

21   state, or local offense;

22             two, that you not unlawfully possess a

23   controlled substance;

24             four, that you refrain from using any

25   controlled substances, and submit to drug testing, as

27

1  required;

2          six, that you pay the special assessment

3  imposed; and

4          eight, that you cooperate in the collection

5  of a DNA sample, as is required of any person convicted

6  of a felony.  That sample will be analyzed and

7  cataloged by law enforcement authorities.

8          This -- Standard conditions of supervised

9  release, set forth in Guideline Section 5D1.3(c), will

10  also apply, and as special conditions of supervised

11  release I'm going to order that you participate in a

12  substance abuse treatment program -- treatment and

13  testing program approved by the probation officer, and

14  that can be either inpatient or outpatient, and I'm

15  going to order that you pay all, or a portion of the

16  cost of that program, based upon your ability to pay,

17  in an amount to be determined by the probation officer.

18          Second, that you participate in a mental

19  health treatment program, again, inpatient or

20  outpatient, as approved by the probation officer, and

21  that you pay all or the portion of the cost of that

22  program, based upon your ability to pay, again, in an

23  amount to be determined by the probation officer.

24          Third, I'm going to order that you submit to

25  a search -- that you consent to a search of your

28

1    residence and vehicle, in a reasonable manner, based

2    upon any reasonable suspicion that you may be in

3    possession of contraband, or evidence of a violation of

4    condition of your release, and failure to commit -- to

5    consent to that search could be grounds for revocation

6    of your supervised release, and that you need to warn

7    any other residents of any premises that you are

8    residing in, or any -- the owners of any cars that you

9    may be using, that you may be subject to that type of

10   search, and finally, I'm going to order that you not

11   possess a firearm or any type of dangerous weapon.

12          With all of these conditions, should you

13   violate any of them, you can be brought back into court

14   and sentenced to additional time in prison for that

15   violation, so it's important that you understand the

16   conditions.  They'll be reviewed with you when you're

17   released, but it's important that you not violate any

18   of those.

19          Let me hear from either counsel -- Actually,

20   before we do that, I am going to recommend to the

21   Bureau of Prisons that you undergo a thorough mental

22   health evaluation at the time that you are taken into

23   their custody, and that you be provided with any

24   appropriate treatment, or given any appropriate

25   conditions that they determine you should be, in order

29

1    to address mental health conditions, and that can

2    include consideration of whether you should be housed

3    in a single cell.

4         Let me hear from either counsel if there's

5    any reason why the sentence that I just outlined cannot

6    be imposed as the sentence of the court.

7         MR. NARDINI:  No, nothing from the

8    government.

9         MR. SCHAFFER:  Nothing from defendant, Your

10   Honor.

11        THE COURT;  All right.  Thank you.

12        Mr. Hines, the sentence that I just outlined

13   is hereby imposed as the sentence of the Court in your

14   case.

15        The judgment of the Court will be prepared

16   for my signature by the clerk's office, in consultation

17   with the U.S. probation office.

18        I want to make sure that you understand that

19   you have a right to appeal your sentence.  If you wish

20   to appeal your sentence, you need to file a notice of

21   appeal within ten days.

22        Do you understand the time limit on your

23   right to file an appeal?

24        THE DEFENDANT:  Ten days.

25        THE COURT:  Right.

1          I want to make sure that you remember though,

2     that in your plea agreement, you agree that you would

3     waive your right to appeal or collaterally attack your

4     sentence, provided it was 327 months of imprisonment or

5     less, and obviously your sentence was.

6          It therefore appears, that you have validly

7     waived your right to appeal.

8          Do you understand?

9          THE DEFENDANT:  (No audible response.)

10          THE COURT:  If you believe that there's some

11     fundamental defect in the proceedings, that you haven't

12     waived, it's important that you understand the time

13     limit that I reviewed with you just a moment ago.

14          All right?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Okay.  All right.

17          If you think you have some basis to appeal,

18     and you wish to do so, we've gone over the time limits.

19     If you file a notice of appeal, but you feel like you

20     can't afford to appeal, you can file a motion to

21     proceed in forma pauperis, and if that motion's

22     granted, the court will waive your filing fee for your

23     appeal, and will appoint a lawyer to handle any appeal,

24     at no cost to you.

25          Do you understand that?

31

```
 1              THE DEFENDANT:  Yes.

 2              THE COURT:  Okay.

 3              Are there other matters we should take up

 4     today?

 5              MR. NARDINI:  None for the government, Your

 6     Honor.

 7              MR. SCHAFFER:  No, Your Honor.

 8              THE COURT:  All right.  Thank you.

 9              Mr. Hines, the sentence you've received is a

10     long sentence.  I want you to think about two things,

11     though.

12              One, it's a lot shorter than it could have

13     been, --

14              THE DEFENDANT:  Yeah.

15              THE COURT:  -- and you got, in effect, the

16     bottom of the guideline range, rather than the middle

17     or the top.

18              THE DEFENDANT:  So I got 22 years, right?

19              THE COURT:  As a practical matter, it's

20     approximately 22 years, right, but you could have

21     gotten --

22              THE DEFENDANT:  Could have got more.

23              THE COURT:  You could have gotten a lot more.

24     You could have gotten close to 30 years.

25              THE DEFENDANT:  Yeah.
```

32

1          THE COURT:  In fact, the statutory maximum

2     here is life.  You could have gotten life in prison.

3          So, what I want to leave you with is the

4     thought that it's a long sentence.  It's not nearly as

5     long as it could have been, but the next one will be,

6     and so I'm very serious, you're going to have to deal

7     with your situation.  You're going to have to improve

8     yourself and be ready to go --

9          THE DEFENDANT:  All right.

10          THE COURT:  -- when you get out, and it's not

11     going to be easy.  I'm not saying --

12          THE DEFENDANT:  I know.

13          THE COURT:  -- it's going to be easy, but

14     you've got to do that.

15          All right?

16          MR. SCHAFFER:  Judge, I think my client

17     smiled because I told -- I was whispering, "No more."

18          THE COURT:  All right.

19          MR. SCHAFFER:  "Don't come back after this."

20          THE COURT:  Right.

21          MR. SCHAFFER:  So, as you --

22          THE COURT:  Right.

23          MR. SCHAFFER:  -- were saying, "The next

24     one."

25          THE COURT:  That's fine.  I understand, and I

34

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.

*Stephen C. Bowles*                    October 2, 2006

STEPHEN C. BOWLES

UNITED STATES DISTRICT COURT

Page 1                                    District of Connecticut

UNITED STATES OF AMERICA                **JUDGMENT IN A CRIMINAL CASE**

v.                        CASE NO. *3:05cr118 (SRU)*
                                         USM NO: *16275-014*

CRAIG HINES

                                         *William J. Nardini*
                                         Assistant United States Attorney

                                         *Peter J. Schaffer*
                                         Defendant's Attorney

**THE DEFENDANT:** pleaded guilty to counts <u>one, two and three of the Indictment</u>.

Accordingly the defendant is adjudicated guilty of the following offenses:

| Title & Section | Nature of Offense | Offense Concluded | Counts |
|---|---|---|---|
| 18:922(g)(1) & 924(e) | Felon in Possession of a Firearm | January 15, 2005 | one |
| 21:841(a)(1) & 841(b)(1)(B) | Possession with Intent to Distribute Five or More Grams of Cocaine Base | January 15, 2005 | two |
| 18:924(c)(1) | Possession, Use and Carrying a Firearm During, in Relation to, and in Furtherance of a Drug Offense | January 15, 2005 | three |

The following sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IMPRISONMENT**

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total of 262 months on count one; 202 months' imprisonment on count two to run concurrent to count one and 60 months' imprisonment on count three to run consecutive to the term imposed on count two, but concurrent to the term imposed on count one.

**SUPERVISED RELEASE**

Upon release from imprisonment, the defendant shall be on supervised release for a total term of 5 years on count one; five years on count two and five years on count three, to run concurrently. The Mandatory and Standard Conditions of Supervised Release as attached, are imposed. In addition, the following Special Conditions are imposed:

    1.   The defendant shall participate in a program approved by the Probation Office for inpatient or outpatient substance abuse treatment and testing. The defendant shall pay all or a portion of the costs associated with treatment based on the defendant's ability to pay as determined by the probation officer.

    2.   The defendant shall participate in a program approved by the Probation Office for mental health treatment. The defendant shall pay all, or a portion of the costs associated with treatment, based on the defendant's ability to pay as determined by the probation officer.

    3.   The defendant shall submit his person, residence, office or vehicle to a search, conducted by a United States probation officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

    4.   The defendant shall not possess a firearm or other dangerous weapon.

**CRIMINAL MONETARY PENALTIES**

The defendant must pay the total criminal monetary penalties under the schedule of payments as follows:

**Special Assessment:**   $300.00          $100 for each count, to be paid immediately.
**Forfeiture:**                  The defendant shall forfeit to the United States the following items:
                                        (1) an EXCAM Amri Tanfoglio Giuseppe .32 caliber semi-automatic handgun, serial number C61224
                                        (2) a magazine containing .32 caliber ammunition
                                        (3) a High Point sawed-off shotgun with an obliterated serial number
                                        (4) a box of .32 caliber ammunition
                                        (5) one 9mm round
                                        (6) three shotgun rounds

It is further ordered that the defendant will notify the United States Attorney for this district within 30 days of any change of name, residence or mailing address until all fines, restitution, costs and special assessments imposed by this judgment, are paid.

**JUDICIAL RECOMMENDATION TO THE BUREAU OF PRISONS**

        The court recommends that the defendant undergo a thorough mental health evaluation and be provided with appropriate treatment or conditions to address any mental health condition, and specifically that the Bureau of Prisons consider whether the defendant should be housed in a single cell.

**The defendant is remanded to the custody of the United States Marshal.**

_____          **February 17, 2006**_____
_____          Date of Imposition of Sentence

                                                          _____/s/_____
                                                          Stefan R. Underhill
                                                          United States District Judge
                                                          Date: March 1, 2006

**RETURN**

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____, with a certified copy of this judgment.

_____          _____
                                                                              John F. Bardelli
                                                                              United States Marshal

                                                          By   _____  Deputy Marshal

*CERTIFIED AS A TRUE COPY*
*ON THIS DATE _____*
*Kevin F. Rowe, Clerk*
*BY: _____*
*     Deputy Clerk*

# CONDITIONS OF SUPERVISED RELEASE

In addition to the Standard Conditions listed below, the following indicated (■) Mandatory Conditions are imposed:

## MANDATORY CONDITIONS

■ (1)    The defendant shall not commit another federal, state or local offense;

■ (2)    The defendant shall not unlawfully possess a controlled substance;

☐ (3)    The defendant who is convicted for a domestic violence crime as defined in 18 U.S.C. section 3561(b) for the first time shall attend a public, private, or private non-profit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is available within a 50-mile radius of the legal residence of the defendant;

■ (4)    The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter for use of a controlled substance;

☐ (5)    If a fine is imposed and has not been paid upon release to supervised release, the defendant shall adhere to an installment schedule to pay that fine;

■ (6)    The defendant shall (A) make restitution in accordance with 18 U.S.C. sections 2248, 2259, 2264, 2327, 3663, 3663A, and 3664; and (B) pay the assessment imposed in accordance with 18 U.S.C. section 3013;

☐ (7)    A defendant convicted of a sexual offense as described in 18 U.S.C. sections 4042(c)(4) shall report the address where the defendant will reside and any subsequent change of residence to the probation officer responsible for supervision, and shall register as a sex offender in any State where the person resides, is employed, carries on a vocation or is a student.

■ (8)    The defendant shall cooperate in the collection of a DNA sample from the defendant.

While on supervised release, the defendant shall also comply with all of the following Standard Conditions:

## STANDARD CONDITIONS

(1)    The defendant shall not leave the judicial district or other specified geographic area without the permission of the court or probation officer;

(2)    The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

(3)    The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

(4)    The defendant shall support the defendant's dependents and meet other family responsibilities (including, but not limited to, complying with the terms of any court order or administrative process pursuant to the law of a state, the District of Columbia, or any other possession or territory of the United States requiring payments by the defendant for the support and maintenance of any child or of a child and the parent with whom the child is living);

(5)    The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

(6)    The defendant shall notify the probation officer at least ten days prior to any change of residence or employment;

(7)    The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician;

(8)    The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered, or other places specified by the court;

(9)    The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

(10)   The defendant shall permit a probation officer to visit the defendant at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

(11)   The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

(12)   The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

(13)   The defendant shall pay the special assessment imposed or adhere to a court-ordered installment schedule for the payment of the special assessment;

(14)   The defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay any unpaid amount of restitution, fines, or special assessments.

**The defendant shall report to the Probation Office in the district to which the defendant is released within 72 hours of release from the custody of the U.S. Bureau of Prisons. Upon a finding of a violation of supervised release, I understand that the court may (1) revoke supervision <u>and impose a term of imprisonment,</u> (2) extend the term of supervision, and/or (3) modify the conditions of supervision.**

**These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.**


(Signed) _____          _____
**Defendant**                                                        **Date**



_____          _____
**U.S. Probation Officer/Designated Witness**              **Date**

**A - 122**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES | No. 3:05-cr-118 (SRU) |
| v. | No. 3:16-cv-1044 (SRU) |
| CRAIG HINES | |

### RULING ON SECTION 2255 AND FIRST STEP ACT MOTIONS

Craig Hines ("Hines"), a prisoner currently incarcerated at the United States Penitentiary Coleman II in Sumterville, Florida, has moved to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 and also requests to be resentenced under the First Step Act. For the reasons that follow, I **deny** Hines's habeas petition and **grant** his First Step Act motion regarding his request for a resentencing.

### I.      Background

On August 30, 2005, Hines pled guilty to each count of a three-count indictment charging: felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (count one), possession with intent to distribute five or more grams of cocaine base, *i.e.*, "crack cocaine," in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (count two), and possession, use, and carrying a firearm during, in relation to, and in furtherance of a drug offense, in violation of 18 U.S.C. § 924(c)(1) (count three).[1] *See* Plea Agreement, Cr. Doc. No. 29; Min. Entry, Cr. Doc. No. 27.

On February 17, 2006, I sentenced Hines to 262 months' imprisonment on count one, 202 months' imprisonment on count two, and 60 months' imprisonment on count three. *See*

---

[1] I refer to documents in Hines's criminal case, *United States v. Hines*, No. 3:05-cr-118 (SRU), with the shorthand "Cr. Doc."

Judgment, Cr. Doc. No. 38.  The sentences on counts two and three were to run consecutively,

for a total of 262 months; and that combined sentence was to run concurrently with the 262

months on count one.  *Id.*  I also sentenced Hines to five years of supervised release on each

count, all terms to run concurrently.  *Id.*

At sentencing, in accordance with the plea agreement, the parties stipulated that Hines

qualified as an armed career criminal under the Armed Career Criminal Act ("ACCA") and as a

career offender under the federal Sentencing Guidelines.  Hines's predicate offenses were a 1995

state conviction for conspiracy to sell hallucinogens, a 1996 state conviction for third-degree

robbery, and a 1997 state conviction for conspiracy to commit second-degree assault.  *See* Plea

Agreement, Cr. Doc. No. 29, at 5; Final PSR at ¶¶ 21–28.  Because Hines "[was] determined to

be a career offender" under the guidelines and was "convicted of [violating] 18 U.S.C. § 924(c),"

U.S.S.G. § 4B1.1(c), he was subject to the higher of (a) the Guidelines range for Count Two (188

to 235 months of imprisonment) plus the mandatory minimum of 60 months on Count Three (a

total of 248 to 295 months of imprisonment), or (b) the Guidelines range for Count Three (a total

of 262 to 327 months of imprisonment).  *See id.* at § 4B1.1(c)(2).  The latter range was higher, so

I concluded that Hines's advisory Guidelines range was 262 to 327 months of imprisonment, *see*

*id.* at § 4B1.1(c)(3), and sentenced him to the bottom of that range.  I did not discuss Hines's

designation as an armed career criminal under ACCA.  *See generally* Sentencing Hr'g Tr., Cr.

Doc. No. 11-3.

Judgment entered on March 2, 2006. Cr. Doc. No. 38.  Hines appealed, and the Second

Circuit summarily affirmed.  *See* Cr. Doc. No. 58.

II.       **Section 2255 Motion to Vacate, Set Aside, or Correct Sentence**

     **a.  Standard of Review**

     Section 2255 provides a prisoner in federal custody an opportunity to challenge the

legality of his sentence.  To obtain relief under section 2255, the petitioner must show that his

prior sentence was invalid because the sentence: (1) was "imposed in violation of the

Constitution or laws of the United States"; (2) was imposed "without jurisdiction" by the

sentencing court; (3) was "in excess of the maximum authorized by law"; or (4) is "otherwise

subject to collateral attack."  28 U.S.C. § 2255(a).  The standard is a high one; even

constitutional errors will not be redressed through a section 2255 petition unless they have had a

"substantial and injurious effect" that results in actual prejudice to the petitioner.  *Brecht v.*

*Abrahamson*, 507 U.S. 619, 623, (1993) (internal citations omitted); *Underwood v. United*

*States*, 166 F.3d 84, 87 (2d Cir. 1999) (applying *Brecht*'s harmless error standard to section 2255

petition).

     A section 2255 petition "may not be employed to relitigate questions which were raised

and considered on direct appeal."  *Cabrera v. United States*, 972 F.2d 23, 25 (2d Cir. 1992); *see*

*also Reese v. United States*, 329 F. App'x 324, 326 (2d Cir. 2009) (quoting *United States v.*

*Sanin*, 252 F.3d 79, 83 (2d Cir. 2001)).  That limitation prohibits relitigation of issues that were

expressly or impliedly decided on direct appeal.  *See United States v. Ben Zvi*, 242 F.3d 89, 95

(2d Cir. 2001).  A court may only reconsider an earlier decision if it is "confronted with 'an

intervening change of controlling law, the availability of new evidence, or the need to correct a

clear error or prevent manifest injustice.'"  *United States v. Becker*, 502 F.3d 122, 127 (2d Cir.

2007) (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)).

     Furthermore, a section 2255 petition is "not a substitute for direct appeal."  *Harrington v.*

*United States*, 689 F.3d 124, 129 (2d Cir. 2012) (citing *Zhang v. United States,* 506 F.3d 162,

166 (2d Cir. 2007)).  A court will not review claims that the petitioner failed to properly raise on

direct review "unless the petitioner shows (1) good cause to excuse the default and ensuing

prejudice, or (2) actual innocence . . . ." *Id.* (citing *Bousley v. United States*, 523 U.S. 614, 622

(1998)).  In the context of a habeas petition, "actual innocence means factual innocence, not

mere legal insufficiency." *Bousley*, 523 U.S. at 623 (internal quotations omitted).

The petitioner bears the burden of proving, by a preponderance of the evidence, that he is

entitled to relief. *See Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995).  A district court

is not required to accept the petitioner's factual assertions as credible "where the assertions are

contradicted by the record in the underlying proceeding." *Puglisi v. United States*, 586 F.3d 209,

214 (2009).  Section 2255 also requires that the district court hold a hearing on the petitioner's

motion unless "the motion and the files and records of the case conclusively show that the

prisoner is entitled to no relief." *Chang v. United States*, 250 F.3d 79, 84 (2d Cir. 2001).  But

"although a hearing may be warranted, that conclusion does not imply that a movant must always

be allowed to appear in a district court for a full hearing if the record does not conclusively and

expressly belie his claim." *Id.*  (citing *Machibroda v. United States*, 368 U.S. 487, 495 (1962)).

"[I]f it plainly appears from the [petition], any attached exhibits, and the record of prior

proceedings that the [petitioner] is not entitled to relief, the judge must dismiss the [petition]."

*Puglisi*, 586 F.3d at 213.

> **b.  Eligibility for Relief**

Hines asserts that his sentence was unconstitutionally enhanced under the Residual

Clause of ACCA, 18 U.S.C. § 924(e)(2)(B)(ii), and that he is entitled to resentencing pursuant to

*Johnson v. United States*, 135 S. Ct. 2551 (2015).  I agree that Hines was improperly

characterized as an armed career criminal under ACCA, but I conclude that the error was harmless.  Hines received two concurrent sentences that, together, equal the length of his sentence under ACCA, and neither of those sentences may be challenged under *Johnson*.  In addition, when sentencing Hines, I did not rely upon his purported status as an armed career criminal under ACCA.

As noted above, Hines received separate sentences on each count of a three-count indictment: 262 months on Count One (for violation of 18 U.S.C. §§ 922(g)(1) & 924(e)), 202 months on Count Two (for violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)), and 60 months on Count Three (for violation of 18 U.S.C. § 924(c)(1)).  Hines's sentence on Count Two ran concurrently with his sentence on Count One; his sentence on Count Three ran consecutively to his sentence on Count Two and concurrently with his sentence on Count One.  *Johnson*, which provides the legal basis for Hines's petition, invalidated only the sentence on Count One (the ACCA count).  The penalties for Counts Two and Three were not affected by ACCA, and Hines's sentences on those counts were not rendered suspect by *Johnson*.

Furthermore, Hines's advisory range under the Sentencing Guidelines—which dominated my discussion at the sentencing hearing, *see* Sentencing Hr'g Tr., Doc. No. 11-3—was not impacted by his armed career criminal designation under ACCA.  Hines's Guidelines range was enhanced not because of his designation under ACCA, but because he was a career offender under the Guidelines who "ha[d] at least two prior felony convictions of either a crime of violence or a controlled substance offense."  *See* U.S.S.G. § 4B1.1(a).  Because Hines was "convicted of [violating] 18 U.S.C. § 924(c) . . . and [was] determined to be a career offender," *id.* at § 4B1.1(c), he was subject to a higher Guidelines range of 262 to 327 months of imprisonment.  *See id.* at § 4B1.1(c)(2)(3).  Hence, with respect to the Sentencing Guidelines

range, his armed career criminal designation under ACCA never entered the picture:  Hines's

advisory range was increased solely due to the Guidelines' career offender provision.

I emphasize that *Johnson* did not affect Hines's designation as a career offender under the

Guidelines because "the advisory Guidelines are not subject to vagueness challenges under the

Due Process Clause."  *Beckles v. United States*, 137 S. Ct. 886, 890 (2017).  At the time of

sentencing, Hines qualified as a career offender under the Guidelines on the basis of at least two

prior convictions: one in 1996 for third-degree robbery in violation of Conn. Gen. Stat. § 53a-

136,[2] and another in 1997 for conspiracy to commit second-degree assault in violation of Conn.

Gen. Stat. § 53a-48.[3]  The 1996 conviction qualifies as a predicate offense under the Elements

Clause of the career offender guideline.  As other judges of this court have determined, third-

degree robbery is "categorically a violent felony" because "an essential element of th[e] offense

is the use or threatened use of physical force upon another person."  *Carter v. United States*, 731

F. Supp. 2d 262, 273 (D. Conn. 2010); *see Gomez v. Ashcroft*, 293 F. Supp. 162, 166 (D.

Conn. 2003); *cf.* Conn. Gen. Stat. § 53a-133 (defining robbery to require the defendant to have

"use[d] or threaten[ed] the immediate use of physical force").  Thus, third-degree robbery

remains a "violent felony" or "crime of violence" under the Guidelines' Elements Clause, and

---

[2] Conn. Gen. Stat. § 53a-136(a) provides: "A person is guilty of robbery in the third degree when he commits robbery as defined in section 53a-133."  Section 53a-133, in turn, provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[3] Conn. Gen. Stat. § 53a-48 provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."  The underlying crime of assault in the second degree is codified at Conn. Gen. Stat. § 53a-60(a).

Hines's 1996 conviction serves as a predicate offense for the application of the career offender guideline.[4]

Hines's 1997 conviction does not clearly qualify as a predicate offense under the Elements Clause of the career offender guideline.  Although the underlying crime that Hines was convicted of conspiring to commit—assault in the second degree—appears to "ha[ve] as an element the use, attempted use, or threatened use of physical force,"[5] *see Johnson*, 135 S. Ct. at 2555 (quoting 18 U.S.C. § 924(e)(2)(B)(i)); *see also* U.S.S.G. § 4B1.2(a)(2) (observing that "'[c]rime of violence' includes . . . aggravated assault"), I have ruled that "conspiracy to commit an offense does not qualify as a violent felony simply because the underlying offense, if completed, would require the use of physical force against another person." *Wiggan v. United*

---

[4] Hines was a minor at the time of his 1996 conviction, but that offense may be counted because he was "convicted as an adult and received a sentence of imprisonment exceeding one year and one month." *See* U.S.S.G. § 4A1.2(d)(1).  Hines must have been convicted as an adult because he was sentenced to eight years of incarceration, well above the four-year maximum authorized for "youthful offenders" in Connecticut. *See* Conn. Gen. Stat. § 54-76j(a); *cf.* Conn. Gen. Stat. § 46b-140(b) (not authorizing any term of incarceration as punishment for a juvenile delinquent).

[5] Conn. Gen. Stat. § 53a-60(a) is a "divisible" statute, i.e., it is divided into a number of subsections, each one of which constitutes an "alternative version[] of the crime." *See Descamps v. United States*, 570 U.S. 254, 262 (2013). Ordinarily, such a statute would be analyzed under the Supreme Court's "modified categorical approach," which allows courts to "examine a limited class of documents" in order to "determine which of [the] statute's alternative elements formed the basis of the defendant's prior conviction." *Id.* In this case, however, I need not apply the modified categorical approach: nearly all of section 53a-60(a)'s subsections expressly require that the defendant have intentionally "cause[d]" some form of "physical injury" to another person, and the Supreme Court has held that "the knowing or intentional causation of bodily injury necessarily involves the use of physical force." *See United States v. Castleman*, 572 U.S. 157, 169 (2013). Only subsection (3) criminalizes "reckless" conduct, and that subsection requires the defendant to have "cause[d] serious physical injury to another person by means of a deadly weapon or a dangerous instrument," Conn. Gen. Stat. § 53a-60(a)(3), which also would "necessarily involve[] the use of physical force." *See Castleman*, 572 U.S. at 169.

I note that *Castleman* "abrogated" the "understanding of the use of force" reflected in *Chrzanoski v. Ashcroft*, 327 F.3d 188 (2d Cir. 2003), which held that *third*-degree assault was not a "crime of violence" under Connecticut law because "the intentional causation of injury does not necessarily involve the use of force." *Id.* at 195–96; *see Villanueva v. United States*, 893 F. 3d 123, 130 (discussing *Castleman*'s impact on *Chrzanoski*). Whereas *Chrzanoski* reasoned that "even second[-]degree assault . . . can be committed without any physical force," *see* 327 F.3d at 195–96—like when "a doctor . . . deliberately withholds vital medicine from a sick patient," *id.* (citing *State v. Nunes*, 260 Conn. 649 (2002))—*Castleman* "made clear that physical force 'encompasses even its indirect application,' as when a battery is committed by administering a poison." *United States v. Hill*, 890 F.3d 51, 59 (2d Cir. 2018) (quoting *Castleman*, 134 S. Ct. at 1414–15). Because "a use of physical force can encompass acts undertaken to cause physical harm, even when the harm occurs indirectly," *Hill*, 890 F.3d at 60, *Castleman* makes clear that all of the subsections of Connecticut's second-degree assault statute "ha[ve] as an element the use, attempted use, or threatened use of physical force." *See Johnson v. United States*, 135 S. Ct. 2551, 2555 (2015).

*States*, 2016 WL 4179838, at *15 (D. Conn. Aug. 5, 2016).  That is so because, to convict on a

conspiracy charge, "[a] jury need only find that the defendant 'intended to bring about the

elements of the conspired offense,'" *id.* (quoting *State v. Padua*, 273 Conn. 138, 166 (2005)),

and mere "'[i]ntent' to use physical force does not amount to the actual use, threatened, or

attempted use of physical force."  *Id.*; *see also United States v. Alfonso*, 2019 WL 1916199, at *3

(D. Conn. Apr. 30, 2019) ("conspiracy to commit robbery in violation of Conn. Gen. Stat. § 53a-

48(a) is not a crime of violence under the Elements Clause [of the career offender guideline]

because it does not have as an element the use, attempted use, or threatened use of physical

force.").

　　Thus, conspiracy to commit second-degree assault does not qualify as a "violent felony"

under the Guidelines' Elements Clause and could not, after *Johnson*, serve as a predicate offense

for an armed career criminal designation under ACCA.

　　At the time of Hines's sentencing, conspiracy to commit second-degree assault qualified

as a "crime of violence" under the Guidelines' Residual Clause because it "involve[d] conduct

that presents a serious potential risk of physical injury to another."  U.S.S.G. § 4B1.2(a)(2).  As

the Second Circuit has observed, "[a] conspiracy, by its very nature, . . . enhances the likelihood

that the planned crime will be carried out."  *United States v. Elder*, 88 F.3d 127, 129 (2d Cir.

1996) (per curiam) (quoting *United States v. Patino*, 962 F.2d 263, 267 (2d Cir. 1992)).  Thus,

"when a conspiracy exists to commit a crime of violence," such as second-degree assault, "the

conspiracy itself poses a 'substantial risk' of violence, which qualifies it . . . as a crime of

violence" under the Guidelines' Residual Clause.  *See id.*

　　Since the time of Hines's sentencing, the United States Sentencing Commission has

amended the Guidelines to conform with the Supreme Court's ruling in *Johnson*.  In 2016, the

Sentencing Commission amended section 4B1.2(a) by striking the Residual Clause.  *See*

U.S.S.G. § 4B1.2(a)(2).[6]  As a result, a defendant sentenced today can no longer be designated as

a career offender under the Guidelines based on one or more prior felony convictions that

involved "conduct presenting a serious potential risk of physical injury to another."  *See id*.

Hines, however, was sentenced in 2006 when the Guidelines' career offender Residual

Clause remained in effect.  Furthermore, even though the Supreme Court struck down ACCA's

Residual Clause as unconstitutionally vague in *Johnson*, the Court has expressly held that the

corresponding provision of the Sentencing Guidelines is "not void for vagueness."  *Beckles*, 137

S. Ct. at 895.  Accordingly, Hines's 1997 conviction still served as a predicate offense for his

career offender status under the Guidelines' Residual Clause when he was sentenced.  Because

Hines had "two prior felony convictions of . . . a crime of violence" after *Johnson*, *see* U.S.S.G.

§ 4B1.1(a), he qualified as a career offender under the Guidelines regardless of whether the

government could obtain a higher statutory sentencing range under ACCA or a higher Guidelines

range under the armed career criminal provision of the Guidelines.

Finally, the record makes clear that when sentencing Hines, I relied upon his Guideline

range rather than his status as an armed career criminal under ACCA.  At sentencing, I noted that

Hines's range under the Guidelines was "even longer than" his 15-year mandatory minimum

---

[6] "Section 4B1.2(a) is amended by striking paragraph (2) as follows:

'(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another,'

and inserting the following:

'(2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. [§] 5845(a) or explosive material as defined in 18 U.S.C. [§] 841(c).'"

U.S.S.G. § 4B1.2 (amended 2016).

pursuant to ACCA's Residual Clause.  Sentencing Hr'g Tr., Doc. No. 11-3, at 20–21, and I

expressly stated that a sentence within Hines's Guidelines range was "correct" and

"appropriate."  *See id.* at 22, 25.  Ultimately, I sentenced Hines to a term of incarceration that fell

at the very bottom of the Guidelines range (262 months), but well above his 15-year mandatory

minimum under ACCA.  Nothing in the record suggests that I "felt constrained by the statute and

might [have] impose[d] a lesser sentence" without ACCA.  *Cf. United States v. Feldman*, 647

F.3d 450, 459 (2d Cir. 2011).  Instead, I unambiguously indicated that I "would have imposed

the same sentence" irrespective of whether the government sought the statutory sentencing range

under ACCA.  *See United States v. Baldwin*, 743 F.3d 357, 361 (2d Cir. 2014) (per curiam);

*Feldman*, 647 F.3d at 459.  Simply put, the erroneous ACCA designation "did not affect"

Hines's sentence.  *See United States v. Outen*, 286 F.3d 622, 640 (2d Cir. 2002).

Hines's two concurrent sentences are not subject to a *Johnson* challenge, and in

sentencing him on those counts, I did not rely on his armed career criminal designation under

ACCA.  Because the ACCA error "caused no prejudice," *Underwood*, 166 F.3d at 87, Hines is

"not entitled to habeas relief."[7]  *Brecht*, 507 U.S. at 637.  Therefore, I **deny** his section 255

petition.

---

[7] Hines argues that harmless error analysis cannot be applied here because, as I held in *Shabazz v. United States*, 2017 WL 27394, at *1 (D. Conn. Jan. 3, 2017), a "*Johnson* error is a structural error not amenable to harmless error review."  The government correctly responds that *Shabazz* is inapposite. In *Shabazz*, the defendant was convicted and sentenced under ACCA on a single count. I held that I could not retrospectively decide whether Shabazz's prior offenses qualified as "violent felonies" under ACCA's Elements Clause, "because invalidation of the Residual Clause 'affect[s] the entire framework in which an ACCA finding proceeds.'" *Id.* at *8 (quoting *Villanueva v. United States*, 191 F. Supp. 3d 178, 190 (D. Conn. 2016), *rev'd on other grounds*, __ F.3d __, 2018 WL 3077064 (2d Cir. 2018)).  In the present case, consistent with *Shabazz*, I do not consider whether Hines's ACCA conviction can be salvaged under the Elements Clause. Rather, I hold that the erroneous ACCA enhancement is harmless because Hines also was convicted and sentenced on two unrelated counts.

### III.    First Step Act Motion

Hines seeks relief pursuant to the recently passed First Step Act, requesting an immediate release or, in the alternative, a prompt resentencing on his three counts of conviction from 2006: felon in possession of a firearm (count one), possession with intent to distribute five or more grams of cocaine base, *i.e.*, "crack cocaine" (count two), and possession, use, and carrying a firearm during, in relation to, and in furtherance of a drug offense (count three). *See* First Step Act Motion ("FSA Mot."), Cr. Doc. No. 63.  The government opposes the motion on the basis that Hines is not entitled to a resentencing on counts one and three, which are not covered offenses. *See* Opp'n to FSA Mot., Cr. Doc. No. 67.  Further, the government argues that, in my discretion, I should refuse to reduce Hines's sentence anyway because of the nature of this crime. *Id.*  For the following reasons, Hines's motion is **granted** insofar as he requests a resentencing.

#### A. Eligibility for Relief

Following Hines's sentencing, Congress passed the Fair Sentencing Act of 2010, Pub. Law 111-220, 124 Stat. 2372 ("Fair Sentencing Act"), which "'reduced the statutory penalties for cocaine base[] offenses' in order to 'alleviate the severe sentencing disparity between crack and powder cocaine.'" *United States v. Sampson*, 360 F. Supp. 3d 168, 169 (W.D.N.Y. 2019) (quoting *United States v. Peters*, 843 F.3d 572, 575 (4th Cir. 2016)).  In 2018, Congress passed, and the President signed into law, the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 ("First Step Act").  Section 404 of the First Step Act made retroactive some provisions of the Fair Sentencing Act.  First Step Act § 404(b).  First Step Act relief is available to those convicted of a "covered offense," which Section 404 defines as "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 . . . , that was committed before August 3, 2010."  First Step Act § 404(a).

At the time of Hines's sentencing, pre-Fair Sentencing Act, cases involving five grams or more of crack cocaine fell under 21 U.S.C. § 841(b)(1)(B) and carried a mandatory minimum penalty of five years' incarceration and a maximum of 40 years' incarceration. *See United States v. Rivera*, 170 F. App'x 209, 210 (2d Cir. 2006). Section two of the Fair Sentencing Act changed the statutory section and penalties for cases involving five grams or more of crack cocaine; that quantity of crack cocaine now falls under 21 U.S.C. § 841(b)(1)(C) and carries no mandatory minimum penalty and a statutory maximum penalty of twenty years' incarceration. *See* Fair Sentencing Act § 2. Accordingly, because the Fair Sentencing Act modified the penalties for a crime involving five grams or more of crack cocaine, that crime, if committed before August 3, 2010, is a "covered offense" for purposes of the First Step Act. *See* First Step Act § 404(b). The government also concludes that Hines's conviction on count two is a covered offense. *See* PSR Addendum, Cr. Doc. No. 64 at 2; Opp'n to FSA Mot., Cr. Doc. No. 67, at 9. Thus, there is no question that under the First Step Act, Hines is eligible for relief on count two. The only remaining question is whether he is eligible for resentencing on counts one and three.

**B. Scope of Relief**

In other First Step Act cases before me, defendants who were convicted of one covered offense and one or more other offenses have argued for plenary resentencing on all counts. *See, e.g.*, *United States v. Felix DeJesus*, 2019 WL 5997336, at *1 (D. Conn. Nov. 1, 2019). I have granted those requests because, in my view, a defendant who is entitled to relief under the First Step Act for a covered offense is also entitled to a full resentencing on related convictions. *See id.*; *see also United States v. Medina*, 2019 WL 3769598 (D. Conn. July 17, 2019). But Hines does not really argue for a plenary resentencing here. Instead, Hines seeks to "set[] aside the issue of whether [he] would be entitled to plenary resentencing or a limited resentencing" and

simply asserts that he is entitled to a resentencing on count two.  *See* Def.'s Response to PSA Addendum, Doc. No. 66.  Hines argues instead that under section 2255, described *supra* in Part I, he is entitled to a resentencing on count one and that his new guidelines range on that count— should I find that he is no longer an armed career criminal under ACCA—would drop drastically from 262-327 months to 37-46 months.  *See* Response to PSR Addendum, Doc. No. 66.  Had those been the guidelines when I sentenced Hines back in 2006, Hines argues, I very likely would have given him a lesser sentence on count two, too.  However, as explained above, Hines is *not* entitled to a resentencing on count one.  Thus, Hines's reliance on his section 2255 motion is misplaced.

Despite that misplaced reliance, Hines is still entitled to a plenary resentencing because I hold that the First Step Act authorizes me, when a defendant is entitled to relief for a covered offense, to conduct a plenary resentencing.  I have recently set forth comprehensively the reasons for that conclusion in *United States v. Luna*, __ F. Supp. 3d __, 2020 WL 464778 (D. Conn. Jan. 29, 2020).  Those reasons apply equally here.

**IV.    Conclusion**

For the foregoing reasons, Hines's section 2255 motion to vacate his sentence is **denied**.  Hines's First Step Act motion is **granted**, and Hines is entitled to a plenary resentencing.  The clerk shall schedule a prompt resentencing.

So ordered.

Dated at Bridgeport, Connecticut, this 7th day of February 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

13

UNITED STATES DISTRICT COURTt
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA            :  3:05CR 118 (SRU)

VS

CRAIG HINES                         :  July 6, 2020


**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**FACTS**

On August 30, 2005, Craig Hines pled guilty to Counts 1, 2 and 3 of a three count

Indictment.  In count 1, he was charged with Felon in Possession of a firearm, in

violation of 18 U.S.C Section 922(g)(1) and 924(e).  In Count 2, he was charged with

Possession with Intent to Distribute 5 grams or more of Cocaine Base, in violation of

21 U.S.C. Section 841(a)(1) and (b)(1)(B).  In Count 3, he was charged with Possession,

Use and Carrying a Firearm during, in relation to and in furtherance of a drug

offense, in violation of 18 U.S.C. section 924(c)(1).  At the time of the original

sentencing, Count 2 carried statutory penalties that included a mandatory minimum

term of 5-40 years imprisonment, 4 years of life supervised release and a fine of

$2,000,000.00.

On February 17, 2006, the defendant was sentenced to 262 months' imprisonment on

Count 1, 202 months' imprisonment on Count 2 but concurrent to Count 1. He was

sentenced to 60 months on Count 3 concurrent to Count one but consecutive to Count

2.  In addition, he was sentenced to 5 years' supervised release on each count,

concurrent.

The Statement of Reasons (SOR) reflects the Court adopted the PSR and guideline

applications without change.  The Court determined the total offense level was 34,

1

that Mr. Hines fell within criminal history category VI, and that the resulting

guideline ranges were 262 to 327 months imprisonment, 5 years' supervised release,

and a fine of $15,000 to $2,000,000.  The SOR states "[t]he Court determines that a

sentence at the bottom of the guidelines range will address all factors to be

considered in imposing a sentence."

With regard to the Sentencing Guidelines calculations underlying the Court's

determination at that time, the PSR reveals the following.  The defendant qualified at

that time,  as both a Career Offender and an Armed Career Criminal under the

sentencing guidelines. Because the computation resulted in the highest guideline

range, namely 262 to 327 months imprisonment, it was used.  The parties' plea

agreement also indicates agreement that the total offense level was 34, that Mr.

Hines fell in Criminal History Category VI and that the applicable guideline renege

was 262 to 327 months imprisonment. The agreement also notes that the parties

stipulated to the three specific predicate convictions sustained by Mr. Hines that

triggered Armed Career Criminal Status which were his February 5, 1996 Sale of

Hallucinogen/Narcotics conviction, and his two October 22, 1997 convictions for

Robbery 3rd Degree and Conspiracy to Commit Assault 2nd Degree. On  December

21, 2018, the President signed into law the First Step Act of 2018, which among other

things, retroactively applied the reduced mandatory minimum penalty for crack

cocaine offenses detailed in the Fair Sentencing Act of 2010.  Specifically, the First

Step Act provides that if "[a] Court that imposed a sentence for a covered offense

may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney

for the Government, or the Court, impose a reduced sentence as if sections 2 and 3 of

the Fair Sentencing Act of 2010 (Public Law 111-22-; 124 Stat 2372) were in effect at

the time the covered offense was committed".(see First Step Act, Section 404(b).) a"Covered offense '' means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing act of 2010, that was committed before August 3, 2010 (see First Step Act, Section 404(a)). Section 2 of the Fair Sentencing Act increased the quantity of crack cocaine that triggered mandatory minimum penalties.  Section 3 of the Fair sentencing Act eliminated the statutory mandatory minimum sentence for simple possession of crack cocaine.  Thus, the First Step Act provides statutory authorization to the sentencing Court to modify a previously imposed term of imprisonment; see 18 U.S.C. Section 3582(c)(1)(B).  The Court retains its discretion to deny motions of otherwise eligible offenders, since Section 404(c) of the First Step Act states "[n]othing in this section shall be construed to require a Court to reduce any sentence pursuant to this section".

On June 20, 2019, Defense counsel filed a motion seeking a reduced sentence for defendant pursuant to the First Step Act.  As noted above, as to Count 2, Mr. Hines pled guilty to an offense that charged a threshold quantity of 5 grams or more of cocaine base.  At the time of his arrest, Mr. Hines was in possession of 6.48 grams of cocaine base. Had Section 2 of the Fair Sentencing Act of 2010 been in effect when Mr. Hines originally committed the offenses of conviction, the statutory penalties pertaining to Court 2 would have been driven by 21 U.S.C Section 841(b)(1)(C), and principally included a 20 year maximum term of imprisonment (with no mandatory minimum) and a supervised release term of 3 years to life.

It is the probation officer's opinion that, as to Count 2, Mr. Hines committed a "covered offense" under the meaning given that term in the First Step Act.

Therefore, the probation officer believes the First Step Act provides the Court with the authority to impose a reduced sentence on Count 2.  It does not appear to the probation officer that Counts 1 or 3 are "covered offenses", because the statutory penalties  pertaining to offenses detailed at 18 U.S.C. Section 922(g)(1) and 924(c)(1) were not modified by sections 2 or 3 of the Fair Sentencing Act of 2010.  Therefore, the probation officer does not believe the Act provides the Court with the authority to reduce the sentences imposed on Counts 1 or 3. On 2/7/20 this Court denied Defendant's 18 USC 2255 petition as to his sentencing on Count One .  Defendant subsequently appealed to the U.S. Court of Appeals for the 2nd Circuit; Subsequently this Court denied his Certificate of Appealability.  The actions are based on the Court's ruling that although Johnson v. U.S. 135 S.Ct 2551 (2015) may have invalidated an ACCA designation, Defendant still met the predicate requirements for Career Offender status and therefore would  have received the same sentence.  It should be added that one of the predicates for the Career Offender determinators consisted of a Conspiracy  to Commit Robbery and another was a Connecticut narcotics matter.  Several recent cases have put the use of a conspiracy as a predicate for both ACCA and Career offender  in question.  Another case put a Connecticut narcotics conviction in question as a predicate. At the time of sentencing, a conspiracy could  be used as a predicate. Since the time of sentencing in this matter, Defendant has been sentenced to 125 years in prison in Connecticut State Court on May 6, 2014 on 2 counts of Murder and One Count of Pistol without a Permit.  Subsequently, Defendant has attacked his conviction and sentences by means of a State Habeas Petition Craig Hines v. Commissioner of Corrections DKT # TSR CV 16 4008294 S; Superior Court Judicial District of Tolland at Rockville.)  That

case originally had a trial date of April 20, 2020. Because of his pending legal actions and the possibility of success, the resentencing of Defendant under the First Step Act has importance for him.

### Law

The Court must impose a sentence that is "sufficient, but not greater than necessary."  18 U.S.C. Section 3553(a) provides several factors for the Court to consider in making its determination of a reasonable sentence, of which the following factors are the most pertinent here:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed;

A.  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

B.  to afford adequate deterrence to criminal conduct;

C.  to protect the public from further crimes of the defendant; and

D.  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentence available;

(4) the kinds of sentence and sentencing range established for:

A. the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines:

(5) any pertinent policy statement:

A. issued by the Sentencing Commission

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. section 3553.

While the Federal statute "requires a sentencing Court to consider Guideline ranges .... it permits the Court to tailor the sentence in light of statutory concerns as well" <u>United States v. Booker</u> 543 U.S. 220, 245-46 (2005). To allow the Guidelines to be presumptively correct would effectively reinstate the formerly mandatory nature of the Guidelines, which <u>Booker</u> belies. cf <u>Gall v. United States</u> 552 U.S. 38, 47-48 (2007) (rejecting "appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range"). In <u>Booker</u>, the U.S. Supreme Court held that judges in Federal criminal cases were no longer bound by the sentencing guidelines. In other words, the guidelines were no longer mandatory but became "advisory" in nature. <u>Booker</u> at 264.

The <u>Booker</u> Court held that the guidelines violated the Sixth Amendment to the U.S. Constitution by requiring judges to impose sentences based on facts not found by a jury beyond a reasonable doubt or admitted by the defendant. See <u>Booker</u>, at 244. As a remedy to this constitutional violation, the Court ruled that Federal judges need no longer apply the Federal sentencing guidelines in calculating defendants' sentences and made the guidelines "advisory." <u>Booker</u>, at 245. However, in <u>United States vs. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005), the Court ruled, first, that while the guidelines are no longer mandatory, the sentencing Court must consider the applicable guidelines and relevant policy statements before sentencing. Thus, a sentencing Court must continue to calculate the guideline

sentence as it would have done prior to the Supreme Court's decision in <u>Booker</u>, and must take into account any and all relevant permissible bases for departures. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in Sec. 3553(a).  Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and the other factors set forth in Sec. 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence.  Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.  <u>Crosby</u>, 397 F.3d 103, 113 (2005).  <u>The individualized justice" called for by Crosby allows this Court to effectively impose a sentence well below the guideline sentence.</u>  On appellate review, the ultimate determination will be focused upon whether or not the sentence imposed was "<u>reasonable</u>," in light of all of the factors involved and available for consideration by the sentencing Court.

Moreover, 18 U.S.C. Sec. 3661 provides that "no limitation shall be placed on the information concerning the background, character, and conduct of the defendant which a Federal Court may receive and consider for the purpose of imposing an appropriate sentence."  This statute affords sentencing judges wide discretion in the information which they use when fashioning sentences for criminal defendants. Sentencing Courts now have great ability to tailor sentences to the particular facts of a given case and are no longer bound by the guideline ranges previously imposed in

the pre-Booker era.  After Booker, the sentencing Court may now consider even those mitigating factors that the mandatory guidelines would have prohibited such as poverty, racial discrimination and humiliation, drug abuse and addiction, dysfunctional family background, lack of guidance as a youth, and more.  See United States vs. Ranum, 353 F. Supp. 2d 98 (E.D. Wisc.2005).

The Defendant is scheduled for a plenary resentencing.  This Court and other Courts have interpreted the plenary resentencing as effectively an initial sentencing and not modification of the original sentence.

If the Court were sentencing Defendant today, the presence of career offender and armed career offender would be questionable.  The Supreme Court in Johnson struck down the residual clause as to armed career offender status which was his initial legal basis for armed career offender status.  This Court has ruled that a conspiracy to commit a crime such as assault is not a violent offense which would qualify as a predicate  for career offender status.

Additionally, the effort to ameliorate the harsh narcotics laws which has been joined by virtually everyone up to the President has led most Court to adopt a 1 to 1 ratio between powder cocaine and crack cocaine.  The previous ratio of 100 to 1 powder to crack has been generally thought to be arbitrary and capricious and to not have a basis in reason.

Defendant also has 2 violent convictions in the State matters.  He has presently filed a Habeas Corpus petition to invalidate his murder convictions. He has requested that both he and another individual be given polygraph tests as his claim is actual innocence.

The change in the legal framework allows the Court to impose a reasonable

sentence without being constrained by the previous harsh narcotics laws and the effects of previous convictions which no longer count toward his enhanced sentencing status.

## ARGUMENT

### FIRST STEP ACT

The history of the First Step Act came from an understanding that narcotics sentences were too severe.  The consensus by both the President and the congress was that  narcotics sentences  required review based on a recognition of the devastating  effect on the lives of defendants and their families.

Both the 2014 modifications of the drug guidelines and the extensive law produced with the entire history of the guidelines relative to the unreasonable disparate treatment of crack and powder cocaine produced an enlightened analysis of the somewhat arbitrary and harsh effects of the narcotics guidelines leading to a more equitable and reasonable view of defendants with narcotics convictions.

According to the judgement in the underlying criminal case, Mr. Hines received a five-year sentence for his 924(c) violation, consecutive to the 202 months on the (b)(1)(B) conviction, which was within the career offender range that would have applied to that charge, absent the 924(c) conviction.   Under the First Step Act, however, a career offender range for 5 grams or more would be in the (b)(1)(C) range of 151-188 months.

More specifically, with the passage of the First Step Act, sentencing reform for cocaine base offenses has finally reached back to those sentenced before passage of the Fair Sentencing Act, such as Mr. Hines.  Enacted on December 21, 2018, Section

404 of the Act provides that the Court may "impose a reduced sentence as if sections

2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111-220, 124 Stat. 2372) were

in effect at the time the covered offense was committed"  Pub L. No. 1150-391, 132

Stat. 5194 Section 404(b); see also 18 U.S  Section 3582(c)(1)(B).  The Act defines a

"covered offense" as a violation of a Federal criminal statute, the statutory penalties

for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010". *Id.*

Section 404(a). Section 2 of the Fair Sentencing Act modified the statutory penalties

for certain violations of the Controlled Substances Act, 21 U.S.C. 841(b), effectively

reducing the penalty applicable to Mr. Hines's conviction for a controlled offense by

increasing the requisite amount above that at issue here, see Pub. L. No. 111-220, 124

Stat. 2372 (2010).

Today pleading guilty to a charge of possessing with intent to distribute 5

grams or more of cocaine base would result in a conviction under 21 U.S.C. Section

841(b)(1)(C), not section 841(b)(1)(B). A section 841(b)91)(C) offense yields a statutory

maximum prison term of 20 years and minimum of 3 years supervised release.  A

Section 841(b)(1)(B) offense yields a maximum prison time of 40 years and a

mandatory-minimum term of 5 years, along with a minimum of 4 years of

supervised release.

The difference in the statutory maximums impact the Guidelines' calculations

and, thus, further warrant resentencing, even though a career offender designation

is at issue here although it might not be if Defendant were presently before the

Court..  See e.g. U.S. Sentencing Commission Office of Educ. & Sentencing Prac., *ESP*

*Insider Express, Special Edition, FIRST STEP Act* dated Jan., 2019 at 8 (answering

affirmatively that a "defendant sentenced as a career offender under USSG Section

4.B1.1 [can] receive a sentence reduction under the FIRST STEP ACT"...

"Provided that the statutory maximum penalty was in effect on the date of the

original sentencing") In 2006, because Mr. Hines was a career offender and his

offense had a statutory maximum of 25 years or more, his base offense level in

considering only the crack offense would have been 34.  See Guidelines section

4B1.1(b).  Less three levels for acceptance of responsibility, and directed to criminal

history category VI by the Guidelines career offender section, *see id.*, the resulting

Guidelines range was 188-235.  The Court imposed 202 months on that count.

Now pursuant to the First Step Act, the base offense level is 32 because his

conviction-possession with intent to distribute 5 grams or more only makes him

subject to a maximum term of 20 years.  See Guidelines Section 4B1.1(b) (assigning

offense level 32 to instances where statutory maxim is "20 years or more, but less

than 25 years").  Less 3 levels for acceptance of responsibility, along with a Criminal

History Category of VI, the resulting Guidelines range is 151-188 if he were a career

offender.

Given the impact of the First Step Act, and for reasons previously addressed in

the Johnson- litigation briefing, the Court should resentence Mr. Hines.  His situation

is strikingly similar to that recently facing Judge Pratt in the U.S. District Court for

the Southern District of Iowa.  See United States v. Tucker, F Supp. 3d,  WL 324423

(S.D.Iowa Jan 23, 2019)  There, the district Court reduced the defendant's sentence

significantly, in accordance with the career offender sentencing range that would

have applied  at the sentencing had the Fair Sentencing Act been retroactive, as the

First Step Act now dictates.

In reducing the sentence, the Court observed .the following

The First Step Act was passed by Congress, and signed by the President, in an

effort to remedy the disproportionately harsh sentences imposed for crack cocaine offenses.  Had Defendant been subject to this new Guidelines range at the time of his sentencing, the lower range would have been mandatory [because he was sentenced pre-Booker].  Further the Court notes that the defendant turned fifty last year, an age at which the Sentence Commission has found that the recidivism rate begins to decline substantially.  U.S Sentencing Commission , the Effects of Aging on Recidivism among Federal Offender at 22 (2017), www.ussc.gov/research/reseach-reports/effects-aging-recidivism-amount-federal-off enders.  A sentence of 188 months, the low end of the new Guidelines Range, would entail a sentence reduction of seventy-four months, more than enough to warrant immediate release.  The Court is sensitive to the concerns of the Government but ultimately finds that a sentence reduction to reflect Defendant's new Guidelines range is in the interests of justice and furthers the purposes set forth in 18 U.S.C. Section 3553(a). That would be the sentencing range on Count Two with Defendant as a career offender.

_____

There are additional legal and factual arguments to be made on Defendant's

behalf today which might not have been available to Defendant at the time of the

original sentencing based on 18 USC 3553a factors. The sentencing range on a count

where he received 202 months would be substantially less.  If he were still

considered a career offender he would be in the range of 151-188 months..

### COVID-19

Most Covid -19 claims for compassionate release come up in connection  with

motions under 18 USC 3582(C) for a modification.  As this Court has held, the plenary

resentencing is not the same as a motion for modification. However, factors such as

Covid-19 and other health vulnerabilities are certainly relevant under 18 USC 3553a.

There have been positive tests at Wyatt Detention Center which as the Court knows

has affected the Defendant.  The susceptibility to the virus is heightened for those in

incarceration. The Defendant has attached 2 declarations by medical professionals

relative to the threat of the virus while incarcerated. The lack of social distancing

and facilities for hand washing are factors which increase the threat dramatically

The above declarations by Doctors Beyrer and Meyer are a bit dated as the BOP has

taken steps to stop the spread.  However, Defendant has been moved between 3

facilities; Coleman FCI in Florida; Philadelphia and Wyatt.  Wyatt is not a BOP

facility.  There is no proof that all inmates have been tested.

      Since Defendant is in a peculiar situation where he is beyond vulnerable , his

further incarceration implicates his right to be free from cruel and unusual

punishment under the 8th Amendment to the United States Constitution.

### CRACK - POWDER DISPARITY IN <u>DEFENDANT'S MATTER</u>

      "The primary objective for this as any sentencing, is to make an

individualized assessment based upon the facts presented.  <u>Gall</u>, cite supra

@597. In Mr. Hines's case when the Court considers a sentence sufficient but

not more than necessary, he is respectfully requesting that this Court impose

a minimum term treating the drug amount as similar to powder cocaine.

      In addition to the holding in <u>Gall v. United States</u> that the sentencing

guidelines are advisory only and have no greater or lesser weight than any

other factor the Court may consider the disparity argument  in sentencing a

defendant. In the case of  <u>Kimbrough v. United States</u> 522 U.S. 85 (2007) the

Supreme Court held that the District Courts may consider the disparity in

sentencing guidelines range between the "crack or base" cocaine range and

powder cocaine offense.  In <u>Kimbrough </u>the Supreme Court held that a Court

does not abuse its discretion by "finding when sentencing a particular

defendant that the crack / powder disparity yields a sentence" greater than

necessary to achieve Section 3553(a)'s purpose , even in a mine run case."

Kimbrough v. United States 552 U.S. at 110(2007).  The Supreme Court

recognized that the "crack cocaine guidelines do not exemplify the

Commission's exercise of its characteristic institutional role.  Kimbrough thus

holds that with respect to the crack cocaine guidelines, a categorical

disagreement with and variance from the guidelines is not suspect". Spears v.

United States 129 S. Ct 840 843 (2009).

The disparity in sentencing guidelines is onerous due to the purely

political calculations that went into the random selection of the new 18 to 1

disparity in sentencing between crack cocaine and powder. There is no good

justification for this disparity as there was no good justification for the

former 100 to 1 disparity in sentencing between crack and powder cocaine.

Therefore this Court should sentence Mr. Hines based upon a 1 to 1 ratio of

powder to crack cocaine.  In addition there have been efforts in Congress

which admittedly have failed to change the mandatory minimum in cases

involving crack cocaine even further.  The efforts are based on the arguments

set out in <u>Kimbrough</u> and put forth in many learned journals and editorials that the use of the mandatory minimums and harsh sentences as set out in this case does not comport with legitimate sentencing concerns as set out in the enabling legislation for the guidelines.

The Guidelines utilizing a 1 to 1 ratio and considering Mr. Hines's Criminal History would result in a lesser sentence if career offender status was not an issue in these matters.

If there were  1-1 ratio in this matter, 6.83 grams of cocaine base without the career offender designation but Criminal History Category 6 would produce an advisory sentence of 30-37 months at Level 12.

If the crack designation were used under the guidelines, the recommended sentence would be 46-57 months at Level 16 Criminal History Category 6.

As a career offender, the predicate sentence would be 151-188.  As stated before the career offender designation would be an issue  under present circumstances.

<u>Career Offender</u>

If the defendant were sentenced today he would argue that he is not a

15

career offender or an armed career offender.  One of the predicates is a

conspiracy to commit an assault which would not be a predicate as of now.

The drug matter would also be questionable based on a recent ruling

regarding Connecticut narcotics conviction.

U.S. v. Townsend  CA2-17-757 cr (7/23/18)

The Defendant has 2 murder convictions upon which he has a habeas

filed based on actual innocence.  The Defendant is confident that he will

prevail based on the results of scheduled lie detector tests. If he were to

prevail, the Court would have to consider at a plenary resentencing if

Defendant were a career offender on Count One or Count 3.  Obviously if

Defendant were not to prevail on his Habeas claims, the situation would be

different but Defendant asserts he is innocent of the Murder charges.  Suffice

it to say that the legal landscape with regard to armed career offender, career

offender and crack sentencing has changed dramatically and the Court must

consider the options available today.

CONCLUSION

The Court must consider the arguments, the shift in the law as to armed

career offender,  career offender and cocaine base sentencing as evidenced

by the First Step Act and the decisions regarding the crack powder ratio..

The Court also is required to consider the mandated factors set out in USC 3553a in sentencing defendant.

The Court must consider that Defendant has already served 182 months on the sentences imposed in these matters back in 2006.  The Court was bound to sentence defendant on these matters by strictures which no longer exist.

Taking into consideration that Defendant is guilty of serious offenses in these matters and the legally binding considerations in 18 USC 3553a, the Defendant has served a sufficient sentence and should receive a sentence that translates into time served to allow him to contest the State convictions.


Attachments

Declaration Dr. Meyer 3/13/2020

Declaration Dr. Beyrer 3/16/2020


The Defendant reserves the right to submit relevant letters and medical reports at least seven (7) days before sentencing.


The Defendant, Criag Hines

By  /s/ Vito A Castignoli
Vito A. Castignoli
185 Broad Street
Milford, CT  06460
Tel 877-8407 Fed Bar# 10057

CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2020, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of Court's electronic filing system or by mail  to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

 /s/Vito A Castignoli
Vito A. Castignoli

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:05-cr-00118 (SRU) |
| | : | |
| v. | : | |
| | : | |
| CRAIG HINES | : | September 16, 2020 |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in aid of the re-sentencing of the defendant, Craig Hines, ordered by this Court pursuant to the First Step Act of 2018, *see* Doc. No. 70, and in response to the defendant's sentencing memorandum filed on July 6, 2020, *see* Doc. No. 80. For the reasons set forth herein, the Government respectfully submits that, upon re-sentencing, Hines should receive a term of imprisonment equal to that imposed at his original 2006 sentencing. This sentence is necessary to reflect the seriousness of his crimes and to address his violent criminal history, which now includes a 2014 state conviction for double murder and is thereby even more egregious than was originally known when this Court initially imposed sentence.

## I. BACKGROUND

### A. Procedural History

On May 3, 2005, a federal grand jury charged Hines in a three-count indictment with the following offenses:

- Count One: possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 924(e);

- Count Two: possession with intent to distribute more than five grams of crack cocaine, which was then in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(B); and

- Count Three: possession, use and carrying of a firearm during, in relation to, and in furtherance of the charged drug offense, in violation of 18 U.S.C. § 924(c).

Doc. No. 1.  On August 30, 2005, Hines entered a guilty plea, pursuant to a plea agreement, before the Honorable William I. Garfinkel, acting on behalf of the District Court, to all three counts of the Indictment.  *See* Doc. No. 29 (Plea Agreement) at 1.  By order of this Court, Hines' guilty plea was accepted on September 9, 2005.

On February 17, 2006, Hines was sentenced by this Court.  *See Hines v. United States,* 16CV1044 (SRU), Doc. No. 11-3 (Sentencing Hearing Transcript) at 1.  This Court imposed a sentence of 262 months of imprisonment for Count One, 202 months of imprisonment for Count Two, and 60 months of imprisonment for Count Three. The sentences imposed for Counts Two and Three were set to run consecutively for a total of 262 months; the 262 month sentence for Count One was imposed concurrently with the sentences for Counts Two and Three.  *Id.* at 25-26. Accordingly, Hines received a total effective sentence of 262 months of imprisonment.  At the time of his 2006 sentencing, this Court determined that Hines qualified as a career offender.

After unsuccessfully pursuing a direct appeal in 2006, Hines filed a habeas petition seeking to set aside his sentence under 28 U.S.C. § 2255 on June 26, 2016.  *See Hines v. United States,* 16CV1044 (SRU), Doc. No. 1.  On June 20, 2019, Hines filed a motion to reduce his sentence under the First Step Act, on the grounds that the First Step Act reduced the penalty applicable to his narcotics conviction in Count Two.  *See United States v. Hines*, 5CR118 (SRU), Doc. No. 63.   On February 7, 2020, this Court issued an order denying Hines' habeas petition, but granting his First Step Act motion for a resentencing.  *United States v. Hines*, 5CR118 (SRU), Doc. No. 70; *Hines v. United States,* 16CV1044 (SRU), Doc. No. 26.  Pursuant to that order, it scheduled a plenary resentencing of the defendant on all counts of conviction.  *See id.* at 12-13.

-2-

## B.  Offense Conduct

The basic and uncontested facts underlying the offenses of conviction are summarized at paragraphs 7-16 of the Presentence Report ("PSR").  *United States v. Hines*, 5CR118 (SRU), Doc. No. 64-2.

On December 24, 2004, Hines approached three men, including victim Chaz Washington, standing outside of a grocery store.  PSR ¶ 9.  Hines asked, "Do you have anything?" and Washington replied, "No, we don't do that."  *Id.*  Hines then pulled a gun and fired three times, hitting the victim once in the right leg near the knee before leaving.  *Id.*  Two .32 caliber shell casings were recovered at the crime scene. *Id.*

A few weeks later, on January 10, 2005, Hines was standing in front of the Ronald McDonald House in New Haven when Hines's girlfriend Kia Smedley and her cousin drove by.  PSR ¶ 10.  Upon seeing the two women, Hines fired a gun twice at the vehicle—one round hit the driver's side rear window and another grazed the hood.  *Id*.  After the first shots were fired, Smedley exited the car and began chasing Hines.  Hines turned around and shot two more times at Smedley, missing her both times.  *Id.*  Police recovered two .32 caliber shell casings at the scene, and one fired round was recovered from inside Smedley's vehicle.  *Id.*

Police determined that, just over a week before the January 10, 2005 shootings, Hines had purchased one box of .32 caliber rounds and one box of 9mm rounds at The Sports Authority Store in Orange, Connecticut. PSR ¶ 11.  Hines signed an identification form containing his Connecticut identification number at the time of purchase.  *Id.*

On January 11, 2005, law enforcement agents received written consent from Smedley to search her residence in Hamden, Connecticut, where Hines had also lived until the day before.  PSR ¶ 12.

During the search, police located and retrieved a High Point sawed-off shotgun with an obliterated serial number, three 12-gauge shotgun shells, one 9mm round, a box of .32 caliber ammunition, and Hines's Connecticut identification card.  *Id.*

By January 15, 2005, the State of Connecticut issued arrest warrants for Mr. Hines based on the shootings incidents involving Washington and Smedley.  PSR ¶ 13.  Both victims had identified Hines as their assailants.  *Id*.  On January 15, 2005, police developed information that Hines was present at 518 George Street in New Haven.  *Id*.  During police surveillance, officers observed Hines leaning out the front window of an apartment and in possession of what they believed to be a weapon. *Id*.  As police entered the apartment, they observed Hines open a window leading to the fire escape, place a handgun on the base of the roof, and then grasp the gun back and attempt to hide it.  *Id*. Police then detained Hines and searched the apartment.  *Id*.  During the search of the apartment, police recovered a firearm and a magazine.  The firearm, a .32 caliber EXCAM, had one round chambered and the safety off, and contained a magazine with six rounds.  *Id*.  The magazine contained three .32 caliber rounds.  *Id*.  Subsequent ballistics analysis determined that the EXCAM handgun had been the weapon that Hines used to shoot Washington and shoot at Smedley.  PSR ¶ 15.  Because EXCAM handguns are manufactured in Italy, Hines' firearm necessarily moved in interstate and/or foreign commerce.  *Id*.

Police also strip-searched the defendant and discovered four clear plastic bags in his anus.  The plastic bags contained a total of eighty-eight individually wrapped pieces of crack cocaine.  PSR ¶ 14.  Laboratory analysis of the substance determined that the net weight of the crack cocaine was 6.48 grams.  *Id*.

In his plea agreement's stipulation of offense conduct, Hines admitted to possession of the firearm, ammunition and crack cocaine recovered from his person and his apartment on January 15, 2005. *See* Doc. No. 29 (Plea Agreement) at 10. He acknowledged that he intended to sell the crack cocaine. *Id.* Moreover, he admitted that he carried the firearm to protect himself from robberies in connection with his drug sales. *Id.* Hines also acknowledged having sustained multiple felony convictions at the time he knowingly possessed the EXCAM firearm. *Id.*

**C. Hines' Pre-Conviction Criminal History**

At the time of his initial sentencing, Hines, then age 26, had sustained a series of drug and violent crime convictions representing virtually continuous criminal conduct in his adolescence and young adult years. In August 1995, at age 16, Hines was arrested and ultimately convicted of conspiracy to commit the sale of hallucinogens/narcotics, for which he received a six-year suspended sentence and three years of probation. PSR ¶ 21. About a month later, in September 1995, Hines was arrested and ultimately convicted of assault in the third degree (after charges of robbery in the second degree and larceny in the second degree were dropped), for which he received a concurrent one-year suspended jail sentence and three years of probation to run concurrently with that imposed for his prior drug offense. PSR ¶ 22. Six months later, in March 1996, Hines was arrested and later convicted of criminal mischief in the third degree, receiving a 90-day suspended sentence and another year of probation. PSR ¶ 23.

A few months later, in July 1996, Hines was arrested and later convicted of larceny in the second degree and robbery in the third degree after an incident in a club in which Hines issued threats and took a gold necklace from another person. PSR ¶ 24. For this offense, Hines received an eight year jail sentence (two years to serve), an additional three years of probation, as well as a violation of his

prior term of probation and a failure to appear conviction in relation to these proceedings. Hines was incarcerated from May 1997 to May 1999, during which time he sustained another conviction for conspiracy to commit assault in the second degree, stemming from an assault in which Hines and three fellow detainees punched, kicked and struck another inmate with a chair in an attempt to rob the victim of his Reebok sneakers, causing the victim head injuries. PSR ¶ 26. For this offense, he received a one-year concurrent jail sentence.

Hines was arrested again in January 2001 and ultimately convicted of assault in the third degree, for which he received a one-year suspended sentence and another term of probation. PSR ¶ 27. This arrest and conviction arose out of a November 2000 assault that Hines committed against a coworker, in which Hines, after a verbal argument, waited for the coworker in a restroom and then punched him repeatedly in the face. *Id.* A few months later, in July 2001, Hines was arrested and later convicted of resisting/interfering with arrest. PSR ¶ 28. He also sustained another revocation of probation. PSR ¶¶ 27-28. Hines was incarcerated again from October 2001 to November 2003. He then committed the federal crimes of which he now stands convicted in December 2004 through January 2005.

In addition to these convictions, at the time of his original sentencing, Hines sustained 25 disciplinary infractions while in Department of Corrections custody, for offenses including assault, threats, fighting, destruction of property, security risk group affiliation, and possession of contraband. PSR ¶ 28.

Notably, at the time of his original sentencing, Hines' commission of a double murder in 2000 was not known to authorities (see further discussion below, Section I.F).

### D.  Plea Agreement and Guidelines Stipulation at Initial Sentencing

As noted above, Hines pleaded guilty to all three counts of the Indictment on August 30, 2005. Pursuant to his plea agreement, Hines agreed that he qualified as an Armed Career Criminal under 18 U.S.C. § 924(e). *See* Plea Agreement, Doc. No. 29 at 5.

Based on his plea of guilty to possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), Hines faced at the time a mandatory minimum penalty of 15 years' imprisonment and a maximum penalty of life in prison.  *Id.* at 2.  Based on his plea of guilty to possession with intent to distribute more than five grams of crack cocaine, which was then in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(B), Hines faced at the time a mandatory minimum of five years' imprisonment and a maximum of 40 years' in prison.  *Id.*  Based on his plea of guilty to use of a firearm in furtherance of a drug offense, in violation of 18 U.S.C. § 924(c), Hines faced a mandatory minimum of five years' imprisonment, to be served consecutively to any term of imprisonment imposed on the other counts of conviction.  As set forth in the Plea Agreement, Counts One and Three also carried terms of supervised release of five years and Count Two carried a four year term of supervised release.  *Id.*

The Plea Agreement also set forth the parties' stipulation as to the applicable Guidelines range. Based on the defendant's prior state convictions for Sale of Hallucinogens/Narcotics, Robbery Third degree, and Conspiracy to Commit Assault Second Degree, the parties stipulated that Hines qualified both as an Armed Career Criminal under 18 U.S.C. § 924(e) and as a career offender under U.S.S.G. § 4B1.1.  *Id.* at 5.  Accordingly, Hines was subject to the highest offense level applicable either to the underlying offense or to the career offender guideline.  U.S.S.G. § 4B1.4(b)(2).  Between the two, the career offender guideline triggered the highest offense level—a level 37 under U.S.S.G.

§ 4B1.1(b), because Count One's felon-in-possession charge carried a statutory maximum sentence of life imprisonment at the time.  The parties agreed to a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, resulting in a total offense level of 34.  Pursuant to U.S.S.G. § 4B1.1(b), all career offenders are placed into Criminal History Category ("CHC") VI.

The combination of offense level 34 and CHC VI resulted in a range of 262 to 327 months imprisonment.  *See* Plea Agreement, Doc. No. 29 at 5; U.S.S.G. Chapter 5 Pt. A (sentencing table). A defendant categorized as a career offender who is convicted of § 924(c) offense is likewise subject to 262 to 327 months pursuant to the table set out in § 4B1.1(c)(3).  The plea agreement stipulated that a sentence within the 262 to 327-month range would be reasonable and that neither party would seek neither a downward nor upward departure.  *See id.* at 5.

The agreement included a waiver of right to appeal, stating that the defendant would not appeal or collaterally attack the conviction of imprisonment imposed by the Court if that sentence did not exceed 327 months of imprisonment.  *See id.* at 6.  The government further agreed to take no position with respect to where within the range the defendant should be sentenced.  *See id.* at 6.  The government agreed that it would not file a second-offender notice pursuant to 21 U.S.C. § 851, which would increase Hines's statutory range of imprisonment to a mandatory minimum of ten years and a maximum of life, a maximum fine of $4,000,000, and a mandatory minimum term of supervised release of eight years.  *See id.* at 6.

**E.  The 2006 Sentencing**

On February 17, 2006, Hines appeared before this Court for sentencing. *See Hines v. United States,* 16CV1044 (SRU), Doc. No. 11-3 (Sentencing Hearing Transcript).  As an initial matter, without objection from the parties, the Court adopted the facts set forth in the PSR.  *Id.* at 3-4.  The

Court also granted the Government's motion under U.S.S.G. § 3E1.1(b) recommending that the Court reduce the defendant's adjusted offense level by a third point. *Id.* at 8. Accordingly, and without objection from the parties, the Court found that the applicable Guidelines range was accurately set forth in the PSR: a total offense level of 34, given Hines' status as a career offender under U.S.S.G. § 4B1.1(b) and taking into account a three-level reduction for acceptance of responsibility, a CHC of IV also under the career offender Guideline, and a sentencing range of 262 to 327 months' imprisonment, five years' supervised release, a fine of between $15,000 and $2,000,000 and a mandatory special assessment of $300. *Id.* at 8. The Court also noted that the parties had stipulated not to seek a departure from that range. *Id.* at 6, 9.

The Court then heard arguments from defense counsel, the defendant's father, a victim of the defendant's crimes, the defendant himself and Government counsel before imposing sentence. Then, the Court addressed the purposes of sentencing and applied them to the defendant's case. In particular, the Court emphasized the seriousness of his offenses, noting that Hines was lucky, in effect, that although he had shot one victim and shot at two more, none had died: "But for some luck, you'd be facing murder charges, and you would, in effect, have no hope of getting out of jail ever." *Id.* at 20. The Court went on to note the grave dangers that can result "when you take a gun into your hands and you start shooting it:" "[V]ery bad things can happen. Bad things can happen to you. Bad things can happen to the people that you're shooting at. Bad things can happen to people who just happen to be around." *Id.* at 21. Noting that he was a former resident of the neighborhood where Hines had committed one of the shootings, the Judge pointed out that Hines' "shot could have hit me, it could have hit my family, it could hit anybody walking down that street." *Id.* Focusing on the possible consequences of Hines' violence, the Court reiterated that the

"guidelines here are quite high . . . [and] are serious punishment, and I think that's appropriate." *Id.*
at 22.

Notably, the Court also warned Hines that any further violence or drug crimes would be taken
extremely seriously and sentenced accordingly:  "[I]f you pick up a gun when you get out, if you
start selling drugs when you get out, if you hurt somebody when you get out . . . .  You're going to
get caught.  You're going to get brought back into court.  You're going to be at the top of the
guideline range, and you're going to be looking at basically the rest of your life in prison." *Id.*  After
imposing sentence, the Court reiterated that if Hines found himself back in court, the next sentence
he received would be "as long as it could have been." *Id.* at 32.

With these considerations in mind, the Court explained that, "I don't see any reason to depart
from that [Guidelines] range [stipulated to by the parties]." *Id.* at 25.  The Court observed that a
sentence within the Guidelines range addressed the seriousness of Hines' offense, provided the
appropriate deterrence to Hines and others, and gave Hines a chance to rehabilitate himself. *Id.*

Accordingly, the Court imposed a sentence at the bottom of the stipulated Guidelines range: 262
months for Count One, 202 months for Count Two, and 60 months for Count Three. *Id.* at 25-26.
The sentences imposed for Counts Two and Three were set to run consecutively for a total of 262
months; the 262 month sentence for Count One was imposed concurrently with the sentences for
Counts Two and Three, such that Hines faced a total effective sentence of 262 months. *Id.* at 26.
The Court also imposed five years' of supervised release on each count, to be served concurrently,
and a total of $300 in special assessments. *Id.* at 26.

For the purposes of the pending resentencing, it is notable that the Court's explanation of
sentence focused almost exclusively on Hines' violent crimes, and the grave consequences of his

-10-

use of a gun.   At no time did this Court focus on the quantity of crack cocaine at issue in Hines' drug crimes in providing the reasoning underlying the chosen sentence.

Additionally, as the Court explained in its February 2020 ruling on Hines' habeas petition and First Step Act motion, Hines' status as an Armed Career Criminal under the Armed Career Criminal Act ("ACCA") was not a basis for the Court's sentence: "[W]hen sentencing Hines, I did not rely upon his purported status as an armed career criminal under ACCA. . . .   Hines Guidelines range was enhanced *not* because of his designation under ACCA, but because he was a career offender under the Guidelines."   Ruling on Section 2255 and First Step Act Motions, Doc. No. 70 at 5 (emphasis added).

### F.  Subsequent Murder Convictions

After his 2006 sentencing, it was discovered that Hines had committed a double murder on June 1, 2000—*i.e.*, prior to his federal convictions in the instant case.   On that day, in the late evening, Hines and an accomplice drove to 500 Winthrop Avenue in New Haven.   *See* Gov't Response to Hines First Step Act Motion, Doc. No. 67, at 13.   Hines got out of his car and fired a gun into the car, hitting 21-year-old Lakeia Vaughn in the head and killing her.   *Id.*   A second victim, 26-year old Lamont Brockenberry, turned and tried to run into a house, but Hines fired multiple shots into Brockenberry's back.   *Id.*   Both victims died.

Hines was tried in Connecticut Superior Court, and a jury convicted him of two counts of murder in violation of Conn. Gen. Stat. § 53a-54a(a) and one count of carrying a pistol without a permit in violation of Conn. Gen. Stat. § 29-35(a).   *State v. Hines*, 165 Conn. App. 1 (2016) at 3. The court sentenced Hines on May 6, 2014 to a total of 125 years' imprisonment, to run consecutively to his federal sentence.   *See* Doc. 67 at 13.

### G. Habeas Petition and First Step Act Motion

On June 26, 2016, Hines filed a petition pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his sentence. *See Hines v. United States,* 16CV1044 (SRU), Doc. No. 1. In that petition, Hines sought re-sentencing based on the Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591 (2015), which held that the residual clause of the ACCA was unconstitutionally vague. In light of *Johnson*, Hines argued that he could no longer be deemed an Armed Career Criminal under 18 U.S.C. § 924(e).

On June 20, 2019, Hines filed a motion for immediate release or resentencing under Section 404 of the First Step Act. *See* Doc. No. 63. In that motion, Hines argued that, under the sentencing regime in place today, his conviction in Count Two for possession with intent to distribute five grams or more of crack cocaine would fall under 21 U.S.C. § 841(b)(1)(C) and trigger a lower statutory penalty range of zero to twenty years' imprisonment, rather than the five to 40 years applicable to his 2005 conviction under 21 U.S.C. § 841(b)(1)(B). He also argued that the lower statutory maximum penalty would, in turn, trigger a lower advisory Guidelines range for a career offender under U.S.S.G. § 4B1.1(b), resulting in a reduced Guidelines range of 151 to 188 months' imprisonment.

On February 7, 2020, this Court issued a ruling denying Hines' habeas petition but granting his motion for a resentencing under the First Step Act. As to the habeas petition, the Court held that, while Hines was improperly characterized as an Armed Career Criminal for purposes of Count One in light of *Johnson*, the error was harmless. *See* Doc. 70 at 4-5. Because Hines received two concurrent sentences (for Counts Two and Three) that, together, equaled the length of his Count One (*i.e.*, the ACCA offense) sentence, the Court found that Hines' total effective sentence was not

rendered suspect by *Johnson*. *Id. at 5*. Further, the Court reasoned that, when sentencing Hines, it did not rely on his purported status as an Armed Career Criminal under ACCA: "with respect to the Sentencing Guidelines range, his armed career criminal designation under ACCA never entered the picture: Hines' advisory range was increased solely due to the Guidelines career offender provision." *Id.* at 6.

The Court granted Hines' First Step Act motion, however, as all parties agreed that Count Two (the narcotics offense) constituted a "covered offense" for purposes of the First Step Act. As to the scope of relief, the Court held that "the First Step Act authorizes me, when a defendant is entitled to relief for a covered offense, to conduct a plenary resentencing" on all counts, even those not expressly determined to be "covered offenses." *Id.* at 13. Accordingly, the Court ordered a plenary resentencing for Hines.

## II. LEGAL STANDARD

After the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220, 243-245 (2005) rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007). Under 18 U.S.C. § 3553(a), the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The statute provides that the Court shall consider the following factors in determining the particular sentence to be imposed:

(1) "[T]he nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense."

18 U.S.C. § 3553(a). The Second Circuit reviews a sentence for reasonableness. *See Booker*, 543 U.S. at 260-62. The reasonableness standard is deferential and focuses "primarily on the sentencing court's compliance with its statutory obligation to consider the factors detailed in 18 U.S.C. § 3553(a)." *United States v. Canova*, 412 F.3d 331, 350 (2d Cir. 2005).

## III. STATUTORY AND GUIDELINES EXPOSURE

### A. Current Statutory Exposure

At the time of his original sentencing, Hines faced the following statutory terms of imprisonment on the three counts of conviction: (1) for the felon-in-possession charge in Count One, as an Armed Career Criminal, a mandatory minimum term of 15 years and a maximum of life; (2) for the

-14-

possession with intent to distribute five or more grams of crack cocaine charge in Count Two, a mandatory minimum term of five years and a maximum of 40 years; and (3) for the use of a firearm in furtherance of a drug trafficking felony charged in Count Three, a mandatory five year consecutive term of imprisonment.  *See* PSR ¶ 51.

Those statutory terms have now changed for two of the three offenses.  For the felon-in-possession charge in Count One, without the enhancement triggered by the ACCA, Hines faces a maximum term of imprisonment under 18 U.S.C. §§ 922(g) and 924(a)(2) of ten years, with no mandatory minimum.  For Count One, Hines also faces a maximum term of supervised release of three years, a maximum fine of $250,000 and a mandatory $100 special assessment.

After an intervening change in the law, for the possession with intent to distribute five or more grams of crack cocaine charge in Count Two, Hines now faces a maximum term of imprisonment under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) of 20 years, with no mandatory minimum.  *See* First Step Act Addendum, Doc. No. 64 at 2.  For Count Two, Hines also faces a term of supervised release of three years to life, a maximum fine of $1,000,000 and a mandatory $100 special assessment.  *See id.*

For the use of a firearm in furtherance of a drug trafficking felony charged in Count Three, Hines' statutory exposure remains as it was at the time of his original sentencing in 2006.

**B. Current Guidelines Provisions**

As an initial matter, the Court must calculate Hines' Guidelines range for resentencing.  The last Pre-Sentence Report ("PSR") prepared by the Probation Office was filed over a year ago, on July 2, 2019.  *See* Doc. No. 64.  That document focused primarily on whether Hines would be entitled to relief under the First Step Act, and concluded that, of the three counts of conviction, only Count

Two constituted a covered offense. Because it predated this Court's February 2020 order granting a plenary resentencing, the July 2019 PSR assumed a more limited resentencing, and accordingly did not recalculate the Guidelines range applicable to all three counts of conviction. *See id.* at 2-3. Additionally, because it predated the Court's February 2020 ruling on Hines' *Johnson* challenge to the underlying predicates, the July 2019 PSR assumed that Hines would continue to qualify as a career offender and an Armed Career Criminal, such that his Guidelines range of 262 to 327 months of imprisonment would remain unaffected. *See id.* at 3.

### 1. Application of Career Offender Guideline

Against this backdrop, the threshold question at this time is whether the career offender Guidelines range continues to apply to Hines. In conducting a plenary resentencing, the sentencing court must apply the current version of the Sentencing Guidelines, and, as relevant here, determine whether Hines is "presently is subject to the Guidelines' career offender enhancement." *United States v. Benjamin*, 2019 U.S. Dist. LEXIS 177494 at *15 (D. Conn. 2019).

The relevant Guideline, set forth at U.S.S.G. § 4B1.1(a), provides that a defendant qualifies as a career offender if three conditions have been met:

> A defendant is a career offender if (1) the defendant was eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

Since Hines indisputably fulfills the first two conditions, the pertinent question is whether Hines has at least two prior felony convictions of either a crime of violence or a controlled substance offense. USSG § 4B1.1(a). At the time of his original plea and sentencing, Hines qualified as an Armed Career Criminal based on a February 5, 1996 conviction for Sale of Hallucinogens/Narcotics under

-16-

Conn. Gen. Stat. § 54a-48, and an October 22, 1997 conviction for Robbery Third Degree and

Conspiracy to Commit Assault, 2nd Degree under Conn. Gen. Stat. §§ 53a-136 and 53a-48 and 53a-

61. *See* Plea Agreement, Doc. No. 29 at 5. Hines qualified as a career offender under the Guidelines

on the basis of at least two of those three prior convictions. *See* Ruling on Section 2255 and First

Step Act Motions, Doc. No. 70 at 6.

Since that time, however, the Sentencing Commission has amended the career offender

guidelines to cohere with the Supreme Court's opinion in *United States v. Johnson*, 576 U.S. 591

(2015). Now, under the amended Sentencing Guidelines, an offense may only constitute a predicate

"crime of violence" for purposes of the career offender guideline if it is punishable by more than

one year in prison and "ha[ve] as an element the use, attempted use, or threatened use of physical

force against the person of another." USSG § 4B1.2(a)(1). Conspiracy to commit assault in the

second degree does not, according to this Court, continue to qualify as a predicate offense for

purposes of the career offender guidelines because it lacks the necessary force element. *See* Ruling

on Section 2255 and First Step Act Motions, Doc. No. 70 at 7-8 (quoting *Wiggan v. United States*,

2016 WL 4179838, at *15) (D. Conn. Aug. 5, 2016)). Additionally, state drug convictions typically

do not now qualify as a predicate offense for purposes of the career offender guidelines. *See United

States v. Townsend*, 897 F.3d 66 (2d Cir. 2018) (addressing comparable New York drug conviction).

Hines' 1997 convictions for third-degree robbery and conspiracy to commit second-degree assault

thus no longer constitute valid predicates.

Accordingly, of the three prior convictions that qualified (or potentially qualified) as predicate

offenses at Hines' original sentencing in 2006, only one—Hines' 1996 conviction for robbery in the

third degree—continues to serve as a valid predicate for the application of the career offender

guideline.  *See* Ruling on Section 2255 and First Step Act Motions, Doc. No. 70 at 6-9.

Nevertheless, the career offender analysis does not end there.  Though unbeknownst to the Court

(or to law enforcement) at the time of his original 2006 sentencing, Hines had already committed

two murders in June 2000, for which he was convicted under Conn. Gen. Stat. § 53a-54a(a) and then

sentenced in 2014.  *See State v. Hines*, 165 Conn. App. 1, 3 (2016).  As a general matter, a double

murder constitutes a "crime of violence" for purposes of the career offender guidelines.  *See* U.S.S.G.

§ 4B1.2(a)(2) ("the term 'crime of violence' means any offense . . . that—is murder, voluntary

manslaughter, kidnapping . . .").

The question, however, is whether the double murder qualifies as a "prior felony conviction" for

Hines.  U.S.S.G. § 4B1.1(a).  Hines committed the 2000 murders before committing the instant

federal offenses in 2004 and 2005 and before his 2006 federal sentencing.  Of course, the murder

convictions also pre-date Hines' pending 2020 re-sentencing.  The murder convictions do, however,

*post*-date his commission of the instant federal offenses, which may be the dispositive factor.

According to U.S.S.G. § 4B1.2(c), for purposes of the career offender guidelines:

The term 'two prior felony convictions' means . . . the defendant committed the instant
offense of conviction subsequent to sustaining at least two felony convictions of either
a crime of violence or a controlled substance offense . . . .  The date that a defendant
sustained a conviction shall be the date that the guilt of the defendant has been
established, whether by guilty plea, trial, or plea of nolo contendere.

Because Hines "committed the instant offense of conviction" in 2004 and 2005 *before* "sustain[ing]

the double murder] conviction" in 2014, the language of Section 4B1.2(c) suggests that his double

murder should not constitute a valid predicate.  Accordingly, the career offender guideline likely

should *not* apply to Hines upon resentencing.[1]  *See, e.g.*, *Gonzalez v. United States*, 433 F. App'x 24, 27 (2d Cir. 2011) (citing *Puello v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 330–31 (2d Cir. 2007)).

Even if the career offender guideline is not technically applicable to Hines upon resentencing, the Court may still account for his history of violent crimes in the Guidelines calculation itself via another method.  In particular, a district court should recalculate a defendant's Criminal History Category as of the time of the re-sentencing, rather than the time of the original sentencing, even if that means assessing additional points.  *See, e.g.*, *United States v. Fermin*, 277 F. App'x 28, 34 (2d Cir. 2008) (resentencing a defendant under CHC VI who had previously fallen into CHC III following vacatur of one count of conviction).  As the Second Circuit has instructed, the district court is "*required* to resentence [the defendant] in light of the circumstances as they stood at the time of his resentencing."  *Werber v. United States,* 149 F.3d 172, 178 (2d Cir. 1998) (emphasis added); *accord United States v. Tidwell*, 827 F.3d 761, 763-65 (8th Cir. 2016) (holding that a conviction imposed after the original sentencing but before a *de novo* sentencing may be taken into account when computing criminal history points anew); *United States v. Burke*, 863 F.3d 1355, 1358-60 (11th Cir. 2017) ("prior sentence[s]" under U.S.S.G. § 4A1.2 encompass sentences sustained before the resentencing proceeding); *United States v. Klump*, 57 F.3d 801, 803 (9th Cir. 1995).  *Cf. United States v. Ticchiarelli*, 171 F.3d 24 (1st Cir. 1999) (holding that sentences imposed after original sentencing but before resentencing cannot be considered based in part on its "mandate

---

[1] It is worth noting that this conclusion is not incontrovertible.  Indeed, the defendant himself has called the application of the career offender guideline to be "questionable."  Def. Mem. at 8.  Indeed, he calculates his own Guidelines range to include the career offender designation.  *See* Def. Mem. at 11.

rule" which, when applied, essentially precludes plenary resentencing as a district court must conform with the remand order from an appellate court).

Additionally, and unquestionably—separate and apart from its Guidelines calculation—the Court can and should take Hines' double murder into account in its consideration of the sentencing factors, its analysis of 18 U.S.C. § 3553(a), and its balancing of the equities. *See* Discussion, Section IV, below.

### 2.  Calculation of Guidelines Range

Assuming, therefore, that the career offender guideline does not apply to Hines at resentencing, the Government submits that the following Guidelines calculation should apply.[2]

For the felon-in-possession conviction charged in Count One, Hines' base offense level under U.S.S.G § 2K2.1(4)(A) is 20, since he committed the instant offense after sustaining a felony conviction for a crime of violence (his 1996 conviction for third-degree robbery). Four levels should be added under § 2K2.1(b)(4)(B), which is applicable if "any firearm . . . had an altered or obliterated serial number." *See* PSR ¶ 12. Hines' total offense level for Count One is 24.

For the possession with intent to sell five or more grams of crack cocaine offense charged in Count Two, Hines' base offense level under U.S.S.G § 2D1.1(c)(12) is 16, because he possessed 6.48 grams of crack cocaine. *See* PSR ¶ 14. Because Hines was also convicted of use of a firearm

---

[2] If, however, the Court determines that Hines continues to qualify as a career offender, his sentence under the current Guidelines is still governed by U.S.S.G. § 4B1.1(c), which provides that the applicable Guidelines range is the *greater* of the range that results from adding the mandatory minimum consecutive penalty required by Hines' 18 U.S.C. § 924(c) conviction to the minimum and the maximum of the otherwise applicable guideline range for the other counts *or* the range determined by the table in U.S.S.G. § 4B1.1(c)(3). Here, the greater of the two is the latter. Thus, if deemed a career offender, Hines would be subject to the same Guidelines range of 262 to 327 months of imprisonment as he faced at his first sentencing.

in furtherance of a drug trafficking offense, no weapons or violence enhancements apply.  U.S.S.G. § 2K2.4, Application Note 4.

Counts One and Two are grouped pursuant to § 3D1.2(c).  And pursuant to § 3D1.3(a), the offense level applicable to the Group comprised of Counts One and Two is the highest offense level of the counts in the Group.  The offense level for Count One is higher, and thus the Count One level of 24 is the total level for the group of offenses including Count One and Count Two.  A three-level reduction in Hines's offense level remains in effect for his acceptance of responsibility pursuant to § 3E1.1, resulting in an adjusted offense level of 21.

As to Count Three, § 2K2.4(b) directs that absent a career offender designation, the guideline sentence for a defendant convicted of violating 18 U.S.C. § 924(c) is the minimum term of imprisonment required by statute.   Here, the guideline sentence applicable under 18 U.S.C. § 924(c)(1)(A)(i) is five years.

Even absent a career offender designation, Hines remains in CHC VI.  As set forth in his PSR, Hines has 12 criminal history points resulting from his pre-2006 convictions.  PSR ¶ 29.  Upon resentencing, Hines' criminal history score now must include his 2014 conviction for double murder, for which Hines received a sentence of 125 years.  Accordingly, Hines now has accumulated 15 criminal history points, placing him in CHC VI.

An adjusted offense level of 21, coupled with a Criminal History Category of VI, results in a range of 77 to 96 months of imprisonment (sentencing table).  Adding the statutory mandatory minimum of 60 consecutive months dictated by 18 U.S.C. § 924(c)(1)(A) to the top and bottom of that range results in a final Guidelines range of 137 to 156 months of imprisonment.  Hines is also

subject to a Guidelines fine range of $15,000 to $150,000, *see* U.S.S.G. §§ 2K2.4(d), 5E1.2(c)(3), and a Guidelines term of supervised release of three years.  U.S.S.G. § 5D1.2.

## IV. DISCUSSION

The Government respectfully submits that this Court should exercise its discretion not to disturb Hines' total effective sentence, because the primary impetus behind his original sentence was the violent shooting of multiple people that, but for a stroke of luck, could have resulted in multiple murders.  Since Hines last appeared before this Court for sentencing in 2006, his criminal record has become even more disturbing, since it has come to light that he committed a heinous double murder in 2000, prior to his commission of the instant federal offenses.  Though Hines does stand convicted of distribution of crack cocaine, his more serious crimes involve the manner in which he has taken multiple lives and attempted to take multiple others.  He is not the type of offender that Congress intended to be re-sentenced or released under the First Step Act.  Accordingly, and with an eye toward the purposes of sentencing set forth in 18 U.S.C. § 3553(a), the Government respectfully urges that this Court re-impose a total effective sentence of at least 262 months of imprisonment upon Hines at resentencing.

### A. The Statutory Purposes of the First Step Act

Sections 2 and 3 of the Fair Sentencing Act of 2010, retroactively authorized by the First Step Act of 2018, had a single purpose: to "'reduce[] the statutory penalties for cocaine base[] offenses' in order to 'alleviate the severe sentencing disparity between crack and powder cocaine.'" *United States v. Medina*, No. 3:05-cr-58 (SRU), 2019 WL 3769598, at *3 (D. Conn. July 17, 2019) (quoting *United States v. Sampson*, 360 F. Supp. 3d 168, 169 (W.D.N.Y. Mar. 13, 2019)); see also *United States v. Allen*, 384 F. Supp. 3d 238, 240 (D. Conn. 2019) ("The Fair Sentencing Act of 2010 was

enacted in response to widespread criticism of the relatively harsh treatment of crack cocaine offenses compared to offenses involving powder cocaine."); *United States v. Rose*, 379 F. Supp. 3d 223, 229 (S.D.N.Y. 2019) ("Both the Fair Sentencing Act and the First Step Act have the remedial purpose of mitigating the unfairness created by the crack-to-powder cocaine ratio."). As the Hon. Vanessa L. Bryant noted in *United States v. Slutzkin*, No. 3:09-CR-00060 (VLB), 2019 WL 5696122, *7-8 (D. Conn. Nov. 4, 2019):

> In passing the Fair Sentencing Act in 2010 and the First Step Act in 2018, Congress' objective was to stop over-penalizing non-violent drug offenders. The penalties in place prior to 2010, Congress determined, sometimes served to turn some young people, who may have made one unfortunate mistake, after many years of being housed in federal prison, into career criminals. Hence the Fair Sentencing and First Step Act's desire to lower, at a Court's discretion, sentences for individuals who were within Congress' contemplation when passing these statutes.

Hines, a perpetrator who has committed multiple murders and shootings, simply does not fall into the category of non-violent crack dealers who "may have made one unfortunate mistake" and thus deserves release under the First Step Act.  In fact, Hines' involvement in dealing crack cocaine was a minimal factor in the Court's reasoning for its initial sentence.  It was Hines' violent conduct that constituted the driving force behind his sentence.  The First Step Act was simply not intended to offer leniency to violent criminals.

Congress clearly intended relief under the First Step Act to be discretionary, as Section 404 of the Act specifically provides that '[n]othing in this section shall be construed to require a court to reduce any sentence pursuant to this section."  As this Court explained in *United States v. Morales*, No. 3:94-CR-112 (SRU), Doc. No. 2254, at 10 (D. Conn. Aug. 20, 2020), "even if [a defendant] is entitled to a plenary resentencing, he is not necessarily entitled to a sentence reduction."  "Whether to reduce a sentence is a matter left to the district court's sound discretion."  *Id.  See also United*

*States v. Richardson*, No. 3:99-CR-264-8, 2019 WL 4889280, *7 (D. Conn. Oct. 3, 2019) (noting

that "eligibility for relief under the First Step Act should not be confused with an entitlement to a

sentence reduction"); *United States v. Holloway*, No. 19-1035-cr, at 19 (2d Cir. Apr. 24, 2020)

(cautioning that while a defendant may be "plainly *eligible* for relief, he is not necessarily *entitled*

to relief") (emphasis in original); *United States v. Rose*, 379 F. Supp. 3d 223, 233 (S.D.N.Y. 2019)

(recognizing that eligibility for relief under the First Step Act does not result in automatic relief).

**B.  The Statutory Sentencing Factors Weigh Against Reducing Hines' Sentence**

As this Court has recently explained, the statutory sentencing factors set forth in 18 U.S.C.

§ 3553(a) guide the decision as to whether to reduce a defendant's sentence.  *United States v.*

*Morales*, No. 3:94-CR-112 (SRU), Doc. No. 2254, at 10 (D. Conn. Aug. 20, 2020).  *See also United*

*States v. Adams*, No. 04-CR-236 (SRU), Doc. No. 77, at 7 (D. Conn. Aug. 20, 2019); *United States*

*v. Richardson*, 2019 WL 4889280, at *10 (D. Conn. Oct. 3, 2019) ("Having determined that Mr.

Richardson is eligible for consideration of relief under the First Step Act, the issue instead is whether

the length of that sentence should now be reduced, taking into consideration his various criminal

acts and all of the other factors relevant under 18 U.S.C. § 3553(a)."); *United States v. Page*, 2020

WL 1698671, at *4 (D. Conn. Apr. 8, 2020) ("The extent of the reduction that should be granted

under the First Step Act is determined by considering the sentencing factors in 18 U.S.C. §

3553(a)."); *United States v. Jones*, 2019 WL 6907304, at *6 (D. Conn. Dec. 19, 2019) ("The Court

agrees that its exercise of discretion should be informed by the § 3553(a) factors."); *United States v.*

*Rose*, 379 F. Supp. 3d 223, 231 (S.D.N.Y. 2019) ("This Court concludes that the First Step Act

authorizes the Court to re-evaluate § 3553(a) factors in light of post-sentencing factual

developments.").

In this case, the sentencing factors speak with one voice in counseling against a sentence reduction for Hines.  First, the nature and circumstances of Hines' offenses of conviction were indisputably serious.  *See* 18 U.S.C. §§ 3553(a)(1)-(a)(2)(A).  On Christmas Eve of 2004, Hines approached a victim on the street, pulled a gun, and shot him in the leg, seriously wounding him in an incident that, but for a stroke of luck, could well have ended in the victim's death.  *See* PSR ¶ 9. A mere few weeks later, Hines again shot repeatedly at a car carrying his girlfriend and another passenger, with one bullet smashing a rear window and another grazing the car's hood.  *See* PSR ¶ 10.  After his girlfriend exited the vehicle, Hines fired the gun twice more at her, fortunately missing both times.  *Id.*  When police searched the home Hines shared with his girlfriend, they found a sawed-off shotgun with an obliterated serial number, as well as ammunition.  *See* PSR ¶ 12.  When police later arrested Hines, he was in possession of another gun—the one he had used in the December 2004 and January 2005 shootings—which was fully loaded, with a round chambered and the safety off.  *See* PSR ¶ 13-14.  At the time, Hines claimed he kept the gun to protect himself from robberies in connection with his drug sales.  But his history of gratuitous, unprovoked shootings undercut any notion that his possession of the gun was strictly defensive in nature.

As the Court discussed at length during Hines' 2006 sentencing, this offense conduct is exceptionally violent and extremely grave.  Hines could easily have killed one of the people he shot or shot at, or could have killed or wounded a bystander.  As it is, he did seriously injure one victim with a shot to the leg.  Violence and shootings, like those committed by Hines, not only cause catastrophic consequences to individual victims, they also impose ruinous costs on whole neighborhoods.  Gun violence and drug dealing can cause residents to live in perpetual fear, produce

a toxic environment for children, and create lasting trauma for community members.   Hines'
sentence must reflect the gravity of his crimes.

The defendant's history and characteristics only increase the need for a meaningful sentence.
*See* 18 U.S.C. §§ 3553(a)(1).   At the time of Hines' original sentencing, his criminal record was
already deeply troubling.   *See supra*, Section I.C.   He had effectively spent his entire adulthood
committing crimes, including multiple violent assaults.   While incarcerated, he had beaten a fellow
inmate in an attempt to steal his sneakers.   *See* PSR ¶ 26.   While at work, he had laid in wait in a
restroom for a coworker and punched him repeatedly in the face.   *See* PSR ¶ 27.   And while
imprisoned prior to his original sentencing, he had racked up no less than 25 disciplinary infractions,
for offenses including assault, threats, fighting, destruction of property, security risk group
affiliation, and possession of contraband.   PSR ¶ 28.   This pre-conviction criminal history alone
indicated a disturbing proclivity toward violence and, as the Court observed, a need for a sentence
that would serve to deter Hines and others.[3]   *See Hines v. United States,* 16CV1044 (SRU), Doc.
No. 11-3 (Sentencing Hearing Transcript) at 25; 18 U.S.C. § 3553(a)(2)(B).

But, troubling as that criminal record was, the full scope of Hines' criminal history is far more
alarming than what was known to the Court at the time of his 2006 sentencing.   It later came to light

---

[3] It is worth noting that, at the time of his original sentencing, Hines received lenient treatment in several respects.
First, the Government agreed in the plea agreement not to file a second offender notice under 21 U.S.C. § 851, which
would have increased the applicable mandatory minimum and maximum terms of imprisonment, as well as increasing
the maximum fine and the mandatory minimum period of supervised release.   *See* Plea Agreement at 6.   Second, the
Government agreed to a guilty plea in which Hines admitted to possessing or carrying a firearm in furtherance of a
drug trafficking offense under 18 U.S.C. § 924(c)(1)(A)(i), which carries a mandatory minimum sentence of only five
years in prison.   Because Hines actually discharged the firearm in the December 24, 2004 shooting after engaging in a
drug-related colloquy with the victim, there is reason to believe that Hines could have been found guilty of discharging
a firearm in furtherance of a drug trafficking offense under 18 U.S.C. § 924(c)(1)(A)(iii), which would have carried a
mandatory minimum sentence of 10 years in prison.

that Hines had committed a brutal double murder on June 1, 2000, some four years before committing the instant federal offenses.  On that night, Hines shot one victim in the head as she sat in a car.  When the second victim attempted to run for his life, Hines gunned him down, shooting him repeatedly in the back and killing him.  *See* Gov't Response to Hines First Step Act Motion, Doc. No. 67, at 13.  Because Hines' commission of this heinous crime was unknown to the Court in 2006, his criminal history at the time of his original sentencing was in fact dramatically understated. At his original sentencing, the Court made note of Hines' proclivity to violence, observing that, "but for some luck, you'd be facing murder charges" based on his offense conduct in the federal case. *Hines v. United States,* 16CV1044 (SRU), Doc. No. 11-3 (Sentencing Hearing Transcript) at 20.  As it happens, Hines would indeed be facing murder charges within the decade.  Today, he stands convicted of two vicious murders, for which he has been sentenced to 125 years in prison.  *See State v. Hines*, 165 Conn. App. 1 (2016) at 3.

Moreover, Hines has apparently proven unwilling to display better behavior following his federal convictions.  His prison disciplinary history following his convictions in this case has been consistently problematic.  According to the PSR Addendum filed in July 2019, Bureau of Prisons records show that Hines "has generally displayed poor institutional adjustment and has been placed in a Special Housing Unit (SHU) at various times." PSR Add. at 3-4.  He has sustained 26 disciplinary citations, dating from February 2007 through March 2018.  These citations include acts of violence: fighting with another person (3/7/2008), assaulting without serious injury (8/5/2008, 4/13/2009), and threatening bodily harm (8/24/2011). They include possessing drugs/alcohol (suboxone) (5/8/2017).  They include damaging property worth $100 or less (1/15/2016, 1/20/2016). He has accumulated numerous citations for directly disobeying prison rules, such as refusing to obey

an order (2/5/2007, 11/11/2008, 3/11/2009, 11/23/2010, 1/11/2012, 8/31/2014, 1/14/2016); refusing

a work assignment (2/6/2010, 5/23/2011, 7/12/2011, 8/22/2011, 6/13/2017, 8/8/2017); being absent

from assignment (5/1/2008); interfering with security device (5/15/2011); phone abuse  (2/5/2015);

and failing to follow safety regulations (3/18/2018). He has been repeatedly sanctioned by loss of

good conduct time, commissary privileges, phone and email privileges, visiting privileges,

disciplinary segregation, and other penalties.  *Id.*  This BOP disciplinary history is disturbingly

consistent with Hines' disciplinary history while in the custody of the Connecticut Department of

Corrections, during which time he accumulated 25 disciplinary infractions, including for violence

and threats.  PSR ¶ 28.

Together, the defendant's history and characteristics militate in favor of at least as long a

sentence as was imposed in 2006—if not longer.  Indeed, as a matter of law, this Court would be

well within its discretion to hand down an even lengthier sentence than that imposed in 2006.  As

the Second Circuit has instructed, "[w]hen a defendant challenges convictions on particular counts

that are inextricably tied to other counts in determining the sentencing range under the guidelines,

the defendant assumes the risk of undoing the intricate knot of calculations should he succeed.  Once

this knot is undone, the district court must sentence the defendant *de novo* and, if a more severe

sentence results, vindictiveness will not be presumed." *United States v. Atehortva,* 69 F.3d 679, 685-

86 (2d Cir. 1995) (citation omitted); *see also United States v. Quintieri,* 306 F.3d 1217, 1227-28 (2d

Cir. 2002) ("A district court's sentence is based on the constellation of offenses for which the

defendant was convicted and their relationship to a mosaic of facts, including the circumstances of

the crimes, their relationship to one another, and other relevant behavior of the defendant. . . .  For

the district court to sentence the defendant accurately and appropriately, it must confront the offenses of conviction and facts anew.").

Notably, Hines does not—and indeed, cannot—meaningfully argue otherwise.  In his July 2020 sentencing memorandum, he recites the various legal developments, including the First Step Act and the change in the threshold quantity of crack cocaine triggering a five-year mandatory minimum, which permit the Court to apply a more lenient term of imprisonment.  He also explains the rationale behind some of the modifications to the law in general terms.  But nowhere does he explain why he himself should benefit from the Court's discretionary lenience.  Nowhere does he describe any mitigating factors for his crimes, or any personal changed circumstances or improved conduct that might persuade the Court to reconsider a sentence of 262 months' imprisonment.  Indeed, that may well be because Hines has little or no positive developments to relay.  If anything, while the circumstances of his federal crimes have remained constant, the defendant's own position has actually worsened since his 2006 sentencing, and nothing in his most recent sentencing submission suggests otherwise.  And as this Court has instructed, a "sentencing court must sentence the *defendant*, not the crime." *United States v. Luna*, 436 F. Supp. 3d 478, 487 (D. Conn. 2020) (emphasis in original).

During Hines' 2006 sentencing, this Court explained that a sentence of 262 months' imprisonment was appropriate to address the seriousness of Hines' offense, provided the appropriate deterrence to Hines and others, and gave Hines a chance to rehabilitate himself.  *See* Sentencing Hearing Transcript at 25.  With the benefit of more complete information, especially regarding Hines' commission of the 2000 double murder, this reasoning applies with even greater force today. In 2006, the Court expressly warned Hines that any further violence would be taken seriously and

sentenced accordingly. *See id.* at 22. Now, it is clear that Hines had committed even more wanton violence before his initial sentence and continued to commit violent infractions in prison afterwards. In order to address the statutory sentencing factors—in particular, the need to reflect the history and characteristics of the defendant, the need to promote respect for the law and to provide just punishment for the offense, the need to afford adequate deterrence to the defendant and others, and the need to protect the public from further crimes of the defendant, *see* 18 U.S.C. § 3553(a)(1)-(2)— this Court should impose, at minimum, the same sentence that it did in 2006. His sentence today should reflect the admonition that the Court gave him in 2006. Further violence should not be met with greater lenience. As this Court noted recently, after considering post-sentencing factual developments, the section 3553(a) factors counsel against a reduction of sentence under the First Step Act where, as here, the defendant "committed the most serious kind of crime—murder." *United States v. Morales*, No. 3:94-CR-112 (SRU), Doc. No. 2254, at 11 (D. Conn. Aug. 20, 2020).[4]

Accordingly the Government submits that this Court should not reduce Hines' sentence below the 262-month total effective term of imprisonment imposed in 2006. Insofar as a recalculated Guidelines range may fall below that term, the Government urges that the Court consider either an upward departure or variance as a matter of equity. This can be accomplished in a variety of ways, including by an upward departure in Hines' Criminal History Category to take into account his commission of the brutal double murder, even though Hines already falls within the highest CHC of

---

[4] In one sense, Hines' arguments for a reduction carry even less force than did Morales', in that Morales had demonstrated exceptional rehabilitation while in custody, earning both an Associate's Degree and a Bachelor's Degree, maintaining BOP employment, receiving no disciplinary infractions, publicly renouncing his prior gang affiliation, volunteering as a suicide watch companion and donating his limited BOP earnings to charity. Hines, by contrast, has demonstrated no such rehabilitation.

VI.  *See* U.S.S.G. § 4A1.3(a)(1) and Application Note 2(B) (authorizing upward departures from CHC VI); *see also United States v. Thomas*, 6 F.3d 960 (2d Cir. 1993) (affirming an upward departure from CHC IV that effectively doubled the defendant's sentence, and explaining the mechanism whereby such a departure is accomplished);  *United States v. Harris*, 13 F.3d 555, 558 (2d Cir. 1994) (concluding that a twelve level upward departure from level five to seventeen was reasonable; reaffirmed that departing upward from CHC VI does not require a rigid step-by-step approach); *United States v. Campbell*, 967 F.2d 20, 27 (2d Cir. 1992) (finding reasonable an upward departure from 15-21 month guideline range to a sentence of 54 months).

Alternatively, the Court can accomplish the same goal by means of an upward variance.

If the Court opts to maintain the 262-month effective term of imprisonment, it should impose such a sentence with an eye toward the current statutory maximum terms for each offense of conviction.  In particular, the felon-in-possession charge in Count One now carries a 10 year statutory maximum term of imprisonment, without the ACCA enhancement, and the possession with intent to distribute five grams or more of crack cocaine carries a 20 year statutory maximum term of imprisonment.  The use of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c) has a maximum term of life in prison, however.  Therefore, insofar as the Court agrees that the original 262-month total effective term of imprisonment continues to be the appropriate sentence, it may still impose such a sentence consistent with the applicable statutory maximum terms.

### C.  Other Matters: COVID and Powder-to-Crack Ratio

Hines raises two other arguments in his July 2020 sentencing memorandum, neither of which, the Government respectfully submits, carry meaningful weight.

First, Hines asserts in conclusory fashion that the COVID-19 pandemic should be considered by the Court at resentencing. *See* Defendant's Memorandum in Aid of Sentencing, Doc. 80, at 12-13. While not a model of clarity, Hines' memorandum does not appear to request compassionate release under 18 U.S.C. § 3582(c), but rather asks the Court to consider the risk of contracting COVID-19 as a factor under § 3553(a).

Hines' COVID-related arguments fall flat in part because he fails to set forth any circumstances specific to himself that might warrant heightened concern. He provides no evidence of his medical condition, pre-existing health concerns, or any circumstances that might differentiate himself from any other detainee. Instead, Hines merely states that "Covid-19 and other health vulnerabilities are certainly relevant under 18 U.S.C. § 3553(a)," that "there have been positive tests at Wyatt Detention Center which as the Court knows has affected the Defendant," and that "the susceptibility to the virus is heightened for those in incarceration." *Id.* at 12. Consideration of the § 3553(a) factors are meant to address circumstances specific to the defendant. Here, however, Hines has failed to assert any personal circumstances at all.

Moreover, Hines' COVID-related argument is particularly unconvincing in light of the 125-year sentence he has yet to serve for his double murder conviction as a state detainee. Hines does not explain whether or how the state prison system is better equipped to handle the COVID pandemic, or even argue that his detention in a federal facility presents amplified risk. In all, Hines' COVID argument fails to make a meaningful case for any sentence reduction.[5]

———————————————

[5] In the last sentence of the "Covid-19" section of his sentencing memorandum, Hines seems to assert an 8th Amendment argument. *Id.* at 13. Without any stated grounds for such an argument, the Government cannot adequately respond at this time, but reserves the right to do so if and when appropriate.

Second, relying on *Kimbrough v. United States*, 552 U.S. 85 (2007), Hines seeks a new sentence based on a 1-to-1 ratio of crack cocaine to powder cocaine. Essentially, Hines asks the Court to apply the Guidelines range for powder cocaine to his crack cocaine offense. *See* Def. Mem., Doc. 80, at 14. According to Hines, this would result in a sentencing range of 151-188 months with a career offender designation, but just 30-37 months without the career offender designation. *Id.* at 15. This argument too is unpersuasive.

As an initial matter, Hines overstates the holding of *Kimbrough*, which was issued at a time when the crack-to-powder ratio for purposes of the Sentencing Guidelines stood at 100-to-1. Under the current Guidelines, however, the ratio stands at just 18-to-1, which Hines attempts to miscast in an exercise of false equivalency: "There is no good justification for this disparity as there was no good justification for the former 100 to 1 disparity." *See* Def. Mem., Doc. 80, at 14. But both Congress and the Sentencing Commission have indicated that *some* disparity in the sentencing treatment of the two narcotics is warranted, as *Kimbrough* recognizes: "Some differential in the quantity-based penalties is warranted because crack is more addictive, crack offenses are more likely to involve weapons or bodily injury, and crack distribution is associated with higher levels of crime." 552 U.S. at 98.

More pertinent, however, is the fact that Hines' case is exceptionally ill-suited to 1-to-1 treatment. Kimbrough was highly dissimilar from Hines: he committed an "unremarkable" drug-trafficking offense, had no prior felony convictions, served in the U.S. military and received an honorable discharge, and had a steady history of employment. *Id.* at 110. Further, Kimbrough's lengthy Guidelines range of 228 to 270 months' imprisonment was driven by the then-applicable crack cocaine Guideline. Hines, by contrast, was sentenced in 2006—and should be resentenced

now—primarily based on his exceptionally violent conduct.  The original Guidelines range was established based on Hines' status as a career offender, not based on the quantity of drugs recovered from his rectum.  Additionally, in the original sentencing, the Court focused almost exclusively on Hines' possession and use of firearms to shoot and wound multiple victims.  His possession of 6.48 grams of crack cocaine factored very little, if at all, into the Court's stated reasoning for Hines' 262-month sentence.  Now, with the benefit of new information about Hines' commission of two murders, the details of Hines' crack cocaine offense may feature even less prominently upon resentencing, if such a thing is possible.  Hines has not—and indeed, cannot—demonstrate any basis for 1-to-1 treatment or for a further reduction of his Sentencing Guidelines that would be compatible with the § 3553(a) factors or the purposes of sentencing.

## V.  CONCLUSION

At the time of his 2006 sentencing, this Court saw fit to impose a 262-month total effective sentence on Craig Hines to address the exceptionally serious nature of his violent conduct.  As of today, following Hines' conviction in 2014 of a heinous double murder, the reasons to maintain that sentence have only grown more urgent and compelling.  For the reasons set forth herein, and to effectuate the purposes of sentencing set forth in 18 U.S.C. § 3553(a), the Government respectfully requests that the Court impose a sentence equal to that in Hines' original sentencing.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

  /s/

ELENA L. CORONADO
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv09758
Elena.coronado@usdoj.gov
1000 Lafayette Blvd, 10th Floor
Bridgeport, Connecticut 06604
(203) 696-3000

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 16, 2020, a copy of foregoing Government's Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


/s/ *Elena L. Coronado*
ELENA L. CORONADO
ASSISTANT UNITED STATES ATTORNEY

APPENDIX CONTINUED
IN FOLLOWING VOLUME