# 21-3121-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

————— ❯❯❮❮ —————

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

CRAIG HINES,

*Defendant-Appellant.*

————————

*On Appeal from the United States District Court
for the District of Connecticut*

## APPENDIX
## VOLUME II OF II
## Pages A-189 to A-323

UNITED STATES ATTORNEY'S OFFICE
  FOR THE DISTRICT OF CONNECTICUT
*Attorneys for Appellee*
1000 Lafayette Boulevard, 10th Floor
Bridgeport, Connecticut 06604
203-696-3027

     *and*

Connecticut Financial Center
157 Church Street
New Haven, Connecticut 06510

LAW OFFICE OF JAMES M. BRANDEN
*Attorneys for Defendant-Appellant*
80 Bay Street Landing, Suite 7j
Staten Island, New York 10301
212-286-0173

**A - i**

```
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
----------------------------------------x

UNITED STATES OF AMERICA,

                Appellee,                    Docket No.
                                             21-3121-cr
           -against-

CRAIG HINES,

                Defendant-Appellant.

----------------------------------------x
```

<u>**APPENDIX FOR APPELLANT CRAIG HINES**</u>

*Page No.*

Docket Entries. . . . . . . . . . . . . . . . . . . . A1-17

The Indictment. . . . . . . . . . . . . . . . . . . . A18-20

The Guilty Plea Agreement . . . . . . . . . . . . . . A21-32

The Transcript of the Change of Plea Proceeding . . . . . A33-85

The Original Sentencing . . . . . . . . . . . . . . . A86-118

The Original Judgment . . . . . . . . . . . . . . . A119-121

District Court's Ruling on Section 2255 and
       First Step Act Motions . . . . . . . . . . . . . A122-134

The Resentencing

       The Defendant's Re-sentencing Memorandum . . . . . A135-152
       The Government's Response. . . . . . . . . . . . A153-188
       The Defendant's Supplemental Re-sentencing
          Memorandum. . . . . . . . . . . . . . . A189-191
       The Government's Supplemental Response . . . . . A192-195
       The Re-sentencing Hearing, Part I. . . . . . . . A196-248
       The Re-sentencing Hearing, Part II . . . . . . . A249-314

The Amended Judgment. . . . . . . . . . . . . . . . A315-318

The Notice of Appeal. . . . . . . . . . . . . . . . A319-323

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          :  3:05 CR 118 (SRU)

VS

CRAIG HINES                                  :  OCTOBER 12 2021

DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM

The Defendant hereby submits that there are some facts and arguments

which were not made based on recent developments at the sentencing on September

21, 2020 which are relevant to the disposition of this matter.

**State Murder Convictions**

There was much discussion at the sentencing relevant to Defedant's 2 murder

convictions and 125 year State sentence which were imposed subsequent to

Defendant's original sentence in this matter.

Clearly, the convictions cannot be used to establish armed career offender or

career offender status.  USSG section 4B1.2(c) Also there is no evidentiary link to

indicate that they were relevant  re: the convictions in this matter.

But the Defendant has taken steps far beyond the timing argument on the

convictions.  He has filed a State Habeas matter and has asserted actual innocence.

He has gone to the extent of having a lie detector test completed which resulted in a

finding of no deception as to Defendant's denials that he committed the murders for

which he was convicted.

At least partially due to Covid-19, he has been thwarted in his efforts.  Because

of Covid-19 and a change in his State lawyers, his trial and his ability to prove his

innocence has been put off until November of 2025 thus ensuring that he will be

incarcerated somewhere until then.  This is a trial that was initially scheduled in

April  2020.

He has also accumulated evidence regarding his accusers and has at all times asserted his innocence  with undersigned counsel.

The Defendant, if he is not resentenced before the Habeas proceeding will have served 244 months on this sentence. He has served 193 months.  All of his arguments and his rights under the First Step Act become academic if he is not sentenced prior to the Habeas proceeding..

Even if he is not completely exonerated at the Habeas trial, he has been at Wyatt Detention Center, a place for pretrial detainees for over one year and is facing another 48 months, at a facility with limited programming, effectively in limbo.

Although the argument has been made that he will be incarcerated regardless of the outcome today, time served on this matter would allow him to start serving his lengthy State  sentences at the very least.  It would allow him to pursue his State claims in Connecticut which we would all agree is almost all of his future incarceration.

<u>**ATTACHMENTS**</u>

1.  Aramark Letter

2.  Donald J Wyatt Certificate

3.  Global Polygraph Network - LieDetector test and information

4.  Court Docket Sheet - State Habeas matters

The Defendant, Craig Hines

By <u> /s/ Vito A Castignoli</u>
Vito A. Castignoli
185 Broad Street
Milford, CT  06460

2

Tel 877-8407 Fed Bar# 10057

### CERTIFICATE OF SERVICE

   I hereby certify that on October 12, 2021, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail  to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

   /s/Vito A Castignoli
Vito A. Castignoli

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:05-cr-00118 (SRU) |
| | : | |
| v. | : | |
| | : | |
| CRAIG HINES | : | October 25, 2021 |

**GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM**

The government respectfully submits this brief memorandum to supplement its more extensive Government's Response to Defendant's Sentencing Memorandum, filed September 16, 2020 (Doc. No. 86), and in response to the Defendant's Supplemental Sentencing Memorandum, filed October 10, 2021 (Doc. No. 110). Defendant Craig Hines is set to appear before this Court on October 27, 2021 for a resentencing pursuant to the Fair Sentencing Act of 2010 and the First Step Act of 2018. *See* Doc. No. 70 (Ruling on Section 2255 and First Step Act Motions) at 13.

On October 13, 2021, in an Addendum to the Presentence Report, the U.S. Probation Office updated the calculation of the defendant's Guidelines range in light of the Court's February 7, 2020 Ruling on Section 2255 and First Step Act Motions and the Court's determination at the defendant's first resentencing hearing in September 2020 that, after a change in the law, "the career offender provisions of the Guidelines don't apply." Resentencing Hearing Tr., Sept. 21, 2020, Doc. No. 105, at 7. The Probation Office's Addendum calculated the defendant's Guidelines range to include 92 to 115 months of imprisonment on Counts 1 and 2, plus an additional 60 months of imprisonment (to run consecutively) on Count 3, for a total term of 152 to 175 months of imprisonment. The Addendum also set forth the provisions as to supervised release and the applicable fine. *See* Supplemental First Step Act of 2018 Addendum to the Presentence Report, Oct. 13, 2021, Doc. No.

111, at 2.

Two days after the Probation Office filed its Addendum (and only a little over one week ago), the Second Circuit issued its opinion in *Chery v. Garland*, No. 18-1036, 2021 WL 4805217 (2d Cir. Oct. 15, 2021).  This opinion represents a change in controlling case law as to which Connecticut felony drug offenses may qualify as valid predicates for career offender status under the Guidelines.  Given the recency of the decision and its application in a somewhat different context than the instant case, it is not entirely clear what the impact of *Chery* is for the defendant.  But it appears that *Chery* makes it more likely that Hines does, in fact, qualify as a career offender under the Guidelines, based on two prior felony convictions for either a crime of violence or a controlled substance offense.  *See* U.S.S.G. § 4B1.1(a).  At this point, however, the Government (and, to its knowledge, the Probation Office) does not have access to documents from the records of the defendant's prior state convictions (in particular, his February 5, 1996 conviction for Sale of Hallucinogens/Narcotics) necessary to carry its burden to re-establish Hines' career offender status.

Nonetheless, irrespective of his career offender status, the Government respectfully submits that, upon re-sentencing, Hines should receive a term of imprisonment equal to the 262 months imposed at his original 2006 sentencing.  This position is set forth at greater length in the Government's September 16, 2020 Response to Defendant's Sentencing Memorandum, on which the Government continues to rely.[1]  *See* Doc. No. 86.

The defendant's submissions to the Court do not change, and cannot obscure, Hines'

---

[1]    Although the Government continues to rely on its September 16, 2020 Sentencing Memorandum in material part, the Government acknowledges that the Department of Justice now supports elimination of the powder-to-crack cocaine sentencing disparity—a point that was not made in the prior Memorandum.  Nonetheless, as set forth in the prior Memorandum, Hines' 2006 sentencing was driven—and his 2021 resentencing should be driven—by his exceptionally violent conduct.  *See* Doc. No. 86 at 33-34.  Accordingly, even discretionary consideration of 1-to-1 treatment should not, in the Government's view, prove reason to reduce his sentence.

exceptionally violent history.   In his most recent Supplemental Sentencing Memorandum, the defendant argues that he has arranged to take a lie detector test, which "resulted in a finding of no deception as to Defendant's denials that he committed the murders for which he was convicted by the state." Doc. No. 110 at 1.   But as the Supreme Court has explained, "there is simply no consensus that polygraph evidence is reliable." *United States v. Scheffer,* 523 U.S. 303, 309 (1998).   Indeed, both the Second Circuit and its district courts have "consistently expressed serious doubt as to the reliability of such evidence." *United States v. Canter*, 338 F. Supp. 2d 460, 463–65 (S.D.N.Y. 2004) (collecting cases).   More to the point, in this case, is the rule set forth by the Supreme Court of Connecticut that "polygraph evidence should remain per se inadmissible in all trial court proceedings in which the rules of evidence apply, and for all trial purposes, in Connecticut courts."   *State v. Porter*, 241 Conn. 57, 93–94, 698 A.2d 739, 758–59 (1997).   Accordingly, Hines' polygraph results may be of little moment in his upcoming habeas trial in Connecticut state court.

At bottom, this is primarily a case not about crack cocaine, but about the exceptionally serious violence committed by a defendant who murdered two people and attempted to murder multiple others.   In imposing the original sentence in 2006, this Court was motivated by Hines' shooting of multiple people that, but for a stroke of luck, could have resulted in multiple murders. Since then, it has come to light that Hines did commit a heinous double murder in 2000, making his criminal record even more egregious.   This is simply not the type of case or the type of offender to whom the First Step Act was intended to offer relief.   The defendant's commission of greater violence should not be met with greater lenience.   His request for a reduced sentence should be denied.

-3-

## CERTIFICATE OF SERVICE

This is to certify that on October 25, 2021, a copy of foregoing Government's Supplemental Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


/s/ Elena L. Coronado_____

ELENA L. CORONADO
ASSISTANT UNITED STATES ATTORNEY

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - - - - - - - x
 3
     UNITED STATES OF AMERICA,      :  No. 3:05-cr-00118(SRU)
 4                  Government,     :  915 Lafayette Boulevard
                                    :  Bridgeport, Connecticut
 5           v.                     :
                                    :  September 21, 2020
 6   CRAIG HINES,                   :
                    Defendant.      :
 7
     - - - - - - - - - - - - - - - x
 8

 9                    RESENTENCING HEARING

10   B E F O R E:

11       THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

12
     A P P E A R A N C E S:
13

14       FOR THE GOVERNMENT:

15           UNITED STATES ATTORNEY'S OFFICE
             1000 Lafayette Boulevard
16           Ste 10th Floor
             Bridgeport, Connecticut  06604
17           BY:  HAROLD CHEN, AUSA
             ELENA CORONADO, AUSA
18

19       FOR THE DEFENDANT:

20           LAW OFFICE OF VITO A. CASTIGNOLI, ESQ.
             P. O. Box 110
21           Milford, Connecticut  06460
             BY:  VITO A. CASTIGNOLI, ESQ.
22

23
                 Sharon L. Masse, RMR, CRR
24                 Official Court Reporter
                   915 Lafayette Boulevard
25             Bridgeport, Connecticut  06604
               sharon_masse@ctd.uscourts.gov
```

```
1                (Proceedings commenced at 3:12 p.m.)

2                THE COURT:  Good afternoon.

3                MR. CHEN:  Good afternoon, Your Honor.

4                MR. CASTIGNOLI:  Good afternoon, Your Honor.

5                THE COURT:  We're here for a resentencing

6    hearing in the matter of United States v. Craig Hines.

7    Could I have appearances, please.

8                MR. CHEN:  AUSA Hal Chen for the United States

9    on behalf of the government, as well as AUSA Elena

10   Coronado.  Good afternoon, Your Honor.

11               THE COURT:  Good afternoon.  Thank you.

12               MR. CASTIGNOLI:  Attorney Vito Castignoli for

13   the defendant Craig Hines, who's present.  Good afternoon,

14   Your Honor.

15               THE COURT:  Good afternoon.  Meghan Nagy is with

16   us through the Zoom software.

17               And because we're doing this during the

18   pandemic, I would encourage everyone to speak up.  Our

19   masks tend to muffle our sound, and if you could speak up

20   so the court reporter can hear you clearly, that would be

21   helpful.

22               I granted Mr. Hines' motion for resentencing

23   under the First Step Act, and that leads us to two

24   questions today.  The first is whether to impose a reduced

25   sentence under the First Step Act, and the second is, if
```

1    so, what sentence to impose.

2           I would just note the formalities.  On August 30

3    of 2005, Mr. Hines appeared before Magistrate Judge

4    William I. Garfinkel and entered a guilty plea to Count --

5    to a three-count indictment charging him with, in Count

6    One, possession of a firearm by a convicted felon in

7    violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(2);

8    in Count Two, possession with intent to distribute more

9    than five grams of crack cocaine in violation of 21 U.S.C.

10   Sections 841(a)(1) and 841(b)(1)(B).  And in Count Three,

11   possession, use and carrying a firearm during, in relation

12   to, and in furtherance of a drug offense in violation of

13   18 U.S.C. Section 924(c)(1).

14          On September 9, 2005 I approved and adopted

15   Judge Garfinkel's finding and recommendation, and I

16   accepted Mr. Hines' plea.

17          A presentence report was thereafter prepared for

18   the Court by the U.S. Probation Office.  The initial

19   report was dated December 15, 2005.  There was a first

20   addendum dated January 5, 2006; and a second addendum to

21   the report, which related to the question of the First

22   Step Act relief, was dated July 2, 2019.

23          On February 17, 2006, I sentenced Mr. Hines to a

24   total effective sense of 262 months of imprisonment, which

25   was 262 months on Count One, 202 months on Count Two, and

1    60 months on Count Three.  I ordered the term of

2    imprisonment on Counts Two and Three to run consecutive to

3    each other, but concurrent with the term imposed on Count

4    One.

5              In June of 2016, Mr. Hines filed a habeas

6    petition that sought to vacate his sentence in light of

7    the Supreme Court's decision regarding the Armed Career

8    Criminal Act in *Johnson v. United States*.

9              And in June of 2019, Hines made a motion for a

10   reduction of sentence pursuant to the First Step Act.

11             In a published opinion in February 2020, I

12   denied Hines' habeas petition but granted his motion for a

13   plenary resentencing under the First Step Act, and that is

14   why we are here today.

15             I should note that in preparation for today's

16   hearing, I have reviewed the presentence report and each

17   of the addenda to that report.  I have also conferred with

18   Meghan Nagy, but that was back at the time of the original

19   sentencing.  I have not spoken with her about today's

20   proceeding.

21             I've also reviewed the defendant's memorandum on

22   behalf of Mr. Hines, the government's memorandum in aid of

23   sentencing, and the supplemental materials filed in

24   connection with this proceeding, many of which I believe

25   were prepared by Mr. Hines himself.

```
 1            Mr. Castignoli, have you and Mr. Hines had an

 2    opportunity to review the presentence report and both

 3    addenda to that report?

 4            MR. CASTIGNOLI:  Yes, we have both reviewed the

 5    original presentence report and the addendum to the

 6    presentence report that I believe was filed last year.

 7            THE COURT:  All right.  And do you see any

 8    reason -- do you have any objections to any of the factual

 9    statements set forth there?

10            MR. CASTIGNOLI:  I don't have an objection to

11    the factual statements.  As Your Honor knows from the

12    memorandum, the interpretation and the change in the law

13    in both armed career offender and career offender, I had

14    said at the time that I objected to her findings, although

15    Ms. Nagy's findings were conditional on things that have

16    happened since then, since the time of the sentencing.  So

17    other than that, I don't have any objection.

18            THE COURT:  All right, very well.

19            Mr. Chen, has government had the same

20    opportunity?

21            MR. CHEN:  I have, Your Honor.

22            THE COURT:  Any objections to any of the factual

23    statements?

24            MR. CHEN:  No objection to the factual

25    statements, Your Honor, but with respect to the Guideline,
```

1    I agree with brother counsel that a new Guideline

2    calculation would have to be fashioned if there were a

3    resentencing, for there will be a new sentence to be

4    imposed.

5            THE COURT:  All right.  As I did before, I'm

6    going to adopt the factual statements of the presentence

7    report as the findings of fact of the Court in this case.

8            All right.  The maximum and minimum penalties

9    have changed somewhat since we were here before.  On Count

10   One, Mr. Hines faces a term of imprisonment of up to ten

11   years, a supervised release term of up to three years, a

12   fine of up to $250,000, a $100 mandatory special

13   assessment.

14           And in Count Two, he faces a term of

15   imprisonment of up to 20 years, a term of supervised

16   release of up to life, with a minimum of three years, and

17   a fine of up to $1 million, and a special assessment of

18   $100.

19           And on Count Three, Mr. Hines faces a minimum of

20   five years supervised -- excuse me, five years of

21   imprisonment, with up to life, and that sentence must run

22   consecutive to the other sentences.  And he faces a

23   supervised release term of five years and a fine of up to

24   $250,000.

25           Let me hear from anyone -- and that, obviously,

**A - 202**

1  reflects the implicit acknowledgment that the armed career

2  criminal provisions, statutory provisions, do not apply to

3  Mr. Hines any longer.

4          So let me hear from anyone who thinks that those

5  statements of the maximum and minimum penalties are in any

6  way incorrect.

7          MR. CHEN:  No objection from the government,

8  Your Honor.

9          MR. CASTIGNOLI:  Your Honor, I don't have any

10  objection to the maximum.  Again, my only issue is

11  probably with career offender, not with the armed career

12  offender.

13          THE COURT:  Yes, that's a Guideline provision.

14          MR. CASTIGNOLI:  Yes.

15          THE COURT:  And we'll talk about that in just a

16  moment.

17          MR. CASTIGNOLI:  Yes.

18          THE COURT:  All right.

19          So the Guidelines, I believe, are to be

20  calculated as follows.  I would note that the armed career

21  criminal provisions, as I noted, don't apply, and the

22  career offender provisions of the Guidelines don't apply.

23  Both of those affected, especially the career offender

24  provisions, affected the Guideline calculation when we

25  were here before.

1          On Count One, the base offense level is 20, and

2  four levels are added because of an obliterated serial

3  number on one of the firearms that was recovered.

4          On Count Two, the base offense level is 16, and

5  there are no adjustments.

6          Those two counts are grouped as closely related

7  offenses.  They constitute one-and-a-half units, and

8  therefore one offense level is added as a result of the

9  grouping, which gives us a total offense level of 25.

10          Count Three does not have an offense level but

11  rather is a separately imposed sentence, minimum five

12  years consecutive.

13          So after the adjustment for acceptance of

14  responsibility, which I'm going to adopt from last time,

15  we end up with a total offense level of 22, a Criminal

16  History Category of VI, and the Sentencing Guideline range

17  is 92 to 115 months on the first two counts, plus a

18  minimum 60 months consecutive on Count 3, which is a

19  Guideline range of 152 to 175 months of imprisonment, five

20  years of supervised release, a fine of $15,000 to

21  $1 million, and a $100 special assessment on each count,

22  for a total of $300.  There's also a forfeiture, which has

23  already occurred as far as I know.

24          So let me hear anyone, including Ms. Nagy, who

25  wishes to weigh in on the appropriate calculation of the

1    Sentencing Guidelines here.

2              MR. CHEN:  Your Honor, so just to clarify, for

3    Counts One and Two, after they're grouped, the adjusted

4    offense level is 22.  Is that correct, Your Honor, for

5    Counts One and Two?

6              THE COURT:  Well, the total offense level is 22.

7              MR. CHEN:  Total --

8              THE COURT:  In other words, it becomes 25, then

9    we subtract 3.  I mean, you've already made a motion under

10   3E1.1(b), so I assume that motion is still going to be

11   made today.

12             MR. CHEN:  Yes, Your Honor.

13             THE COURT:  So you subtract 3 from 25, and you

14   end up with 22.

15             MR. CHEN:  Yes, Your Honor.  I agree with Your

16   Honor.

17             THE COURT:  Okay.

18             MR. CASTIGNOLI:  May I be heard, Your Honor?

19             THE COURT:  Yes.

20             MR. CASTIGNOLI:  Your Honor, the only issue I

21   have -- and, again, I just want to say because of the

22   nature of this proceeding here, some of this hasn't

23   been -- and because I didn't represent him at the time

24   that he was sentenced, some of the factual issues I don't

25   think have been completely -- I've had my chance to argue

1    some of the factual issues.  The only problem I have with

2    it, and I don't know if it was an issue at the time, is I

3    did not see, and maybe I just didn't -- wasn't aware of

4    it, the four levels for altered or obliterated serial

5    number under 2K2.1(b)(4)(B), I didn't see that in the

6    evidence.  I don't know if it was there.  I looked at

7    every document I could to see if that was part of the plea

8    agreement or had been mentioned before, and I couldn't

9    find it.  That's the only thing I would have an issue with

10   in terms of the calculation of the Guideline ranges.

11        And, by the way, because of the grouping of the

12   counts, I'm not sure how that would affect the

13   calculation.

14        THE COURT:  I'm sorry, what was that?

15        MR. CASTIGNOLI:  Because of the grouping of the

16   two -- first two counts, I'm not sure how that would

17   affect the calculation, reducing those four levels, if

18   Your Honor were to do that.

19        THE COURT:  If you look at paragraph 12 of the

20   PSR, the original PSR, it is set forth there.  And I found

21   those facts both initially and again today.  It says

22   specifically, this is the third sentence:  During the

23   search, police located and retrieved from the defendant's

24   bedroom closet a Hi-Point sawed-off shotgun with an

25   obliterated serial number, etc.

**A - 206**

11

1          MR. CASTIGNOLI:  That was a different firearm

2     than the one that was -- the handgun, I take it.  That was

3     what I -- threw me off.  That wasn't the -- I wasn't aware

4     that was what was charged in Count One.

5          THE COURT:  Well, Count One is possession of a

6     firearm by a convicted felon, so all the firearms would --

7          MR. CASTIGNOLI:  I see.  I apologize, Your

8     Honor.

9          THE COURT:  That's all right.  I mean, correct

10    me if I'm wrong.  I believe that's how we get there.  I'm

11    trying to see whether the indictment charged that.  But it

12    wouldn't matter because it's relevant conduct anyway.

13    Even if it wasn't the charged firearm, it would be --

14          MR. CASTIGNOLI:  I understand.

15          THE COURT:  -- relevant conduct, I believe.

16          MR. CASTIGNOLI:  Thank you, Your Honor.

17          THE COURT:  Yes, that firearm was not

18    specifically charged in Count One, but I believe relevant

19    conduct would account for the four levels.

20          Mr. Chen, do you want to be heard on that?

21          MR. CHEN:  No, Your Honor.

22          THE COURT:  All right.

23          Well, Mr. Castignoli, let me hear from you.  I

24    will say I think there's a real issue whether I should

25    impose a reduced sentence under the First Step Act.  The

1   ruling on the First Step Act granted Mr. Hines a plenary

2   resentencing because I couldn't decide based upon what I

3   had been presented with on the First Step Act motion

4   whether I was inclined to impose a lesser sentence.  It's

5   now been fully briefed, and the government has submitted a

6   lengthy sentencing memorandum urging me not to employ a

7   lesser sentence, so I think we should start with that

8   question.

9           MR. CASTIGNOLI:  Well, Your Honor, if I might be

10  heard.  One of the -- and I'm going to get to the 18-3553

11  relevant issues.  But one of the things you may know, and

12  it's really related to -- I just want to say one thing.

13  All the submissions to Your Honor, and my relationship

14  with Mr. Hines, one of the things is the two murder

15  convictions since the time that he was sentenced here.

16          A couple of things about those murder

17  convictions.  Number one, as you probably know and as

18  those documents point out, since the time he was convicted

19  on those things, he's attempted to prove that he's

20  innocent.  He's done everything he possibly can.  Part of

21  what's come into play lately, within the last year, is

22  COVID 19.  When I first met Mr. Hines, I told him, Why

23  don't you resolve that issue, and then we'll go in front

24  of the Court, because obviously the argument is going to

25  be that it's much more serious than it was when you first

1  got sentenced.  On a plenary resentencing, you're being

2  sentenced as to the person you are today.

3         That has not happened, and I don't think that's

4  his fault.  I think a lot of that is COVID 19.  He

5  originally had a trial date on his habeas case back in

6  April, and that went off, and right now he doesn't know

7  when it's going to be.  I know he's going to address you

8  and it's going to be largely about that.  That's been what

9  a lot of our conversations have been about.

10        What that does mean, however, is that regardless

11 of what Your Honor does today, he knows he's still going

12 to be incarcerated one way or another.  He's going to be

13 either incarcerated in federal custody or in state

14 custody.  What he has done -- and one other thing about

15 that, that murder conviction there and the murder case.

16 There was one thing which I might take odds with in the

17 government's memorandum.

18        By the way, does Your Honor have problems with

19 me standing here?

20             THE COURT:  No.  That's fine.

21             MR. CASTIGNOLI:  Okay.  One thing I would take,

22 I think the language that was used was "unbeknownst to law

23 enforcement," he had that -- he later picked up a murder

24 case.  I read the warrant in the murder case, and the

25 warrant in the murder case indicates to me that he was

1    accused of that six or seven months before he was

2    sentenced here, and he was accused of that by the New

3    Haven Police Department.  I don't doubt at all that the

4    government may not have known that, but law enforcement,

5    the New Haven Police Department who investigated all these

6    cases, certainly knew him, okay?  So, I mean, just that.

7    And I don't know if that makes an enormous difference

8    except that in just about everywhere along the line he has

9    worked diligently to attempt, as Your Honor can see, to

10   try to get his day in court on a habeas.  Okay.

11           Now, in terms of what I consider to be the 3553

12   issues that come up and largely is what the government

13   argues, is that Your Honor has to now look at those issues

14   for sentencing and make a determination, based on those,

15   what a reasonable sentence would be for somebody like

16   Mr. Hines, who obviously has a history, and I don't think

17   there's any question about that.  But I think there's a

18   number of things that Your Honor can consider in

19   fashioning a sentence here, and I believe a fair sentence

20   would be, since he has already at this point done 188

21   months incarcerated, calendar months, it's not like he has

22   done part of that and got credit for other parts, he's

23   been incarcerated for 188 months since January of 2005

24   when he first went into federal custody.

25           There's a number of factors that Your Honor can

1   consider.  Even if you took the 152 and 175 -- I believe

2   there was a slightly shorter amount in the government's

3   memo -- and you were to give him 188, let's just say that

4   for an example, you'd still be departing -- have to depart

5   upward to get him that sentence.  So that's already

6   factored into the time that he's already served.

7           The other factor is obviously the fact that he's

8   going right into state custody.  Now, if he can prove he's

9   innocent of those charges, then I believe that's a

10   sentence that's more than fair to both sides, and I might

11   even argue, with all due respect, might be excessive, if

12   he can prove he's innocent.  If he can't prove he's

13   innocent, if he doesn't win the habeas, as Your Honor can

14   see from that state case, and Your Honor can consider

15   this, he's in jail forever, forever to him.  Okay?  So

16   those are factors I think Your Honor can consider.

17           A few of the other factors is although he's not

18   an old individual, he's 41 years old, the COVID 19, I

19   think that the government -- I think that was mentioned in

20   the government's memo, but a couple of things you have to

21   understand.  One of the reasons this was put off for a

22   period of time is that Mr. Hines was originally in Florida

23   when the COVID 19 issue began back earlier this year.

24   Then he, to be brought here, he had to be brought first to

25   Philadelphia, then to here, had a positive test.  I'm not

1    going to -- I didn't ask for any of that to be sealed.  I

2    think it was in the documents that we provided.  So he's

3    vulnerable.  I think anybody -- our position has always

4    been in other cases that everybody who's incarcerated is

5    vulnerable.

6            The two reports that I sent to Your Honor, I

7    know Your Honor has probably had those for many, many,

8    many different people, but I still think they're relevant.

9    Even though they were sent out back in March, they're

10   relevant to anybody in incarceration, anybody who has to

11   be moved around like Mr. Hines does.

12           Is his record in prison not a good one?  You

13   know, arguably it's not a good record, but you have to

14   understand, and from the documents that we provided, that

15   he has decided from day one to try to fight that other

16   conviction.  And has he had disagreements and adversarial

17   relationships with his jailers?  Yes, he has; he has over

18   certain things like wanting to meet with attorneys,

19   wanting to get a lie detector test, wanting to exercise

20   his rights.  He also -- I think in there is that they had

21   told him you can have a lie detector test if you program,

22   get into programs.  He did that.  Then they told him, no,

23   you can't do it.  Losing money on a lie detector test

24   because they wouldn't let the individual in to do the lie

25   detector test in Florida.  So I think at least that's the

**A - 212**

17

1  background for some of the -- some of the disagreements

2  he's had with people in jail and how that record that Your

3  Honor sees there in the update has been generated.

4         He's had some medical issues, as he's mentioned,

5  and his biggest problem is -- and I think you're going to

6  hear from him about this -- is that he's really focused

7  tremendously, with all his documents, with everything he

8  does, on those two issues on that murder case, which again

9  I don't know that it was unbeknownst to law enforcement.

10  It might have been unbeknownst to the government.  I have

11  no reason to believe that they knew about it at the time.

12  But for some strange reason, somebody went to them and

13  said that Mr. Hines was involved in something that

14  happened five years earlier.  The New Haven police at that

15  point did not get a warrant for a period of about six

16  years, and then for some reason after all that time they

17  did get a warrant.  And he had his trial; he lost; he's

18  been fighting it ever since.  I think he will speak to

19  that, I know that he will because he's spoken of it with

20  me at length.

21         I think what's fair in this matter, considering

22  everything that Your Honor could consider under the 3553

23  factors, is a sentence to allow him -- that allows him to

24  go into state custody.  And he knows that's what's

25  happening here.  He knows the chances of him getting out

1  at any rate are probably slim at this point, and that's

2  the only thing he has.  But I think that with everything

3  that's happened since then, with regard to career

4  offender, armed career offender, the First Step Act, which

5  involves drugs -- and, by the way, it wasn't an enormous

6  amount of drugs.  It was the 6.83 grams of crack.  And

7  even if you go by the crack guidelines, that sentence

8  is -- he's served all those sentences by far.

9        Now, I've done a calculation, if there was no

10  grouping here, as to what would happen on each of the

11  cases, and this is just hypothetical, just to show Your

12  Honor at least our position would have been -- and, again,

13  this was when I felt that the four levels were -- relevant

14  conduct were too much.  If you gave him the 70 to 87,

15  which would have been without the four levels on the first

16  charge, 46 to 57 months which was on the crack charge, and

17  the 60 on top of that, my calculation, even if you gave

18  him the top of every one of those guidelines and made them

19  consecutive without the grouping, it would be something

20  like 176 to 204, which is roughly what he's done already.

21        So to get to where you even have to give him

22  time served, Your Honor would have had to depart up at

23  least a few levels.  I think when I did the original

24  calculation of what the government said, it was four

25  levels.  With the 152 to 175 I think it's two or three

 1   levels.  You'd have to depart upward just to get him time
 2   served at this point.  And that is calendar.  That's not
 3   including any credits that he has.  I believe he has some
 4   credit.
 5          So I think for all the 3553 factors and the law
 6   in these matters that have been put together, I think
 7   that's more than a reasonable sentence.  I would have
 8   argued that if he hadn't done that amount of time, that a
 9   lesser sentence would be reasonable.  But I think under
10   the circumstances, and I know there's concerns here about
11   that case that he has pending, not pending in the sense of
12   a habeas, I think that's a reasonable sentence based on
13   all the 3553 factors.
14          THE COURT:  All right, thank you.
15          Mr. Hines, do you wish to make a statement
16   today?
17          MR. HINES:  I want to tell you what's going on.
18   Do you mind?
19          THE COURT:  Yes, please do.
20          THE DEFENDANT:  This is going on, mind you.
21   These are adjudicated facts, along with these substantive
22   issues that will be presented in federal court.  Craig
23   Hines v. United States, Case Number 3:05-CR-118-SRU.
24          This statement is developed to provide the Court
25   with an overview of those adjudicated facts, along with

1    the legislative changes in law that have occurred.  Also,

2    those subsequent actions of occurrences during my

3    incarceration, pretrial and post-conviction.  I'm stating

4    that a miscarriage of justice has resulted in a term of 15

5    years 7 months of incarceration.  I am seeking a

6    relinquishment from my prison sentence at this time as

7    time served.  Changes in laws, legislative laws, have

8    developed, laws with Guideline -- one moment -- have

9    developed, laws with Guideline regulations -- all right,

10   laws have developed, laws and Guideline regulations that

11   provide legal reasoning for my release from federal

12   custody, this being in accordance with the First Step Act,

13   the Fair Sentencing Act, the Johnson Armed Career Offender

14   Act.

15         I am developing this letter that it may be

16   documentized by the courts.  I have prepared information

17   in a timeline sense from 2005 to 2020, addressing

18   adjudicative facts, along with matters of affliction that

19   occurred during my incarceratory period.  This will

20   provide transparency and reflection of laws developed and

21   enstated by our United States Constitution and those

22   adjoining amendments, along with malice and miscarriages

23   of justice that have occurred as a result of my

24   incarceration, arrest and conviction.  I am seeking that

25   the Court remit into evidence, in the form of a polygraph

**A - 216**

21

1   test, understanding those legislative changes mentioned

2   above, along with forwarding adjudicative facts to provide

3   sufficient reasoning to avoid the scheduled action of

4   appeal that will prove evidentiary on my behalf.

5       2005.  Steven Singh was indicted.  In 2005, he

6   cooperated and was released from incarceration.  He went

7   home.  He went home on supervised release.  He violated

8   those terms and conditions of his release in 2009.  Again

9   he was released in 2010 by the Second Circuit federal

10  court led by Judge Underhill.

11      In 2011, Steven Singh was indicted by our

12  federal government.  This time he was facing 35 years and

13  three months under state prosecutorial guidelines, along

14  with 20 years federal time.  At this time of incarceration

15  due to the indictment, Steven Singh made false statements

16  and developed false police reports so as to provide

17  cooperation to incriminate me.  This eight-time convicted

18  felon, known for making false reports, was again released

19  from custody.  Stating a miscarriage of justice and with

20  malicious intent, that those above stated allegations were

21  developed against me, Craig Hines.

22      On May 2006 -- May 26, 2017, it was on this date

23  that I filed a federal *Johnson* claim.  My attorney,

24  Charles Willson, made a promissary statement to me saying

25  that he would assuredly take all the necessary actions to

1   have a polygraph taken and provide the results of the

2   testing to the Second Circuit federal court officers and

3   Judge Underhill, therefore providing evidence that I

4   didn't commit the double homicide in New Haven,

5   Connecticut on June 1.  This polygraph test has been

6   continually placed on hold for reasons that do not justify

7   legal action/reason for provision of the testing.  Stating

8   to the federal Brady Act, ineffective counsel has resulted

9   in continued malice.

10          Attorney Charles Willson failed to respond to

11   me, Craig Hines, in that Attorney Charles Willson sealed

12   the proceeding on above such stated double homicide case

13   on October 23, 2006, whereas Steve Singh explained, in

14   detail, how Anthony D. Harris committed the murders, the

15   double homicide.  Charles Willson was an attorney

16   practicing for the law firm of Nevins & Nevins firm at

17   this time.

18          Being that Attorney Charles Willson was

19   providing counsel, acting on behalf of both parties,

20   Steven Singh and Anthony D. Harris, this therefore was a

21   serious conflict of interest between attorney and client.

22   So what Attorney Charles Willson, to avoid conflict and

23   transparency, was that he removed Anthony D. Harris from

24   his caseload, and then in Chambers with Judge Donna F.

25   Martinez and Attorney Bruce Koffsky on the same day of

1    October 23, 2006 at 2:30 p.m. those statements of detailed

2    explanations that Steven Singh provided, so as my, Craig

3    Hines' innocence, will be deemed evident, and Anthony D.

4    Harris will be appropriately charged and tried for the

5    double homicide.  Those statements were subsequently

6    sealed in Chambers.  Therefore, those inappropriate

7    actions of counsel, Charles Willson, would never come to

8    the light.  Stating this as documentized facts and a

9    miscarriage of justice.  Attorney Charles Willson then

10   found reason (inappropriate) to adjourn proceedings on my

11   *Johnson* claim.

12           This continued form of ineffective counsel

13   prolonged court review of my claim, along with the

14   necessary action that should have taken place in order to

15   bring the sealed proceedings to light during judicial

16   court proceedings based upon the motion that was provided

17   on my, Craig Hines', *Johnson* claim.  So that I am stating

18   that with those adjudicated facts in that Anthony D.

19   Harris had committed the double homicide, the report, upon

20   the DEA being provided with statements, would have

21   resulted in the suppression of evidence against me, Craig

22   Hines, and the relinquishment of charges and those

23   incarceratory terms that were enstated.

24           On May 15, 2017, on this date Attorney Walter

25   Bansley III came to Florida USP (Coleman 2).  He arrived

1   at the prison facility with the intention of preparing

2   legal work and documentizing my statements pertaining to

3   the double homicide.  The warden, Charles Lockett, refused

4   to allow my attorney to bring in legal documents or the

5   laptop into the prison facility, violating my 14th

6   Amendment, my due process of law, along with the rights to

7   assist counsel, effective counsel.

8           September 2017.  A $700 check was sent to

9   (inaudible), an attorney for the firm Bansley & Burdo.

10  This check was provided as a payment for a polygraph test.

11          THE COURT:  Mr. Hines, I'm sorry to interrupt.

12  Could you read that part again?

13          THE DEFENDANT:  What part?

14          THE COURT:  Starting with September 2017.

15          THE DEFENDANT:  September 2017.  A check was

16  sent to Alexandra Georgieva, an attorney for the law firm

17  of Bansley & Burdo.  This check was provided as a payment

18  for a polygraph test.  Again the Warden, Charles Lockett,

19  refused to allow such progress be instituted at Coleman 2

20  USP.  She was unable to obtain a court order for a

21  polygraph testing, and she left the Bansley & Burdo law

22  firm.  And she explained to me before that she left the

23  firm, that she sent my money, $700, to the polygraph

24  expert, David Bryant (813)977-4700, on March 28, 2018.

25  Being that a court order was never attained by Bansley &

1    Burdo Law Firm, my polygraph was never provided, and the

2    money received to David Bryant has never been returned to

3    me.

4            Another attorney was then provided, Ryan M.

5    Desmond, from Mystic, Connecticut.  He also tried to

6    follow up with visitations, and provision of attaining a

7    polygraph test were again denied.  I have not been

8    provided with a lawyer visitation since May 15, 2017.  I

9    haven't even met with Attorney Ryan Desmond as of the

10    current date, is now August 1st, 2020.  I haven't seen a

11    lawyer in four years.

12            October 9, 2018.  On this date, a writ of habeas

13    corpus was filed, Case Number 5:18-CV-522-0C-10-PRL.  As

14    defined in the filing as supportive factual information to

15    Judge Virginia M. Hernandez, Covington Middle District of

16    Florida, my application was denied in that Judge Hernandez

17    claimed that I had not exhausted the remedy process.  The

18    application request of the court order be provided so that

19    the polygraph test could be completed in lieu of Warden

20    Charles Lockett's denial of my rights providing due

21    process of the 14th amendment along with the

22    constitutional right to pursue truth and justice.  I

23    stated as supportive factual information in that the unit

24    manager at Coleman 2 USP notarized and explained at that

25    time a court order was formal procedure necessary to

1   proceed.  My affidavit for the court order was notarized

2   by my unit manager, Mr. Jeffrey Smith, on February 13,

3   2019.  I submitted additional motion to Judge Hernandez,

4   Covington, Federal Request for Civil Procedure 59(e) that

5   Judge Hernandez reconsider and amend her judgment.  On

6   January 6, 2020, she denied above such stated motion.

7          On January 2, 2019, on this date I was assigned

8   Attorney Daniel M. Erwin, who stated that he was assigned

9   to my case in order to review those adjudicative and

10  legislative facts and seek justice in that a polygraph

11  test be instituted, would secure my rights as sought based

12  upon the filing of a habeas corpus 2241.  Again efforts

13  failed in that my case was passed on, without any attempt

14  for actions and resolution.

15         On January 18, 2019, a letter from Pieszak Law

16  Firm stated that Ryan M. Desmond was now assigned to my

17  case and that he intended to provide legal action where

18  Alexandra Georgieva left off.  No recognition of that

19  statement in that Attorney Daniel M. Erwin would produce

20  efforts on my behalf.  His letter included documents for

21  authorization to release all information that was

22  pertaining to my case.  I signed this form and notarized

23  it for Attorney Ryan M. Desmond.  In lieu of a polygraph

24  test on February 21, 2019, I signed and returned an

25  additional comprehensive authorization form (notarized) so

1   as to release all case information to Attorney Ryan M.

2   Desmond.

3           On May 14, 2019, on this date Attorney Ryan M.

4   Desmond addressed Ocala Court, Florida, seeking resolution

5   based upon filing of the habeas corpus 2241 motion,

6   seeking orders for providing polygraph testing.  This writ

7   was filed on February 13, 2019.

8           On January 6, 2020, Ocala Court made a ruling in

9   which the habeas corpus motion was dismissed.  At this

10  time, Attorney Ryan M. Desmond wrote me explaining that he

11  has legal reasons to believe in that my previous

12  understanding that the factual testimony was sealed on the

13  double homicide and that the conflict of interest motion

14  be heard under United States v. Harris, that sealed

15  testimony can prove my actual innocence claim.

16          Charles Willson, my attorney for the *Johnson*

17  claim, is worried about what was said and wants to remove

18  himself off of my case once I file pro se to unseal the

19  proceeding, not knowing that I knew that he sealed the

20  proceeding on October 23, 2006.  And all along he knew I

21  didn't commit the murders.  He was Steven Singh's attorney

22  and Harris's attorney in 2006.  He became the public

23  defender for my *Johnson* claim in 2015.  When I filed the

24  *Johnson* claim, he was appointed by the Court as my

25  counsel.  He suppressed my *Johnson* claim because of the

1  murder case for four years, not wanting to turn over

2  evidence that could free me, to unseal the file on

3  October 23, 2006 and provision for the polygraph test.

4          On July 31, 2019, Ryan M. Desmond wrote me

5  saying that the warden, Steven Reiser, agreed to allow

6  David Bryant, (813)977-470077 -- (813)977-4700 to come

7  inside the institution if I, Craig Hines, agree to

8  program.  The warden's attorney, Jeffrey Middendorf, told

9  Attorney Ryan that if I program, he would be willing to

10  consider granting my request for the expert, David Bryant,

11  to administer a polygraph test in the institution.  He,

12  the warden, no promises or guarantees that he will

13  cooperate with law enforcement, which I, Craig Hines --

14  let me go over -- attorney and Attorney Middendorf told me

15  to sign up for the program, which I did, Craig Hines, on

16  8/15/2019, on 8/26/2019, on 8/25/2019, on 8/06/2019, on

17  8/05/2019, on 8/02/2019, on 7/31/2019, on 8/29/2019, on

18  8/30/2019, on 8/31/2019, on 9/01/2019, on 9/05/2019, on

19  8/27/2019, on 8/26/2019, on 8/08/2019, on 8/16/2019.

20          They would not allow me to program because I had

21  detainer to get my points reduced so I could go to the FCI

22  medium facility.  Dr. Dinis, the psych coordinator, would

23  not allow me to sign on to the Challenge Program.  Also,

24  the other psych was Dr. Brodel.  She would not allow me

25  into RDAP program and that the program was necessary for

1   provision of the polygraph testing.

2          Warden Charles Lockett blocked me for four

3   years, not allowing any legal work pertaining to my case

4   to proceed with my assistance -- with my attorney's

5   assistance.  He violated -- he violated Sixth Amendment

6   right.  I have a compulsory right to obtain witnesses in

7   my favor and defense counsel to effectively face my

8   accusers.  My Fourteenth Amendment was violated.  My state

9   and federal rights to due process of law were violated.

10         On August 15, 2019, on this date at 10:52 a.m. I

11  wrote Dr. Brodel and told her that I wanted to purify

12  myself.  I was going through immense stress and

13  psychological issues with the warden, Charles Lockett,

14  blocking me, and that the help was necessary for legal

15  action.  They continued to decline me because of Warden

16  Charles Lockett.  I was stressing, depressed, suicidal,

17  emotionally distressed, and no help or assistance from

18  Dr. Dinis, Dr. Ramos, Dr. Sierra, Dr. Brodel, Dr. Kennedy.

19  With all these physicians working in the prison facility,

20  I was left unstable and by myself, Judge Underhill.  Why

21  am I being blocked of those rights that the Constitution

22  guarantees, along with the adjoining amendments and

23  guarantees as a citizen in the Bill of Rights?

24         My *Johnson* claim.  Charles Willson is corrupt.

25  Judge Donna F. Martinez and Attorney Charles Willson know

**A - 225**

30

1    that I didn't commit the double homicide that I've been

2    convicted of, stating that -- with malicious intentions

3    these mentioned officers of the Court are known and

4    willing to be involved in a scheme to suppress a civil

5    proceeding that would provide Craig Hines innocence, that

6    would prove my, Craig Hines', innocence.  The warden,

7    Charles Lockett, would not cooperate with my attorneys on

8    legal procedures.

9            This has caused me prolonged undue stress and

10   that -- and that I have developed diabetes, hair loss,

11   along with ulceritis, suppression of polygraph testing for

12   Judge Underhill's review of the *Johnson* claim.

13           On February 20, 2018, Attorney Georgieva at

14   3:16 p.m. wrote my counselor, Gwenda Bailley, an email

15   trying to set up a legal visit again to review important

16   factual information pertaining to my case, with legal

17   transcripts and a laptop computer for an attorney

18   visitation for Walter Bansley III.  The warden once again

19   denied his visitation to the facility.

20           On May 31, 2019, the public defender office

21   would not award Ryan M. Desmond, attorney, a thousand

22   dollars to visit me so as review important factual

23   information pertaining to my case.  I haven't met with an

24   attorney since May 2017.  The warden, Charles Lockett, and

25   the Office of the Public Defender has refused provisions

**A - 226**

1    for attorney visitation.  On May 31, 2019, the Public

2    Defender Office denied funding to public defender so as to

3    provide me, Craig Hines, with counsel.

4            2016 I filed my habeas corpus, in 2016.  My case

5    was to be heard on April 20, 2020, Judge Underhill.  It

6    has been five years in that a continuous suppression of

7    evidence that has occurred.  Sir, how is this any fault of

8    mine when I have been collaterally challenging the murder

9    conviction, and claims for evidence and polygraph testing

10   has not been appropriated since 2016?  It is now August 5,

11   2020.  Why am I not in court proceedings?

12           On June 6, 2018 a hearing took place to remove

13   Alexandra Georgieva from my case, #TSR-CV16-4008294-S, due

14   to the sealed proceeding and the court order for polygraph

15   testing.  Judge Newson said that she was going to help me

16   get a court order for the sealed proceeding and a

17   polygraph.  Ms. Georgieva and Attorney Ryan M. Desmond

18   both have failed to provide any legal action pertaining to

19   Craig Hines v. Commissioner of Corrections, Case

20   TSR-CV16-4008294-S.  Judge Newson lied when he stated in

21   court that Ms. Georgieva would be provided a court order

22   for a polygraph test on June 6, 2018, District Court of

23   Tolland/Rockville Court -- Court of Appeals.

24           I am requesting that my attorney, Vito

25   Castignoli, be provided with all this information sent to

1    his office, is documentized with all necessary court

2    officials, so that the prosecutor and Judge Underhill can

3    read and understand all this factual information.  Also

4    provide Attorney Ryan M. Desmond a copy of this

5    information and to the State's Attorney, Craig Nowak.

6    Ryan M. Desmond, 73 Main Street, Middletown, Connecticut.

7           On June 10, 2020, Ryan wrote, Attorney Ryan

8    wrote and said that when contact visits are permitted, he

9    would schedule a polygraph test with Mr. Wesche.  It's

10   August 1, 2020, and I still don't have a test.

11          On July 23, 2020, I sent Ryan M. Desmond at 73

12   Main Street, Middletown, Connecticut, 06457, two negative

13   test results showing that I don't have COVID, one dated

14   7/1/2020 and the other 6/26/2020, and a letter stating on

15   July 20 -- on July 23, 2020 that the Donald E. Wyatt

16   Detention Facility, 950 High Street, Central Falls, Rhode

17   Island, 02863, has been COVID-19 free from the virus for

18   six weeks and for him to go on www.com Donald Wyatt

19   Detention Facility.  I sent it certified mail.  So no more

20   excuses.

21          My attorney, Vito Castignoli, 185 Broad Street,

22   Milford, Connecticut, 06410, has been to visit me three

23   times since visits are permitted, and since June 6, 2020

24   there is no reason Attorney Ryan M. Desmond should not

25   have a date for a polygraph expert to come into the

```
 1    institution.  Ms. Ferguson just came in B-pod on July 28,

 2    2020 and stated Donald Wyatt Detention is about to resume

 3    the normal operations, meaning program visits are normal.

 4            They been doing a lot of things to me that's

 5    wrong.  I wanted to give it to you because it's all right

 6    here.  Vito said he already gave it to you, but I'm going

 7    through a lot of stuff.  They don't -- they don't want to

 8    do -- they don't want to do the right thing.  It ain't

 9    constitutional.  I'm getting scared because I supposed to

10    been home.  They kept -- they kept my money, too.  I paid

11    for polygraph, and they kept my money.  I don't know

12    what's going on with these people.

13            This is a real serious, serious, serious,

14    serious matter, like real serious, serious, serious

15    matter.  And they didn't give me medical treatment for

16    like seven years.  They didn't give me medical treatment

17    for seven because they said I was malingering.  And I had

18    a hernia in my throat.

19            Do you think, Your Honor, this treatment is

20    fair?

21            THE COURT:  Well, I think we need to look into

22    this a little bit.  I mean, I'll talk about that in a

23    moment.  But I want to make sure you -- have you finished?

24            I've looked at that, yes.

25            THE DEFENDANT:  Do you want it?
```

1          THE COURT:  I've looked at it.  Attorney

2     Castignoli filed it on the docket, and I've looked at

3     that.

4          THE DEFENDANT:  This is why -- this is why my

5     *Johnson* claim wasn't put up because Charles Willson knows

6     what happened, and Donna F. Martinez, you know, my

7     attorney said Donna F. Martinez just retired.

8          THE COURT:  That's correct.

9          THE DEFENDANT:  So they don't want to come

10    forward with the information to free me.  I'm getting kind

11    of scared right now about what's going on.  So I showed

12    him that in the CJA motion that he wanted to be removed,

13    because the CJA motion, he doesn't want the sealed

14    proceeding to ever come to the light.

15          I didn't -- I didn't kill those people.  I

16    didn't kill those people, Underhill.

17          THE COURT:  All right.  Thank you.

18          MR. CASTIGNOLI:  Your Honor, may I add one or

19    two things?

20          Number one, it's not Attorney Ryan Desmond.

21    It's Attorney Desmond Ryan.  That is actually the

22    attorney's name that got a habeas.

23          Two, I visited him four times, not three times.

24    That was before the fourth time.

25          Number three.  Just I think the 202 months that

1   Your Honor imposed on the drug charge was as a career

2   offender.  Now, I know that --

3           THE COURT:  That's correct.

4           MR. CASTIGNOLI:  -- he had a max of more than

5   that, but I think at the time the Guidelines were between

6   188 and 235 as a career offender.  And this is brought up

7   in my memo.  I don't want to bore you.  I don't want to

8   belabor this point.  I think it was 188 to 235 as a career

9   offender on the drug charge for the 6.83 grams of crack.

10          If you went under the First Step Act, I think it

11  would be 151 to 188, and that's as a career offender,

12  which I think we determined that he is.  And obviously the

13  maximum amount is longer than that.  But just to make

14  absolutely sure.

15          The other thing is I misspoke before.  I had

16  calculated the 70 to 87 on the gun charge; but if you add

17  up 100 to 120 on the gun charge, which would be a hundred

18  on the government's calculations to the max, which is 120,

19  the 46 to 57 on the 6.83 grams of crack without

20  considering career offender, and the 60 months on the

21  other charge where he has to be consecutive, that's with

22  no grouping, no acceptance of responsibility, I added

23  those up, it comes out to 206-237.  So it's close to time

24  served.  That's going to be one of my points.  My main

25  point is that he's already done more time than he would

1   have done if all those calculations had been made and even

2   if Your Honor had departed upward, with all due respect.

3              Thank you, Your Honor.

4              THE COURT:  Thank you.  Mr. Chen?

5              MR. CHEN:  Your Honor, AUSA Coronado's brief is

6   very lengthy, so I'm going to try to be very brief.  But

7   essentially Your Honor has, under the FSA, wide discretion

8   whether to resentence Mr. Hines in this case.  As AUSA

9   Coronado pointed out in her lengthy brief, that would not

10  be an appropriate, the government would submit, decision

11  in this case based on the record where we are today,

12  particularly the two murder convictions that have been

13  affirmed.  And I understand that the Connecticut Supreme

14  Court denied cert on those.  So Your Honor has discretion.

15             If Your Honor chooses to exercise discretion as

16  AUSA Coronado pointed out, she suggests that either a

17  variance or a downward departure would be in order because

18  based on your prior sentence, what animated the Court was

19  not necessarily the small amount of drugs but really the

20  very serious violence, which did not result in the taking

21  of a human life.  And based on this record, the government

22  would submit Mr. Hines is in less well stead now.

23             Thank you, Your Honor.

24             THE COURT:  All right, thank you.

25             So let me just cut to the chase.  This

**A - 232**

 1  resentencing turns entirely on whether or not Mr. Hines

 2  murdered two people.  That conviction has been affirmed,

 3  but Mr. Hines is challenging it through a habeas.  He's

 4  sought to take a polygraph examination, and I think the

 5  chances of him succeeding on his habeas, as is true with

 6  any habeas, are very slim.  But should he succeed on a

 7  habeas, I would be inclined to reduce his sentence.  If he

 8  doesn't succeed on a habeas, I am not inclined to reduce

 9  his sentence.  So the outcome of today's proceeding turns

10  really on whether the habeas is going to be successful,

11  and that turns in part on whether he can get a polygraph

12  examination.

13          So my question for counsel is, can we arrange a

14  polygraph examination at Wyatt before Mr. Hines is

15  returned to Florida?

16          MR. CASTIGNOLI:  Well, Your Honor, I believe

17  he's at Wyatt now because of the habeas.  He was brought

18  back to Wyatt because of the habeas, to have the habeas

19  trial in Connecticut, in Rockville.  So he's probably

20  going to be there for a little bit of time.  I would say

21  my experience from -- I got involved in this thing, too,

22  with the polygraph, too, and right now what he's doing is

23  he's attempting to get another lawyer for his habeas.

24  Right now Mr. Ryan is still his lawyer on it.

25          The earliest I have been able to talk to

**A - 233**

38

1   somebody about having a polygraph test was the end of

2   October.  There were COVID-19 issues with the polygraph

3   test, and there are also issues with finding somebody to

4   do it.  And, you know, I will say for the record that what

5   I had done originally was I asked Mr. Hines to put this

6   off until we could do that.  I think he's right in wanting

7   to get this done at some point or another, but it probably

8   would not be happening until at least a month and a half

9   or so from now.  There's COVID-19 issues.  I think those

10  have been resolved there, frankly.  I've been there, I

11  feel safe going there, so -- and I tell people that.

12           I mean, look, my argument is really that, as

13  Your Honor brought it up, I mean if he's guilty of the

14  murders, they can't -- through the habeas, he's in jail

15  for the rest of his life anyways regardless of whether

16  he's in state court or here.  If he's innocent, then he

17  really deserves to be out.  So, I mean, either way you

18  look at it, look, my argument is if he got time served, it

19  doesn't matter, he's going to go to state custody to

20  resolve those issues, and that gets him off of federal

21  custody and this case here.  But if Your Honor wanted me

22  to, I could -- I could work with his state attorney and

23  see if we could resolve it so he could get a polygraph

24  test.

25           Then the issue becomes one of how does he use

1    that in state court in Connecticut because of, you know,

2    scientific issues of facing that in state court.  There

3    are some places which allow polygraph tests if both sides

4    agree.  Connecticut isn't one of them.  But we could

5    certainly work on it.  We've tried to do that.

6              The problem has really been the COVID-19, which

7    really stopped him from getting a polygraph for I'd say at

8    least six months.

9              THE COURT:  Right.  So my sense is that

10   Mr. Hines wanted to be heard, and that's why we're here

11   today, and he felt it important to have something to say,

12   and I'll turn your argument around.  Until the habeas is

13   granted, he's going to be in state custody forever, so if

14   he's sitting in a federal prison, it doesn't matter.  I

15   have to rule on the motion in front of me, and so the

16   question really turns on what happens with those murder

17   convictions.  And so I'm inclined to postpone decision on

18   the resentencing until the habeas runs its course, and

19   then we'll see where we are.

20             THE DEFENDANT:  They keep -- they keep holding

21   this off.  This has been pending since 2016,

22   Mr. Underhill.  They keep holding this off for reasons

23   that don't justify Constitution.  I sent my money to

24   Bansley's law firm in 2017.  They keep -- can't get a

25   federal court order.  I told Judge Newson that they're

1   hindering me.  I'm being hindered now.

2          THE COURT:  Well, okay, but that's a different

3   topic.  So what I'm trying to do is get you the test that

4   you want so that you can use it in the state habeas, and

5   you'll see what happens.  You'll have a habeas trial.

6   You'll either win or lose that.  You'll appeal or they'll

7   appeal.

8          THE DEFENDANT:  No, I got -- I also got -- can I

9   talk to you?

10          THE COURT:  Yes.

11          THE DEFENDANT:  Is it all right if we talk?

12          THE COURT:  Yes.

13          THE DEFENDANT:  Thanks.  On July 22, 2015 Steven

14   Singh wrote a letter to you.  You gave him leniency,

15   cooperation.  Under *Napue v. Illinois* the case has to get

16   remanded.  If you testify in bad faith -- Steven Singh

17   didn't testify in good faith or good cause for his friend;

18   Steven Singh testified in bad faith to get help to get

19   hisself out of trouble.

20          THE COURT:  Okay.  That may be, but you can't

21   really complain about -- you can't require Steven Singh to

22   be reprosecuted.

23          THE DEFENDANT:  No, no, no, no.  I'm saying

24   under state law, under *Napue v. Illinois*, the case has to

25   be remanded.  Under *Giglio*, *Napue*, the case has to get

 1   remanded because Steven Singh said --

 2           THE COURT:  Okay, that's the argument you're

 3   making in your habeas petition.

 4           THE DEFENDANT:  Yeah.

 5           THE COURT:  Right.  So I'm trying to get your

 6   habeas petition moving, and the way to get it moving, it

 7   seems to me, is to get a polygraph while you're up here in

 8   Connecticut.

 9           THE DEFENDANT:  Yeah, they keep -- they keep on

10   saying -- Underhill, I don't know what they're doing.

11   They keep doing something that's --

12           THE COURT:  All right.

13           THE DEFENDANT:  -- corrupt.  They don't want

14   to -- they don't want to do it for some reason --

15           THE COURT:  All right.  Well, work with them,

16   work with them.  Work with Mr. Castignoli, and let's try

17   and get it done.

18           THE DEFENDANT:  All right.  So if this is done,

19   then what we going to do?  If I get it done, because I'm

20   telling the truth, this is affecting me now, right,

21   because as you're looking at me, I'm saying you got to

22   judge me off of -- off of what you see.  I mean, you

23   judging a book by its cover before you read the first page

24   right now.

25           THE COURT:  No, no.  No, I'm judging you as I'm

 1   told to based upon your prior convictions.

 2           THE DEFENDANT:  Yeah, I'm saying but you know,

 3   you see what they're doing, right?  They're violating the

 4   14th Amendment, my state and federal rights, my due

 5   process.  This is supposed to have been done.  Now this is

 6   holding up my proceeding, this is hindering me now --

 7           THE COURT:  Yeah, okay.

 8           THE DEFENDANT:  -- because this is supposed to

 9   already been done.

10           THE COURT:  Well, it's supposed to -- justice is

11   slow.

12           THE DEFENDANT:  I understand it is slow, but I'm

13   saying we had -- this has been litigated 15 with my

14   *Johnson*.

15           THE COURT:  Yes.

16           THE DEFENDANT:  15 years.  So that's from '15,

17   '16, '17, '18, '19.  That's six years.  That's six years.

18   All right, I litigated for the habeas state case to

19   overturn my conviction.  That was in '16.

20           THE COURT:  Yes, okay.

21           THE DEFENDANT:  That's supposed to been done,

22   Underhill.  They can't keep hindering me.  This is holding

23   me back.

24           THE COURT:  Okay.

25           THE DEFENDANT:  This is holding me --

1          THE COURT:  Well, let me just make sure you

2   understand.  If you had gotten a *Johnson* in 2015, the

3   effect of that would be to go from federal court to state

4   court.

5          THE DEFENDANT:  Yeah.

6          THE COURT:  So you're just sitting in a

7   different cell than you'd be sitting in.

8          THE DEFENDANT:  But I'm saying in federal

9   custody, I'm saying what these people are doing, you know,

10   these people are doing everything wrong to me.  You see --

11          THE COURT:  I understand, okay.

12          THE DEFENDANT:  The warden, right, the Warden

13   Charles Lockett, he was causing me hardship.  He's causing

14   me a lot of problems.

15          THE COURT:  Okay.  All right, look.  A lot of

16   people complain about how they're treated in prison.  What

17   I'm telling you is this:  *Johnson* doesn't matter because

18   you would just change jail cells.  What matters is to get

19   your habeas decided.  That's your hope.  Your hope is to

20   win your habeas and get set free.  If you win your habeas,

21   then --

22          THE DEFENDANT:  I think they getting scared, my

23   opinion I think they getting scared because if you would

24   have seen this sealed proceeding, like for my *Johnson*

25   claim if I'd been able to come in here with my evidence

1    right now with Vito, and Vito could show you Donna F.

2    Martinez sealed the proceeding, and Steven Singh said

3    Anthony Harris killed the people, and they hid that

4    knowing that I didn't have nothing to do with it, and then

5    I showed you the polygraph test, I think they would have

6    knew that you would have made a call right now and said

7    he's not supposed to be in here.  I think they knew that

8    you would have made a call, Mr. Underhill, saying get him

9    out of there now.

10            THE COURT:  I can't really make a call, all

11    right?  I've got to deal with a defendant by the book.

12            THE DEFENDANT:  I'm saying when you see -- you

13    see that's why I turned over that information to you.  You

14    see that Mr. Newson, when I filed to remove Attorney

15    Alexandra, he told me that in 2018 that that was going to

16    be done.

17            THE COURT:  Okay.

18            THE DEFENDANT:  If you tell me something, right,

19    you're telling me -- I supposed to believe what you're

20    telling me.  You're the law; you're God.  I'm saying

21    you're higher than the president.  I mean, you the only

22    one that can lock the United States president up,

23    Mr. Underhill.

24            THE COURT:  Well, look.  Let me just give you

25    some real practical advice.  Your best hope right now is

1   to proceed with your polygraph, get your habeas tried -- I

2   know, I know -- and then if you win there, I'll let you go

3   here.  But if you lose there, then I'm not going to change

4   what I did before.  That's the bottom line.  So this case,

5   in many ways, turns completely on your habeas.

6           THE DEFENDANT:  Your Honor, you know what I'm

7   saying, you hear what I'm saying?  Like right now you

8   looking at me as -- as the wrong one.  They're -- they're

9   the people that's wrong because they're holding it up --

10          THE COURT:  Yes.

11          THE DEFENDANT:  -- and they've been holding it

12  up -- you don't feel five years is more than enough,

13  Underhill, to have this done?

14          THE COURT:  Well, you know --

15          THE DEFENDANT:  I'm saying this been before the

16  COVID.  I understand, like, my lawyer, he didn't get even

17  no alternative or anything since the COVID pandemic.  So

18  he's letting you know that he doesn't care about

19  Constitution, because if he cared about Constitution of

20  the United States, he would have had an alternative and

21  know that there's a pandemic right now.  He don't care.

22          THE COURT:  Yeah.  Well, all right.  What I want

23  you to do is work with your lawyer here, Mr. Castignoli.

24          THE DEFENDANT:  Can I ask you something?

25          THE COURT:  Sure.

**A - 241**
                                                                    46

1              THE DEFENDANT:  Can we use a polygraph expert

2      for the district attorney, or do we have a district

3      attorney?  We don't have a district attorney in

4      Connecticut, do we?

5              THE COURT:  We have a U.S. attorney.

6              THE DEFENDANT:  U.S. attorney?  And we don't

7      have a district attorney?

8              THE COURT:  And we have a state's attorney.

9              THE DEFENDANT:  Can we just use the state's

10     attorney's office to get this done?  Somebody that you

11     trust, somebody that you trust.

12             THE COURT:  I can't order that.  But I bet your

13     lawyer can work it out so that you get this test quickly,

14     and then you can move on with your habeas.

15             THE DEFENDANT:  That's what I was trying to do,

16     but I don't see why -- they even kept my money, Underhill.

17     Like I saying, I paid for the test.

18             THE COURT:  Right.  I understand.

19             THE DEFENDANT:  They even kept the money,

20     playing games with my own money.

21             THE COURT:  I understand your frustration, but

22     part of the -- part of the issue has been the inability to

23     get the test done in Florida.  And so if I'm a lawyer up

24     here and I'm representing you, and you can't get the

25     polygraph done, or we can't get the polygraph done, then

1   how am I supposed to make the case move forward?

2           THE DEFENDANT:  I'm saying but you can't -- you

3   can't blame me, though.  I tried.

4           THE COURT:  I'm not blaming you.

5           THE DEFENDANT:  I filed a 2241 on my own.

6           THE COURT:  I'm not blaming you.  I'm not

7   blaming you at all.  What I'm saying is, here's your

8   advice.  I'm giving you some free advice.  Don't worry

9   about what happened yesterday, and the day before, and the

10  year before, and the year before that.  Move forward.  You

11  need to move forward with your attorney, get that test.

12  That will allow your habeas counsel to press the Court,

13  "we're ready to go, Judge.  Let's go."  Right now, he

14  doesn't have any ammunition.

15          THE DEFENDANT:  Can I say something?  They

16  not -- they don't want to do it.  Ryan, I just spoke with

17  Ryan like last week.  Ryan is trying to say that he

18  doesn't want to present the motion that I wrote up so I

19  can get free.  I don't -- I don't know what's going on.

20  I'm saying this is my life, this is my life and my

21  liberty.  I don't want to put my life in somebody's hands

22  that can't get a court order.  I got a double homicide.

23          THE COURT:  Yeah.

24          THE DEFENDANT:  I'm putting my life in someone's

25  hands that can't get something as simple done as a court

```
 1    order.  I'm scared of this man.

 2              THE COURT:  Well, okay.  Habeas -- let me just

 3    tell you right now -- habeas is a very difficult remedy.

 4    It's a very difficult remedy.  Now, you've got some

 5    arguments to make, and I'm sure your lawyers want to press

 6    them.  But you really need to move forward with them and

 7    try to get what you need.

 8              THE DEFENDANT:  I'm saying you don't think I

 9    tried?  I'm saying that's --

10              THE COURT:  I know.

11              THE DEFENDANT:  -- why I gave you everything.

12              THE COURT:  I know.

13              THE DEFENDANT:  I tried, man, I tried.  I did

14    everything possible.  I didn't cause any problems.

15              THE COURT:  I know.

16              THE DEFENDANT:  I tried to cooperate with the

17    warden, Charles Lockett.  I did everything possible.  I

18    did nothing wrong.  It's up to them.  It's not on me; it's

19    them.  That's why I can't see you holding me accountable

20    anymore when you know that it's on them now.  We're not

21    talking about one month, two months.  We're talking about

22    years, Mr. Underhill.

23              THE COURT:  Right.  I understand.

24              THE DEFENDANT:  You can't put that on me.  You

25    talking about years.
```

```
 1              THE COURT:  I'm not putting anything on you.

 2              THE DEFENDANT:  Do you understand what I'm

 3    saying?  You can give him the benefit of the doubt if it

 4    was six months, seven months, a year.  We talking about

 5    five years.

 6              THE COURT:  Right, okay.

 7              THE DEFENDANT:  Six years.

 8              THE COURT:  Right.

 9              THE DEFENDANT:  That can't be my fault, can it?

10              THE COURT:  I'm not saying it is.  I'm not

11    saying it's your fault.

12              THE DEFENDANT:  I'm saying can we get this done

13    in two weeks?

14              THE COURT:  I don't know.

15              THE DEFENDANT:  Can we get this done?  We need

16    to get this done in two weeks.

17              THE COURT:  I don't think so, but you work with

18    your lawyer, okay?  I can't do anything more than

19    encourage that it get done.

20              THE DEFENDANT:  I'm saying this is not my fault.

21    That's what I want you to understand.  You can't get upset

22    with me because this is justice.  They're hindering me.

23              THE COURT:  I understand.  I understand.  All

24    right.

25              THE DEFENDANT:  What you gonna do?  You gonna
```

1   get it done?

2          THE COURT:  Let me find out whether either

3   counsel objects to the proposal that I've made, that we

4   postpone the decision whether to impose a lesser sentence

5   until after the habeas is resolved.

6          MR. CHEN:  No objection from the government,

7   Your Honor.

8          MR. CASTIGNOLI:  No objection, Your Honor.

9          THE COURT:  All right.  That's what we're going

10  to do.  And, Mr. Castignoli, I'm going to urge you to work

11  with Mr. Hines and his habeas counsel.  Try and get that

12  polygraph.

13         MR. CASTIGNOLI:  He was close to getting it

14  about three months ago, and we had the person set, and he

15  was going to go down there, and then he wrote us a letter

16  saying because of COVID-19 he didn't want to go ahead and

17  do it.  It was probably related to someone in his family

18  who was ill, and he didn't want to take any chances.

19         THE COURT:  So if it's a question of money, I

20  need it for this case as well, so if you wanted to put a

21  CJA voucher in for it --

22         MR. CASTIGNOLI:  That's fine, Your Honor.  Thank

23  you.

24         THE COURT:  -- I think that's appropriate.  If

25  that moves things forward, that would be very helpful.

```
 1            MR. CASTIGNOLI:  That might very well do it,
 2    Your Honor.
 3            THE COURT:  All right, good.
 4            MR. CASTIGNOLI:  Thank you.
 5            THE COURT:  All right.  I want to thank you all.
 6    This has been a useful proceeding.  And, Mr. Hines, I want
 7    to thank you for coming up.  I know it was a hassle to
 8    come up.  And I encourage you, I understand your position,
 9    and I can't do anything for you until your habeas runs its
10    course.  So please --
11            THE DEFENDANT:  So this time around, my next
12    court date, when this polygraph come back and let you know
13    that I'm telling the truth, there got to be something
14    wrong; right, Underhill?  Because if Donna F. Martinez
15    don't want to unseal the proceeding, and they don't want
16    let me do the polygraph test, that's showing you
17    something's wrong, right?
18            THE COURT:  Well, there's various reasons for
19    sealing, so I don't know what the circumstances were.  I
20    can't really comment on that.
21            But I want to wish you best of luck moving
22    forward, all right?
23            MR. CASTIGNOLI:  Your Honor, what I'll do, then,
24    is I'll make a CJA application to hire a polygraph expert
25    to see Mr. Hines.  That might expedite matters.
```

```
 1                 THE COURT:  Right.

 2                 MR. CASTIGNOLI:  I could probably look at who's

 3     available.

 4                 THE COURT:  Very good.

 5                 MR. CASTIGNOLI:  Thank you, Your Honor.

 6                 THE COURT:  All right.

 7                 Thank you all.  We'll stand in recess.

 8                 (Adjournment:  4:27 p.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**A - 248**

53

C E R T I F I C A T E


        I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



                July 12, 2021


                /S/ Sharon L. Masse
            Sharon L. Masse, RMR, CRR
              Official Court Reporter
               915 Lafayette Boulevard
            Bridgeport, Connecticut  06604
            sharon_masse@ctd.uscourts.gov

```
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
 2

 3   _____ )
 4   UNITED STATES OF AMERICA,      ) No. 3:05-cr-00118(SRU)
                                    )
 5                    Plaintiff,    ) October 27, 2021
     v.                             )
 6                                  ) 10:10 a.m.
     CRAIG HINES,                   )
 7                                  ) 915 Lafayette Boulevard
                      Defendant.    ) Bridgeport, Connecticut
 8   _____)

 9

10                     RESENTENCING HEARING

11

12   B E F O R E:

13          THE HONORABLE STEFAN R. Underhill, U.S.D.J.

14

15   A P P E A R A N C E S:

16   FOR THE GOVERNMENT:

17          OFFICE OF THE UNITED STATES ATTORNEY
                1000 Lafayette Boulevard, 10th Floor
                Bridgeport, Connecticut 06604
18          BY:  ELENA CORONADO, AUSA

19   FOR THE DEFENDANT:

20          LAW OFFICE OF VITO A. CASTIGNOLI
                P.O. Box 110
21              Milford, Connecticut 06460
22          BY:  VITO A. CASTIGNOLI, ESQ.

23

24                     Official Court Reporter:
                       Melissa J. Cianciullo, RDR, CRR, CRC
25                     (203) 606-1794
```

**A - 250**

2

1          (Call to order, 10:10 a.m.)

2          THE COURT:  Good morning.

3          MR. CASTIGNOLI:  Good morning, your Honor.

4          THE COURT:  We're here for a resentencing in

5     the matter of *United States v. Craig Hines*.

6          Could I have appearances, please.

7          MS. CORONADO:  Good morning, your Honor.

8     Elena Coronado for the government.

9          MR. CASTIGNOLI:  Good morning, your Honor.

10    Attorney Vito Castignoli for Mr. Hines.

11         THE COURT:  Very good.  And Meghan Nagy of

12    the U.S. Probation Office is also with us in court

13    today.

14         So we're here because I granted Mr. Hines's

15    motion for a resentencing in light of the First Step

16    Act and the Fair Sentencing Act.  And I resisted

17    scheduling this sentencing, frankly, because I didn't

18    think it was -- it made sense to resentence Mr. Hines

19    before his state habeas cases had been resolved.

20    Mr. Castignoli was quite persistent, and I agreed to

21    conduct the resentencing today.

22         I do -- Mr. Hines, I do want to just start by

23    offering you the option of postponing this

24    resentencing.  I am going to be unable to overlook

25    those two state murder convictions when deciding how

1   to sentence you today.  I know you claim to be

2   innocent and you're pursuing state habeas

3   proceedings.  I know you passed a lie detector test.

4   But I can't really assume that you didn't commit

5   those crimes.  And so in deciding how to sentence you

6   today, I am going to consider them.

7          So I wanted to give you one last shot at just

8   postponing this and pursuing your cases in the state

9   court.  I'm happy to give you a minute to speak with

10  Mr. Castignoli, if that makes sense.

11         MR. CASTIGNOLI:  Just a moment, your Honor.

12         THE COURT:  Sure.

13         (Pause.)

14         MR. CASTIGNOLI:  Your Honor, he's decided he

15  wants to be sentenced today.

16         THE COURT:  Very well.

17         MR. CASTIGNOLI:  And I've explained to him

18  all the pluses and minuses of being sentenced today

19  and have some things to say about that, those cases,

20  I just would like to put on the record.

21         THE COURT:  Sure.  Did you want to do that

22  now or later?

23         MR. CASTIGNOLI:  I -- well, I have some

24  sentencing remarks.  They're not going to be long

25  because I know that we went over this the last time.

**A - 252**

4

1      THE COURT:  Yes.  Very good.  Okay.  All

2  right.  We'll proceed today.

3      So on August 30th of 2005, Mr. Hines appeared

4  before Magistrate Judge William I. Garfinkel and

5  entered a guilty plea to a three-count indictment

6  charging him with, in Count 1, possession of a

7  firearm by a convicted felon; Count 2, possession

8  with intent to distribute more than five grams of

9  crack cocaine; and in Count 3, possession, use and

10 carrying a firearm during, in relation to and in

11 furtherance of a drug offense.

12     On September 9, 2005, I approved and adopted

13 Judge Garfinkel's recommendations and accepted his

14 plea.

15     A presentence report was thereafter prepared

16 for the Court by the U.S. Probation Office.  The

17 initial report was dated January 5, 2006, and there

18 was a -- the first addendum was of the -- excuse me.

19 The initial report and the first addendum were both

20 dated January 5th.  The second addendum was dated

21 July 2, 2019, and referred to the First Step Act.  A

22 supplemental addendum was thereafter prepared and

23 filed on October 13th of this year.  And I, at the

24 time -- well, let me just say, in preparation for

25 today's sentencing, I've reviewed all of those

1    documents and I have conferred with Ms. Nagy in

2    advance of today's sentencing.

3            In addition, I have considered the following

4    materials:  the defendant's memorandum in aid of

5    sentencing dated July 6, 2020; the government's

6    response to defendant's sentencing memorandum dated

7    September 16, 2020; defendant's submissions in aid of

8    sentencing, September 17, 2020; defendant's

9    supplemental sentencing memorandum dated October 12,

10   2021; and the government's supplemental sentencing

11   memorandum dated October 25, 2021.

12           Mr. Castignoli, let me make sure that you and

13   Mr. Hines have had a chance to review the presentence

14   report and each of the addenda to that report.

15           MS. CORONADO:  Yes, we have, your Honor,

16   including I've reviewed with him the findings of the

17   latest presentence addendum which was filed a week or

18   two ago.  I believe it goes along with the findings

19   that your Honor made back in September of 2020.  And

20   I've gone over that with Mr. Hines and the guidelines

21   calculation in that, the advisory guidelines

22   calculation.

23           THE COURT:  Very good.

24           Ms. Coronado, has the government had the same

25   opportunity?

1          MS. CORONADO:  We have, your Honor.

2          THE COURT:  All right.  Let me just inquire

3   whether either of you have any objections to any

4   aspect of the presentence report.

5          MR. CASTIGNOLI:  No, your Honor.

6          MS. CORONADO:  Your Honor, I -- we don't have

7   any objections.  I did include this comment in my

8   most recent supplemental sentencing memorandum.  I

9   think that the probation office did an excellent job

10  with the presentence report including the most recent

11  supplement.  Those calculations were made on October

12  13th which was a mere two days before the Second

13  Circuit actually issued its opinion in *Chery v.*

14  *Garland*.  I do think *Chery v. Garland* represents a

15  change in controlling case law as to which

16  Connecticut felony drug offenses qualify as valid

17  predicates under the guidelines.

18          I can tell you right now, it's not entirely

19  clear to me what the impact is here.  *Chery* was in a

20  different context.  And although I have really made a

21  real effort to find the necessary paperwork that I

22  believe I would need to submit to the Court for the

23  modified -- under the modified categorical approach,

24  I dug through multiple boxes that had been at a

25  records center.  I just, given the age of the

1  February 1996 conviction, I don't have the sentencing

2  transcript or other documents that I can show the

3  Court.  So I'm not pressing it at the moment, but I

4  did just want to bring the new authority to the

5  Court's attention insofar at it has any impact on the

6  offense level or, really, the guidelines computation

7  and Mr. Hines's career offender status that the

8  probation office just put together quite recently.

9        THE COURT:  Right.  The *Chery* case was in the

10 immigration context.

11       MS. CORONADO:  It was.

12       THE COURT:  And it -- the -- somewhat

13 recently the Second Circuit held in the *Townsend* case

14 that -- in a way that suggested perhaps that *Chery*

15 doesn't have the impact that you suggest.  Obviously

16 *Townsend* was before *Chery.*  But I think in the

17 sentencing context, the Second Circuit has very

18 recently made clear kind of how state drug offenses

19 count for purposes of sentencing.

20       So I'm not going to apply *Chery* here, but I

21 appreciate your bringing it to my attention.

22       MS. CORONADO:  Understood, your Honor.  And

23 I'm not really pressing a different outcome.  I just

24 did want to raise it.

25       THE COURT:  Fair enough.

1      All right.  I have previous accepted the plea

2  agreement.  So in terms of the various maximum

3  penalties, on Count 1, Mr. Hines faces a maximum term

4  of ten years of imprisonment, supervised release of

5  up to three years, a fine of up to $250,000, and $100

6  mandatory special assessment.

7      On Count 2, he faces a maximum term of

8  imprisonment of up to 20 years, a maximum term of

9  supervised release of up to life, a fine of up to $1

10  million and a special assessment of $100.

11      And on Count 3, Mr. Hines faces a mandatory

12  minimum five years consecutive to the prior two

13  counts as well as, I believe, a fine of up to

14  $250,000, a supervised release term of up to five

15  years and the mandatory special assessment of $100.

16      Any correction to that statement of the

17  maximum penalties on each of these three counts?

18      MR. CASTIGNOLI:  Not from the defense, your

19  Honor.

20      MS. CORONADO:  Nor from the government.

21      THE COURT:  All right.  Very good.  So the

22  sentencing guidelines here are complex, and I believe

23  that the probation office has correctly set them

24  forth in one of the addenda.  Counts 1 and 2 are

25  grouped, and Count 3 is required to be consecutive to

**A - 257**

9

1   that grouping.  In terms of the grouping, Count 1 has

2   a base offense level of 22, in light of the nature of

3   the firearm at issue and the prior criminal history

4   that Mr. Hines had and has.  Four levels are added

5   for an obliterated serial number.  So we have an

6   adjusted offense level of 26.  The offense level on

7   Count 2 is 16.  Count 1 is the higher grouping, and

8   so it is used -- the government has previously made a

9   motion under 3E1.1(b), and so I'm going to subtract

10  three levels for acceptance of responsibility.  That

11  gives us a total offense level of 23.

12       Mr. Hines is in Criminal History Category VI,

13  and the resulting sentencing guideline range is 92 to

14  115 months on Counts 1 and 2 plus the 60 months

15  consecutive for an overall guideline range of 152 to

16  175 months of imprisonment.

17       In terms of supervised release, the

18  supervised release guideline range for Count 1 is one

19  to three years.  On Count 2, it's three years.  And

20  on Count 3, it's two to five years.

21       The fine range is between 10,000 and one

22  million dollars.  That's using the 2014 guideline

23  manual.

24       And there is, of course, a $300 mandatory

25  special assessment.

```
1          Let me hear from either counsel if there's

2    any objection to that calculation of the sentencing

3    guidelines or the statement of the resulting

4    sentencing guideline range.

5          MS. CORONADO:  No objection, your Honor.

6          MR. CASTIGNOLI:  No, your Honor.

7          THE COURT:  All right.  Very good.

8          Mr. Castignoli, let me turn to you with

9    whatever comments you'd like to make regarding

10   sentencing.

11         MR. CASTIGNOLI:  Should I make them from

12   here, or do you want me to go to the podium?

13         THE COURT:  Wherever you're comfortable is

14   fine.

15         Mr. Hines, I'll hear from you if you wish to

16   make a statement today.

17         THE DEFENDANT:  I understand.  I know you

18   just -- the *Johnson* claim, you know Charles Willson

19   was my attorney.  You know they sealed the

20   proceeding.  You know that they didn't want to turn

21   over the polygraph test.  You just keep denying me.

22   I did everything right.  I didn't get in any trouble.

23   I passed the lie detector test.  You know what no

24   deception means, right?

25         THE COURT:  I do.
```

1      THE DEFENDANT:  Could you tell me what that
2  means in your eyes, Your Honor?
3      THE COURT:  Well, it means that you passed
4  the lie detector test.
5      THE DEFENDANT:  Yeah, but do you -- can you
6  tell me what no deception means, no deposition?
7      THE COURT:  It means that you were not -- the
8  polygraph operator came to the conclusion that you
9  are not attempting to be deceptive.
10      THE DEFENDANT:  Yeah.  I have nothing to do,
11  know nothing about the murder at all.
12      Steven Singh, I mean, you gave them leniency
13  for cooperation.  He was in trouble.  I had 43
14  witnesses on the murder case, only one testified, it
15  was him saying that I did it and he on the streets
16  now.  Nobody else out of the 42 witnesses said I did
17  anything.
18      THE COURT:  Okay.  All right.  Well, let me
19  hear from your lawyer.  Then I'll give you a chance
20  to speak, and then I'll hear from Ms. Coronado.
21      MR. CASTIGNOLI:  May I proceed, your Honor?
22      THE COURT:  Please.
23      MR. CASTIGNOLI:  Your Honor, the law is that
24  the Court should impose a sentence that's sufficient
25  but not greater than necessary to comply with the

1  purposes set out in the statute.  And I just want

2  to -- I'm going to focus on the word "necessary" at

3  this point.

4         Probation came up with a calculation of 152

5  to 175 with the changes in the law that have happened

6  since the time, because this is a plenary

7  resentencing.  The government in their first memo

8  came up with 137 to 156.  I had had 151 to 188 as the

9  sentencing range.  In every one of those occasions,

10 on every one of those, he has now served 201 months.

11        Virtually all the reasons that were set out

12 in the government's memo, and I know what your Honor

13 is thinking, in terms of his situation now, all those

14 situations, whether your Honor gives him time served

15 or whatever, those -- that reasoning, that he should

16 get above what he's looking at on the sentencing

17 guidelines, that's all been redeemed just by the time

18 that he's already served because he's already served

19 201 months.

20        I did a quick calculation, and if he got the

21 maximum on the first count which is the 120, and he

22 got the maximum on the third count which is 60, that

23 would add up to 180.  So in order to give him 262,

24 you would have to give him something like 80 months

25 on the drug count alone, which to me, with all due

1   respect, would violate every reason for the First

2   Step Act in the first place to -- and what it says

3   about drug sentencing as it is.

4         He has already served 201 months, and every

5   single reason -- he's already served beyond every one

6   of the guideline calculations of the Court, myself

7   and the government.

8         And so all those reasons, that he's a violent

9   individual and deserves more time than the guidelines

10  would say, that's been redeemed regardless of what

11  happens here today because he's already served far

12  beyond that time.

13        Now, the reason we're here today, and if this

14  habeas trial happened next week or a week from now,

15  whatever, we wouldn't be here, obviously.  The

16  problem with the habeas trial is because of COVID-19,

17  something that he had no control over, and issues

18  he's had with his attorneys, the habeas trial that he

19  has and his ability to prove that he's innocent will

20  not come up for another 48 months.  If he was to

21  continue here for 48 months, he will have served 250

22  or 251 months, which is the reason he want -- he's

23  asking to be sentenced today.  He realizes that in

24  order to prove his innocence, he'd pretty much have

25  to continue this sentence virtually until the end,

1   and I imagine with good time credits it will

2   probably -- if he just had that sentence and nothing

3   else, he probably would have been out by that time

4   anyways.

5        Now, on the case on the double murder which

6   allegedly happened 2000, listen, I'm not going to get

7   into the investigation and the evidence and all that.

8   Suffice it to say that at least in my opinion it was

9   not the greatest case in the world; however, he --

10  because of what's happened in COVID-19, because of

11  some issues he's had with his previous attorneys in

12  getting a lie detector test, he couldn't get a lie

13  detector test because the lie detector operators

14  would not go to Wyatt during COVID-19.  We finally

15  found one who would.

16       He's pretty much been thwarted in every time

17  he's tried to do anything with regard to proving his

18  innocence.

19       Finally, we did get the lie detector test.

20  And that's not evidence, and I totally agree, that's

21  not evidence that can be put before a jury in a

22  criminal case.  I think the *Porter* case was cited.

23  An expert can't get up there in front of a jury and

24  testify, well, he did not show any deception on the

25  lie detector test.  However, as we well know, your

1   Honor, it  used for many other reasons besides being

2   put in front of a Court, in front of a jury.  I

3   believe, you know, from at least reading, the CIA and

4   many other agencies believe in that.  Now, I agree,

5   it cannot be put before a Court.  He'll have to prove

6   his innocence in other ways.  But in every way that

7   was available to him, which is the lie detector test,

8   he's done that, he's been thwarted.  If he goes on

9   the theory that I'll wait until I have a habeas

10  trial, he'd have to wait another four years, and then

11  there would be the issue of when you get a decision

12  after that, the appeal, things of that nature.

13         So he's done everything he possibly can to

14  try to prove his innocence, and he's insisted that to

15  me every time, probably in phone calls every other

16  day.

17         Now, you're going to -- your Honor brought up

18  the point before of, well, what difference does it

19  make to him, he's going to be incarcerated anyways.

20  But that's something I want to address, okay, because

21  I know that can be an argument here.

22         He was brought to Wyatt -- my understanding

23  is he was initially brought to Wyatt for the habeas

24  trial; and obviously that never occurred, but he

25  obviously, regardless of what happen --

1           THE DEFENDANT:  I object.  I object.

2           MR. CASTIGNOLI:  Please, Mr. Hines.

3           THE DEFENDANT:  I'm saying I object to that

4    because that's a lie.

5           MR. CASTIGNOLI:  He tells me now that it's

6    just for the sentencing, but initially that's what I

7    was told.  I was told that.  He's going to be --

8    regardless of what the sentence here, he's going to

9    be moved around.  He's going to be incarcerated for

10   four years regardless.

11          So the question becomes is it necessary to

12   give him more time, and my argument would be it's not

13   necessary.  He's going to be incarcerated anyways

14   probably at the state level, will be incarcerated

15   until that habeas trial in four years.  In other

16   words, he'll do every single day of what he was

17   supposed to do here in some type of incarceration.

18          Yes, the two murders are very serious.  The

19   guidelines indicate that because they happened after

20   he was sentenced here, they wouldn't be considered in

21   terms of a career offender.  I think your Honor

22   mentioned the last time, possibly, as relevant

23   conduct.  I don't believe they had anything to do

24   with this -- these particular cases here.

25          And I think that even if you gave him the

1   maximum on at least two of the charges here, you

2   would have to give him what I would consider to be an

3   extremely long sentence on the drug case to get to --

4   even get to the 262.  And if the thinking is even

5   that it's beyond that, then I would argue that, yes,

6   that would be what I would consider, with all due

7   respect, an extremely harsh sentence just on the

8   drugs, because effectively he's already done the

9   entire sentence on both the first count on the gun

10  and the third count on the 60 months.

11          THE COURT:  Well, the 60 months is a

12  mandatory minimum consecutive; it's not a maximum.

13          MR. CASTIGNOLI:  Right.

14          THE COURT:  So the weight of the sentence can

15  be placed on the conviction for use of a gun in

16  connection with a drug offense but not on the drug

17  offense.

18          MR. CASTIGNOLI:  I apologize if I misstated

19  the law.

20          THE COURT:  Okay.

21          MR. CASTIGNOLI:  Okay.  But that's basically

22  my argument is that at this point he would have to

23  really -- the sentence would have to fall mainly on

24  the drug case, which in my view the reason we're here

25  is the First Step Act which said the drug sentences,

1   what he was sentenced under initially, were harsh to

2   begin with, not to add more time to the drug case.

3   That's the way this falls down, your Honor.

4        I would argue that everything here can be

5   redeemed, all the arguments, the arguments from the

6   government.  I think the concerns, the legitimate

7   concerns that your Honor have can all be redeemed

8   with the sentence that he's already served because

9   he's been incarcerated for 201 months beyond any

10  calculation here.  My argument -- and, look, I hate

11  to bore the Court with this.  I think it's 27 months

12  over the 175 -- well, 26 months over the 175, which

13  was the top of the range probation calculated and

14  your Honor calculated, 46 over the top of the range

15  that the government calculated and over what I

16  calculated which is a 151 to 188.

17       So all those reasons can be redeemed.  Plus

18  he's got the 125 years on the murders case.  And if

19  your Honor feels that he did commit the murders and

20  is going to look at it, your Honor has to look at it

21  like he's doing another -- he's going to be in jail

22  the rest of his life anyways if that's the baseline

23  here.

24       So I would say it is not necessary that he do

25  any more time than he has done, with all due respect.

1   And I'll leave it at that.

2           THE COURT:  Very Good.

3           Mr. Hines.

4           THE DEFENDANT:  All right.  Charles Willson

5   was the attorney for Anthony Harris and Steven Singh.

6   Steven Singh told Charles Willson, this is when

7   Charles Willson worked for Nevins Nevins firm.  He

8   told Charles Willson that Anthony Harris committed

9   the murders.  Donna F. Martinez, Attorney Bruce

10  Koskoff went in chambers and sealed the proceeding;

11  and Steven Singh said Anthony Harris committed the

12  murders.  Charles Willson never wanted to get the

13  sealed proceeding unsealed.  As my attorney, as you

14  know, this evidence is supposed to go in front of you

15  for my *Johnson* claim.  They held my *Johnson* claim up

16  for four years waiting to do a polygraph test and get

17  that unsealed so they could show that I did not

18  commit the murders.  They never reported that to the

19  DA.  You let Steven Singh go.  Steven Singh

20  cooperated for a deal.  He was in trouble.  Eleven

21  years later, he saying I killed the people.  He never

22  said I did nothing until eleven years later and when

23  he was in trouble.  I didn't do that.  There's 43

24  witnesses, 42 people who say they don't know who did

25  nothing.  They convicted me on a double homicide.

1    Also there's a dude named Anthony Washington,

2    he was on a prison bus with a dude named Arnold Penny

3    (phonetic).  He told Arnold Penny how the murder

4    happened.  He told him that Detective Breland came to

5    Whalley Avenue County and asked him to do a lie

6    detector test.  He said he refused a lie detector

7    test because that was like telling on himself.  He

8    said they came back to him again when he was in

9    Bridgeport County.  He declined the test again.

10    Braulio Marquez, the person that was our boss

11    that we sold drugs for, said that if Anthony Harris

12    or Craig Hines said that he ordered the hit on Lakeia

13    Vaughn or Lamont Brockenberry, then we're lying.  And

14    he told Agent Lawton and M. Mastropetre for the Safe

15    Streets Task Force for the New Haven Police

16    Department that he is willing to take a lie detector

17    test.

18    I feel that my lie detector test should be

19    presented as evidence because if not, that's being

20    bias and prejudice towards me.  I didn't kill the

21    people.  The person just told you I didn't kill the

22    people with no deception.  No deception indicates

23    that nothing about the murder.  This guy is

24    postconviction.  He is qualified postconviction for

25    sex offender, qualified for the courts.  You got --

1  you the one that wanted to get it done.  You got it

2  done.  You said, Mr. Hines, I'm going to get you the

3  lie detector test done.  I got it done.  What else

4  should be the problems?

5        These people are suppressing my evidence for

6  me to go home.  They're not letting me see a lawyer.

7  They're violating my Sixth Amendment and my

8  Fourteenth Amendment, my state and federal rights.

9  What's going on, your Honor?  Like I supposed to have

10 been in Court.  I mean, the pandemic, they could have

11 been working due diligence from at home about my

12 evidence.  These lawyers are not even coming to visit

13 me.  You putting me in harm's way.  The warden down

14 there, Charles Lockett, he doesn't like me.  He

15 didn't let them come in with no legal work or the

16 laptop computer to go over my case for five or six

17 years.  They're not letting them come in the prison.

18 They're not letting them come in the prison to go

19 over my case.  That's not constitutional, Underhill,

20 that's not constitutional.  Everybody has a right to

21 see their attorney, doesn't he?

22        THE COURT:  Yes.

23        THE DEFENDANT:  But not me.  Not me.  Brian

24 Desmond was then court appointed.  The

25 postconviction, they won't let him, the public

1  defender's office won't award him any money to come

2  visit me to go over my case.  My case was filed 2016.

3  They won't let him come see me.  All I'm doing is

4  talking to these people on the phone.  They

5  endangering my life, my life and my liberty.  They're

6  violating my constitutional amendments.  What you

7  think about that?

8          Because you tell me because -- that's a Sixth

9  Amendment violation.  I have a right, a supposed

10  right to face my accuser and have witnesses in my

11  favor, Underhill.

12          THE COURT:  Well --

13          THE DEFENDANT:  And also the lie detector

14  test is only an investigative tool for the prosecutor

15  and for you to come up with your decision.  I didn't

16  do it.  What other way that I'm going to tell you the

17  truth if we don't do a lie detector test?  There is

18  no other way for me to tell you the truth.

19          THE COURT:  Well, here is the problem.  You

20  got convicted, and I can't undercut that conviction.

21  You've --

22          THE DEFENDANT:  Nah.  I understand you can't

23  undercut the conviction.  I know you can't undercut

24  the conviction.

25          But under *Giglio*, it says that if you

**A - 271**

23

1  cooperate for leniency and the prosecutor doesn't

2  tell my attorney, the defense counsel, the case

3  automatically has to get reversed.  That's law.

4       THE COURT:  Well, that's an issue to raise in

5  the state habeas proceeding.

6       THE DEFENDANT:  You saying here, listen, you

7  denied my *Johnson*.  My *Johnson*, I'm no longer on a

8  career offender.  I'm no longer on career offender

9  under the new sentencing guidelines with that.  You

10  granted my First Step Act.  My First Step Act, Trump

11  passed a bill in 2018, said for all crack offenders,

12  powder and crack offenders, it's a ratio of one to

13  one.  I'm from 151 to 188 months with the new

14  sentencing guidelines.  I ain't be getting in no

15  trouble.  You know you what you told me?  You used to

16  be the one that used to live around the corner from

17  me when you used to live on Dwight Street.

18       THE COURT:  That's right.

19       THE DEFENDANT:  You told me, you said,

20  Mr. Hines, don't go in trouble, get involved with no

21  gangs or nothing like that in prison.  I only caught

22  26 shots.  I'm not in no gangs.  The marshal just

23  wrote a letter stating that I'm not getting in

24  trouble in prison.  I'm working with basic skills.

25  What else do you want?

**A - 272**

24

1          These people just -- the chief public

2    defender's office said I'm eligible.  What else do

3    you want?  I just took the lie detector test that you

4    ordered.  You're going to go against your word about

5    what these people are telling you now.  These people

6    are telling you from Global Polygraph test that

7    you've got the wrong guy.  This is not him.

8          THE COURT:  Okay.  I was trying to help you

9    in your state case to the extent you couldn't get a

10   lie detector test.

11         THE DEFENDANT:  Yeah.  But I'm saying now,

12   Underhill, you saying that the expert is lying.  So

13   you're saying that the expert --

14         THE COURT:  No.

15         THE DEFENDANT:  Listen, you're saying that

16   this expert that you -- who ordered Vito Castignoli

17   to get done, you saying that this man is lying?

18         THE COURT:  No, I'm not.  I'm not making any

19   comment at all on the lie detector test.

20         THE DEFENDANT:  I'm saying how will we

21   prove -- I'm asking you this, and you tell me there's

22   law, how are we going to prove that somebody is

23   lying?  How can we do this?  How can we prove that --

24   if one of these people are saying I did something and

25   they're lying on me, how could we prove it?  Could

1   you please tell me that?

2          THE COURT:  It's difficult.

3          THE DEFENDANT:  I'm saying the only way that,

4   your Honor, that's what you made the polygraph test

5   for.

6          THE COURT:  Okay.

7          THE DEFENDANT:  Don't you agree or no,

8   Underhill?  I'm just saying please tell me this,

9   because the only reason how you're going to tell if

10  I'm telling the truth or not, I'm lying, right, is

11  the polygraph test.  If you got any other way, can we

12  get -- if you want the test ran again, could we go

13  another time with this because I need to get home.

14         THE COURT:  What you're saying is I should

15  assume that the state habeas will be decided in your

16  favor?

17         THE DEFENDANT:  No, I'm not saying that.  I'm

18  saying right now your Honor is saying that I'm here,

19  I'm in Donald Wyatt for the state habeas.  I'm in

20  Donald Wyatt for resentencing.  I came up here for

21  resentencing for the First Step Act.  Trump passed a

22  bill in 2018 -- no, 2000- yeah, 2018 saying everybody

23  that got sentenced up to 2010 that has crack one to

24  one.  I'm one to one.  I've been down 17 years.  I

25  got 824 good time days.  What is the problem?  You

1  know that I'm in danger down there Coleman Florida.

2  Mr. Lockett and them, they won't let me get no

3  legal -- I mean, didn't you see how many times I

4  signed up to get the polygraph test, why I try the

5  Challenge Program and RDAP do and all the programs

6  and they was telling me no.  You putting my life in

7  danger.  Like you're letting them -- they're not

8  going to let me get no legal counsel.  I'm not lying.

9  That's -- I got a documents on my property.  They're

10 not letting the lawyers come inside the institution.

11      THE COURT:  Okay.  But that's not something I

12 can consider today.  It's just not so . . .

13      THE DEFENDANT:  So what you want?  You want

14 to give me more time?  What you want to do?

15      THE COURT:  Well, I'm going to listen to

16 everybody's arguments first.

17      MR. CASTIGNOLI:  Your Honor, could I address

18 two things?

19      THE COURT:  Sure.

20      MR. CASTIGNOLI:  One is I forgot to say this

21 before, and I think the addendum to the presentence

22 does go over this, that he hasn't had any demerits

23 since the last time we were here.

24      Secondly, he mentioned something about

25 lawyers going to see him at Wyatt, that he -- I have

1    gone to see him at Wyatt on several occasions.  I

2    believe he's talking about the state.

3           THE DEFENDANT:  No.  No, I'm not talking

4    about the state.  Mr. Underhill, didn't you see the

5    paperwork that I sent you?

6           THE COURT:  You're talking about Florida.

7           THE DEFENDANT:  Hold up.

8           THE COURT:  You're talking about Florida.

9           THE DEFENDANT:  Yeah, and you sending me back

10   to.  You got to understand, them people racist, man.

11          THE COURT:  Okay.

12          THE DEFENDANT:  I'm saying, Underhill, you

13   from New England states.  You pass the Mason-Dixon

14   Line -- but we in the patriot states.  But the people

15   down there, bro, in the Midwest states, them people

16   are crazy, bro.  There are crazy people.  But the

17   warden, he was a death row warden.  Mr. Charles

18   Lockett and Mr. -- Marberry and -- they were death

19   row people.  So, you know, anybody that -- I'm not

20   saying that they got to judge a book by its cover,

21   but I know that they're people that's in prison and

22   they run the prison.  So, you know, they're going to

23   judge everybody accordingly.  This dude killed people

24   in jail, like him and Steven Reiser, Marberry.  Terre

25   Haute is lethal injection.  He came from lethal

1    injection.

2           So they wrongful convicted me.  So, you know,

3    this is causing a problem.  This is causing a problem

4    with me and Mr. Lockett.  Mr. Lockett is -- they

5    don't like inmates.  I agree because we're on the

6    other side of the fence.  I agree that they shouldn't

7    like inmates.  But I'm saying, I'm really in some

8    serious problem that I've got nothing to do with.

9    I'm really in some real -- wrongfully convicted.  I

10   mean, I got a piece of evidence right now -- what

11   would you do if you was in my shoes?  Wouldn't you do

12   a lie detector test too if you was telling the truth?

13          THE COURT:  I would do everything I could,

14   and you have done everything.

15          THE DEFENDANT:  No.  I'm saying, listen to

16   me, would you -- would you take a lie detector test,

17   would you -- if your life was -- if you was right

18   here with me and how we have to tell the truth right

19   now.

20          THE COURT:  I would do everything.

21          THE DEFENDANT:  With me taking a polygraph

22   test, it just told you that there's no deception.  So

23   do you believe him, or are you saying that your

24   expert is lying?

25          THE COURT:  No.  I'm not saying either.  I

```
 1   don't believe him and I am not saying he is lying.
 2   I'm saying you have two convictions in state court
 3   for murder.
 4              THE DEFENDANT:  Yeah.
 5              THE COURT:  And so I think that is
 6   information that I have to take into account.
 7              THE DEFENDANT:  You did take into account.
 8   That's why you held me a couple years ago.  Right?
 9   I'm saying, my Johnson, you denied my Johnson.  I'm
10   no longer on career offender.  You know that, right?
11              THE COURT:  I do.
12              THE DEFENDANT:  All right.  You know that
13   Charles Willson, Bruce Koskoff, attorney, and Donna
14   F. Martinez, the judge, sealed the proceeding.
15   Steven Singh was Charles Willson's client.  He told
16   Charles Willson that Anthony Harris committed the
17   murders.  On October 23, 2006, at 2:53 to 3:09 p.m.
18   in chambers, they went in there under a sealed
19   proceeding and they discussed it.  Charles Willson
20   became my attorney for my Johnson claim with you.  He
21   suppressed my evidence.  It never went before you.  I
22   was sitting down in Coleman, Florida for five years
23   just sitting on the docket waiting to show you the
24   sealed proceeding and the lie detector test so I
25   could go home.  You denied my Johnson.  It was
```

1  sitting on your docket for five years.  Don't you

2  think that's way too long?  It was sitting on your

3  docket for five years.  Man, they didn't want to --

4  they suppressed the evidence.  When I tried to unseal

5  it, he removed all my case, they gave me veto.  You

6  granted my First Step Act.  Now I'm from 151 to 188

7  months.  I'm in now 200 months and one month.

8          I did what you told me from back in the days

9  in 2005.  You told me don't go to jail getting in no

10  trouble messing with no gangs.  You said, Hines,

11  you'll be a fairly young man.  You're going to be a

12  fairly young man when you get out to live your life.

13  I've been in, I haven't been in trouble.  I've been

14  doing everything right in prison.  I only caught 26

15  shots in 17 years.  I did what you told me from back

16  in the days.

17          Now this dude Steven Singh, he's getting in

18  trouble eleven years later.  When the murder first

19  happened, he said he never seen who did it.  Then he

20  said Anthony Harris did it.  Now, when he's indicted

21  on new charges, he's coming up saying I did this.  I

22  was never involved with this.  I don't know nothing

23  about it.  I can't even tell you who, what.  I don't

24  even know no alibi.  If I tell you an alibi, I'm

25  lying.  I can't say that -- where I was at at that

1  time.  I'm dealing with everything right here.  I
2  don't remember that.  I wasn't there.  I don't know
3  nothing about it.  It's the truth.  That's the truth.
4      THE COURT:  All right.  And you'll have a
5  chance to prove that.
6      THE DEFENDANT:  Can you call Steven Singh in
7  here to do a lie detector test if you keep doing this
8  to me?  Because what if he fails, then you going to
9  believe me?  Because right now you're calling me a
10  liar.
11      THE COURT:  I'm not calling you a liar.  I'm
12  saying these are issues that have to be resolved in
13  your state habeas.
14      THE DEFENDANT:  Yeah.  But I'm saying we're
15  dealing right now with federal.  Federal is holding
16  me up.  You're basing my federal time right now on
17  the state.  That's not right.  Trump passed a bill
18  saying for crack.  I'm here for the crack, and you
19  don't want to deal with the crack.  The crack is
20  saying I must go.  The crack is saying I must leave.
21  The crack is saying I must leave, 151 to 188 months.
22      You sitting there keep bringing up the murder
23  case.  I didn't kill the people.  Why did you get the
24  lie detector test done, Underhill, if you wasn't
25  going to take that into discretion?  Like why did you

1    get that done, to mess with my brain, sir?

2              THE COURT:  No.

3              THE DEFENDANT:  What did you get it done for?

4              THE COURT:  I was trying to help your state

5    case.

6              THE DEFENDANT:  Listen, the state -- I filed

7    it in 2016.  Newson, he told me that I was going to

8    get the polygraph test done.  He lied to me.  Through

9    Georgieva or Ryan Desmond or Aaron Deyau (phonetic)

10   didn't get the test done.  They kept my money on the

11   lie detector test.  They won't let me see the lawyer.

12             THE COURT:  All right.  You know, these

13   are --

14             THE DEFENDANT:  I showed you the paperwork

15   though.  You aid -- I'm saying, listen, you want to

16   see what's on black and white, right, or what are you

17   doing?

18             THE COURT:  Mr. Hines, you've challenged your

19   state convictions.

20             THE DEFENDANT:  I'm not challenging that.

21   I'm saying, I'm telling you what they're doing, and

22   you need to tell me what you're doing because I'm

23   telling you that ain't that a Sixth Amendment

24   violation?  Because this is what they tell us in the

25   Bill of Rights.

**A - 281**

33

```
1        THE COURT:  Okay.  But that's not something
2    that I take into consideration when sentencing you on
3    these charges.
4        THE DEFENDANT:  All right.  I'm saying so you
5    not going to go with Trump passed a bill in 2018
6    saying that all crack offenders from 2010 all the way
7    up through now should be eligible for relief?
8        THE COURT:  You got that relief.  That's why
9    we're here.
10       THE DEFENDANT:  All right.  So, Underhill,
11   man, I don't know what you -- you told me all this
12   back in the days.  You told me don't go in jail
13   getting in no trouble.  I'm coming back in front of
14   you with two claims, the Johnson claim that I'm no
15   longer on career offender, and now I come in front of
16   you with the Johnson -- I mean with the First Step
17   Act.  I thought you wouldn't do this to me, man.  I
18   don't understand.  Like I don't think you would do
19   this to me.  I didn't do nothing wrong.  I did
20   everything that you told me to do.  You told me don't
21   go to jail getting in no trouble.
22       THE COURT:  Okay.
23       THE DEFENDANT:  You don't remember you said
24   that?
25       THE COURT:  I remember saying that but I
```

1   didn't know at the time --

2           THE DEFENDANT:  Yeah, you say --

3           THE COURT:  I did not know at the time that

4   you were going to be convicted of two murders.

5           THE DEFENDANT:  Yeah.  But, Underhill, I

6   didn't do it.

7           THE COURT:  Well, it's beyond a reasonable

8   doubt.

9           THE DEFENDANT:  So what can we do?  What do

10  you want done?  You want another polygraph test done?

11          THE COURT:  I want you to go to state, the

12  state court, and pursue your habeas.  I am here and

13  I've got this, these convictions in black and white.

14          THE DEFENDANT:  Yeah.  I can't -- if I go to

15  Coleman, I told you, the warden down there, they're

16  not letting me litigate my case.

17          THE COURT:  I understand.

18          THE DEFENDANT:  So can you go ahead and let

19  me go to the state and start that now so I -- because

20  I can't do nothing from down at Wyatt.  Down at

21  Wyatt, they got another COVID crisis again.  I mean,

22  don't want to be down in Wyatt.  That's for people

23  that's all type of crazy people, man, that's over

24  there.  I don't even need to be over there.  That

25  place is bad.  I need to be out of that, please.  I'm

1   saying, I need to be in the state of Connecticut so I

2   can handle this case, Underhill.

3              THE COURT:  All right.

4              THE DEFENDANT:  Can I go to the state and

5   fight this case?  Can I go?

6              THE COURT:  Well, let me hear from

7   Ms. Coronado.  Okay?

8              MS. CORONADO:  Your Honor, everything I just

9   heard over the course of the last 30 or more minutes

10  leads me to believe that the defendant seems to think

11  somehow that he is the victim here.  That is just not

12  the case.  He is actually the perpetrator.  This is

13  someone who shot someone in the leg, who shot at his

14  girlfriend, who possessed a sawed-off shotgun, a

15  firearm with an obliterated serial number who

16  committed the counts of the conviction today.

17             And so given that the defendant is not the

18  victim, I'd actually like to draw the Court's

19  attention, as an initial matter, to the actual

20  victims in this case.  Now, I acknowledge that the

21  counts of conviction, the 922(g), the 924(c) and the

22  crack charge, don't trigger notice obligations under

23  the Crime Victims' Rights Act.

24             But given the nature of the defendant's

25  conduct, the government reached out and has kept Chaz

1   Washington and Kia Smedley Reed apprised of the

2   proceedings in this court.  The Court will recall

3   that Mr. Hines shot Mr. Washington in the leg and he

4   shot at but fortunately missed Ms. Reed.

5          When we didn't hear back, Special Agent Mark

6   Essing reached out in person and by phone, and I can

7   tell you that Chaz Washington lives in Virginia, he

8   couldn't appear today, but he did tell Special Agent

9   Essing that he was very glad that justice was served

10  and that he personally still bears the physical and

11  mental scars from being shot by Mr. Hines.

12         Kia Smedley Reed also told Special Agent

13  Essing that she had no interest in appearing.  She

14  said she had put that part of her life behind her and

15  just hoped that the defendant would stay away.

16         But beginning with the victims, I think, is

17  an important point to understand the government's

18  position which is, as we've set forth at length in

19  our papers, we strongly, strongly urge the Court to

20  reimpose the 262-month sentence that was imposed at

21  the time of Mr. Hines's original 2006 sentence --

22  sentencing.

23         The reasons for this lengthy sentence have

24  actually only grown stronger over the course of the

25  last 15 years because what we didn't know then but we

**A - 285**

1   do know now is that the defendant would be convicted

2   of a heinous double murder.

3           Now, I want to back up a little bit and

4   discuss first the conduct underlying the federal

5   convictions and then move on to that, those double

6   murders.

7           So in December, late December of 2004,

8   Mr. Hines approached three people, including victim

9   Chaz Washington, asked if they had anything,

10  quote/unquote, a reference to drugs, and when

11  Mr. Washington said no, Mr. Hines shot at him three

12  times and hit him in the leg.  And, as I said,

13  Mr. Washington still does bear those both physical

14  and mental scars from a clearly terrifying

15  experience.

16          A few weeks later in January of 2005,

17  Mr. Hines was on the street when he saw his

18  then-girlfriend Kia Smedley and a female cousin drive

19  by in a car.  Mr. Hines pulled out a gun, shot at the

20  car twice, hit the driver's side rear window and the

21  hood of the car.  Ms. Smedley then jumped out of the

22  car and actually started running after him, and he

23  ran away, turned around and shot at her two more

24  times.  So fortunately he missed.  But that easily,

25  as this Court noted in the 2006 sentencing, could

**A - 286**

38

1   have been yet another murder.

2        The next day a consent search of Ms. Medley

3   and Mr. Hines's home revealed a sawed-off shotgun

4   with an obliterated serial number plus different

5   kinds of ammunition, and then a few days later a

6   search warrant of a location at which Mr. Hines was

7   then staying revealed additional evidence of

8   criminality.  So the police, when they approached,

9   they actually saw Mr. Hines carrying what they

10  believed to be a weapon.  He actually tried to hide

11  that gun on the fire escape and sort of jumped out of

12  that apartment.  The police recovered that firearm.

13  And I should note that the safety was off and it was

14  fully -- it was loaded with six rounds; and further

15  testing determined that that was the same gun that

16  Mr. Hines had used to shoot Chaz Washington and to

17  shoot at Kia Smedley.

18        At that time the police also found 88

19  individually wrapped pieces of crack cocaine in the

20  defendant's rectum.

21        At the time of the 2006 sentencing, this

22  Court's primary, I would go so far to say really sole

23  focus at the time of the sentencing was Mr. Hines 's

24  violent conduct.  Your Honor said to him at the time,

25  But for some luck, you'd be facing murder charges.

1    Indubitably true.

2         Your Honor talked about the consequences of

3    violence for the community.  Actually, it was a

4    community that your Honor previously lived in, and

5    you mentioned that you could have been a victim of

6    his shootings.  And your Honor also noted that

7    although the guidelines were high, they were, quote,

8    appropriate punishment for the very, very serious

9    crimes he had committed.

10        Your Honor also warned that if he used a gun

11   again, he would face effectively life imprisonment.

12   The Court determined that there was no reason to

13   depart downward, and the defendant received a

14   sentence at the bottom of the guidelines range of 262

15   months.  And I have to note here that that guidelines

16   range was actually quite lenient, and some of that

17   lenience carries over to the range he faces today,

18   because at the time he was facing only a 60-month

19   mandatory minimum on the 924(c) charge, the use of

20   a -- 60-month mandatory minimum for use of a firearm

21   in furtherance of a drug trafficking felony.

22        But, actually, Mr. Hines had shot Chaz

23   Washington.  So he didn't just possess the firearm,

24   he didn't just brandish the firearm, he actually

25   discharged it.  And according to 18 U.S.C. Section

**A - 288**

40

1    924(c), that crime actually carries a ten-year

2    mandatory minimum, not a 60-month, not a five-year

3    but a ten-year mandatory minimum.  So in some ways

4    that guideline range at the time represented some

5    lenience.

6         Now, the government is in no way suggesting

7    that he was convicted of that particular subsection;

8    but I just mention this in terms of the relevant

9    conduct that has already been determined in the PSR

10   and accepted by this Court.  There was some lenience

11   baked into that original sentencing, and that

12   lenience carries over to the 60-month minimum that

13   the defendant is facing today.

14        At the time of the original 2006 sentencing,

15   the Court was also looking at a defendant who had a

16   very long and violent criminal history.  This was a

17   criminal history that involved convictions for

18   robbery, for larceny, for narcotics sales, for

19   assault in prison, for assault of a coworker.  I

20   believe the facts underlying that case was that he

21   had, you know, kind of sequestered himself in a

22   bathroom and when the coworker came in, he repeatedly

23   punched him in the face, for a number of different

24   very serious crimes.

25        And also, Mr. Hines had incurred 25

```
 1   disciplinary infractions while in custody.  And these
 2   were serious.  They were things like assaults, for
 3   threats, for fighting, for gang affiliation, for
 4   property destruction and the like.
 5             So at the time of the 2006 sentencing, this
 6   Court found that it was appropriate to give him the
 7   bottom of the guidelines range at the time, 262
 8   months.
 9             What we didn't know then but we now do know
10   is that Mr. Hines would be convicted of the double
11   murder that took place on June 1st of 2000.  And this
12   was a pretty terrible murder.  Mr. Hines encountered
13   two people, 21-year-old Lakeia Vaughn and 26-year-old
14   Lamont Brockenberry.  They were sitting in their car.
15   First Mr. Hines approached and fired into the car,
16   hitting Ms. Vaughn in the head and instantly killing
17   her.
18             THE DEFENDANT:  You, Miss.  I didn't do that.
19             MS. CORONADO:  Mr. Brockenberry got out of
20   the car, attempted to flee into the house but
21   Mr. Hines repeatedly shot him in the back.  He was
22   tried by a jury, he was convicted and he was
23   sentenced in May 2004 to 125 years imprisonment on
24   those -- on the state case, and that was to run
25   consecutive to his federal sentence.
```

**A - 290**

42

1          Now, today the defendant seems to think he
2     can relitigate his state murder convictions here.  He
3     seems to be asking for the Court's legal advice as to
4     how to do so, and he seems to think that the Court
5     can sift through the evidence and determine that he
6     wasn't actually guilty of the crimes that he has been
7     duly convicted of in the state.  That's just simply
8     wrong.  It's not even possible for this Court, as I
9     know this Court is well aware and as this Court has
10    indicated repeatedly, to revisit and relitigate
11    Mr. Hines's guilt.  Mr. Hines has had his day in
12    court.  He has been tried by a jury, and he will have
13    an additional day in court on his habeas petition.

14          But at the time of his 2020 sentencing, this
15    Court made very clear, and you've also made it very
16    clear today, your Honor, that any reduction in
17    sentence here would be dependent on the state habeas
18    petition's outcome.  You mention at the time, If you
19    win here, I'll let you go.  But if you lose here,
20    then I'm not going to change what I did before.

21          Now, I'll just note parenthetically that the
22    government opposes release regardless of what happens
23    in the state habeas action because of the gravity of
24    the federal offenses specifically which I've already
25    discussed.

1      But needless to say, there has been no change

2   in the state habeas action.  Yes, the defendant has

3   taken a polygraph, but the state law is quite clear

4   that the polygraph evidence is per se inadmissible,

5   and defense counsel mentioned this a few moments ago,

6   that state courts have indicated that polygraph

7   evidence is highly unreliable, that polygraph tests

8   can effectively be beaten, that a person undergoing a

9   polygraph test can sort of work to change their own

10  physical reactions in order to yield a response that

11  suggests deception or no deception when that may not

12  actually comport with what actually happened.  So I

13  just think based on the law, the polygraph is going

14  to have effectively no meaningful evidentiary impact

15  on the state habeas action.  Now, yes, there are ways

16  in which maybe it can be used for negotiation

17  purposes, as defense counsel indicated.  But it is

18  not clear to me that this polygraph test has any

19  really impact on the -- this upcoming state habeas

20  action or on the validity of Mr. Hines's underlying

21  murder convictions.

22      So with all of that in mind, this is a case

23  where the 3553(a) factors really speak with one voice

24  and that -- and they weigh heavily, heavily against

25  any sentence reduction.  This defendant has a long

1    history of violence, of not just violent conduct but

2    gratuitous, unprovoked shootings.  He has additional

3    infractions in prison and out of prison, including

4    infractions serious enough to require time in the

5    special housing unit.  He even has, according to the

6    probation office's October 13th report, he actually

7    even has incurred additional infractions since we

8    last met, although those are of a nonviolent nature.

9         And then, of course, in addition to the very,

10   very serious federal offense conduct, he has

11   committed a heinous double murder.

12        This is ultimately just not a case where --

13   is that merits relief.  The First Step Act was not

14   intended by Congress to provide relief in this type

15   of case.  Crack cocaine was not the primary or really

16   any meaningful motivator for Mr. Hines's underlying

17   sentence, according to the sentencing transcript.

18        He also has committed multiple shootings and

19   we now know a double murder.  There has been no

20   change in the state habeas case.  The ends of justice

21   here just require a meaningful sentence, and the

22   government urges the Court to reimpose the 262-month

23   term of imprisonment that was imposed back in 2006.

24        Thank you.

25        THE COURT:  Thank you.

**A - 293**

1        MR. CASTIGNOLI:  May I be heard about some of

2  those points, your Honor?

3        THE COURT:  Sure.

4        MR. CASTIGNOLI:  I'll try to be brief.

5        First of all, again, this is not the habeas

6  matter.  It's not about the murder charge.  But I

7  think counsel went into it deeply enough that I think

8  I have to say a few things about that case.

9        The -- technically, the murder allegedly

10  happened in 2000.  The main witness had given an

11  inconsistent statement.  Then five years later, with

12  a federal charge pending, he changed his mind and

13  said that Mr. Hines had committed the murders.

14  Another individual had admitted committing the

15  murders.  The warrant -- by the way, that individual

16  gave the inculpatory statement, who I think your

17  Honor sentenced, gave it in, I think, 2005.

18        And then the -- for some strange reason, the

19  New Haven police didn't get a warrant until 2011.

20  And the whole process there, with all due respect, I

21  feel was completely flawed.  And, frankly, with my

22  experience, I felt that it was a very, very shaky

23  case to begin with.  Anybody -- obviously, the jury

24  didn't think so, and then I know your Honor has to

25  consider that.  But there are issues there with the

**A - 294**

1    murder.  There's no question about that.  And if we

2    want to have a long discussion about the murder, we

3    can have it.  I don't think that's necessary right

4    now.

5         Most of the factors that Attorney Coronado

6    mentioned were taken into consideration by your Honor

7    at the original sentencing back in, I think, 2006.

8    The reason we're here is for a number of different --

9    for the First Step Act, for the change in the law in

10   the career offender which would lessen the amount of

11   time he can receive, especially on the First Step Act

12   and the reasons for the First Step Act, because in

13   large part that's going to be a big part of his

14   sentence here.  We haven't talked about it much, but

15   even if he did, again, as I said before, 120 months

16   on the first count and 60 on the third count to even

17   get to the 262, you would have to give most of it on

18   the second count, although I realize on the third

19   count there is a maximum that can be given.

20        So I think a lot of these were taken into

21   consideration.  There's a lot of issues with the

22   habeas that he has to bring up.  And the only reason

23   we're here, had there been a habeas trial in April of

24   2020 which is what we hoped would happen, and he got

25   a decision on that, he would have waited.  It's

**A - 295**

47

1    because he's got to wait four years here.  That's the

2    whole point, and that he's going to be in jail for

3    four years anyways awaiting that habeas trial whether

4    it's here or in state court.  If your Honor -- again,

5    as I said before, if your Honor has to consider that

6    state conviction and that state sentence, he's going

7    to be spending the rest of his life in jail.  Okay?

8              Our feeling is that at this point we think

9    that he has served 201 months, redeemed every one of

10   the issues that were brought up by the government and

11   some of the concerns your Honor had beyond what the

12   guidelines say, and I think at this point we feel

13   that what's necessary is for him to have -- finish

14   this sentence and go to the state and take his

15   chances on the habeas matter.  That's what we feel,

16   Your Honor.

17             Just a couple of points.  And, again, he

18   hasn't had any disciplinary problems for a number of

19   years here.  He has been moved around.  He'll be

20   moved around again, I'm sure.  And we feel everything

21   taken into consideration, that the 201 months he's

22   served meets every one of the requirements and allows

23   him to go back and be incarcerated in Connecticut to

24   fight his habeas.

25             Thank you, your Honor.

1          THE COURT:  Thank you.

2          Mr. Hines, as you know, I have to consider

3   all the factors set forth in 18 U.S.C. Section

4   3553(a) when deciding how to sentence you.  I've done

5   that and I want to talk to you about why I'm going to

6   impose a sentence that I intend to impose today.

7          THE DEFENDANT:  Can I ask you something?

8          THE COURT:  Go ahead.

9          THE DEFENDANT:  In this affidavit right here,

10  in 2000 when the murder happened on June 1, 2000,

11  Steven Singh got questioned 14 days after the murder

12  and he said his back was turned, he didn't see.  Then

13  years later when he got indicted on new and federal

14  charges and assault, he was shooting at somebody

15  outside, he got indicted and he had state charges for

16  assault in the first degree, that's when he came and

17  said I killed the people.

18          Now, there's 43 witnesses.  Nobody is saying

19  that Craig Hines did this murder but Steven Singh.

20  Now, I'm going to remind you, I told you Braulio

21  Marquez said that if Anthony Harris and Craig Hines

22  told Agent Lawton or Mastropetre of the Safe Streets

23  Task Force that he ordered a hit on Lakeia Vaughn and

24  Lamont Brockenberry and -- we're lying and he's

25  willing to take a polygraph test.  Anthony Washington

**A - 297**

49

1   denied the polygraph test when Detective Breland came

2   up there to visit him and he told Arnold Penny in a

3   letter how he killed the people and he said that if

4   he took the lie detector test, that was like telling

5   on his self.  So I feel that the lie detector test

6   should be used in consideration on my case.

7          Now, also you've got third-party culpability.

8   Gaylord Salters shot Lavar Burney with the same gun

9   that was used six months prior to the murder.

10  Gaylord Salters moved in the area 393 and told

11  Anthony -- I mean Brockenberry, Singh, Tisdale and

12  Harry Carter that he wanted to sell drugs in the

13  neighborhood.  They disagreed.  They called the

14  police.  His spot got raided.  Steven Singh was at

15  the Exxon gas station, hit one of Salter's friends in

16  the head with the bottle.  My lawyer tried to produce

17  third-party culpability saying that in retaliation of

18  Steven Sing's hitting Gaylord Salters in the head

19  with the bottle, that's why Lamont Brockenberry and

20  Lakeia Vaughn had got shot.

21          Denise Burney was on the phone, that's Lavar

22  Burney's mother, she grabbed the phone from Lavar

23  because Gaylord Salters came in her house and was

24  outside talking on the phone telling Lavar that he

25  wanted to pay him for not cooperating with the

1  police.  She grabbed the phone from him and told him

2  she couldn't believe that he shot her son.  She was

3  fearful for her sons that was incarcerated to make a

4  legitimate statement because she didn't want Gaylord

5  Salters or people that -- in prison to harm her kids.

6       So my lawyer never subpoenaed Denise Burney

7  to the witness stand to produce third-party

8  culpability.  The gun was used six months prior to

9  the murder by Gaylord Salters.  He was in that area.

10 And Detective Pappy (phonetic) seen the car that was

11 in the area of the Quinnipiac projects and had no

12 safety, no DNA, no forensic, none of that to find out

13 if that was the car.

14      None of the 42 people, Underhill, are saying

15 I did the murder.  Ain't there something wrong with

16 that?  There's 42 people outside this day and nobody

17 saying I did it but a convicted felon.

18      Now, you also know that Steven Singh is an

19 eight-time convicted felon known to make false police

20 reports.  Remember the time when he shot himself and

21 he went in front of the doctor, Mascato (phonetic),

22 and the doctor concluded how the bullet entered his

23 buttocks and they concluded he shot himself?  He went

24 in front of the judge, J. Benjamin, in Meriden,

25 Connecticut, plead Alford and got off.  So this guy

1   is not credibility -- his -- you're going to believe

2   another inmate over another inmate?

3           THE COURT:  Yeah.  I'm not going to believe

4   anybody with respect to the murders.

5           THE DEFENDANT:  Yeah.  I'm saying that's why

6   I had to do the lie detector test, because if

7   somebody is lying, I have to do the test to find out.

8           THE COURT:  I understand.

9           THE DEFENDANT:  I'm saying if me and you are

10  inmates, if I say he did it and he said I did it, you

11  going to believe either one of us?

12          THE COURT:  The problem is the jury has

13  decided.  That's what I -- that's the only thing I

14  can consider right now.

15          THE DEFENDANT:  I'm saying the jury makes

16  wrong -- the jury doesn't know law.  I should have

17  went with a three-panel judge.  If you would have

18  seen the evidence, Underhill, you're not going to

19  convict me.  He said he never seen the person do it

20  when the murder first happened.

21          THE COURT:  Okay.  I appreciate that.  But

22  let me go ahead and impose sentence, Mr. Hines.

23          You know, we're here because of the First

24  Step Act.

25          THE DEFENDANT:  First Step Act, right?

**A - 300**

52

```
1           THE COURT:  The First Step Act.  And so you
2     don't have a mandatory minimum on the crack cocaine
3     count, and the guidelines on that count necessarily
4     call for a lesser sentence than was imposed initially
5     on that count.  The guideline range here is 152 to
6     175.  I'm going to impose a nonguideline sentence
7     above that range principally because what I didn't
8     know at the time of the original sentencing is that
9     you would be convicted of two murders.  I
10    understand -- I understand you've challenged those
11    and it sounds like you have some arguments to make.
12          But for me, I talked to you at the time of
13    your original sentencing about the violence.  The
14    violence is what concerned me.
15          THE DEFENDANT:  Yeah, but it wasn't me.  You
16    just made -- you made me do a lie detector test to
17    see if it was me or not.
18          THE COURT:  Just a minute.  The violence in
19    this case was you.  You pled guilty.
20          THE DEFENDANT:  Yeah.
21          THE COURT:  Yeah.  That's the violence that I
22    talked to you about.
23          THE DEFENDANT:  Yeah.
24          THE COURT:  And I told you that this is very
25    concerning.  The sentence was a very high sentence
```

**A - 301**

53

1  because you were, under the guidelines, a career

2  offender.

3          THE DEFENDANT:  Yeah.  I was looking at 327

4  to 262.  You said back then, you know what you told

5  me, you said, Mr. Hines, talk to me, because I could

6  go underneath the guideline range.  I was upset at

7  that time.  I just said, eh, and I took the time.  I

8  took the time.

9          THE COURT:  Yeah.

10          THE DEFENDANT:  But I'm not out there doing

11  this stuff no more.

12          THE COURT:  Okay.

13          THE DEFENDANT:  I'm a changed man now,

14  Underhill.  Underhill, that's 27 years ago.  You --

15  I'm saying I did exactly what you told me.  You -- 26

16  shots or 25 shots in 17 years.  You think that's bad?

17  I'm saying do you think that's bad for being in

18  prison?

19          THE COURT:  Mr. Hines, I have to sentence you

20  based upon what I know today; and I know today, and

21  obviously you dispute it, I've heard a lot about that

22  both today and prior to today.  But I've got two

23  murder convictions.

24          THE DEFENDANT:  Yeah.  But I think right now,

25  your Honor, Underhill, I think that you're not being

**A - 302**

```
 1   right 'cause you -- if you in my shoes, how are we
 2   going to find out the truth?  If I don't do a lie
 3   detector test, how are you going to find out that I'm
 4   not lying to you?
 5              THE COURT:  That's --
 6              THE DEFENDANT:  Could you tell me that?  I'm
 7   saying, could you please tell me this, Underhill,
 8   because that only makes sense.  Tell me how you're
 9   going to find out what's in my brain or my pressure.
10   I'm not CIA.  I'm not a CIA dude.  I'm not secret
11   service.  I need you to tell me how you're going to
12   find out that I'm lying or I'm telling the truth.
13              THE COURT:  I'm not going to find out.  I'm
14   not going to find out.  I don't have to find out.
15   That's up for --
16              THE DEFENDANT:  I'm saying but you're judging
17   these murders, my past history from back in the day.
18   I changed.
19              THE COURT:  I understand.
20              THE DEFENDANT:  They could tell you that,
21   that I changed.  I'm not the same.  I'm not doing --
22   I'm 42 years old now.
23              THE COURT:  All right.
24              THE DEFENDANT:  I'm supposed to be home at
25   45.  You told me, you said, Mr. Hines, don't get in
```

**A - 303**

55

1    trouble.  I can't tell you what Steven Singh, Steven

2    Singh is out there getting in trouble.  You released

3    Steven Singh on cooperation for testifying on me

4    saying I killed these people in cold blood.  I don't

5    know nothing about it.  I wasn't there.  I don't know

6    who did it.  I don't know nothing.  I just gave you

7    what you asked me to do to see if I was lying and

8    they just told you no deception.  No deception comes

9    back.  It's four things.  There's deception,

10   deceit --

11          THE COURT:  Mr. Hines --

12          THE DEFENDANT:  I'm saying inconclusive.

13   Inconclusive.  The paperwork is right there.

14          THE COURT:  It doesn't matter.  It doesn't

15   matter.  Okay?  I -- what I have in front of me is a

16   record in this case where you were violent against

17   two people, shooting at two people.

18          THE DEFENDANT:  Underhill, that's a lie.  I

19   did not do it.  I just told you the truth.  I did not

20   do it.

21          THE COURT:  You did.  Listen to me --

22          THE DEFENDANT:  You can't tell me I did that.

23   I just proved to you I didn't do it.

24          THE COURT:  Sir, please listen to me.

25          THE DEFENDANT:  I'm listening.

**A - 304**

56

```
 1          THE COURT:  You pled guilty to firing at two
 2   people in this case.
 3          THE DEFENDANT:  Yeah.  We talking about back
 4   in the days.
 5          THE COURT:  Back in the day, right.
 6          THE DEFENDANT:  You talking about back in the
 7   days though.  You can't go with back in the days,
 8   Underhill.  You told me -- the last time you told me
 9   on this record, you said, Mr. Hines, I'm dealing with
10   you as of today, as of today.  You got to judge me as
11   of today.
12          THE COURT:  And as of --
13          THE DEFENDANT:  As of today, I didn't do
14   that.
15          THE COURT:  Yes, you did.  You shot --
16          THE DEFENDANT:  How did I do it?  How did I
17   do it when you told --
18          THE COURT:  Mr. Hines, listen to me.  Listen
19   to me, please.  You pled guilty to shooting one
20   person and shooting at a second person.
21          THE DEFENDANT:  All right.  Underhill, let me
22   tell you this.  I'm going to tell you this, right.
23   This is the truth right here.  Kia Smedley, right, my
24   baby mother, she tried to get me hurt on the streets.
25   I know that you say -- I mean, you could check my
```

```
 1   record.  I never had guns before.  This girl tried to
 2   get me killed.  I mean, it's a long story with this.
 3   You know, it's a story behind what's going on with
 4   me.  She tried to cheat on me and all that, had
 5   people trying to do stuff to me and all this type of
 6   stuff.  I'm saying this -- there's other things
 7   that's behind this female.  This female is one of
 8   them crazy females.
 9         THE COURT:  Okay.
10         THE DEFENDANT:  As you could see, she got a
11   record too.  You've seen that, right?
12         THE COURT:  Mr. Hines, here is the point.  I
13   have to sentence you today based on what I know
14   today.
15         THE DEFENDANT:  I'm saying --
16         THE COURT:  What I know today.
17         THE DEFENDANT:  You know today that we took
18   that lie detector test and they told me I ain't do
19   it.
20         THE COURT:  What I know today --
21         THE DEFENDANT:  You seen that, right?
22         THE COURT:  What I know today is you have
23   been convicted by a jury of two counts of murder in
24   addition to the violent acts that gave rise to your
25   original plea.
```

1          THE DEFENDANT:  Yeah.

2          THE COURT:  So what I see is somebody who is

3    a violent person.

4          THE DEFENDANT:  Oh, so you're saying I'm a

5    killer now?  All right, Underhill.  So you don't

6    believe -- you ain't going to honor what you told me.

7    You just told me, take the lie detector test to press

8    forward.

9          Now, also, look at this Underhill.  I filed

10   it in '16.  My trial date was set for April 20, 2020.

11   So that's '16, '17, '18, '19, '20.  Before the

12   pandemic.  Everybody could have been working due

13   diligence.  I'm supposed to have a trial.

14         THE COURT:  Yes.

15         THE DEFENDANT:  Do you agree?

16         THE COURT:  That's your state habeas.  I

17   have --

18         THE DEFENDANT:  I'm saying --

19         THE COURT:  I have nothing to do with the

20   state habeas.

21         THE DEFENDANT:  You keep saying "the state."

22   But you keep saying the state too, but what do you

23   feel?  '16, I litigated this case in '16.  They gave

24   me a trial date for April '20.  You called me to

25   court using due diligence.  While the pandemic was

1  on, I came here September 20, 2021, pandemic was

2  going on.  Why ain't the attorneys working due

3  diligence from home?  This is just evidence.  This is

4  just court documents.

5          THE COURT:  Mr. Hines, I can't -- I can't

6  take all that into account.  I cannot.

7          THE DEFENDANT:  I'm saying -- I'm telling

8  you.  I'm saying, so you mean to tell me that my

9  constitutional, my state and federal right, my

10  Fourteenth Amendment is supposed to keep being

11  violated and they supposed to keep pushing this off?

12  I thought that if I had a court date for April '20,

13  five years, six years, you don't think that's enough

14  time to get the evidence done?

15          THE COURT:  All right.  Well, let me go ahead

16  and impose sentence.

17          THE DEFENDANT:  I'm saying, Underhill, just

18  answer this though.  Could you please tell me this,

19  sir.  You don't think '16, '17, '18, '19, '20, '21,

20  you don't think that's enough time to have evidence

21  for court?  I'm saying just be realistic because --

22          THE COURT:  I'm not going to comment on that.

23          THE DEFENDANT:  Don't do no zoom zoom, no

24  Willy Wonka Chocolate Factory.  You don't think six

25  years is enough time to go to court?

1      THE COURT:  It has no bearing on what I'm

2   doing today.  That's an argument for the state court.

3      THE DEFENDANT:  I'm saying, but do you hear

4   what I'm saying on that though?  Do you agree with

5   that?  Would you hold me up, if we had a habeas, six

6   years for no evidence?  Something is going on that

7   ain't -- it ain't my fault.  You can't keep putting

8   this on me, Underhill.  They violating my

9   constitutional rights.

10      THE COURT:  All right.  Well, let me go ahead

11   and impose sentence.

12      I'm going to impose sentence as follows:

13      On Count 1, a term of imprisonment of 120

14   months and supervised release of three years.

15      On Count 2, a term of imprisonment of 28

16   months and supervised release of three years.

17      And on Count 3, a term of imprisonment of 114

18   months and supervised release term of five years.

19      All the terms of imprisonment shall run

20   consecutive to each other.  All terms of supervised

21   release shall run concurrent to each other.

22      I am going to waive a fine in this case based

23   upon the determination that Mr. Hines cannot afford

24   to pay a fine within the guideline range.  I'm

25   required to impose a mandatory special assessment of

1    $300 which I assume has been paid.

2         Let me hear from either counsel if there's

3    any reason why the sentence I just describe -- oh,

4    actually, in terms of supervised release, I'm going

5    to impose the same conditions of supervised release

6    that were originally imposed, both mandatory,

7    standard and special conditions that are set forth in

8    the judgment that was entered in March of 2006.

9         Does anybody wish me to set those forth on

10   the record?

11        MS. CORONADO:  No need, your Honor, so long

12   as there's a reference to the prior conditions.

13        THE COURT:  All right.  Is there any reason

14   why the sentence I just described cannot lawfully be

15   imposed as the sentence of the Court in this case?

16        MS. CORONADO:  None here, your Honor.

17        MR. CASTIGNOLI:  Your Honor, none.  I just

18   want to make one point.

19        I'm sure Mr. Hines is going to appeal in a

20   case like this because I think he's already appealed

21   to the Second Circuit on certain things.  I'm going

22   to file today a motion to withdraw my appearance in

23   this file.  I'm retiring.  I'm not going to be

24   involved in his appeal.  He knows that.  So I'm going

25   to probably file it today.  That's why I waited until

 1    today.  I wanted to get this sentencing done, and

 2    Mr. Hines said today that he wanted to do the

 3    sentencing today.

 4              THE DEFENDANT:  What I got, I got to do

 5    the --

 6              MR. CASTIGNOLI:  262, yeah.

 7              THE DEFENDANT:  I got to do the whole -- so

 8    you want me to do all the time, Underhill?  You want

 9    me to do the extra five years?

10              MR. CASTIGNOLI:  I've explained to him he got

11    the same sentence as he got before.

12              THE COURT:  Same sentence as before.

13              MR. CASTIGNOLI:  But I will be filing a

14    motion to withdraw.  I think he will appeal.  He has

15    the appeal rights.  I've explained them to him.

16              THE COURT:  Well, the appeal rights are

17    limited by his written plea agreement which has a

18    waiver set at 327 months of imprisonment.

19              MR. CASTIGNOLI:  Whatever appeal rights he

20    has.

21              THE DEFENDANT:  Damn, Underhill, you don't

22    even care.  You put me back down there with the

23    warden that ain't going to let me fight my case.

24              Let's go.  Let's just get out of here.  All

25    right.  Thanks, Underhill.

**A - 311**

63

```
 1            THE COURT:  Mr. Hines, the sentence I just --

 2            THE DEFENDANT:  Nah, look, you just did me

 3    dead wrong.  You just put me back down there.  I see

 4    how you playing.  You just put me back down there

 5    with somebody that's not going to let me litigate my

 6    case.

 7            THE COURT:  Okay.  The sentence I just

 8    described is imposed as the sentence of the Court in

 9    your case, Mr. Hines.  The judgment will be filed

10    soon, and the filing of the judgment starts the clock

11    running on your time to file a notice of appeal.  You

12    have 14 days from the entry of the judgment within

13    which to file a notice of appeal.

14            Do you understand?

15            THE DEFENDANT:  You just did me all wrong,

16    man.

17            THE COURT:  Do you understand?

18            THE DEFENDANT:  I don't understand nothing

19    you doing.  You doing everything wrong.  You just

20    doing me wrong.

21            THE COURT:  All right.  So --

22            THE DEFENDANT:  I --

23            THE COURT:  Okay.  Let me just be very clear.

24            THE DEFENDANT:  I don't even want to talk to

25    you no more.  I see you're wrong.
```

```
1            THE COURT:  Okay.
2            THE DEFENDANT:  I'm straight.  I don't want
3  to talk no more.  I'm pissed.
4            THE COURT:  Well, you don't have to talk but
5  you have to listen.
6            THE DEFENDANT:  I don't want to even be
7  listening to you no more.
8            THE COURT:  Okay.  Let me just say it again.
9            THE DEFENDANT:  I don't want to listen.  I'm
10 not listening.  I'm not listening to you.  Put the
11 handcuffs, shackles on me.
12           THE COURT:  You have 14 days -- Mr. Hines,
13 let me just say it.
14           THE DEFENDANT:  Nah, Underhill.  I don't want
15 to listen to you.  You're wrong.  You're corrupt.
16           THE COURT:  All right.  You have 14 days from
17 the date of the judgment in which to file a notice of
18 appeal.  I want to remind you that in your written
19 plea agreement, you agreed to waive your right to
20 appeal and collaterally attack your sentence so long
21 as that sentence of imprisonment does not exceed 327
22 months.  It therefore appears that you have validly
23 waived your right to appeal.  I'm advising you of
24 this right in the event that you believe there is
25 some fundamental defect in your case that has not
```

**A - 313**

65

1    been waived by your written plea agreement.

2           If you wish to appeal but you cannot afford

3    to do so, you can file a motion to proceed in forma

4    pauperis.  If that motion is granted, the Court will

5    waive the filing fee for your appeal and will appoint

6    a lawyer to handle your appeal at no cost to you.

7           Is there anything else to take up today?

8           MS. CORONADO:  Your Honor, I know it's been a

9    little bit difficult to even get a word in edgewise

10   today.  But my understanding is that the sentence

11   imposed, as your Honor mentioned today, was because

12   of the violence, and it sounds as if the prior

13   rationale from your prior sentencing transcript is

14   also incorporated into your reasoning today.

15          THE COURT:  That's correct.  And I would note

16   that it's a nonguideline sentence.

17          MS. CORONADO:  Thank you, your Honor.

18          THE COURT:  Anything further?

19          MS. CORONADO:  Nothing here, your Honor.

20          MR. CASTIGNOLI:  No, your Honor.

21          THE COURT:  Thank you all.  We'll stand in

22   recess.

23          (Proceedings concluded, 11:28 a.m.)

24

25

**A - 314**

```
1              C E R T I F I C A T E

2

3      RE: UNITED STATES OF AMERICA v. CRAIG HINES
                No. 3:05-cr-00118(SRU)
4

5           I hereby certify that the within and

6      foregoing is a true and accurate transcript taken in

7      the aforementioned matter to the best of my skill and

8      ability.

9

10          /s/_Melissa J. Cianciullo_____

11      MELISSA J. CIANCIULLO, RDR, CRR, CRC
                Official Court Reporter
12          United States District Court
             915 Lafayette Boulevard
13            Bridgeport, CT 06604
                (203) 606-1794
14

15

16

17

18

19

20

21

22

23

24

25
```

**A - 315**

UNITED STATES DISTRICT COURT

| Page 1 | District of Connecticut |
| --- | --- |

UNITED STATES OF AMERICA

v.

CRAIG HINES

**AMENDED JUDGMENT IN A CRIMINAL CASE**

CASE NO. *3:05cr118 (SRU)*
USM NO: *16275-014*

*Elena Coronado*
Assistant United States
Attorney

*Vito Castignoli*
Defendant's Attorney

**THE DEFENDANT:** pleaded guilty to counts <u>one, two and three of the Indictment</u>.

Accordingly the defendant is adjudicated guilty of the following offenses:

| Title & Section | Nature of Offense | Offense Concluded | Counts |
| --- | --- | --- | --- |
| 18:922(g)(1) & 924(e) | Felon in Possession of a Firearm | January 15, 2005 | one |
| 21:841(a)(1) & 841(b)(1)(B) | Possession with Intent to Distribute Five or More Grams of Cocaine Base | January 15, 2005 | two |
| 18:924(c)(1) | Possession, Use and Carrying a Firearm During, in Relation to, and in Furtherance of a Drug Offense | January 15, 2005 | three |

The following sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IMPRISONMENT**

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 262 months. The defendant shall be imprisoned for 120 months on count one; 28 months' imprisonment on count two; and 114 months' imprisonment on count three. The sentence on counts one, two, and three shall run consecutive to one another for a total of 262 months.

**SUPERVISED RELEASE**

Upon release from imprisonment, the defendant shall be on supervised release for a total term of 3 years on count one; 3 years on count two; and five years on count three, to run concurrently.   The Mandatory and Standard Conditions of Supervised Release as attached, are imposed. In addition, the following Special Conditions are imposed:

    1.   The defendant shall participate in a program approved by the Probation Office for inpatient or outpatient substance abuse treatment and testing.  The defendant shall pay all or a portion of the costs associated with treatment based on the defendant's ability to pay as recommended by the probation officer and approved by the court.

    2.   The defendant shall participate in a program approved by the Probation Office for mental health treatment.  The defendant shall pay all, or a portion of the costs associated with treatment, based on the defendant's ability to pay as recommended by the probation officer and approved by the court.

    3.   The defendant shall submit his person, residence, office or vehicle to a search, conducted by a United States probation officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

    4.   The defendant shall not possess a firearm or other dangerous weapon.

Page 2

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments as follows:

| | | |
|---|---|---|
| Special Assessment: | $300.00 | $100 for each count, to be paid immediately. |
| Forfeiture: | The defendant shall forfeit to the United States the following items: | |

(1) an EXCAM Amri Tanfoglio Giuseppe .32 caliber semi-automatic handgun, serial number C61224
(2) a magazine containing .32 caliber ammunition
(3) a High Point sawed-off shotgun with an obliterated serial number
(4) a box of .32 caliber ammunition
(5) one 9mm round
(6) three shotgun rounds

It is further ordered that the defendant will notify the United States Attorney for this district within 30 days of any change of name, residence or mailing address until all fines, restitution, costs and special assessments imposed by this judgment, are paid.

## JUDICIAL RECOMMENDATION TO THE BUREAU OF PRISONS

The court recommends that the defendant undergo a thorough mental health evaluation and be provided with appropriate treatment or conditions to address any mental health condition, and specifically that the Bureau of Prisons consider whether the defendant should be housed in a single cell.

**The defendant is remanded to the custody of the United States Marshal.**

Date of Imposition of Sentence

October 27, 2021
/s/

Stefan R. Underhill
United States District Judge
Date: 10/27/2021

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____, with a certified copy of this judgment.

Lawrence Bobnick
United States Marshal

By _____ Deputy Marshal

*CERTIFIED AS A TRUE COPY*
*ON THIS DATE _____*
*Robin Tabora, Clerk*
*BY: _____*
*    Deputy Clerk*

Page 3

# CONDITIONS OF SUPERVISED RELEASE

In addition to the Standard Conditions listed below, the following indicated (■) Mandatory Conditions are imposed:

## MANDATORY CONDITIONS

■ (1)  The defendant shall not commit another federal, state or local offense;

■ (2)  The defendant shall not unlawfully possess a controlled substance;

☐ (3)  The defendant who is convicted for a domestic violence crime as defined in 18 U.S.C. section 3561(b) for the first time shall attend a public, private, or private non-profit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is available within a 50-mile radius of the legal residence of the defendant;

■ (4)  The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter for use of a controlled substance;

☐ (5)  If a fine is imposed and has not been paid upon release to supervised release, the defendant shall adhere to an installment schedule to pay that fine;

■ (6)  The defendant shall (A) make restitution in accordance with 18 U.S.C. sections 2248, 2259, 2264, 2327, 3663, 3663A, and 3664; and (B) pay the assessment imposed in accordance with 18 U.S.C. section 3013;

☐ (7)  A defendant convicted of a sexual offense as described in 18 U.S.C. sections 4042(c)(4) shall report the address where the defendant will reside and any subsequent change of residence to the probation officer responsible for supervision, and shall register as a sex offender in any State where the person resides, is employed, carries on a vocation or is a student.

■ (8)  The defendant shall cooperate in the collection of a DNA sample from the defendant.

While on supervised release, the defendant shall also comply with all of the following Standard Conditions:

## STANDARD CONDITIONS

(1)  The defendant shall not leave the judicial district or other specified geographic area without the permission of the court or probation officer;

(2)  The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

(3)  The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

(4)  The defendant shall support the defendant's dependents and meet other family responsibilities (including, but not limited to, complying with the terms of any court order or administrative process pursuant to the law of a state, the District of Columbia, or any other possession or territory of the United States requiring payments by the defendant for the support and maintenance of any child or of a child and the parent with whom the child is living);

(5)  The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

(6)  The defendant shall notify the probation officer at least ten days prior to any change of residence or employment;

(7)  The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician;

(8)  The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered, or other places specified by the court;

(9)  The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

(10)  The defendant shall permit a probation officer to visit the defendant at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

(11)  The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

(12)  The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

(13)  The defendant shall pay the special assessment imposed or adhere to a court-ordered installment schedule for the payment of the special assessment;

(14)  The defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay any unpaid amount of restitution, fines, or special assessments.

**The defendant shall report to the Probation Office in the district to which the defendant is released within 72 hours of release from the custody of the U.S. Bureau of Prisons. Upon a finding of a violation of supervised release, I understand that the court may (1) revoke supervision and impose a term of imprisonment, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.**

**These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.**

(Signed) _____          _____
                     Defendant                                                        Date


                 _____          _____
                 U.S. Probation Officer/Designated Witness            Date

**A - 319**

DEC 20 2021 PM2:46
FILED - USDC - BPT - CT

**Federal Rules of Appellate Procedure Form 1.    Notice of Appeal to a Court of Appeals From a Judgment or Order of a District Court.**

United States District Court for the District of

_CONNECTICUT_

File Number _3:05 CR 118 SRU_

_CRAIG, HINES_                    )
             _Plaintiff,_              )
        v.                            )                    Notice of Appeal
                                       )
_UNITED STATES OF AMERICA_ )
             _Defendant._             )

Notice is hereby given that _____, (plaintiffs) (defendants) in the above-named case*, hereby appeal to the United States Court of Appeals for the _2ND_ Circuit (from the final judgment) (from an order (describing it)) entered in this action on the _27_ day of _OCT_____, 20_21_ .

                                       /s/ _Craig Hines_

                                       Attorney for _Vito CASTIGNOLI_
                                       Address: _185 Broad ST_
                                       _Milford CT. 06410_

[**Note to inmate filers:** _If you are an inmate confined in an institution and you seek the timing benefit of Fed. R. App. P. 4(c)(1), complete Form 7 (Declaration of Inmate Filing) and file that declaration along with this Notice of Appeal._]

_*See Rule 3(c) for permissible ways of identifying appellants_

Criminal Notice of Appeal - Form A

## NOTICE OF APPEAL

### United States District Court

FOR _____ District of CONNECTICUT

DEC 20 2021 PH2:45
FILED - USDC - BPT - CT

Caption:

CRAIG HINES ___ v.

UNITED STATES OF AMERICA

Docket No.: 3:05-CR-118-SRU

STEFAN R UNderhill
(District Court Judge)

Notice is hereby given that CRAIG HINES appeals to the United States Court of

Appeals for the Second Circuit from the judgment _____ other | FIRST STEP ACT
(specify)

entered in this action on OCT-27 2021
(date)

This appeal concerns: Conviction only |___| Sentence only |___| Conviction & Sentence [✓] Other |___|

Defendant found guilty by plea | | trial | | N/A [✓]

Offense occurred after November 1, 1987? Yes [✓] No |___| N/A |___|

Date of sentence: OCT-27-2021 _____ N/A |___|

Bail/Jail Disposition: Committed |___| Not committed | | N/A |

Appellant is represented by counsel? Yes      | No |    If yes, provide the following information:

Defendant's Counsel: Vito CASTIGNOLI    RETIRED

Counsel's Address: 185 BROAD ST

Milford CT. 06410

Counsel's Phone: 203 897 8407    Cell 203 848 4265

Assistant U.S. Attorney: DONT Know

AUSA's Address: _____

AUSA's Phone: _____

Craig Hines
Signature

**A - 321**

## Inmate Inquiry

[PRINT]

| | | | |
|---|---|---|---|
| Inmate Reg #: | 16275014 | Current Institution: | Coleman FCC |
| Inmate Name: | HINES, CRAIG | Housing Unit: | CLP-L-B |
| Report Date: | 12/07/2021 | Living Quarters: | L02-102L |
| Report Time: | 2:33:56 PM | | |

General Information   |   Account Balances   |   Commissary History   |   Commissary Restrictions   |   Comments

## General Information

| | |
|---|---|
| Administrative Hold Indicator: | No |
| No Power of Attorney: | No |
| Never Waive NSF Fee: | No |
| Max Allowed Deduction %: | 100 |
| PIN: | 9872 |
| PAC #: | 021700800 |
| Revalidation Date: | 16th |
| FRP Participation Status: | Completed |
| Arrived From: | ATL |
| Transferred To: | |
| Account Creation Date: | 4/11/2006 |
| Local Account Activation Date: | 12/3/2021 3:16:04 AM |
| Sort Codes: | |
| Last Account Update: | 12/6/2021 12:11:49 AM |
| Account Status: | Active |
| Phone Balance: | $0.00 |

### Pre-Release Plan Information

| | |
|---|---|
| Target Pre-Release Account Balance: | $0.00 |
| Pre-Release Deduction %: | 0% |
| Income Categories to Deduct From: | ☑ Payroll    ☑ Outside Source Funds |

### FRP Plan Information

| FRP Plan Type | Expected Amount | Expected Rate |
|---|---|---|

## Account Balances

| | |
|---|---|
| Account Balance: | $0.00 |
| Pre-Release Balance: | $0.00 |
| Debt Encumbrance: | $0.00 |
| SPO Encumbrance: | $0.00 |
| Other Encumbrances: | $0.00 |
| Outstanding Negotiable Instruments: | $0.00 |

|                                                   |            |
| ------------------------------------------------: | ---------- |
|                          Administrative Hold Balance: | $0.00      |
|                                 Available Balance: | $0.00      |
|                            National 6 Months Deposits: | $0.00      |
|                          National 6 Months Withdrawals: | $0.00      |
|         Available Funds to be considered for IFRP Payments: | ($450.00)  |
|                     National 6 Months Avg Daily Balance: | $0.00      |
|                     Local Max. Balance - Prev. 30 Days: | $0.00      |
|                       Average Balance - Prev. 30 Days: | $0.00      |

## Commissary History

### Purchases

|                                   |                      |
| --------------------------------: | -------------------- |
|       Validation Period Purchases: | $0.00                |
|                     YTD Purchases: | $0.00                |
|                    Last Sales Date: | 3/16/2020 6:32:40 PM |

### SPO Information

|                       |       |
| --------------------: | ----- |
|     SPO's this Month: | 0     |
|    SPO $ this Quarter: | $0.00 |

### Spending Limit Info

|                           |          |
| ------------------------: | -------- |
|    Spending Limit Override: | No       |
|        Weekly Revalidation: | Yes      |
|      Bi-Weekly Revalidation: | No       |
|             Spending Limit: | $100.00  |
|      Expended Spending Limit: | $0.00    |
|     Remaining Spending Limit: | $100.00  |

## Commissary Restrictions

### Spending Limit Restrictions

|                                    |      |
| ---------------------------------: | ---- |
|           Restricted Spending Limit: | $0.00 |
|          Restricted Expended Amount: | $0.00 |
|    Restricted Remaining Spending Limit: | $0.00 |
|              Restriction Start Date: | N/A  |
|                Restriction End Date: | N/A  |

### Item Restrictions

| List Name | List Type | Start Date | End Date | Active |
| --------- | --------- | ---------- | -------- | ------ |

## Comments

**Comments:**

5/17/17 DHO SANCTION 120 DAYS - NAC
6-20-17- UDC SANCTION 30 DAYS -SM
3-27-18- DHO SANCITON 30 DAYS -SM